IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC,<br>900 Salem Street<br>Smithfield, RI 02917,<br><br>     Plaintiff,<br><br> v.<br><br>JENNIFER TAYLOR,<br>606 Prairie Avenue<br>Glen Ellyn, IL 60137<br><br>     Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: CASE NO. 1:20-cv-2133<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**<u>PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION</u>**

1

Fidelity Brokerage Services LLC ("Fidelity") files this Memorandum of Law in Support of its Motion for a Preliminary Injunction against Jennifer Taylor ("Taylor"). Taylor, a former Fidelity Vice President and Financial Consultant, has taken and/or used Fidelity's confidential and trade secret customer information, which she had access to solely by virtue of her employment with Fidelity. She is using that information to unlawfully solicit Fidelity customers to transfer their business to her at her new firm, Fairhaven Wealth Management ("Fairhaven").

## INTRODUCTION

Under normal circumstances, Fidelity quite likely would be moving for a temporary restraining order in this case, which involves facts that frequently have been found by Judges of this Court, as well as the Seventh Circuit and multiple other U.S. Courts of Appeals, to merit the extraordinary remedy of a temporary restraining order in favor of other financial services firms on similar facts. *See, e.g., Merrill Lynch v. Salvano*, 999 F.2d 211 (7th Cir. 1993).[1]

Fully cognizant of the circumstances of the COVID-19 pandemic and the associated state of emergency, Fidelity is not seeking the immediate judicial attention of a TRO. Instead, Fidelity moves for entry of a preliminary injunction and seeks only limited initial judicial intervention in the form of an order allowing the parties to commence expedited discovery immediately (which Fidelity moves for by separate motion filed herewith), to enable the parties to engage in the type of targeted discovery that counsel cooperating together can accomplish while operating remotely, including expedited limited written discovery, followed by video deposition testimony of Taylor focusing solely on issues relating to the motion for preliminary injunction.

---

[1] *Accord*, *Ruscitto v. Merrill Lynch*, 777 F. Supp. 1349, *aff'd*, 948 F.2d 1286 (5th Cir. 1991); *Merrill Lynch v. Dutton*, 844 F.2d 726 (10th Cir. 1988); *Merrill Lynch v. Bradley*, 756 F.2d 1048 (4th Cir. 1985). *See also, e.g., Merrill Lynch v. Cross*, No. 98 C 1435, 1998 WL 122780 (N.D. Ill. 1998); *Merrill Lynch Patinkin*, No. 91 C 2324, 1991 WL 83163 (N.D. Ill. 1991); *Morgan Stanley v. Ouwenga*, No. 18-cv-06373 (N.D. Ill. Dec. 21, 2018).

*Proposed Procedure in Light of the COVID-19 Pandemic and State of Emergency*

Plaintiff respectfully suggests that its Motion is one that can be briefed by counsel working remotely, with the factual record established through documentary and testimonial evidence (via deposition transcript excerpts) developed by counsel during the remotely conducted expedited discovery. Thereafter, in adjudicating the Motion, Plaintiff proposes that the Court may exercise its authority under Fed. R. Civ. P. 78 to (a) hold telephonic or live video oral argument following briefing and submission of factual material in writing; or (b) have counsel conduct targeted live testimony in a telephonic or video hearing, or (c) rule on the matter on the papers without taking live testimony or oral argument. It is Plaintiff's belief and expectation that facts developed through expedited discovery will likely provide more than sufficient evidence making it clear that there are, to borrow a concept from summary judgment procedure, no material issues of fact on the motion for preliminary injunction, such that the Court could decide the motion for preliminary injunction on the papers based on written submissions of fact and law. *Cf.* Fed. R. Civ. P. 56(a).

*Injunction Pending Arbitration*

Fidelity and Taylor are required to arbitrate the merits of this dispute under the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200. Accordingly, concurrently with filing this Motion, Fidelity is also filing a Statement of Claim with FINRA Dispute Resolution, Inc., seeking binding arbitration of this dispute. Although the merits of this case against Taylor will be resolved in arbitration at FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain any desired preliminary injunctive relief in a court of competent jurisdiction, and only after that can an expedited FINRA arbitration proceed. Once an injunction is issued by this Court, an expedited arbitration will be scheduled with FINRA within fifteen days of the entry of the injunction. If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned

2

to a standard-track arbitration, with a hearing on the merits likely to occur in a year or later. Consequently, the preliminary relief Fidelity seeks is required to preserve the *status quo* pending an expedited arbitration hearing, and Fidelity's application demonstrates that it has met the standard applicable for such relief. *See, e.g., Merrill Lynch. v. Salvano*, 999 F.2d at 214 (a court may enter preliminary injunctive relief despite an arbitration clause "where the plaintiff satisfy[es] the requisites for obtaining such relief under the four usual factors justifying injunctions.").[2]

## FACTUAL BACKGROUND

### I. Fidelity's Unique Business Model and Protection of Trade Secrets

Fidelity's business model is unique because it follows a lead-based approach. *See* Declaration of William Meyers at ¶¶ 5-9. It does not have its Financial Consultants make "cold calls," and instead provides its Financial Consultants with assigned customers and leads to develop relationships. *Id.* Fidelity requires its Financial Consultants to develop relationships and to services its clients based upon these leads. *Id.* In part because of its unique business model, Fidelity is not a signatory to the Protocol for Broker Recruiting[3] and does not permit departing employees to take with them trade secret customer information to their new firm. *Id.* at ¶ 13.

Fidelity's lead-based approach focuses on: (a) prospective customers who initiate contact with Fidelity (either by telephone, over the internet, or in person), and (b) current Fidelity

---

[2] The United States Circuit Courts of Appeal for the First through the Eleventh Circuits all have held a party may properly seek and obtain immediate injunctive relief to preserve the *status quo* and to prevent irreparable harm pending arbitration, including in cases involving exactly this type of injunction action pending securities industry arbitration. *See, e.g.*, *Performance Unlimited v. Questar Pub.*, 52 F.3d 1373 (6th Cir. 1995); *Peabody Coalsales v. Tampa Electric*, 36 F.3d 46 (8th Cir. 1994); *Ruscitto v. Merrill Lynch*, *supra*; *Blumenthal v. Merrill Lynch*, 910 F.2d 1049 (2d Cir. 1990); *Ortho Pharm. Corp. v. Amgen Inc.*, 887 F.2d 460 (3d Cir. 1989); *PMS Dist. Co. v. Huber*, 863 F.2d 639 (9th Cir. 1988); *Merrill Lynch v. Dutton*, *supra*; *Teradyne Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986); *Merrill Lynch v. Bradley*, *supra*; *Merrill Lynch v. Hegarty*, 808 F. Supp. at 1561 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993).
[3] The Protocol for Broker Recruiting (the "Protocol") is an agreement among certain financial institutions governing the movement of registered representatives from one Protocol firm to another. The Protocol is a forbearance agreement in which signatories agree that registered representatives moving from one signatory firm to another signatory firm may take certain customer information and solicit customers provided they follow the requirements set forth in the Protocol. The Protocol, by its own terms, applies only to financial firms who are signatories to the agreement. Fidelity is not, and has never been, a signatory to the Protocol.

3

customers who experience triggering events. *Id.* at ¶¶ 6-8. Fidelity devotes tens of millions of dollars per year to attracting and retaining customers using this lead-based approach. *Id.* Financial Consultants, like Taylor, are the face of Fidelity and are responsible for developing and sustaining the customer relationships for assigned customers. *Id.* It distinguishes Fidelity from its competitors, where individual brokers are responsible for establishing service relationships. *Id.*

Fidelity's success with its unique approach to supporting Financial Consultants is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets. *Id.* at ¶¶ 9-12. Fidelity has compiled the information through a significant investment, and maintains its trade secret customer data in confidence to preserve its competitive advantage and to meet its customer expectations. *Id.* A competitor might randomly solicit Fidelity customers, but it cannot determine who they are and what service needs they may have without Fidelity's trade secret customer information. *Id.* Fidelity protects the information by using password-protected computers; limiting employee access; maintaining a confidentiality policy; educating and training its employees on privacy and confidentiality; requiring all employees to sign confidentiality agreements; and prohibiting employees from taking confidential information upon departure. *Id.*

**II.    Taylor Agreed to Preserve the Confidentiality of Fidelity's Trade Secret Customer Information and Not to Solicit Fidelity Customers.**

On September 20, 1999, Taylor initially executed Fidelity's Employee Agreement, which includes the following terms:

- Acknowledged the confidentiality of Fidelity's records, including Fidelity's lists and customer information;

- Promised to use Fidelity's trade secret customer information only in the course of her employment with Fidelity and promised not to divulge the information to third parties;

- Promised to return any of Fidelity's confidential trade secret customer information in her possession to Fidelity upon termination of her employment; and

- Promised not to solicit Fidelity customers she serviced or whose names became known to her through her employment for one year after the termination of her employment.

Declaration of Scott Marshall ("Marshall Dec."), at ¶ 9 and Exhibit C, ¶¶ 1, 3 & 6. Taylor renewed her promises by executing the Employee Agreement again on June 30, 2011. Marshall Dec. at ¶ 9.

Taylor resigned from Fidelity on March 6, 2020. *Id.* at ¶ 13. After she resigned, Taylor was sent a letter from Fidelity's HR department enclosing a copy of her Employment Agreement and reminding her of her post-employment obligations pursuant to the agreement. *See* Marshall Dec., Exhibit. E. Despite the reminder of her legal obligations, since Taylor resigned, Fidelity has heard reports that she is aggressively soliciting customers to move their business to her new firm.

### III.  Taylor Solicits Customers and Misappropriates Fidelity's Trade Secrets

Fidelity has received multiple reports that Taylor—and representatives from her new firm acting on her behalf—is soliciting Fidelity customers and attempting to induce them to transfer their business. In fact, one client reported that Taylor solicited him, and set up an appointment for him to come meet with her at her new firm, <u>before she even resigned</u>. In a meeting with the new Financial Consultant who assigned to service the customer after Taylor resigned, the customer reported that during his last meeting with Taylor, while she was employed at Fidelity, she set up a meeting for him at her new firm. Taylor told the client he would be able to leave his assets at Fidelity but that Taylor would be able to add her name to their account and provide financial advice. Marshall Dec. at ¶ 16. Accordingly, Fidelity's in-house counsel sent Taylor a letter reminding her of her contractual obligations and demanding that she cease any further solicitation of Fidelity customers. Fidelity also enclosed an affidavit for her to sign attesting that she did not have, or had returned, any of its customer information. Marshall Dec. at ¶ 17 and Exhibit G. Taylor never responded to the letter and never returned the signed affidavit.

Fidelity has since learned that Taylor has continued to use Fidelity's trade secret customer information to aggressively solicit customers to transfer their accounts to her new firm. Since the March 20 letter to Taylor, another client reported that she received a call from the firm Taylor

joined and the person said that she was calling on Taylor's behalf. The employee from Taylor's new firm then asked the Fidelity client to consolidate her assets and transfer them to Taylor at her new firm. The client was not happy that someone called her and wanted to make sure that Fidelity was aware that this was being done by Taylor and her new firm. Marshall Dec. at ¶ 20.

Other clients have also reported to Fidelity that Taylor was contacting them about doing business at her new firm. *Id.* at ¶ 17. The only way Taylor could have contacted these individuals and known they were Fidelity customers with assets to invest was by exploiting her knowledge of and access to Fidelity's confidential customer information. This conduct violates Taylor's Employee Agreements, and federal and Illinois trade secret law. Fidelity asks for the Court's assistance in protecting that information and stopping Taylor's intentional wrongful conduct.

## ARGUMENT

**I.    The Standards for Granting Injunctive Relief Strongly Favor Granting Fidelity Relief**

Fidelity is entitled to injunctive relief because Fidelity can demonstrate: (i) a likelihood of success on the merits; (ii) a likelihood of irreparable harm in the absence of preliminary relief; (iii) that the balance of equities tips in Fidelity's favor; and (iv) that an injunction is in the public interest. *Orr v. Shicker*, No. 19-1280, 2020 WL 1329659, at *7 (7th Cir. Mar. 23, 2020). Applying the foregoing factors, courts in Illinois repeatedly have granted injunctive relief to enforce securities firms' employment contracts under virtually identical circumstances. *See Merrill Lynch v. Salvano*, *supra*; *Merrill Lynch v. Herr*, No. 03C1619 (N.D. Ill. 2003); *Merrill Lynch v. Curry*, No. 00C2351 (N.D. Ill. 2000); *Merrill Lynch v. Kmiec*, No. 00C1189 (N.D. Ill. 2000); *Merrill Lynch v. Smirniotis*, No. 99C5865 (N.D. Ill. 1999); *Merrill Lynch v. Mundrane*, No. 98C6382 (N.D. Ill. 1998); *Merrill Lynch v. Cross*, *supra*.[4]

---

[4] Moreover, courts across the country have regularly enforced Fidelity's contract and trade secret claims in departing broker cases. Fidelity vigorously seeks to protect its contract rights and confidential, trade secret information. Since 2003, Fidelity has sought and obtained injunctive relief to protect its confidential and trade secret information in numerous similar cases: *See, e.g.*, *Fidelity Brokerage Serv. LLC v. Keating*, No. 18-CV-10860 (S.D.N.Y. 2018);

6

## II. Fidelity Is Likely to Succeed on the Merits of Its Claims

Fidelity is entitled to an injunction because it is likely to succeed on the merits of its claims.

### A. Fidelity's Breach of Contract Claim

Fidelity is likely to succeed on the merits of its breach of contract claim because the restrictive covenants at issue are enforceable, the evidence shows that Taylor solicited multiple Fidelity customers, and that she violated her contractual confidentiality obligations in doing so.

#### 1. Taylor's Agreement is enforceable under Illinois law

In Illinois, a restrictive covenant in an employment agreement is enforceable if it is reasonable and necessary to protect a legitimate business interest of the employer. *Instant Tech. LLC v. DeFazio*, 793 F.3d748, 750 (7th Cir. 2015). A restrictive covenant is reasonable if the covenant: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Avison Young-Chicago, LLC v. Puritz*, No. 17 C 0844, 2017 WL 5896887, at *6 (N.D. Ill. Nov. 29, 2017).

##### a. Fidelity's interests are legitimate and protectable

Under Illinois law, "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *Id.* Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions.

---

*Fidelity Brokerage Serv. LLC v. Buri*, No. 8:18-cv-02246-JVS-ADS (N.D. Cal. 2018); *Fidelity Brokerage Serv. LLC v. Rocine*, No. 417-cv-4993-PJH (N.D. Cal. 2017); *Fidelity Brokerage Serv. LLC v. Vee*, No. 12-1986 (D. Colo. 2012); *Fidelity Brokerage Serv. LLC v. McNamara*, 2011 WL 3227546 (S.D. Cal. 2011); *Fidelity Brokerage Serv. LLC v. Fassenfeld*, No. 013945/11 (NY Sup. Ct. 2011); *Fidelity Brokerage Serv. LLC. v. Wilder*, No. 11-37296 (Mass. Super. Ct. 2011); *Fidelity Global Brokerage Group v. Gray*, No. 10-1255 (E.D. Va. 2010); *Fidelity Global Brokerage Group v. Beatty*, No. 652147 (NY Sup. Ct. 2010); *Fidelity Brokerage Serv. LLC v. Sanchez*, No. 08-03863 (C.D. Cal. 2008); *Fidelity Brokerage Serv. LLC v. Downey*, No. 08-1637 (JFB) (E.D.N.Y. 2008); *Fidelity Brokerage Serv. LLC v. Franz*, 8/9564 (N.Y. Sup. Ct. 2008); *Fidelity Brokerage Serv., LLC v. Umstead*, No. 07-347 (E.D. Va. 2007). In each instance, Fidelity obtained an injunction to protect Fidelity's confidential trade secret information and to stop ongoing solicitation of its customers.

Importantly, no factor carries any more weight than any other, but rather the importance of each factor will depend on the specific facts and circumstances of the individual case. *Id.* In assessing whether customer relationships are "near permanent" courts consider a number of factors, including (1) the number of years required to develop clientele, (2) the amount of money invested to acquire clients, (3) the degree of difficulty in acquiring clients, (4) the extent of personal customer contacts by the employee, (5) the extent of the employer's knowledge of its clients, (6) the duration of the customers' activities with the employer, and (7) the intent to retain employer-customer relations." *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 909-10 (C.D. Ill. 2015).

Here, not only did Taylor gain access to trade secrets and confidential information solely by virtue of her employment with Fidelity, but the financial consultant relationship is precisely the type of professional services relationship that courts have found involves "near-permanent" customer relationships. *See, e.g.*, *Cuna Mutual Life Ins. Co. v. Kuperman*, No. 97 C 6228, 1998 WL 409880, at *6-7 (N.D. Ill. 1998). Moreover, Fidelity devotes tens of millions of dollars per year and expends great effort in acquiring and retaining its client relationships. Thus, Fidelity has demonstrated a legitimate and protectable interest in preventing Taylor from exploiting its confidential client information and in protecting its client relationships.

     **b. The Agreements are reasonable in time and geographic scope and impose no undue hardship on the employee**

Taylor's Agreements are narrowly-tailored to protect Fidelity's legitimate business interests. Her Agreements merely preclude her from using confidential information to solicit customers, and from soliciting or inducing customers she serviced at Fidelity for a one-year period. Courts regularly enforce similar restrictions. *See, e.g.*, *Russell Dean, Inc. v. Maher*, No. 17 C 8440, 2018 WL 4679573, at *6-7 (N.D. Ill. Sept. 28, 2018) (entering injunction to prevent former employee from soliciting customers and from using confidential information obtained from former employer to compete with former employer); *Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d

8

85, 100 (Ill. 2006) (upholding 3 and 5-year restrictive covenants); *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys. LLC*, No. 02 C 5403, 2003 WL 1057929, at *20 (N. D. Ill. Mar. 20, 2003) ("Non-compete agreements lasting for one year (or even more) have been upheld" in Illinois). No geographical restriction is necessary here because Fidelity is simply seeking to protect its own, existing customer relationships. Taylor remains free to work for her competing firm and to market securities products and services to non-Fidelity customers in the same geographic area. *See Zabaneh Franchises, LLC v. Walker*, 972 N.E.2d 344, 350 (Ill. App.4th 2012) (geographical restriction unnecessary because agreement only prohibits defendant from servicing clients who she serviced while employed at H&R Block).

Taylor's Agreements are intended to protect against her unfair exploitation of customer relationships and trade secrets acquired during her employment. The restriction is narrowly-tailored to be no more burdensome than necessary to protect Fidelity's legitimate interests. The Agreements do not prevent her from competing in the industry, but rather prevent her only from soliciting Fidelity customers and using confidential information to do so. Numerous courts have found that this type of covenant does not present an undue hardship on a departing employee.

### c. Taylor's Agreements are not injurious to the public.

Enforcing Taylor's Agreements will not harm the public because customers are free to contact her; she simply cannot solicit customers she formerly serviced or use confidential information to do so. *See W. Capra Conslt. Grp, Inc. v. Snyder*, No. 1:19 C 4188, 2019 WL 3935045, at *10 (N.D. Ill. Aug. 20, 2019) ("[T]he limited scope and timeframe of Snyder's non-compete clause seems neither to impose undue hardship on Snyder nor to be injurious to the public."); *Wessel Co. v. Busa*, 329 N.E.2d 414, 417-18 (Ill. App.1st 1975) (3-year restrictive covenant not injurious to the public because enforcing the covenant would not prevent the public

9

FP 37485642.2

or plaintiff's competitors from doing business). Accordingly, the non-solicit agreement meet all three elements of reasonableness under Illinois law.

### 2. Taylor breached her Agreements

Taylor agreed that except as necessary to perform her duties for Fidelity, she would not use Fidelity's confidential client information, including Fidelity's customer list and customers' personal information. Yet, by soliciting Fidelity customers and attempting to induce customers to transfer to her new firm, Taylor did precisely what she promised not to do.

Moreover, the confidential nature of Fidelity's client information is not just a matter of contract. Rather, applicable federal law makes clear that customer names, addresses, and other contact information are entitled to protection. The SEC's Regulation S-P, titled "Privacy of Consumer Financial Information" provides privacy protection for the non-public information ("NPI") of financial services customers. 17 C.F.R. § 248. NPI includes: "Any list, description, or other grouping of customers (*and publicly available information pertaining to them*) that is derived using any personally identifiable information that is not publicly available information." 17 C.F.R. § 248.3(t)(1)(ii) (emphasis added). "Personally identifiable financial information" includes "[t]he fact that an individual is or has been one of [a broker-dealer's] customers or has obtained a financial product or service from [a broker-dealer]." *Id.* at § 248.3(u)(2)(C). Client names, telephone numbers, and addresses also constitute NPI. *See* 65 Fed. Reg. 40,334, 40,343 (2000).

### B. Fidelity's Trade Secret Claim

Fidelity is also likely to succeed on the merits of its trade secret claims because it can prove under state and federal law that it: (1) possessed a trade secret, and (2) Defendant misappropriated and/or used that trade secret in violation of the Defend Trade Secrets Act ("DTSA" or the "Act") and Illinois Trade Secrets Act ("ITSA").

### 1. Fidelity's customer list is a protectable trade secret

10

Fidelity's customer list, including the names, addresses, telephone numbers, financial needs, and account information of its customers, qualifies for trade secret protection under federal and state law. Accordingly, even absent the confidentiality and non-solicitation restrictions set forth above in Taylor's Agreements, injunctive relief is appropriate to protect against misuse of Fidelity's trade secret customer information.

The DTSA provides a federal cause of action for misappropriation of trade secrets that are related to a product or service used in, or intended for use in, interstate commerce. *See* 18 U.S.C. §§ 1831, 1836(b). The Act defines a trade secret to include "compilations" of "all forms and types of financial, business, [or] economic . . . information" if the owner takes reasonable steps to keep the information secret, and the information is valuable because it is not generally known to others who can profit from its use. *Id.* at § 1839(3)(A)-(B). Like the DTSA, the ITSA defines trade secret to include "financial data, or list of actual or potential customers" if the information is: (1) "sufficiently secret to derive independent economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use;" and (2) "the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Trade secrets include "customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information." *Allied Waste Servs. v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016).

The facts in this case demonstrate that Fidelity's customer information is entitled to trade secret protection under both the DTSA and ITSA. The identities of the customers assigned to Taylor at Fidelity are closely guarded and not known to Fidelity's competitors because the list gives Fidelity a competitive advantage over its competitors who cannot target its customers. This list is not publicly available and is only known to a limited number of employees. Taylor and her new employer would unfairly benefit from this list because it would enable them to market to a

11

pre-selected elite group of customers and target their financial products and services without the need to spend any time or money to identify and develop such customers. Moreover, Fidelity's trade secret is not simply a list of names. It includes far more information, including contact and financial information such as customer statements, investment goals and history, assets, income, and net worth, all of which would be very valuable to a competitor in the financial industry.[5]

Because its trade secret customer information is so valuable, Fidelity takes numerous steps to preserve the confidentiality of its trade secret information. Fidelity requires all of its employees to sign confidentiality agreements and it has policies and procedures in place to preserve and safeguard confidential customer information. For example, Fidelity regularly trains and educates its employees on their obligations to protect customer information, it password protects its customer data on its computers, and it does not permit its employees to take, use, or disclose any customer information when they leave Fidelity.

### 2. Taylor's actions violate federal and state law

Taylor has violated both the ITSA and the DTSA. Under Illinois law, "misappropriation" includes "disclosure or use of a trade secret of a person without express or implied consent by another person who: (A) used improper means to acquire knowledge of the trade secret." 765 Ill. Comp. Stat. 1065/2(b). The ITSA further defines "improper means" to include "breach of a confidential relationship or other duty to maintain secrecy or limit use." *Id.* "Misappropriation" is similarly defined under the DTSA as the acquisition of a trade secret by improper means or the unconsented disclosure or use of a trade secret by a person who has a duty to maintain the trade

---

[5] Any claim that the information that Taylor used was publicly-available is misleading. Even if some of the customer information was available in publicly-available sources, there is no public directory of persons interested in financial services or anything that identifies anyone as a customer of Fidelity. It was only by having their identities disclosed to her working at Fidelity that Taylor was then able to look them up in public sources; therefore, the information is still a trade secret. *See SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 714 (N.D. Ill. 2009) ("[E]ven if they are just compilations of otherwise readily known facts, the compilations themselves are not available to competitors and presumably have some value by gathering the materials into one place.").

12

secret's secrecy or to limit its use. *See* 18 U.S.C. at §§ 1839(5)(B)(i), 1839(5)(B)(ii)(11). The Act protects trade secrets "whether tangible *or intangible*." *Id.* at § 1839(3). Thus, it protects intangible trade secrets stored in Taylor's memory that she misuses in violation of her confidentiality agreement and duty to maintain their secrecy. Illinois courts have considered this issue and have ruled that misappropriation by memory is misappropriation. *See, e.g.*, *First Financial Bank, N.A. v. Bauknecht*, 71 F.Supp.3d 819, 845 (C.D. Ill. 2014).

At this time, Fidelity does not know whether Taylor misappropriated physical records, or took photographs of customer profile screens on her Fidelity computer, or whether she recreated Fidelity's customer information from memory. Under the DTSA and ITSA, it is of no consequence whether Taylor took a physical or digital copy of Fidelity's customer information or whether she exploited her "memory" or Fidelity's customers. Whichever she did, she did *in order to solicit the business of Fidelity's customers*. Her *misuse* of the information is crucial. She did not merely go to work for Fairhaven and perform to the best of her abilities. She went a step further and actively *misused* and, therefore, *misappropriated*, Fidelity's trade secret information for her own benefit and on behalf of her new firm. Her actions amount to misappropriation under the DTSA and the ITSA. *See* 18 U.S.C. §§ 1839(5)(B)(i), 1839(5)(B)(ii)(11), 1839(6).[6] Therefore, Fidelity is likely to succeed on the second element of its trade secrets claim as well.

### III. Fidelity Has No Adequate Remedy at Law

Without an injunction, Fidelity will suffer irreparable harm. Courts consistently find that the misappropriation of customer information and attempts to divert customer relationships present an immediate threat of irreparable harm for which money damages are inadequate. *See Merrill*

---

[6] The ITSA expressly contemplates the entry of injunctive relief in cases such as this (i.e. where an employee has violated a contract with his former employer to preserve the confidentiality of the employer's information) to protect against ongoing acts of misappropriation. *See, e.g.*, *Burt Dickens & Co. v. Bodi*, 494 N.E.2d 817 (Ill. App. Ct. 1986) (upholding a 1-year injunction preventing a former operations manager from soliciting his former employer's customers when the former manager misappropriated customer account information before setting up his own competing business).

13

FP 37485642.2

*Lynch v. Salvano*, 999 F.2d at 215 (the taking of client information and the soliciting of clients "sufficiently supports the court's determinations regarding irreparable harm and the inadequacy of Merrill Lynch's remedy"). Consistent with the Seventh Circuit's ruling in *Salvano*, and the decisions of courts throughout the country, courts in Illinois have ruled—with virtual unanimity—that the harm to a firm is irreparable where, as here, a former employee solicits clients and misappropriates client information. *See, e.g.*, *Ultraviolet Devices, Inc. v. Kubitz,* No. 09-cv-5697, 2009 WL 3824724, at *3 (N.D. Ill. Nov. 13, 2009) (finding that the existence of irreparable harm in the absence of injunctive relief is presumed if trade secrets are misappropriated).

The Defendant's wrongful acts also cause irreparable harm because they undermine the trust that Fidelity's customers place in it to maintain customer information in confidence. Harm to Fidelity's goodwill with its clients and diminution of its reputation for scrupulously safeguarding the privacy of clients' personal and financial information is not readily capable of being remedied by monetary damages. *Falcon v. Corr's Beverages, Inc.*, 520 N.E.2d 831, 835 (Ill. App. Ct. 1987) ("the injury to plaintiffs' reputation and good will, and the resulting loss of existing and future business, is incalculable.").

Taylor's conduct threatens to inflict ongoing irreparable harm to Fidelity if not stopped immediately. Fidelity faces the loss of goodwill with its customers, and if Taylor's conduct continues unabated, Fidelity faces the loss of future business or referrals, and further faces loss of its customers' trust in securing inherently-private information. Fidelity customers rightfully have an expectation that their confidential contact and financial information will be protected and not misused by departing employees. Thus, customers understandably become concerned when former Fidelity employees have access to their information and are using it to solicit their business at a new and different financial services firm. In other words, the damage to Fidelity's customer relationships is already occurring, is ongoing and incalculable, as Fidelity cannot put a price on

14

the value of its customer relationships or the damage caused when Taylor took and improperly misused its trade secret customer information for her benefit and on behalf of a competitor.

## IV. The Balance of Interests Favors Fidelity And Injunctive Relief Serves The Public

The benefit of injunctive relief to Fidelity would far outweigh any detriment to Taylor, and it would serve the public interest. An injunction would protect Fidelity's goodwill, business reputation, and contract rights. It would also promote the public interest by protecting Fidelity's trade secret client information and the confidentiality of Fidelity's customers' records. As noted above, the public interest in privacy is so compelling that the SEC implemented Regulation S-P, titled "Privacy of Consumer Financial Information" and Congress declared that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). Against these compelling interests favoring injunctive relief, Taylor has no equities on her side.

The requested injunction would have no legally cognizable effect on Taylor. She would remain free to work for her new firm and can freely compete with Fidelity for the patronage of the public at large. She will simply be restrained from further breaching her contractual obligations to Fidelity and utilizing Fidelity's trade secrets to solicit customers to transfer. Accordingly, the balance of equities favors Fidelity and an injunction would serve the public interest.

## V. There Is No Need For A Bond

Although a bond is required under Fed. R. Civ. P. 65(c), the court has wide discretion as to the amount, and "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Fidelity has demonstrated a likelihood of success on its claims and has made a clear showing of irreparable harm. Further, the requested injunctive relief will not

15

impede Taylor from conducting business. Accordingly, Fidelity respectfully requests that the Court either dispense with the bond requirement, or at most require a nominal bond.

## CONCLUSION

For the foregoing reasons, Fidelity respectfully requests that this Court grant its Motion for Preliminary Injunction and enter Fidelity's proposed order against Defendant pending expedited arbitration against Taylor on the merits before FINRA or further order of this Court.

Dated: April 3, 2020

Respectfully submitted,

FISHER & PHILLIPS LLP

/s/ Joel W. Rice
Joel W. Rice
Franklin Z. Wolf
10 South Wacker Drive, Suite 3450
Chicago, IL 60606
TEL: (312) 346-8061
FAX: (312) 346-3179
jrice@fisherphillips.com
fwolf@fisherphillips.com

*Attorneys for Plaintiff*