IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20-cv-2133 |
| v. | ) | |
| | ) | **REDACTED VERSION** |
| JENNIFER TAYLOR, | ) | **MOTION TO FILE UNDER** |
| | ) | **SEAL PENDING PURSUANT** |
| Defendant. | ) | **TO LR 26.2(c)** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
AMENDED MOTION TO COMPEL DISCOVERY RESPONSES**

Defendant Jennifer Taylor ("Taylor"), respectfully moves to compel Plaintiff, Fidelity Brokerage Services, LLC ("Fidelity" or the "Company"), to produce documents in response to Ms. Taylor's First Set of Requests for Production.

**I. PRELIMINARY STATEMENT**

This motion is precipitated by Fidelity's tactical gamesmanship in discovery. Having obtained leave to commence expedited discovery, Fidelity has effectively taken the position of "you produce everything, and I'll produce nothing." Ms. Taylor has dutifully cooperated in discovery. She timely produced all documents responsive to Fidelity's discovery requests, and affirmed that she has withheld no documents on the basis of any objection. Fidelity, on the other hand: (a) asserts a litany of boilerplate objections to every single request; (b) fails to state whether it has withheld any documents on the basis of those objections; and (c) steadfastly refuses to produce whole categories of documents that are unquestionably relevant to the claims at issue. Based on these objections, Fidelity has managed to get away with timely producing a total of just *five (5) documents* in discovery.[1]

---

[1] Following the parties' Rule 37.2 conference, Plaintiff produced a sixth (6th) document: a heavily redacted copy of Ms. Taylor's Fidelity Outlook Calendar from earlier this year (FID_TAYLOR000078-2433).

Fidelity has accused Ms. Taylor of stealing "trade secrets" and "confidential information," and using those materials to improperly solicit clients. But when asked to produce the documents that would identify the specific information that Ms. Taylor allegedly stole and the clients that she purportedly solicited, Fidelity has taken the remarkable position that such documents are somehow "irrelevant." And where Ms. Taylor has issued discovery based on the verbatim language of the allegations in the Complaint, Fidelity has argued the discovery request is "vague and ambiguous." In truth, all of the documents requested by Ms. Taylor are relevant, and her discovery requests are neither vague nor ambiguous. More to the point, none of Fidelity's objections are valid, and the Company should be compelled to fully respond to Ms. Taylor's discovery requests for the reasons set forth below.

## II. FACTUAL BACKGROUND

After more than 23 years with Fidelity, Ms. Taylor suddenly found herself in an adverse and hostile relationship with a new branch manager. (*See* **Exhibit A** – a true and correct copy of the Declaration of Jennifer Taylor). She received a number of verbal and written warnings for poor performance, even though she was the highest-revenue producer in her office and among the top 10% of producers for the entire region. (Ex. A at ¶¶ 12, 15). The relationship became so antagonistic, that when her branch manager placed her on a "final warning" and told her she could be fired at any time, Ms. Taylor had no choice but to seek alternate employment. (*Id*. at ¶ 17).

On March 6, 2020, Ms. Taylor resigned from Fidelity to begin a new job with Fairhaven. (Ex. A at ¶ 24). Once at Fairhaven, Ms. Taylor received several unsolicited calls from former clients who informed her that Fidelity had refused to provide them with her new contact information when they asked for it. (*Id.* at ¶ 29). ***This violated both Fidelity's internal compliance procedures and FINRA Regulatory Notice 19-10.*** (*Id*.) Moreover, it posed a significant risk to

Ms. Taylor's professional reputation and to the economic welfare of the clients to whom she owed fiduciary duties – especially considering the need for those clients to speak to their trusted financial advisor during the current economic crisis precipitated by the COVID-19 pandemic. (*Id.*). Accordingly, after her employment at Fairhaven had begun, Ms. Taylor called some of her clients to announce that she was no longer employed with Fidelity, and to provide them with her contact information – information Fidelity was required, but wrongly refused, to disclose. (*Id.* at ¶ 30).

In making these calls, Ms. Taylor did not utilize or disclose any documents, materials or "Confidential Information" from Fidelity. (Ex. A at ¶ 31). On the contrary, because she regularly speaks with her clients (especially long-term clients and those with larger or highly active accounts), she possesses a general knowledge of their names, state of residence, and telephone numbers. (*Id.*) Ms. Taylor was extremely careful during these calls to avoid any "solicitation" or "inducement" of her clients. (*Id.* at ¶ 32). She stuck to a short and carefully worded "announcement script" that conveyed *only* the following limited information: (a) as of March 6th, she was no longer with Fidelity; and (b) she now works at Fairhaven. (*Id.*) After providing that information, Ms. Taylor answered any follow-up questions. (*Id.*)

On April 3, 2020, Fidelity filed this lawsuit, asserting eight (8) separate causes of action against Ms. Taylor – specifically, claims for:

1. Injunctive Relief;
2. Breach of Contract;
3. Trade Secret Misappropriation (DTSA);
4. Trade Secret Misappropriation (ITSA);
5. Unfair Competition;
6. Breach of Duty of Loyalty;
7. Tortious Interference; and
8. Unjust Enrichment. (Dkt. 1, at pp. 14-23).

Plaintiff has (falsely) accused Ms. Taylor of "pre-soliciting" clients for Fairhaven when she was still employed with Fidelity. In truth, Ms. Taylor *never* scheduled a single Fairhaven appointment when she was employed with Fidelity; indeed, Ms. Taylor never told anyone she was planning to leave the Company. (Ex. A at ¶ 34). Several months ago – before she had even started looking for alternate employment – Ms. Taylor scheduled some client meetings to occur *at Fidelity* (not Fairhaven) in March and April of this year. (*Id.*) After tracking Ms. Taylor down at her new firm, a couple of those clients asked if they could meet with her at Fairhaven on the same date that they were previously scheduled to meet at Fidelity. (*Id.* at ¶ 35). As of April, just twelve (12) of Ms. Taylor's 450+ clients – representing only 2.4% of her book of business – followed her to Fairhaven. (*Id.* at ¶ 38). Importantly, these clients followed her to Fairhaven by way of their own, unilateral requests; they were not solicited by Ms. Taylor, or by anyone acting on her behalf. (*Id.*)

Plaintiff also (again, falsely) accuses Ms. Taylor of stealing client lists when leaving Fidelity, and using those lists at Fairhaven to solicit clients. That is simply untrue. Upon her departure, Ms. Taylor returned all Company property and "Confidential Information" (as defined in her employment agreement) to Fidelity. (Ex. A at ¶ 25). Prior to her arrival at Fairhaven, Ms. Taylor never informed a single client or co-worker that she was leaving Fidelity. (*Id.* at ¶ 26).

On May 22, 2020, the Court granted Fidelity's request for expedited discovery. (Dkt. 29). The parties exchanged written discovery responses on June 3, 2020. (A true and correct copy of Fidelity's written discovery responses is attached as **Exhibit B**.) Fidelity objected to every discovery request, and has steadfastly refused to produce *any* documents in response to the majority of those requests. Ultimately, Fidelity has produced only six (6) documents in discovery.[2]

---

[2] As noted above, Fidelity produced a copy of Ms. Taylor's 2020 calendar. Instead of producing that document as a single ".pst" file, Fidelity produced each appointment as a separate ".pdf." (FID_TAYLOR 000078-2433). Fidelity has also provided Ms. Taylor with a copy of her personnel file – not through

### III. LOCAL RULE 37.2 CERTIFICATION

On June 4, 2020, at approximately 1:30 p.m., the parties consulted by telephone in a good faith attempt to resolve their differences concerning Plaintiff's discovery responses. The participants included Plaintiff's trial counsel (Susan Guerrette), and Defendant's trial counsel (Christopher Griesmeyer and Zachary Mulcrone). Despite the parties' good-faith efforts, Plaintiff still refuses to produce what is required, and the parties were unable to reach an accord.

### IV. LEGAL STANDARD

A party may discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b).

When responding to a request for production, a party "must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." FED. R. CIV. P. 34(b)(2)(B). Rule 34(b)(2)(C) requires an objection to "state whether any responsive materials are being withheld on the basis of that objection."[3] FED. R. CIV. P. 34(b)(2)(C).

---

discovery, but rather in response to a statutory request under the Illinois Personnel Record Review Act. 820 ILCS 40/1, *et. seq.*

[3] The Advisory Committee's Notes to 2015 Amendment to Rule 34 expand on exactly what is required:

> Rule 34(b)(2)(B) is amended to require that objections to Rule 34 requests be stated with specificity. This provision adopts the language of Rule 33(b)(4), eliminating any doubt that less specific objections might be suitable under Rule 34. The specificity of the objection ties to the new provision in Rule 34(b)(2)(C) directing that ***an objection must state whether any responsive materials are being withheld on the basis of that objection***. An objection may state that a request is overbroad, but if the objection recognizes that some part of the request is appropriate the objection should state the scope that is not overbroad….When there is such an objection, the statement of what has been withheld can properly identify as matters "withheld" anything beyond the scope of the search specified in the objection. (Emphasis added.)

"Ultimately, the party objecting to discovery bears the burden to show the requested discovery is improper." *Baxter Int'l, Inc. v. AXA Versicherung*, 320 F.R.D. 158, 161 (N.D. Ill. 2017). Boilerplate objections are invalid, and tantamount to having made no objection at all. *Fudali v. Napolitano*, 283 F.R.D. 400, 403 (N.D. Ill. 2012).

## V. ARGUMENT

### A. REQUEST FOR PRODUCTION NO. 1

Fidelity has accused Ms. Taylor of misappropriating confidential information and trade secrets, and using those trade secrets at Fairhaven to solicit her former clients. (Dkt. 1, pp. 14-20). Accordingly, Ms. Taylor's first discovery request simply asks Fidelity to produce the "confidential information" and "trade secrets" that she has been accused of stealing. The request could not be more straightforward: please produce "[a]ny and all documents that constitute, identify, describe, concern or relate to the confidential information and/or trade secret information that Fidelity contends Ms. Taylor has misappropriated, as alleged in this lawsuit." (Ex. B).

Stunningly, Fidelity objects to the request on the ground that it "goes well beyond what is relevant to any claim or legitimate defense presented in this action, nor reasonably calculated to the discovery of relevant evidence." (Ex. B, p. 4). Fidelity's bad-faith objection defies belief. Fidelity has filed a lawsuit against Ms. Taylor, expressly accusing her of stealing its trade secrets and confidential information. Having made those accusations against Ms. Taylor, it strains the bounds of credulity for Fidelity to claim the "trade secrets" and "confidential information" that she allegedly stole are somehow *irrelevant*.

Incredibly, Fidelity also objects to the request on the ground that it is "vague and ambiguous." (Ex. B, p. 4). Yet, the request specifically refers to, and is limited to, the allegations that Fidelity has made in its own Complaint. (*Id.*, p. 3). Thus, the request can only be considered

6

"vague" or "ambiguous" to the extent that Fidelity's allegations in its own Complaint are "vague and ambiguous." And therein lies the rub. The Complaint utterly fails to identify the specific "trade secrets" and "confidential information" that Ms. Taylor is accused of stealing. (*See*, Dkt. 1, ¶¶ 49-58). It is nothing if not unfair for Fidelity to accuse Ms. Taylor of stealing trade secrets and confidential information, and then refuse to produce the documents that constitute (or contain) the very trade secret and confidential information she is accused of stealing.

Fidelity also argues that the allegedly misappropriated trade secret and confidential information is already in Ms. Taylor's possession. (Ex B, p. 4). But even if that were true (and, it is not), the fact that a party may already be in possession of relevant documents does not relieve an opposing party from producing those documents in discovery. Fidelity also argues that some of the allegedly misappropriated information may exist in Ms. Taylor's "memory." (*Id.*). But again, that would not obviate the need for Fidelity to produce documents sufficient to identify the allegedly misappropriated information that supposedly exists in her "memory." Unless Fidelity produces a copy of whatever information it contends is a misappropriated trade secret or confidential information, Ms. Taylor will have no way to: (a) understand what that supposed information is, and (b) demonstrate that she did not misappropriate it. Fidelity must produce the responsive documents or concede that there is no confidential or trade secret information at issue.

Finally, Ms. Taylor has no way of knowing whether Fidelity is withholding any documents on the basis of any objections. Fidelity sets forth several boilerplate objections and asserts that, without waiving those objections, it will produce unspecified documents relating to Taylor's alleged misappropriation after the parties execute a "Confidentiality Stipulation." (Ex. B, p. 4). Rule 34(b)(2)(C) requires an objection to "state whether any responsive materials are being

withheld on the basis of that objection." FED. R. CIV. P. 34(b)(2)(C). Because it failed to do so, Fidelity waived whatever objections it may have wanted to assert.

### B. REQUEST FOR PRODUCTION NO. 2

Fidelity has also accused Ms. Taylor of improperly soliciting clients. (Dkt. No. 1, ¶¶ 49-58, ¶¶ 71-83, ¶¶ 104-119). Accordingly, Request No. 2 simply asks Fidelity to produce "[a]ny and all documents that constitute, identify, describe, concern or relate to any allegedly improper solicitation of any Fidelity client(s) by Ms. Taylor, as alleged by Plaintiff in this lawsuit." (Ex. B, p. 4). Once again, Fidelity asserts the same bad-faith objections to this request, as it asserted to Request No. 1, *supra*:

- The request "goes well beyond what is relevant to any claim or legitimate defense presented in this action, nor reasonably calculated to the discovery of relevant evidence." (Ex. B, p. 5).
- The request is "vague and ambiguous." (*Id.*).
- The "information requested is in the possession of the Defendant." (*Id.*).

These objections are utterly without merit for the reasons set forth in § V(A), *supra*. Fidelity has accused Ms. Taylor of improperly soliciting clients. She is entitled to discover any documents that concern or relate to any such allegedly improper solicitation. Fidelity's boilerplate objections are without merit, and have been waived by its failure to state whether any materials have been withheld on the basis of those objections. FED. R. CIV. P. 34(b)(2)(C).

#### 1. Fidelity's Communications About Ms. Taylor's Departure

As explained by Ms. Taylor, documents responsive to Request No. 2 would include "any communications with any Fidelity client concerning Ms. Taylor's departure from the Company." (Ex. B). These documents are relevant to Fidelity's allegation that Ms. Taylor was soliciting clients while at Fidelity, and the issue of whether Fidelity was wrongfully refusing to provide

clients with Ms. Taylor's contact information upon request (in violation of its own internal compliance procedures and FINRA rules).



These email communications are extremely relevant to whether Ms. Taylor solicited her clients (and she plainly did not). Fidelity did not produce any of the emails corresponding to these Salesforce entries, and has only produced *two (2) e-mails* in total (FID_TAYLOR000001-3). Fidelity must produce all of its email communications with clients concerning her departure.

Nor has Fidelity produced a single piece of internal correspondence (*i.e.*, communications between and among Fidelity employees) concerning Ms. Taylor's alleged solicitation. It is inconceivable that there would be no internal e-mail traffic concerning this issue if Ms. Taylor was truly causing Fidelity the irreparable harm it has alleged.

9

### 2. Fidelity's Compliance Manual

Fidelity has not produced its internal compliance manual, which specifies the firm's policies and procedures for dealing with departing financial advisors and inquiries from clients. In November of 2019, the Fidelity Compliance Department circulated a company-wide "Compliance Alert" concerning customer communications related to departing financial advisors. That memo alerted employees to Fidelity's "new policy" concerning departing financial advisors, and mandates that financial advisors ***must*** provide the departing advisor's new contact information to any customers who request it. That was not done in this case; Ms. Taylor heard from several clients who called her that Fidelity was refusing to provide her contact information. (Ex. A at ¶ 29). Fidelity's failure to follow this policy required Ms. Taylor to contact her clients to provide her new contact information.

Fidelity's compliance manual (in particular, its policy on customer communications related to departing financial advisors) and the Company's failure to follow its own policies, is highly relevant to explain why Ms. Taylor was obligated to contact her clients – not to solicit them, but to provide them with the information that Fidelity was required, but refused, to provide.

### 3. Ms. Taylor's *Fidelity* Outlook Calendar

After the parties had fully briefed Fidelity's motion for expedited discovery, Fidelity submitted (without leave) the "Supplemental Declaration of Scott Marshall." (Dkt. 27). In this declaration, Mr. Marshall states that he "had an opportunity to review calendar entries from Taylor's personal Microsoft Outlook calendar," which he then purports to describe. (*Id.* at ¶ 4).[4]

Mr. Marshall then cherry-picks several calendar entries created by Ms. Taylor before she left Fidelity, scheduling appointments with clients to occur after March 6, 2019 (her departure

---

[4] This statement by Mr. Marshall is misleading. The Microsoft Outlook calendar ***was not*** Ms. Taylor's "personal calendar." Rather, it was **_Fidelity's Outlook Calendar_**, assigned and maintained by the Company.

date). From this, Fidelity (incorrectly) infers that Ms. Taylor knew she was leaving Fidelity when she made the appointments, and therefore did so on behalf of Fairhaven. But Ms. Taylor met with numerous clients at regular intervals, and often scheduled client meetings in advance – sometimes far in advance. (Ex. A, ¶ 34).

To rebut Fidelity's argument, Ms. Taylor's Fidelity Outlook Calendar entries will show that she regularly scheduled client meetings in advance, and the select entries cherry-picked by Mr. Marshall are meaningless. Ms. Taylor requires a complete copy of all calendar entries in her Fidelity Outlook Calendar for one full year prior to her departure.

Fidelity has produced only "non-recurring" calendar entries, limited to the current year. (FID_TAYLOR00078-2433). This is insufficient. To rebut the erroneous assumptions in Scott Marshall's Supplemental Declaration, Ms. Taylor requires access to her Company Outlook Calendar for a full year prior to her departure (i.e., March 6, 2019 through March 6, 2020).

## C. REQUEST FOR PRODUCTION NOS. 3 & 5

Request Nos. 3 and 5 can be taken together. Specifically, Request No. 5 seeks documents concerning Ms. Taylor's "compensation and relative performance during the period of Scott Marshall's tenure as branch manager of Fidelity's Oak Brook office." (Ex. B, p. 8). This request is relevant because it speaks to Ms. Taylor's job performance, and her status as one of Fidelity's top performers explains why Fidelity customers voluntarily sought her out, and followed her to Fairhaven without any solicitation or inducement from her.

Based on the documents contained in Ms. Taylor's personnel file, she expects Fidelity to argue in response that she was not top a performer, but instead received several written warnings concerning her job performance. (*See*, *e.g.*, Exs. A-1, A-2, and A-3). To rebut that argument, Ms. Taylor intends to establish that the job warnings her branch manager, Scott Marshall, gave her

were mere pretext, and issued solely because of his personal bias against Ms. Taylor. This is where Request No. 3 comes in. That request seeks "[d]ocuments sufficient to identify each Vice President Financial Consultant that Charles Meyer or Scott Marshall have placed on 'final written warning' at Fidelity." (Ex. B, p. 5). Once Ms. Taylor compares that list to her actual performance metrics (as requested in Request No. 5), she anticipates being able to demonstrate she was treated far differently than the other Vice President Financial Consultants, and her performance reviews from Marshall are unreliable. The documents Ms. Taylor seeks in Request Nos. 3 and 5 are, thus, relevant to whether she solicited Fidelity customers.

Information contained in these documents will also bolster Ms. Taylor's waiver defense, which pertains to both the "likelihood of success on the merits" and "irreparable injury" elements for obtaining injunctive relief. Ms. Taylor knows of at least four former Vice President Financial Consultants who left Fidelity, called clients to inform them of their departure, had clients follow them to their new firms, and whom Fidelity did not sue. (Ex. A at ¶¶ 40-43). Accordingly, Ms. Taylor understood and was led to believe by Fidelity's own conduct and course of dealing that calling clients to tell them of her departure was not a violation of her employment agreement, let alone something that would get her sued.

Even though the burden of proof at all times rests with Fidelity, the false allegations that have been levied against Ms. Taylor place her in the difficult position of trying to establish a "negative" – i.e., that she did not improperly solicit clients. There are limited options for a party trying to establish a negative, and one of those options is to introduce circumstantial evidence regarding the parties' respective incentives.

Moreover, it is hypocritical for Fidelity to object to the production of documents concerning clients' incentives to follow Ms. Taylor, when Fidelity has sought the exact counterpart

of that information from Ms. Taylor: *i.e.,* all "inducements to transfer and divert business." (*See*, Fidelity Production Request, attached as **Exhibit D**, at Request No. 5). The documents Fidelity has sought from Ms. Taylor would not establish whether Ms. Taylor actually solicited anyone; at most, they might establish some incentive for her to do so. Nevertheless, Ms. Taylor voluntarily produced *all of her employment agreements with Fairhaven*. It would be patently unfair to allow Fidelity to seek information relevant to Ms. Taylor's incentives to solicit while denying her the right to seek information establishing that it was the *clients* who had the incentive to seek her out.

### D. REQUEST FOR PRODUCTION NO. 4

In Request No. 4, Ms. Taylor seeks documents "concerning the departure of a Vice President Financial Consultant in Fidelity's Chicago cluster market (each a 'former employee') who, since 2004, left Fidelity to join another firm in the financial services industry." (Ex. B, p. 7). This information is essential for Ms. Taylor's defenses of waiver and estoppel, which are directly relevant to both the "likelihood of success on the merits" and "irreparable injury" elements of Plaintiff's motion for injunctive relief.

A party may establish waiver of a restrictive covenant by showing that the waiving party's "actions in failing to enforce the [restrictive covenants] amount to a complete disregard for those provisions." *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., LLC*, No. 02 C 5403, 2003 WL 1057929, at *26 (N.D. Ill. Mar. 10, 2003), *aff'd* 428 F.3d 706 (7th Cir. 2005). In *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 698 (D. Minn. 1986), *aff'd*, 828 F.2d 452 (8th Cir. 1987), for instance, the court found that a company had waived its right to enforce a restrictive covenant after it "blithely ignored" the provision with respect to prior employees.

Again, Ms. Taylor knows of at least four former Vice President Financial Consultants who left Fidelity, called clients to inform them of their departure, had clients follow them to their new

13

firms, and whom Fidelity did not sue. (Ex. A, ¶¶ 40-43). To the extent that the restrictive covenant is found to prohibit Ms. Taylor from contacting clients, Fidelity blithely ignored that provision with respect to former employees and, thus, waived it. Similarly, Fidelity's abject failure to enjoin (or sue) other departing financial advisors who used client names, addresses and telephone numbers to solicit clients precludes the Company from now characterizing that information as a "trade secret." These documents are clearly relevant.

Fidelity also argues the Request is "overly burdensome" because it seeks documents concerning every Vice President Financial Consultant in Chicago since 2004. (Ex. B, p. 7). A party invoking undue burden must, however, "provide affirmative proof in the form of affidavits or record evidence." *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 360 (N.D. Ill. 2005). Fidelity offers no such facts. Instead, Fidelity surmises that the information might be unwieldy:

> whether or not Fidelity obtained evidence of legal violations relating to those financial consultants and initiated litigation against them for soliciting and diverting Fidelity customers, as Taylor has done, involve completely different facts and circumstances, and would result in a mini-trial of every departure since 2004 to determine whether it presented the exact same circumstances present here in order to have any even tangential relevance to this case.

(Ex. B, p. 6). Nonsense. No "mini-trial" is required. (And even if it were, the matter would be taken up by a panel of FINRA arbitrators – not this Court). Fidelity simply needs to produce documents sufficient for Ms. Taylor to identify which departing financial advisors from her region Fidelity sued, and which ones Fidelity didn't sue. This information is easily obtained by Fidelity; it is highly relevant to Ms. Taylor's defenses, and should be produced.

### E. REDACTIONS

The six documents Fidelity has produced include hundreds of redactions. Fidelity initially provided no explanation for these redactions. During the telephonic meet-and-confer, Ms. Taylor learned that these redactions were designed to protect customer information. Unfortunately, many

14

redactions are in the middle of Salesforce entries discussing Ms. Taylor's departure. (*See*, Ex. C). The redacted text could give critical context to unredacted portion of these entries. To the extent the information needs to be protected, Fidelity has already done so by designating the document "HIGHLY CONFIDENTIAL" under the parties' Confidentiality Stipulation. (*Id.*). There is no reason for Fidelity to further obscure the document by redacting information from it. Accordingly, the Court should order Fidelity to remove any redactions based on customer information.

## CONCLUSION

For all the reasons described above, Ms. Taylor respectfully requests that the Court grant all relief requested in her Amended Motion to Compel Discovery Responses.

Dated: June 10, 2020                                                 Respectfully submitted,

**JENNIFER TAYLOR, Defendant**

By: /s/ *Christopher S. Griesmeyer*
    One of Her Attorneys

Christopher S. Griesmeyer (# 6269851)
Zachary Mulcrone (# 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2020, I electronically filed the foregoing *Redacted Version of Memorandum of Law in Support of Defendant's Amended Motion to Compel Discovery Responses,* with the Clerk of the Court via the CM/ECF System, which will send notification of such filing to those registered to receive electronic notices via email transmission. I further certify that I caused a copy of the foregoing to be sent to Plaintiff's counsel listed below via electronic transmission as the email addresses listed and by U.S. Mail by placing the same in a properly addressed stamped envelope from 205 West Randolph St., Chicago, Illinois 60606 before 5:00 p.m. on June 10, 2020:

| | |
|---|---|
| Joel W. Rice | Susan M. Guerette |
| Franklin Z. Wolf | FISHER & PHILLIPS, LLC |
| FISHER & PHILLIPS, LLC | 150 N. Radnor Chester Road, Suite C300 |
| 10 South Wacker Drive, Suite 3450 | Radnor, PA 19087 |
| Chicago, Illinois 60606 | sguerette@fisherphillips.com |
| jrice@fisherphillips.com | |
| fwolf@fisherphillips.com | |

*/s/ Christopher S. Griesmeyer*
Christopher S. Griesmeyer (# 6269851)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
Bus: (312) 428-2750
Fax: (312) 332-2781
cgriesmeyer@grglegal.com