**IN THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20-cv-2133 |
| v. | ) | |
| | ) | |
| JENNIFER TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S AMENDED MOTION TO COMPEL DISCOVERY RESPONSES**

Defendant respectfully submits this Reply in support of her Motion to Compel (Dkt. 42).

**A. REQUEST FOR PRODUCTION NO. 1**

Ms. Taylor's first discovery request simply asks Plaintiff to produce the "trade secrets" and "confidential information" that she has been accused of stealing. Fidelity misconstrues the request to make it appear far more burdensome than it is. According to Fidelity, the request would require it to produce "all information it has, in any form, relating in any way to any of the clients [Ms. Taylor] serviced while working for Fidelity…." (Dkt. 49 at 5). But Ms. Taylor plainly does not seek *every* document about *every* client. (Surely, Plaintiff must know that a document is not a "trade secret" just because a client's name appears on it.) More importantly, Fidelity ignores the parties' Rule 37.2 conference, where Ms. Taylor explained she was merely asking Plaintiff to produce the Fidelity documents *that would be sufficient for her to identify* the trade secrets and confidential information she has been accused of stealing. To be clear, Ms. Taylor is only asking Plaintiff to produce Fidelity documents that:

(1) Are sufficient to identify the precise "trade secrets" and "confidential information" she has been accused of stealing; and/or

(2) Reflect Fidelity's efforts to protect that information from disclosure.

Incredibly, Fidelity still refuses to produce the most critical (and, we thought, non-controversial) documents in this case: the documents containing the trade secrets at issue.[1] Written discovery should have concluded by now, yet Ms. Taylor ***still*** does not know the answer to the most basic question: "What are the precise 'trade secrets' that Fidelity is accusing me of stealing?"

Fidelity disagrees, and argues "[e]ven a cursory review of Fidelity's allegations against Taylor plainly shows that Fidelity accuses Taylor of misappropriating the names, contact information, and financial information for the clients she serviced or became aware of while working for Fidelity." (Dkt. 49 at 3).[2] But this merely highlights Fidelity's purposeful obfuscation in this case: the Company merely hints at broad categories of information – "names," "contact information," "financial information" – and refuses to identify the particular trade secret(s) that Ms. Taylor allegedly stole. Fidelity's glib treatment of this issue only raises more questions:

- Did she download files on a thumb drive? If so, produce them.
- Did she forward documents to her personal e-mail account? If so, produce them.
- Does Plaintiff contend Ms. Taylor stole a customer list? If so, produce it.
- Did she walk out with branch office financials? If so, produce them.
- Did she print off an "AUM" or "T-12" production report? If so, produce it.
- Or, perhaps Plaintiff thinks Ms. Taylor purposefully memorized the names and addresses of Fidelity clients so she could quickly regurgitate the information at her new firm (like an ill-prepared high school student cramming for a test). If so, then Plaintiff needs to produce Fidelity documents that contain the specific "names" and precise "contact information" (mailing address? email address? phone number?)

[1] Fidelity argues it "did produce all documents in its possession that it believes are relevant to its claims of Taylor's misappropriation of confidential information and trade secrets." (Dkt. 49 at 5). But Ms. Taylor has no way of knowing what categories of information Fidelity withheld, based on its violation of Rule 34(b)(2)(C). (Dkt. 44 at 7). Nor does Fidelity identify in its responses which of the thirteen (13) documents it has produced are responsive to Request No. 1.

[2] According to Fidelity, asking the plaintiff in a trade secret misappropriation case to produce the alleged "trade secrets" at issue somehow constitutes "harassment." (Dkt. 49 at 5). This is as much harassment as asking the plaintiff in a breach of contract case to produce the contract at issue.

> that she allegedly misappropriated. Again, Plaintiff is not being asked to produce every document containing a particular client's name and contact information; rather, Plaintiff merely needs to produce enough Fidelity documents so that Ms. Taylor can understand the specific "name(s)" and precise "contact information" that she has been accused of misappropriating.

We will only know the answers to these questions once (if) Fidelity complies with its discovery obligations and produces the trade secrets and confidential information at issue. Fidelity's approach would be insufficient even at the pleadings stage, and it is woefully inadequate as a discovery response, especially in preparation for a preliminary injunction hearing.[3]

Fidelity also argues that it has no way of knowing what information Ms. Taylor took. (Dkt. 49 at 4). Setting aside the obvious question ("then, why did you sue me?"), Ms. Taylor completed her document production weeks ago, and Fidelity should therefore know exactly what information is at issue. Fidelity even concedes as much by claiming it "now knows that Taylor misappropriated names, addresses and phone numbers, at a minimum for multiple Fidelity clients from Fidelity's trade secret client list." (*Id*. at 3-4). If these assertions are true, then there is ***no reason***, aside from procedural gamesmanship, that Fidelity cannot produce that trade secret information.

Fidelity also argues that it is normal at the preliminary injunction stage for a party not to know exactly what trade secrets are at issue. (Dkt. 49 at 4). The two decisions it cites for this proposition, however, merely reflect that at the preliminary injunction stage, the ***misuse and misappropriation*** of particular trade secret information is often proven by circumstantial evidence. In both of those decisions, the trade secret at issue was well-defined. *See Q-Co Indus., Inc. v.*

[3] *See, e.g., PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.*, No. 16-cv-11390, 2017 WL 7795125, at *15 (N.D. Ill. Dec. 9, 2017) (a plaintiff must point to concrete secrets, not broad areas or categories, to prevail on trade secrets claim). "Hence, [a plaintiff] cannot state a claim for trade secret protection…by simply producing long lists of general areas of information which contain unidentified trade secrets." *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 672 (N.D. Ill. 1997) (quoting *AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1203 (7th Cir. 1987)). "[T]o sustain a trade secrets claim a party must do more than simply persist in the blunderbuss statement that 'Everything you got from us was a trade secret' ... That view is wrong as a matter of law." *Nilssen,* 963 F. Supp. at 672 (internal quotations omitted).

*Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985) (computer software program); *Peerless Indus., Inc. v. Crimson AV LLC*, No. 11 C 1768, 2015 WL 1275908, at *1 (N.D. Ill. Mar. 17, 2015) (tv mounting bracket). These decisions do not hold that it is normal (or even acceptable) for a plaintiff not to know what trade secrets are at issue, and they do not provide Fidelity with a valid reason to oppose discovery.

### B. REQUEST FOR PRODUCTION NO. 2

Request No. 2 asks Fidelity to produce documents related to Ms. Taylor's allegedly improper solicitation. In response, Fidelity has produced: (a) two emails, (b) "Salesforce" notes, and (c) select 2020 calendar entries from Fidelity's Outlook account. This is insufficient.

#### 1. Calendar Entries

Fidelity accuses Ms. Taylor of "pre-soliciting" clients by scheduling appointments with them to occur after she left Fidelity. (Dkt. 1 at ¶ 51). Fidelity filed a declaration cherry-picking several calendar entries Ms. Taylor created before she left Fidelity, where she scheduled appointments with clients to occur – ***at Fidelity, not Fairhaven*** – after her departure date. (Dkt. 27). Ms. Taylor has therefore requested documents that will establish her pattern-and-practice of scheduling client meetings far in advance – sometimes up to a year in advance. She therefore requested a copy of her Fidelity Outlook calendar for the 12 months prior to her departure (*i.e.*, from March 7, 2019 through March 6, 2020). In response, Fidelity produced only "non-recurring" calendar entries for the first three months of 2020. There is no valid reason for this limitation.

In its Response, Fidelity changes its theory of the case and argues it does not need to produce its 2019 Outlook calendar because "[t]he charge that Fidelity is leveling in this case is that [Ms. Taylor] made appointments with customers shortly before her resignation and strategically did not enter those appointments in Salesforce…." (Dkt. 49 at 6). Of course, Fidelity's Complaint

does not come close to notifying Ms. Taylor that her alleged failure to enter appointments into her Salesforce notes is "the charge" against her. Indeed, the Complaint does not discuss Salesforce at all, let alone describe any failure to enter prospective meetings into Salesforce.

Even if this were the only charge leveled against Ms. Taylor (and it is not), Fidelity's new theory would not make obtaining the full year of calendar entries any less important. Ms. Taylor would still need to show that she did not deviate from her historical calendaring practice. Request No. 2 thus requires Fidelity to produce 12 months of Ms. Taylor's Outlook ***and*** Salesforce notes for each of the clients she is accused of "pre-soliciting."[4]

**2. Emails Concerning Ms. Taylor's Departure**

The Salesforce notes that Fidelity has produced contain numerous references to e-mails about Ms. Taylor's departure that have not been produced. (Dkt. 44 at 8-9). In response, Fidelity falsely represents that Ms. Taylor has "quoted from e-mails" contained in the Salesforce notes, and wants Fidelity to produce those e-mails a second time. (Dkt. 49 at 7). To state the obvious: ***Salesforce notes are not e-mails,*** and they are not a substitute for e-mails. Even if a financial advisor had fully copied and inserted every e-mail message into their Salesforce notes, Fidelity would still need to produce the e-mail messages themselves. Fidelity refuses to do so.

Contrary to the false assurances of Fidelity's counsel during the Rule 37.2 conference – that "the whole e-mail is in there" – the Salesforce notes are ***manifestly incomplete*** on their face.

[4] Fidelity also argues that there would be "thousands, if not tens of thousands of Outlook entries for all of 2019." (Dkt. 49 at 6). The idea that Ms. Taylor's 2019 Outlook calendar might have "tens of thousands of entries" is preposterous – a calendar with 10,000 entries in a single year would average more than 27 appointments per day. Moreover, Fidelity did not "provide affirmative proof in the form of affidavits or record evidence" necessary to sustain a burden objection. *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 360 (N.D. Ill. 2005). Presumably, Fidelity did not supply this information because producing Ms. Taylor's calendar entries does not impose any true burden. Because there are no privileged calendar entries, the burden associated with producing 100 calendar entries is nearly identical to the burden associated with producing 1,000 calendar entries or 10,000 calendar entries. All Fidelity has to do is select a date range, extract those calendar entries, and produce them.

Most of the Salesforce notes that reference e-mails consist of: (a) the Fidelity advisor's brief – and potentially inaccurate – summary description of e-mail traffic; (b) selected excerpts from e-mails that have been copied into their Salesforce notes; or (c) only one side of a two-way e-mail exchange. For example:

- an entry from March 12, 2020, mentions "Substantial 2-way Email" between Fidelity and client N.G., yet the Salesforce notes only include Fidelity's e-mail to the client, and do not include the client's e-mail response. (FID_TAYLOR000014);
- similarly, a note from March 13, 2020, references "Substantial 2-way Email" between Fidelity and client D.M., but does not include Fidelity's response to the client (FID_TAYLOR000015);
- an entry from March 17, 2020, states client "[D.S.] sent a reply to JT's departure email that he was sick over this," but does not include the client's reply e-mail. (FID_TAYLOR000027); and
- another entry from March 17, 2020, concerning client S.C. notes, "I called [S.C.] back per his voicemail/email to me. he … was surprised to see Jennifer had left the firm;" but the client's voicemail/email is missing from Salesforce (FID_TAYLOR000034).

Copies of these (redacted) Salesforce notes are attached as Exhibit A. These are just a sampling; there are many more references to e-mails that have never been produced.

Naturally, Ms. Taylor is concerned about the adequacy of Fidelity's search for responsive e-mails that ***would not*** appear in an advisor's Salesforce notes. Fidelity, for instance, has not addressed the inconceivable lack of internal correspondence concerning Ms. Taylor's departure and her alleged solicitation of clients. (*See* Dkt. 44 at 9).[5]

[5] Fidelity now asserts that "it has gone back to search for additional client emails related to Taylor's departure from Fidelity, and it will be producing these shortly" – though, of course, it has not done so. (Dkt. 49 at 7). Ms. Taylor is surprised to hear this, as Fidelity previously represented that it produced all emails. Indeed, Fidelity castigates Ms. Taylor for not accepting its counsel's representations of completeness. (*See* Dkt. 49 at 6). In any event, Fidelity's unilateral rolling production was never discussed or agreed upon, and is improper. Rule 34 provides that "The production must then be completed no later than the time for inspection specified in the request or another reasonable time specified in the response." FED. R. CIV. P. 34(b)(2)(B).

### 3. Fidelity's Compliance Manual / Policy on Customer Communications

Fidelity has not produced its 2019 compliance policy on customer communications related to departing financial advisors, which is highly relevant to explain why Ms. Taylor was obligated to contact her clients – not to solicit them, but to provide them with the information that Fidelity was required, but refused, to provide. That policy requires Fidelity advisors to provide a departing advisor's new contact information to any client who requests it, and to document the request in their Salesforce notes.

During the parties' Rule 37.2 conference, we explained to Fidelity's lawyer that Ms. Taylor did not require the entire compliance manual; we simply needed the 2019 policy regarding FINRA Regulatory Notice 19-10. Fidelity's lawyer said she would follow-up with her client and let us know if Fidelity was willing to produce that policy. Hearing nothing further from Fidelity's lawyer, Ms. Taylor understood Fidelity would not produce the policy unless compelled to do so. In its Response, Fidelity discusses the Rule 37.2 conference, but never informs the Court whether it will be producing the policy to Ms. Taylor, or when. Nor does Fidelity provide any explanation for its failure to do so.

## C. REQUEST FOR PRODUCTION NOS. 3 & 5

In Request Nos. 3 and 5, Ms. Taylor seeks information that would speak to her job performance and her status as one of Fidelity's top performers. In its Response, Fidelity alleges that "Taylor's refusal to abide by company policy requiring use of Salesforce is part of the reason why she was put on final written warning in the first place." (Dkt. 49 at 7 n.2). Tellingly, this is *the very argument* that Ms. Taylor anticipated, which she cited as a reason for requesting these performance-based documents in the first place: "[Ms. Taylor] expects Fidelity to argue…that she

was not a top performer, but instead received several written warnings concerning her job performance." (Dkt. 44 at 12).

After denigrating Ms. Taylor's performance, Fidelity then claims it is irrelevant "whether Taylor was a great financial advisor or not, and whether she had good relationships with customers or not…." (Dkt. 49 at 9). Fidelity, however, ignores Ms. Taylor's (rather obvious) explanation regarding the documents' relevance: notwithstanding Fidelity's burden of proof, she finds herself in the difficult position of trying to establish a "negative" inference – *i.e.*, that she did not improperly solicit clients. There are limited avenues to establish a negative inference, and one of those options is to introduce circumstantial evidence regarding the parties' respective incentives. Information tending to establish that Ms. Taylor was one of Fidelity's most successful sought-after financial advisors would certainly explain why: (a) Ms. Taylor's clients were highly incentivized to seek her out without any solicitation or inducement from her; and (b) consequently, Ms. Taylor had no reason (nor incentive) to violate her post-employment non-solicitation covenant.

Fidelity's position is unapologetically hypocritical. Fidelity *highlights* the fact that this kind of circumstantial evidence will play a large role in proving its case at the preliminary injunction hearing.[6] Moreover, Fidelity issued a discovery request to Ms. Taylor, seeking circumstantial evidence that is *the exact counterpart* of the documents that she has requested: "inducements to transfer and divert business." (Dkt. 44-4 at 6, Request No. 5). Fidelity knows full well that the documents it has requested from Ms. Taylor will not establish whether or not she actually solicited anyone; at best, they might establish some type of "incentive" for her to do so.

[6] Fidelity states, for instance, "'In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place.'" (Dkt. 49 at 4) (quoting *Q-Co Industries, Inc. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985)).

It would be patently unfair to allow Fidelity to seek circumstantial evidence relevant to Ms. Taylor's incentives to solicit while denying her the right to discover rebuttal evidence, *i.e.*, circumstantial evidence relevant to *her clients'* incentives to seek her out.

Fidelity also argues that Requests No. 3 and 5 are unrelated to the preliminary injunction hearing, but instead are meant to bolster Ms. Taylor's employment discrimination claims against Fidelity. (Dkt. 49 at 8). This is a pure construct by Fidelity's counsel. Ms. Taylor will obtain the documents she needs to support her counterclaims through discovery in the FINRA action; there would be no reason for her to waste 40% of her limited expedited discovery requests pursuing that information in this action.

Fidelity removed any doubt that Ms. Taylor will need these documents at the preliminary injunction hearing, when it rejected her proposed stipulation. During the Rule 37.2 conference, Ms. Taylor's counsel offered to withdraw Request Nos. 3 and 5, if Fidelity would agree to stipulate – for purposes of the preliminary injunction hearing only – that the clients who followed her to Fairhaven did so because she was one of Fidelity's top-performing representatives. Fidelity flatly rejected the idea; yet, if Fidelity truly believed this issue were "irrelevant," then it would have no reason to reject the proposed stipulation. In reality, the issue is highly relevant and hotly disputed.

**D. REQUEST FOR PRODUCTION NO. 4**

In Request No. 4, Ms. Taylor seeks documents concerning the departure of four (4) VP Financial Consultants from Fidelity's Oak Brook branch – in 2005, 2011, 2016 and 2018 – each of whom: (a) immediately called their clients to announce their departure from Fidelity and provide their new contact information, and (b) were neither threatened nor sued by Fidelity, either in FINRA or in court. (*See* Dkt. 44-1, Declaration of J. Taylor, at ¶¶ 40-41). These documents are highly relevant to her defenses of waiver and estoppel.

**1. <u>This is not summary judgment.</u>**

Fidelity attempts to transform its response to Ms. Taylor's motion to compel into a *de facto* motion for summary judgment on Ms. Taylor's affirmative defenses. Fidelity starts with the presumption that Ms. Taylor cannot possibly prevail on her affirmative defenses, so therefore Fidelity should not be required to produce any documents on that issue – including, of course, the documents that would allow Ms. Taylor to prevail on her affirmative defenses! (*See* Dkt. 49 at 11) ("Taylor's waiver argument has been considered and rejected by courts across the country.").

That is not how the discovery process works. Parties are allowed to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense…," not just the affirmative defenses that your opposing party believes have merit. FED. R. CIV. P. 26(b)(1). But even if this were the right time to attack the merits of Ms. Taylor's defenses (and it is not), Fidelity has the law wrong. Fidelity cites *Laidlaw, Inc. v. Student Transportation of America, Inc.*, 20 F. Supp. 2d 727 (D. N.J. 1998) and *Minnesota Min. & Mfg. Co. v. Kirkevold*, 87 F.R.D. 324 (D. Minn. 1980) to support its contention that courts have rejected Ms. Taylor's theory of waiver. Neither of these decisions are based on Illinois law.

In Illinois, "[w]aiver may be made by an express agreement or it may be implied from the conduct of the party who is alleged to have waived a right." *Ryder v. Bank of Hickory Hills*, 146 Ill. 2d 98, 105 (1991). Implied waiver arises "where (1) an unexpressed intention to waive can be clearly inferred from the circumstances or (2) the conduct of the waiving party has misled the other party into a reasonable belief that a waiver has occurred." *Costello v. Grundon*, 651 F.3d 614, 641 (7th Cir. 2011).

When called upon to apply Illinois law on this issue, the Northern District of Illinois has adopted a standard articulated in *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 698 (D.

Minn. 1986), *aff'd*, 828 F.2d 452 (8th Cir. 1987), where the court found that a company had waived its right to enforce a restrictive covenant after it "blithely ignored" the provision with respect to prior employees. Applying that standard here, this Court has held that a party may establish waiver of a restrictive covenant by showing that the employer's "actions in failing to enforce the [restrictive covenants] amount to a complete disregard for those provisions." *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., LLC*, No. 02 C 5403, 2003 WL 1057929, at *26 (N.D. Ill. Mar. 10, 2003), *aff'd* 428 F.3d 706 (7th Cir. 2005). The Illinois Appellate Court has also adopted the *Surgidev* standard, holding that where an employer seeks to selectively enforce its restrictive covenants against some employees while choosing to ignore those restrictive covenants in the face of violations by other employees, it waives its right to enforce those restrictive covenants. *Midwest Television, Inc. v. Oloffson*, 298 Ill. App. 3d 548, 558 (3d Dist. 1998).

Ms. Taylor's waiver defense is valid, and she must be allowed to develop it through discovery. The documents she has requested are highly relevant to that defense, so Fidelity must produce those documents.

**2. <u>Fidelity's arguments are circular.</u>**

Fidelity also argues that the content of the documents Ms. Taylor seeks will not help her establish a waiver defense. (Dkt. 49 at 10). But, of course, this logic is purely circular: the only way for Ms. Taylor to rebut Fidelity's argument would be to first obtain the very documents she seeks.

Fidelity also cites a litany of cases – from other jurisdictions, applying different law to different facts – where it obtained injunctive relief, and baldly proclaims, "Fidelity undeniably seeks injunctive relief against financial consultants who solicit customers in violation of their employment agreements." (Dkt. 49 at 13). Fidelity's argument misses the mark for two reasons.

First, the argument amounts to a substantive attack on Ms. Taylor's waiver defense, which *demonstrates precisely why Ms. Taylor needs the documents she has requested*. How could Ms. Taylor possibly rebut Fidelity's argument without first obtaining the very information she seeks? Second, Fidelity attempts to change the premise of the argument. The occasions where Fidelity ***has enforced*** its rights have no bearing on Ms. Taylor's discovery requests, which seeks documents about four (4) specific instances where Fidelity ***did not enforce*** its rights.

Fidelity's arguments demonstrate why courts allow parties to seek discovery of any documents or information that might be relevant to a claim or defense, rather than having the requesting party litigate the merits of their claims and defenses in a discovery motion, without having seen the very documents it is requesting.

**3. Privilege concerns are irrelevant.**

Fidelity also argues that "attempting to inquire into any decision as to whether to sue any particular advisor who left the firm would inevitably involve attorney-client privileged communications and attorney work product…." (Dkt. 49 at 14). This is why the Federal Rules provide for privilege logs. Moreover, not all documents (or even a majority of them) would be privileged – for example: (a) internal branch correspondence regarding the departing advisor's poaching of clients; (b) internal and external correspondence from clients discussing whether the departing advisor solicited – or even "pre-solicited" – their clients; (c) cease-and-desist letters and other forms of dispute correspondence with the departing advisor; (d) court filings and arbitration filings; and (e) non-privileged discussions concerning the business decision whether or not to sue.

**E. REDACTIONS**

The documents Fidelity has produced include hundreds, if not thousands, of redactions. These redactions do not, however, protect any privileged information. (Fidelity has not produced

any privilege log.) Instead, Fidelity has unilaterally redacted information that, *solely in Fidelity's estimation*, Fidelity has deemed "irrelevant." Clearly, the documents themselves are relevant; otherwise, Fidelity would not have produced them. Respectfully, it is not Fidelity's place to pick-and-choose which portions of a relevant document Ms. Taylor may see, and which portions she cannot. If the document is relevant, and the information is not privileged, then she gets to see it.

The Federal Rules do not allow a party to unilaterally redact nonprivileged information from documents before production.[7] *IDC Fin. Publ'g, Inc. v. Bonddesk Group, LLC*, No. 15-CV-1085-PP, 2017 WL 4863202, at *3 (E.D. Wis. Oct. 26, 2017) (recognizing that the unilateral redaction of nonprivileged information creates the "potential for abuse"). Nor would such a practice make sense: Ms. Taylor's view of relevance may (and likely does) differ from Fidelity's. As this Court has recognized, "What constitutes relevant information is often a matter of judgment, and even 'irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information.'" *U.S. Equal Employment Opportunity Comm'n v. Dolgencorp, LLC*, No. 13-CV-04307, 2015 WL 2148394, at *2 (N.D. Ill. May 5, 2015). Fidelity wrongfully seeks to deny Ms. Taylor that contextual information.

Fidelity's alleged concern about the disclosure of client information is mere pretext. During the parties' telephonic meet-and-confer, we explained that it would be unfair for Fidelity to unilaterally redact nonprivileged information from relevant documents without allowing counsel the opportunity to verify the propriety of the redactions. We proposed that Fidelity produce unredacted versions of its documents on an "attorney's eyes only" basis so that counsel could ensure that Fidelity did not over-redact (either inadvertently or purposely). This proposal

[7] The exception is Rule 5.2(a), which allows parties – in court filings only – to redact portions of individuals' social-security numbers, taxpayer-identification numbers, birth dates, the names of minors, and financial-account numbers. FED. R. CIV. P. 5.2(a). Fidelity's redactions – to unfiled documents – go far beyond this.

would have protected both Fidelity's information, and Ms. Taylor's right to discovery. Fidelity would not agree to the proposal.

On June 16, 2020, Fidelity's counsel circulated a revised version of the proposed stipulated protective order. (A highlighted copy of this email chain and proposed stipulated protective order are attached hereto as Exhibit B). In response, we again suggested an "attorneys' eyes only" review of the redacted documents, this time under a protective order:

> I would suggest including an "attorney's eyes only" category of confidentiality, which will allow us to review (but not show to our client) nonredacted versions of the documents you have produced. As I have explained, we need to see a "clean" version of those documents so we can evaluate your characterization of the information that was redacted, and its potential relevance.

(Ex. B, p. 1). Fidelity's counsel again rejected this idea, and replied with a revised draft of the protective order containing no provisions for an "attorney's eyes only" review. (*Id.*).

Plaintiff's redactions are completely unnecessary, because Fidelity has already designated its documents "HIGHLY CONFIDENTIAL" under the parties' proposed stipulated protective order. Based on the very language that Fidelity used in its own proposed protective order, this heightened confidentiality designation fully protects ***"highly confidential, proprietary or trade secret information"*** – expressly including ***"confidential client information"*** – from disclosure and use outside of this litigation. (Ex. B, p. 6 - "proposed order" at ¶¶ 3(b), 5(a)) (emphasis added). Thus, having designated these documents as "HIGHLY CONFIDENTIAL," there exists no justification for also redacting non-privileged information from them.

In sum, even if the parties had not agreed to stringent protections for customer information, Fidelity would have had no valid basis to unilaterally redact nonprivileged portions of relevant documents. Given that the parties *have* agreed to such protections, any concerns about the protection of customer information are moot. Fidelity must produce the unredacted documents.

### F. Correcting the Record

In its Response Brief, Fidelity repeatedly misstates the record. While that should have no impact on the outcome of her Motion, Ms. Taylor feels compelled to briefly address some of the more egregious misrepresentations:

- Fidelity asserts, "documents already produced by Taylor indicate that she had retained extensive Fidelity confidential customer information in her personal cell phone at the time she resigned." (Dkt. 49 at 1-2). Ms. Taylor produced her iPhone contact list. None of her iPhone contacts suggest Ms. Taylor had Fidelity customer information in her cell phone at the time she resigned. On the contrary, she has provided sworn testimony that she left all Confidential Information at Fidelity upon her departure. (Dkt. 44-1 at ¶ 25).

- Fidelity asserts that it produced records of its communications with "one client who indicated that Taylor solicited him and set up an appointment for him to come meet with her at her new firm, before she even resigned." (Dkt. 49 at 5) (emphasis original). Fidelity has produced no communications substantiating this. Ms. Taylor, by contrast, has provided sworn testimony affirming she did not pre-solicit any clients. (Dkt. 44-1 at ¶¶ 26, 34).

- Fidelity asserts, "By putting [client appointments] only in her own personal calendar, and not Salesforce, the new Fidelity employees would have no way of knowing that these appointments had been scheduled…." (Dkt. 49 at 6-7). This alleged "personal" calendar was, in fact, Ms. Taylor's ***Fidelity*** calendar, to which everyone in Fidelity's Oak Brook office had access, and which they regularly used to check on each other's schedules. Indeed, Fidelity employees began modifying Ms. Taylor's calendar entries immediately after her departure.

- Fidelity misleadingly suggests that Ms. Taylor has engaged in some sort of malfeasance by having "not produced a single email, claiming instead that they must be obtained from her new employer, Fairhaven, which has been subpoenaed." (Dkt. 49 at 7 n. 3). In truth, Ms. Taylor agreed to – and has – produced all responsive documents (including text messages and any e-mail correspondence) within her personal possession, custody and control. But Fidelity is now requesting copies of her ***Fairhaven*** e-mails – which, of course, Fidelity has already requested from Fairhaven.

### G. Conclusion

For all these reasons, and those set forth in her Motion to Compel (Dkt. 42) and supporting Memorandum of Law (Dkt. 45), Ms. Taylor respectfully requests that the Court enter an Order granting all relief requested in her Motion.

Dated: June 19, 2020

Respectfully submitted,

**JENNIFER TAYLOR, Defendant**

By: /s/ *Christopher S. Griesmeyer*
One of Her Attorneys

Christopher S. Griesmeyer (# 6269851)
Zachary Mulcrone (# 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2020, I electronically filed the foregoing ***Reply Brief in Support of Defendant's Amended Motion to Compel Discovery Responses,*** with the Clerk of the Court via the CM/ECF System, which will send notification of such filing to those registered to receive electronic notices via email transmission, including Plaintiff's counsel listed below:

Joel W. Rice
Franklin Z. Wolf
FISHER & PHILLIPS, LLC
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
jrice@fisherphillips.com
fwolf@fisherphillips.com

Susan M. Guerette
FISHER & PHILLIPS, LLC
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
sguerette@fisherphillips.com

*/s/ Christopher S. Griesmeyer*
Christopher S. Griesmeyer (# 6269851)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Bus: (312) 428-2750
Fax: (312) 332-2781
cgriesmeyer@grglegal.com