**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| | ) No. 20 CV 2133 |
| v. | )<br>) Judge John J. Tharp, Jr. |
| JENNIFER TAYLOR, | )<br>) |
| Defendant. | ) |

## ORDER

Defendant's amended motion to compel discovery responses [42] is granted in part and denied in part. See Statement below for details.

## STATEMENT

In a complaint filed on April 3, 2020, plaintiff Fidelity Brokerage Services LLC claims that defendant Jennifer Taylor, who was until March 6, 2020, a vice president and financial consultant with Fidelity, is misusing Fidelity's confidential and trade secret customer information to solicit Fidelity customers to follow her to her new employer, Fairhaven Wealth Management. Taylor denies misusing Fidelity information and soliciting investment management business from her former Fidelity customers.

Fidelity has moved for a preliminary injunction. [4] The Court permitted limited expedited discovery [29], in which the parties are now engaged. Among other discovery, each side was permitted to make five document requests. The overarching limitation on the scope of the discovery permitted is that only discovery of "information at the heart of this dispute—that is, whether Ms. Taylor has used Fidelity's information improperly to solicit her former clients at Fidelity to follow her to Fairhaven"—is permitted.

Defendant Taylor has moved to compel more fulsome responses from Fidelity regarding her document requests, complaining that it has (a) asserted a litany of boilerplate objections to every single request; (b) failed to state whether it has withheld any documents on the basis of those objections; and (c) has refused to produce whole categories of documents that are unquestionably relevant to the claims at issue. According to Taylor, Fidelity has produced only six documents in response to her requests. For its part, Fidelity maintains that Taylor's discovery requests are inappropriately broad and/or not relevant to the central question of whether Taylor used Fidelity's information to solicit her clients to follow her to Fairhaven.

The parties' specific disputes are summarized and resolved as follows:

**1. Request No. 1: Documents that "constitute, identify, describe, concern or relate to the confidential information and/or trade secret information that Fidelity contends Ms. Taylor has misappropriated, as alleged in this lawsuit."**

Fidelity contends that this request is too vague and broad to the extent that it seeks discovery of any document that concerns or relates to categories of information like Fidelity's customer lists; read literally, Fidelity contends, the request can be read to call for production of any document relating to Fidelity's customers—a request that would arguably extend to virtually every document in Fidelity's possession. Taylor characterizes this request more narrowly, as seeking the trade secrets and confidential information that she is alleged to have misappropriated. Memorandum, ECF No. 43, at 6 (the request "could not be more straightforward"; it "simply asks Fidelity to produce the 'confidential information' and 'trade secrets' that she has been accused of stealing").

To the extent that Taylor is seeking "information" rather than documents, however, she is off-base. This is a document request, not an interrogatory; it requires the production of existing documents, not the creation of a narrative description or listing of confidential information Taylor allegedly misappropriated.[1] Fairly construed and limited to existing documents, Taylor's request is for Fidelity to produce any document it contends evidences misappropriation of trade secrets by Taylor. That would include documents containing Fidelity's confidential information that Taylor took with her when she resigned,[2] and any documents that discuss the use of proprietary information by Taylor in connection with her resignation and move to Fairhaven. If Fidelity cannot identify any such documents then it will have nothing to produce in response to this request. Taylor has no grounds to object on that score; she can hardly complain about Fidelity's inability to produce materials that would provide evidentiary support for its claims.

**Request No. 2: Documents "that constitute, identify, describe, concern or relate to any allegedly improper solicitation of any Fidelity client(s) by Ms. Taylor, as alleged by Plaintiff in this lawsuit."**

Taylor's motion focuses on three types of information pertaining to her alleged solicitation of Fidelity customers. For one, she seeks production of her Outlook Calendar for the 12 months before her resignation. Fidelity has produced the calendar entries for 2020 but maintains that earlier entries are not relevant and overly burdensome to produce. Taylor says that the entries are relevant to show her normal calendaring practices to rebut Fidelity's argument that she made appointments with Fidelity clients for dates she knew she would no longer be working for Fidelity. That misses the point, Fidelity argues; Taylor's calendaring was relevant because she only made entries for

---

[1] In any event, Fidelity has identified what it maintains is the trade secret information that Taylor misappropriated. Fidelity says that "Taylor misappropriated names, addresses and phone numbers, at a minimum for multiple Fidelity clients from Fidelity's trade secret client list." Response, ECF No. 49, at 3-4. In complaining that this description is inadequate, Taylor conflates interrogatories with document requests.

[2] Taylor's reply brief makes it clear that she is asking for production of trade secret documents that she is alleged to have misappropriated. See Reply, ECF No. 50, at 2 (*e.g.*, "Did she download files on a thumb drive? If so, produce them.").

post-resignation meetings with Fidelity clients in her personal Outlook calendar, not in the Sales Force calendar that others could access. Taylor argues that is consistent with her historical practice, so a full year's information is needed. While this line of evidence strikes the Court as lacking substantial probative force (for either party), since both sides agree that calendaring is going to be an issue, the Court will require Fidelity to produce Taylor's Outlook calendar for the 12-month period prior to her resignation. The burden in doing so should be minimal; as Taylor points out, producing 12 months of calendar data is only minimally more burdensome than producing 3 months' worth. In suggesting that this will potentially require review of tens of thousands of calendar entries, Fidelity's unexplained estimate is unpersuasive hyperbole.

In her initial brief, Taylor also sought production of Fidelity's full compliance manual. Fidelity says it offered to produce the portions of the manual addressing "what an employee should say when asked by a client about a former financial consultant's new contact information, and in reply, Taylor has limited her request to "the 2019 policy regarding FINRA Regulatory Notice 19-10" ("Guidance on Customer Communications Related to Departing Registered Representatives"). Again, this is of dubious probative force (evidence that Fidelity had a policy requiring employees to provide contact information of departed advisers seemingly cuts against a claim that Fidelity employees did not do so; Taylor's evidence presumably must come from testimony of clients or Fidelity employees who say that, notwithstanding such a policy, such information was not provided, or from records of communications between Fidelity employees and Taylor's former clients—see next paragraph). At any rate, Fidelity's policy concerning information to be provided about departed advisers has some relevance and should not pose any significant burden to produce; accordingly, Fidelity is directed to produce it.

Third, and perhaps most significantly, Taylor seeks documents constituting or reporting Fidelity's communications with clients about Taylor's departure. These documents, she argues, "are relevant to Fidelity's allegation that Ms. Taylor was soliciting clients while at Fidelity, and the issue of whether Fidelity was wrongfully refusing to provide clients with Ms. Taylor's contact information upon request (in violation of its own internal compliance procedures and FINRA rules)." Memorandum, ECF No. 43, at 8-9. Fidelity has produced its "Salesforce" (a client contact application) records of communications with Fidelity clients about Taylor's departure, but Taylor correctly notes that numerous Salesforce entries refer to email communications that are either paraphrased or only partially copied into the Salesforce entry. Fidelity's production of the relevant Salesforce records is a necessary, but not sufficient, response; they provide, at best, only a partial record of Fidelity's communications with clients about Taylor's departure.

Fidelity characterizes Taylor as seeking the production of "the full contents of her Microsoft Outlook account," which "would include every email ever sent or received." Resp. ECF No. 49 at 7. But that is not what Taylor asks for; her request is more limited: "Fidelity must produce all of its email communications with clients concerning her departure." Memorandum, ECF No. 43, at 9. That is a reasonable request, and indeed, Fidelity says that it has "gone back to search for additional client emails related to Taylor's departure from Fidelity, and it will be producing those shortly," Resp. at 7, so there appears to be no dispute as to the need to produce such documents. Fidelity is directed to produce all of its email (or other documented communications) with clients concerning Taylor's departure, whether they are included (in whole or part) in the Salesforce records already produced.

3

**Request No. 3 and 5: documents relating to the quality of Taylor's performance.**

Taylor maintains that documents showing that she was a top performer at Fidelity are relevant because they explain why clients would follow her to Fairhaven without being solicited to do so. Specifically, she seeks in Request 5 documents that "identify, describe, concern or relate to Ms. Taylor's compensation and relative performance during the period of Scott Marshall's tenure as branch manager of Fidelity's Oak Brook office." In Request 3, she seeks documents "sufficient to identify each Vice President Financial Consultant that Charles Meyer or Scott Marshall have placed on 'final written warning' at Fidelity." These documents, she contends, would somehow show that she was the victim of bias by her bosses and that their reviews of her work are therefore unreliable and do not rebut the evidence that she was a top performer.[3]

These documents have little relevance to the question of whether Taylor improperly used Fidelity's trade secret and confidential information to solicit Fidelity clients to follow her to Fairhaven. Unquestionably, evidence that Taylor was an effective financial consultant at Fidelity would tend to make it more likely that some clients would follow her to Fairhaven. The proposition is simple: good financial advisers engender more client loyalty than poor ones. But that does not tell us anything about whether Ms. Taylor solicited clients to follow her or whether they did so on their own. Even if we accept the proposition that more clients would follow an effective financial consultant without prompting than would follow an ineffective consultant, that says nothing about whether any clients who did move from Fidelity to Fairhaven in the wake of Ms. Taylor's move did so at her behest or on their own initiative.

At best, evidence that Ms. Taylor was a strong performer may lend some plausibility to other evidence that is more directly related to the question of whether Taylor solicited clients to follow her to Fairhaven. In that light, evidence that she was compensated well, or that her evaluations were strong has enough probative weight to warrant production and, accordingly, the Court will require Fidelity to produce documents described in Paragraph 5 of Ms. Taylor's motion.

The documents sought by Request No. 3, however, are another matter. They are not documents relating to Taylor's performance but to the performance of others. This gives them even less probative value; the argument for their relevance requires additional layers of inference (her supervisors treated others better than her, so they were biased against her, so their performance reviews are unreliable, so Taylor was actually a top performer, so clients would have an incentive to follow her to Fairhaven, so some of them must have done so unbidden). That the requests seek personal and sensitive information about non-parties to this suit who have nothing to do with the events surrounding Ms. Taylor's departure provides another substantial reason to deny these requests. In short, this chain of inferences is too tenuous and tangential to support discovery— much less limited expedited discovery for purposes of resolving a preliminary injunction motion— of personnel records of other individuals who are not parties to this dispute and who had nothing to do with Taylor's departure from Fidelity.

---

[3] Ms. Taylor does not explain how documents that identify others who were given final performance warnings would show that she was mistreated.

4

**Request No. 4: "documents and communications concerning the departure of a Vice President Financial Consultant in Fidelity's Chicago cluster market (each a "former employee") who, since 2004, left Fidelity to join another firm in the financial services industry."**

Ms. Taylor says that she needs this information to bolster her "waiver/estoppel" defense; evidence that Fidelity did not sue others who left Fidelity and took clients with them, she contends, establishes that Fidelity waived its right to enforce contractual restrictions on disclosure of confidential information and solicitation of customers. There are several problems with this argument, but three will suffice. Putting aside the question of whether non-enforcement of restrictive covenants can ever rise to the level that would establish waiver or estoppel of any attempt in another case to enforce such restrictions, the proposition that Fidelity regularly ignores violations of its restrictive covenants is unpersuasive in light of the myriad cases Fidelity identifies in which it has successfully enforced its restrictive covenants against departing employees. See Response, ECF No. 49, at 13. Second, any species of estoppel argument that might be made would depend on a showing that individual cases in which Fidelity did not seek enforcement of its restrictive covenants were substantially similar to this case. As Fidelity argues, establishing that proposition would require a "mini-trial" as to each situation Taylor identifies in order to establish that reliance on non-enforcement in that situation would have been reasonable. *Id.* at 14. That is not an exercise that the Court is going to entertain in the context of a preliminary injunction hearing, particularly one that is merely a precursor to an arbitration. The evidence that Taylor would require to support such a defense would take the hearing far afield of the limited scope of expedited discovery the Court has authorized. And third, as with Taylor's Request No. 3, this request would extend discovery in this case to private and confidential employment records of individuals who have nothing to do with the present dispute.

Beyond her motion to compel the production of additional documents, Ms. Taylor also objects to Fidelity's redaction of information from the documents it has produced. Fidelity represents that it has redacted only information "regarding customer investments and investment decisions." *Id.* at 15. Ms. Taylor contends that "attorneys' eyes only" treatment of such records should suffice and that she has no means to verify that the scope of the redactions is as Fidelity describes it. Here, Ms. Taylor has the better of the argument; the Court has entered an agreed protective order that adequately protects the confidentiality of information produced in the course of discovery; that is the appropriate manner of protecting the confidentiality of documents produced in discovery. Fidelity is therefore directed to produce unredacted copies of the documents it has produced and will produce in this matter.

\* \* \* \* \*

Fidelity is required to produce the additional materials identified above by July 2, 2020. Because Ms. Taylor's motion received a mixed verdict, the Court denies her request for fees and costs associated with bringing the motion.

|  |  |
|---|---|
| Dated: June 24, 2020 | /s/ John J. Tharp, Jr.<br>John J. Tharp, Jr.<br>United States District Judge |