**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 1:20-cv-2133** |
| | ) | |
| JENNIFER TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

**ANSWER AND AFFIRMATIVE DEFENSES
TO PLAINTIFF'S COMPLAINT**

The Defendant, Jennifer Taylor ("Defendant" or "Taylor"), by and through her undersigned counsel, timely submits the following answer and affirmative defenses to Plaintiff's Complaint (Dkt. No. 1).

1.      Plaintiff Fidelity Brokerage Services LLC is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts. Fidelity is a member firm of FINRA.

**ANSWER:**    Admitted.

2.      Defendant Jennifer Taylor is a former Vice President, Financial Consultant of Fidelity's Oak Brook, Illinois office. She is an adult citizen and resident of Illinois. Taylor was registered with FINRA during her employment with Fidelity.

**ANSWER:**    Admitted.

3.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 *et seq. See* 18 U.S.C. § 1836(c) (West 2017) ("The district courts

of the United States shall have original jurisdiction of civil actions brought under this section."). This Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. § 1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy. Notably, the Defendant used Fidelity's customer information to solicit Fidelity customers.

**ANSWER:** Denied; however, Defendant does not challenge jurisdiction.

4. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Indeed, Taylor's conduct threatens approximately 425 Fidelity client households, representing in excess of $ 1.18 billion in client assets under Fidelity management.

**ANSWER:** Denied; however, Defendant does not challenge jurisdiction.

5. Venue is proper in this District because Taylor lives and works in this District, and most or all of the conduct alleged in this Complaint occurred within this District.

**ANSWER:** Denied; however, Defendant does not contest venue.

6. Through this action, Fidelity seeks preliminary injunctive and other relief to stop Taylor's continuing violation of her Employee Agreement, misappropriation of Fidelity's trade secrets, and unfair competition.

**ANSWER:** Denied.

7. Taylor, a former Fidelity Vice President, Financial Consultant, has used Fidelity's confidential and trade secret customer information, that she had access to solely by virtue of her employment with Fidelity, to unlawfully solicit Fidelity customers to transfer their business to her new firm.

**ANSWER:** Denied.

8.      On March 6, 2020, Taylor resigned from Fidelity and immediately thereafter joined Fairhaven Wealth Management, a registered investment adviser firm (RIA), and began providing competing service.

**ANSWER:**      Denied.

9.      In connection with her resignation, Taylor was sent a letter from Fidelity's HR department reminding her of her post-employment obligations pursuant to her Employee Agreement, and enclosing a copy of her Employee Agreement. A copy of the March 14, 2020 letter is attached to the Declaration of Scott Marshall as Exhibit F.

**ANSWER:**      Admitted.

10.      Despite her post-employment obligations, since Taylor resigned she has aggressively and blatantly misappropriated Fidelity's confidential and trade secret customer information and used, and continues to use, that information to unlawfully target and solicit Fidelity customers to transfer their accounts to her new firm, as set forth more fully below.

**ANSWER:**      Denied.

11.      Fidelity seeks a preliminary injunction requiring Defendant to return to Fidelity any and all records and/or documents in any form, received or removed from Fidelity by Defendant, containing information pertaining to customers Taylor served or whose names became known to Taylor while in the employ of Fidelity, including, but not limited to, any customer list or documents replicated or recreated by Taylor from memory or otherwise, and from using Fidelity's confidential and trade secret information concerning Fidelity's customers. Fidelity also seeks an order prohibiting further solicitation of Fidelity clients by Taylor. This injunctive relief is necessary to end Defendant's unlawful activities, which include misuse of Fidelity's trade secrets and unfair competition.

**ANSWER:** Denied.

12. Fidelity and Taylor are obligated to arbitrate the merits of this dispute consistent with the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200. Accordingly, concurrently with the filing of its Motion for a Preliminary Injunction, Fidelity also is filing a Statement of Claim with FINRA Dispute Resolution, Inc. seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2).

**ANSWER:** Denied.

13. Although the merits of this case will be resolved in arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed. Once an injunction is issued by this Court, an expedited arbitration will be scheduled with FINRA within fifteen (15) days of the entry of the injunction. If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned to a standard-track arbitration, which would likely delay a hearing on the merits for a year or more. Preliminary injunctive relief, therefore, is required to preserve the *status quo* until the merits of this case can be adjudicated by FINRA.

**ANSWER:** Denied.

14. Fidelity and its affiliates provide a variety of financial services—such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships. Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies.

**ANSWER:**    Denied.

15.    Fidelity is unique in the retail brokerage field because Fidelity does not have its Financial Consultants, such as Taylor, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity.

**ANSWER:**    Denied.

16.    Instead, Fidelity requires its Financial Consultants to develop service relationships based upon leads that Fidelity provides.

**ANSWER:**    Denied.

17.    Fidelity provides leads to its Financial Consultants from two primary sources.

**ANSWER:**    Denied.

18.    First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.

**ANSWER:**    Denied.

19.    Fidelity and its affiliates devote tens of millions of dollars per year towards attracting customers to Fidelity's various businesses in a variety of means. Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit.

**ANSWER:**    Denied.

20.    A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

**ANSWER:**    Denied.

21.    Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship, when those customers experience "triggering events," such as Fidelity 401(k) distributable events, which may lead to interest in Fidelity's retail financial services.

**ANSWER:**    Denied.

22.    In addition, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position. Moreover, Fidelity clients may be serviced by multiple Fidelity representatives depending upon the clients' needs and service offerings in which they opt to participate at Fidelity.

**ANSWER:**    Admitted.

23.    A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.

**ANSWER:**    Admitted.

24.    Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers.

**ANSWER:**    Denied.

25.    Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Taylor, is also directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.

**ANSWER:**    Denied.

26.     Fidelity's trade secret customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.

**ANSWER:**    Denied.

27.     Although certain portions of such information might be publicly available — such as an individual's name or published home telephone numbers — only a limited number of Fidelity employees know who among the general public are Fidelity customers who have demonstrated a specific need and desire for investment services.

**ANSWER:**    Denied.

28.     Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.

**ANSWER:**    Denied.

29.     Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence.

**ANSWER:**    Denied.

30.     Fidelity derives substantial economic value from preserving its customer data as a trade secret.

**ANSWER:**    Denied.

31.     Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and

address their needs without access to or specific knowledge of Fidelity's trade secret customer data. In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

**ANSWER:** Denied.

32. Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information. Fidelity does not provide its trade secret customer data to competitors.

**ANSWER:** Denied.

33. Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access.

**ANSWER:** Denied.

34. Fidelity maintains and advises its employees of a Global Policy on Information Protection that is displayed on Fidelity's intranet. A true and correct copy of Fidelity's Global Policy on Information Protection is attached to the Marshall Declaration as Exhibit A. Fidelity periodically reminds its employees of this policy and provides employees with a Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information. A true and correct copy of Fidelity's QRC is attached to the Marshall Declaration as Exhibit B.

**ANSWER:** Admitted.

35. Fidelity also preserves trade secret customer data by requiring employees, including Taylor, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity, and not to solicit Fidelity customers.

**ANSWER:** Denied.

36. Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity. Furthermore, as discussed more fully below, Fidelity is required by federal law to prevent the disclosure to third-parties of nonpublic customer information, including customers' contact information and financial information. *See* 15 U.S.C. § 6801, *et seq.*; 17 C.F.R. § 248.1, *et seq.*

**ANSWER:** Denied.

37. At the time of her resignation on March 6, 2020, Taylor was a Vice President, Financial Consultant in Fidelity's branch office in Oak Brook, Illinois. While working at Fidelity, Taylor was assigned clients to service on behalf of Fidelity.

**ANSWER:** Admitted.

38. In order for Taylor to service the customers' accounts she was assigned to service, Taylor required access to the customers' confidential personal and financial information.

**ANSWER:** Admitted.

39. Taylor specifically acquired access to and knowledge of the names, contact information and confidential financial data for numerous Fidelity clients. By the time of her departure, she had daily access to and had gained knowledge of confidential Fidelity information relating to approximately 425 households, representing in excess of $ 1.18 billion in client assets under Fidelity management. Moreover, throughout her employment at the Oak Brook branch, the confidential information to which Taylor was given access was continually updated as clients were added, new accounts were opened, client assets and investments changed value, clients' financial goals evolved, and as a result Taylor was provided with ongoing access to a pool of continually

updated and evolving confidential information about the Fidelity clients she was assigned to service.

**ANSWER:** Generally admitted; however, Defendant denies that client names and/or publicly-available information is confidential information.

40. Fidelity protects its customers' information by requiring each employee who will have access to that information to execute a standard Fidelity Employee Agreement.

**ANSWER:** Denied.

41. Fidelity records indicate that Taylor executed the Employment Agreement on September 20, 1999. Taylor then renewed her commitment to the provisions by signing it again on June 30, 2011. Copies of Taylor's signed September 20, 1999 and June 30, 2011 Employee Agreements are attached to the Marshall Declaration as Exhibits C and D.

**ANSWER:** Denied.

42. In her Employee Agreement, Taylor acknowledged the confidentiality of Fidelity's records, including Fidelity's customer lists and customer information. *See* Marshall Declaration Exhibits C and D at ¶ 1.

**ANSWER:** Denied.

43. Taylor promised to use Fidelity's trade secrets only in the course of her employment with Fidelity and not to divulge Fidelity's trade secrets to third parties. *Id.*

**ANSWER:** Admitted.

44. Taylor promised that, upon termination of employment, she would "return all company property … including but not limited to Confidential Information." *Id.* at ¶ 3.

**ANSWER:** Denied.

45. Taylor also promised that following termination of employment she would not use Fidelity's Confidential Information to solicit Fidelity's clients. *Id.* at ¶ 6.

**ANSWER:** Admitted.

46. Taylor further promised that for a period of one year following termination of her employment she would not directly or indirectly solicit in any manner or induce or attempt to induce any customer or prospective customer with whom she had personal contact or about whom she otherwise learned during the course of her employment with the Fidelity. *Id.*

**ANSWER:** Denied.

47. Taylor agreed that any violation of the Employee Agreement—including after her termination—would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information. *Id.* at ¶ 10 (Ex. C) and ¶ 11 (Ex. D).

**ANSWER:** Denied.

48. As consideration for the Employee Agreements Taylor executed, Fidelity hired her, promoted her, provided her with ongoing access to continually updated confidential business information, compensated her throughout her employment, and provided her with introductory and continuing on-the-job training, and promotions. Fidelity assigned Taylor customers with higher assets to service on behalf of Fidelity and provided Taylor with leads to enable her to succeed at Fidelity. Fidelity further provided Taylor with support services; paid for facilities, computer equipment, market reporting services, and all other business expenses; and registered Taylor with the Financial Industry Regulatory Authority and the New York Stock Exchange. Fidelity provided Taylor with sales assistance, research, the benefit of Fidelity advertising, goodwill and name

recognition, access and use of experts in asset management, tax, estate planning and insurance, and with promotional marketing and sales support.

**ANSWER:**   Denied.

49.     Despite her contractual obligations and her obligations under Illinois law, Taylor misappropriated Fidelity's trade secret customer information and has used and continues to use Fidelity's trade secret customer information to solicit Fidelity customers.

**ANSWER:**   Denied.

50.     Since Taylor resigned from Fidelity, Fidelity has been receiving reports that she— and representatives from her new firm acting on her behalf—have been soliciting Fidelity customers to transfer their business to Fairhaven.

**ANSWER:**   Denied.

51.     In fact, one client reported that Taylor solicited him, and set up an appointment for him to come meet with her at her new firm, <u>before she even resigned</u>. After Taylor resigned Fidelity representatives were assigned to service the customers that were previously serviced by Taylor. In a meeting with the new Financial Consultant, the customer reported that during his last meeting with Taylor, while she was employed at Fidelity, she set up a meeting for him at her new firm. Taylor also told the client that he would be able to leave his assets at Fidelity but Taylor would be able to add her name to their account and provide financial advice. *See* Marshall Declaration at ¶ 16.

**ANSWER:**   Denied.

52.     Accordingly, Fidelity's in-house counsel sent Taylor a letter reminding her of her contractual obligations, enclosing a copy of her Employee Agreement, and demanding that she cease any further solicitation of Fidelity customers. Fidelity also enclosed an affidavit for her to

sign attesting that she did not have, or had returned, any of its customer information. A copy of the March 20, 2020 letter is attached to the Marshall Declaration as Exhibit G.

**ANSWER:**   Denied.

53.   Taylor never responded to the letter and never returned the signed affidavit. *See* Marshall Declaration at ¶ 18.

**ANSWER:**   Denied.

54.   Fidelity has since learned that Taylor has continued to use Fidelity's trade secret customer information to aggressively solicit customers to transfer their accounts to her new firm. *Id.* at ¶ 19

**ANSWER:**   Denied.

55.   Since Fidelity's March 20, 2020 letter to Taylor, another client reported to her new Financial Consultant that she received a call from the firm that Taylor joined and the person said that she was calling on Taylor's behalf. The employee from Taylor's new firm, Fairhaven, then asked the Fidelity client to consolidate her assets and transfer them to Taylor at her new firm. The client was not happy that someone called her and wanted to make sure that Fidelity was aware that this was being done by Taylor and her new firm. *Id.* at ¶ 20.

**ANSWER:**   Denied.

56.   Other clients have also reported to Fidelity that Taylor was contacting them about doing business with her at her new firm. *Id.* at ¶ 21.

**ANSWER:**   Denied.

57.   The only way Taylor could have known that these particular individuals were customers of Fidelity and how to contact them is by exploiting the ongoing access she was given to Fidelity's constantly updated confidential and trade secret information, and using her knowledge

of that confidential information about Fidelity's clients to identify and target Fidelity clients for her own benefit, and the benefit of her new firm.

**ANSWER:**   Denied.

58.     The reports from Fidelity customers confirm that Taylor has Fidelity's confidential and trade secret customer information in her possession and is using that information to solicit customers to transfer their business to her at her new firm.

**ANSWER:**   Denied.

59.     Defendant's conduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately. Indeed, the theft and misuse of Fidelity's trade secret customer information to solicit and unfairly compete with Fidelity causes Fidelity both monetary and irreparable harm. Defendant's conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing goodwill, losing future business or referrals, as well as losing trust and confidence in securing inherently-private information, which cannot be calculated with precision and cannot be adequately compensated.

**ANSWER:**   Denied.

60.     Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations. The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a) (2012). The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent. 17 C.F.R. § 248.10 (2017). Nonpublic personal information is defined to include customer lists from financial

14

institutions, *even if those lists contain only names of Fidelity customers* because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017). Indeed, these regulations also protect a customer's account information. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

**ANSWER:** Denied.

61. Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their identities, contact information, net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. Thus, customers understandably are concerned when former Fidelity employees, such as Taylor, have access to their information and are using it to solicit their business to a new and different securities firm.

**ANSWER:** Denied.

62. In other words, the damage to Fidelity's customer relationships has already occurred, is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage caused when Taylor took and improperly misused confidential and trade secret customer information on behalf of a competing business.

**ANSWER:** Denied.

63. Based on all the foregoing facts and conduct, Fidelity believes and thereon alleges that Taylor prepared to engage in, is engaging in, and plans to continue to engage in the following wrongful acts:

- use and/or disclosure of Fidelity's trade secret customer information and misappropriation of the trade secret information contained in confidential Fidelity business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information of Fidelity customers;

- transmission verbally, in writing or in another manner for the use of a Fidelity competitor, customers' contact and financial information contained in Fidelity's records; and

- solicitation of Fidelity customers on behalf of Taylor and her new firm.

**ANSWER:** Denied.

64. Fidelity has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of customers and customer goodwill caused by Defendant's misappropriation and misuse of Fidelity's trade secret customer information and solicitation of Fidelity's customers in violation of her Employee Agreement and in violation of Illinois law.

**ANSWER:** Denied.

65. Denial of injunctive relief would also leave Fidelity vulnerable to the same conduct from other employees.

**ANSWER:** Denied.

66. Fidelity asks for the Court's assistance in protecting that information and stopping Defendant's knowing and intentional wrongful conduct.

**ANSWER:** Denied.

## FIRST CAUSE OF ACTION
### (Injunctive Relief)

67. Fidelity hereby realleges and incorporates by reference the allegations of paragraphs 1 through 66 of the Complaint, inclusive, as though set forth in full.

**ANSWER:** Defendant adopts and incorporates by reference her answers to paragraphs 1 through 66.

68. In doing the acts described herein, Defendant has harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of federal and Illinois law, to give Taylor a

competitive edge over Fidelity, attempting to poach Fidelity's customer accounts, and diminishing Fidelity's reputation and goodwill.

**ANSWER:** Denied.

69.     Unless the Defendant is preliminarily, and thereafter permanently, enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

       (a)     Disclosure of trade secrets, customer lists, and other confidential information that is solely the property of Fidelity and its clients;

       (b)     Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

       (c)     Potential future economic loss, which is presently incalculable.

**ANSWER:** Denied.

70.     Thus, Fidelity is entitled to preliminary injunctive relief.

**ANSWER:** Denied.

<u>**SECOND CAUSE OF ACTION**</u>
**(Breach of Contract)**

71.     The allegations of Paragraphs 1 through 70 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:** Defendant adopts and incorporates by reference her answers to paragraphs 1 through 70.

72.     Taylor's Employee Agreements are valid contracts supported by adequate consideration.

**ANSWER:** Denied.

73.     In the Employee Agreements, Taylor acknowledged that as a consequence of her employment with Fidelity, and in order to assist her in performing the duties of a Financial Consultant, Taylor would be given access to Confidential Information about Fidelity's clients. *See* Exhibits D and E to the Marshall Declaration at ¶ 1.

**ANSWER:**     Denied.

74.     Pursuant to the terms of her Employee Agreements, Taylor agreed to keep Fidelity's records, including particularly Fidelity's customer lists and customer information, confidential. Exhibits D and E to the Marshall Declaration at ¶ 1.

**ANSWER:**     Denied.

75.     Taylor promised to use Fidelity's customer information only in the course of her employment with Fidelity and promised not to divulge Fidelity's customer information to third parties such as her new firm. Exhibits D and E to the Marshall Declaration at ¶ 1.

**ANSWER:**     Denied.

76.     Taylor violated the confidentiality and non-disclosure provisions of her Employee Agreements by using Fidelity's confidential customer information on behalf of herself and her new firm, including by using that information to solicit Fidelity clients to transfer their business.

**ANSWER:**     Denied.

77.     Taylor also promised to return any of Fidelity's customer information in her possession to Fidelity upon termination of her employment. Exhibits D and E to the Marshall Declaration at ¶ 3.

**ANSWER:**     Denied.

78.     Taylor sought to circumvent and in fact breached this provision of her Employee Agreements by, on information and belief, either taking the Confidential Information, or creating or recreating the Confidential Information from memory for competitive use at her new firm.

**ANSWER:**     Denied.

79.     Taylor also promised that she would not solicit Fidelity customers for a period of one year after her termination. Exhibits D and E to the Marshall Declaration at ¶ 6.

**ANSWER:**     Denied.

80.     Taylor breached the non-solicitation provision of her Employee Agreements by using her knowledge of Fidelity's customer information to solicit Fidelity customers to transfer their business to Taylor at her new firm.

**ANSWER:**     Denied.

81.     Taylor is violating her contractual obligations and will continue to violate these obligations in the future.

**ANSWER:**     Denied.

82.     As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.

**ANSWER:**     Denied.

83.     In her Employee Agreement, Taylor expressly agreed that "violation of this Agreement will cause irreparable damage" to Fidelity. Exhibits D and E to the Marshall Declaration at ¶ 10.

**ANSWER:**     Denied.

84.     Unless Taylor is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a)     Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b)     Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c)     Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(d)     Potential future economic loss, which is presently incalculable.

**ANSWER:**    Denied.

### THIRD CAUSE OF ACTION
**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1831 *et seq.*)**

85.     The allegations of Paragraphs 1 through 84 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**    Defendant adopts and incorporates by reference her answers to paragraphs 1 through 84.

86.     The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Defendant pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, in one or more of the following respects.

**ANSWER:**    Denied.

87.     Fidelity's above-described trade secrets, including the contact and confidential financial and account information of Fidelity customers, are subject to reasonable efforts by

20

Fidelity to maintain their secrecy and/or confidentiality. Fidelity's customer information is not generally known.

**ANSWER:** Denied.

88. Defendant has used Fidelity's customer information without Fidelity's consent. Taylor engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Taylor owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity.

**ANSWER:** Denied.

89. Such information is also protected as "non-public" information under federal securities Regulation S-P. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u). Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account information such as that misappropriated by Defendant is not disclosed to third parties without consent. 17 C.F.R. § 248.10.

**ANSWER:** Denied.

90. Fidelity derives a significant economic benefit from the above-described trade secrets.

**ANSWER:** Denied.

91. Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Defendant's ongoing misappropriation and misuse of Fidelity's trade secret customer information.

**ANSWER:** Denied.

92. Unless Defendant is preliminarily, and thereafter permanently, enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

      (a)     Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

      (b)     Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

      (c)     Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

      (d)     Potential future economic loss, which is presently incalculable.

**ANSWER:**    Denied.

93.    Defendant's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

**ANSWER:**    Denied.

94.    Thus, Fidelity is entitled to preliminary injunctive relief to enjoin further legal violations.

**ANSWER:**    Denied.

## FOURTH CAUSE OF ACTION
**(Misappropriation of Trade Secrets and Misuse of Confidential Information in Violation of the Illinois Trade Secret Act, 765 Ill. Comp. Stat. 1065)**

95.    The allegations of Paragraphs 1 through 94 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**    Defendant adopts and incorporates by reference its answers to paragraphs 1 through 94.

96.     As described above, Fidelity possessed trade secrets, including the contact and confidential financial and account information of Fidelity customers, which are subject to reasonable efforts by Fidelity to maintain its secrecy and/or confidentiality.

**ANSWER:**     Denied.

97.     Defendant has used Fidelity's trade secret customer information without Fidelity's consent. Taylor engaged in this conduct despite a duty to maintain the information's secrecy and limit its use.

**ANSWER:**     Denied.

98.     Plaintiff derives economic value from this confidential information, due to it not being generally known to other persons who could obtain economic value from its disclosure or use.

**ANSWER:**     Denied.

99.     Plaintiff has made efforts that are reasonable under the circumstances to maintain the secrecy of such information.

**ANSWER:**     Denied.

100.     Defendant is using this information to compete with Plaintiff and to injure Plaintiff's relationships with its clients.

**ANSWER:**     Denied.

101.     The disclosure and use of such information constitutes a misappropriation of trade secrets in violation of applicable law, including the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065.

**ANSWER:**     Denied.

102.    Defendant's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets and has caused Plaintiff irreparable harm and loss.

**ANSWER:**    Denied.

103.    Accordingly, Fidelity is entitled to preliminary injunctive relief to enjoin further legal violations.

**ANSWER:**    Denied.

### FIFTH CAUSE OF ACTION
### (Unfair Competition)

104.    The allegations of Paragraphs 1 through 103 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**    Defendant adopts and incorporates by reference her answers to paragraphs 1 through 103.

105.    Defendant's conduct constitutes an unfair method of competition.

**ANSWER:**    Denied.

106.    As a direct and proximate result of the acts and course of conduct of Defendant described above, Fidelity has suffered and will continue to suffer irreparable harm and loss.

**ANSWER:**    Denied.

### SIXTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

107.    The allegations of Paragraphs 1 through 106 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**    Defendant adopts and incorporates by reference her answers to paragraphs 1 through 106.

108.    Taylor had, and continues to have, a common law duty of loyalty arising as a result of her relationship as an employee, agent and/or representative of Fidelity.

**ANSWER:**    Denied.

109.    Taylor had a confidential relationship with Fidelity.

**ANSWER:**    Denied.

110.    Taylor is now using for her own benefit the customer information she gained as a result of her employment with Fidelity, and is doing so for the purpose of soliciting Fidelity clients to transfer their accounts to her new employer.

**ANSWER:**    Denied.

111.    As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm and loss.

**ANSWER:**    Denied.

**SEVENTH CAUSE OF ACTION**
**(Tortious Interference with Existing Business Relations)**

112.    The allegations of Paragraphs 1 through 111 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**    Defendant adopts and incorporates by reference her answers to paragraphs 1 through 111.

113.    Defendant Taylor tortiously interfered with Fidelity's client relationships by planning to and in fact soliciting clients to move their accounts to her new firm, including through the use of Fidelity's confidential information and trade secrets.

**ANSWER:**    Denied.

114.     As a direct and proximate result of Defendant's conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

**ANSWER:**     Denied.

115.     Fidelity is entitled to preliminary injunctive relief enjoining Defendant from further acts of tortious interference.

**ANSWER:**     Denied.

## EIGHTH CAUSE OF ACTION
### (Unjust Enrichment)

116.     The allegations of Paragraphs 1 through 115 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**     Defendant adopts and incorporates by reference her answers to paragraphs 1 through 115.

117.     Defendant Taylor misappropriated Fidelity's trade secrets and confidential information, breached her Employee Agreement, and unfairly competed with Fidelity thereby wrongfully benefitting from her actions.

**ANSWER:**     Denied.

118.     As a result of Defendant's wrongful and illegal conduct, she has benefitted in the form of Fidelity customer accounts that have transferred to Taylor at Fairhaven Wealth Management. Also as a result of the Defendant's wrongful and illegal conduct, Fidelity has suffered harm.

**ANSWER:**     Denied.

119.     Allowing Taylor to benefit from such conduct would be unfair and should be prohibited.

**ANSWER:**     Denied.

WHEREFORE, Defendant Jennifer Taylor respectfully requests that the Court enter an Order:

A.     Dismissing Plaintiff's Complaint in its entirety, *with prejudice*;

B.     Denying all relief sought by Plaintiff in its Complaint;

C.     Awarding to Defendant all of her costs and attorneys' fees incurred in connection with this proceeding; and

D.     Awarding to Defendant any such other and further relief as the Court deems just.

## DEFENDANT'S AFFIRMATIVE DEFENSES

Defendant Jennifer Taylor ("Taylor" or "Defendant"), by and through her undersigned counsel, submits the following affirmative defenses to the claims alleged by Plaintiff Fidelity Brokerage Services, LLC ("Plaintiff," "Fidelity," or the "Company") in its Complaint. In support of these affirmative defenses, Defendant alleges as follows:

### FACTS COMMON TO ALL AFFIRMATIVE DEFENSES

1.     Fidelity has engaged in a "scorched earth" campaign against Ms. Taylor – one of its longest-tenured and most successful financial advisors – whose only transgression was to join a small and independent registered investment advisory ("RIA") firm called Fairhaven Wealth Management ("Fairhaven") *after* Fidelity had constructively discharged her employment.

2.     While most financial advisors remain with Fidelity for only a couple of years, Ms. Taylor worked as a financial advisor at Fidelity for 25 years. During that time, Ms. Taylor nurtured her deep and personal relationships with several clients, and became a valuable and high producing financial advisor in the Company's Oak Brook, Illinois office.

3.    Ms. Taylor very much enjoyed working at Fidelity, and had no desire (or plans) to ever leave the Company.  To the contrary, after devoting more than 25 years to Fidelity, she hoped to remain with the Company until she retired.

4.    Unfortunately, Fidelity's appointment of Scott Marshall as the branch manager of the Oak Brook office ultimately destroyed any hope for Ms. Taylor's future with the Company. Shortly after his arrival in August of 2018, Mr. Marshall made it clear that he harbored a discriminatory animus against Ms. Taylor because of her age and gender.  He continually harassed Ms. Taylor, and embarked upon a pretextual campaign to terminate her employment.

5.    Although Ms. Taylor was a top-performer within the Company, Mr. Marshall seized every chance he had to formally criticize Ms. Taylor in written warnings and improvement "plans" that: (a) were ambiguously based on soft skills such as "client service style," for which there is no corresponding measurable performance metric; (b) were designed to provide Marshall with "cover" for his overt age and sex discrimination; and (c) would ultimately result in Ms. Taylor's constructive discharge from Fidelity.

6.    When Ms. Taylor complained about Marshall's discrimination and harassment to Fidelity's management, the Company refused to conduct a proper investigation; instead, it merely provided "lip service" to her concerns by allowing a member of the operations department to sit in on meetings between Marshall and Taylor.  In response to her complaints, Marshall retaliated against Ms. Taylor by giving her an extended "final warning," and letting her know that her employment would likely be terminated.

7.    Marshall made it clear to Ms. Taylor that her days at Fidelity were numbered.  Left with no other choice, Ms. Taylor reluctantly accepted employment with Fairhaven.

8.      Importantly, Ms. Taylor never told anyone – not a single client, and not a single employee at Fidelity – that she was leaving the Company or joining Fairhaven.  Ms. Taylor was very careful to ensure that she made a "clean break" from Fidelity; consequently, she never communicated anything about her departure to any clients (or anyone else) until after her registration transfer (i.e., FINRA Form U4) was submitted by Fairhaven.

9.      Equally important, Ms. Taylor did not take a single scrap of paper or single byte of Fidelity's data with her when she left.  Notwithstanding her constructive discharge – and the harsh treatment, discrimination, harassment and retaliation that she experienced at the hands of Mr. Marshall – Ms. Taylor has abided by the terms of her employment agreement with the Company in all respects.

10.      Yet, Fidelity has wrongly accused Ms. Taylor of misappropriating the Company's "trade secrets" and taking its confidential information, and then using that information to solicit her former clients.  The accusations Fidelity has made against Ms. Taylor are untrue, and were made recklessly and for an improper purpose – to further retaliate against her for complaining about the workplace harassment and discrimination that she experienced at the Company.

11.      Fidelity's claims are based upon two affidavits – from Charles Meyers and Scott Marshall – which largely rely upon hearsay and utterly fail to establish that Ms. Taylor misappropriated anything from Fidelity.  The Company either knew these affidavits were false and misleading when it first used them in an attempt to obtain expedited discovery and a preliminary injunction, or it failed to verify that their contents were true.

12.      The false claims that Fidelity has asserted against Ms. Taylor (not only in this forum, but in the pending federal court lawsuit) run directly contrary to the Company's obligation

to "observe high standards of commercial honor and just and equitable principles of trade," and a clear violation of FINRA Rule 2010.

### A.  Ms. Taylor's Career with Fidelity

13.  Ms. Taylor first became interested in working at Fidelity through her participation in Fidelity's co-op program while she was attending college at Louisiana State University.  That was in the year 1994.

14.  After that first indication of interest, Ms. Taylor finished her college education with her sights on working in the financial sector and, more specifically, working for Fidelity.  The Company's reputation in the industry and the supportive culture she had experienced first-hand while in the co-op program are what fueled Ms. Taylor's passion and desire to assimilate into Fidelity, and she knew she would be able to grow her career and achieve success in the financial services industry.

15.  Ms. Taylor worked her way up from a Customer Service representative for Fidelity in 1995, where she greeted customers upon entry and handled service and operations requests, to becoming an Associate Representative ("Junior Consultant") in Fidelity's Oak Brook office in 1997, to being promoted to a Financial Consultant in December of 1998, where she worked tirelessly on behalf of her clients and enjoyed a successful and rewarding career, until she was constructively discharged on March 6, 2020.

16.  Over the course of her 25-year career with Fidelity, Ms. Taylor had many supervisors who recognized her passion and ability, and the fact that she took pride in her work. Ms. Taylor was a high-performing and high-achieving Financial Consultant, and her clients maintained deep and personal relationships with her as their personal financial advisor.

17.     As Ms. Taylor's book of business grew throughout her career, her work generated large profits for Fidelity, and also translated into her individual success as a Financial Consultant with Fidelity.  Ms. Taylor's managers and colleagues recognized that she was, by all accounts, an asset to Fidelity.

18.     Unfortunately, Ms. Taylor's most recent manager, Mr. Marshall (who began supervising Ms. Taylor when he was appointed Branch Manager of Fidelity's Oak Brook office on or about August 10, 2018), immediately took issue with Ms. Taylor – not because of her performance (which was high by Fidelity's own metrics, and far outpaced her peers), but because she was a female over the age of 40.

**B.     Fidelity's Goals and Activity Metrics**

19.     The most important performance metrics to Fidelity are: (a) "Tier 3" production, which concerns revenue on managed accounts, managed account referrals, and annuities; and (b) asset "Flows," which measure the amount of money coming into Fidelity versus the amount of money leaving the Company.

20.     During Marshall's tenure as Branch Manager, Ms. Taylor generated approximately $140 million of Tier 3 revenue.  Specifically, Ms. Taylor's Tier 3 production was:

  a.  Approximately double her sales goal;

  b.  $40 million above the approximate $100 million average for Vice Presidents in Fidelity's Central South Region;

  c.  $45 million above the approximate $95 million average for Vice Presidents throughout the country;

  d.  $25 million more than the next highest producing Financial Consultant in the Oak Brook office;

  e.  $70 million above the average for all financial advisors in Fidelity's Central South Region; and

      f.   In the top 10th percentile (beating 90% of her peers) of the approximate 200 Vice Presidents in Fidelity's entire Central South Region.

21.     During this same time period, Ms. Taylor also generated more than $115 million of net "Flow." Specifically, Ms. Taylor's net asset flow was:

      a.   More than 11% greater than her sales goal;

      b.   Nearly $10 million greater than the approximate $107 million average for Vice Presidents in Fidelity's Central South Region;

      c.   More than $5 million greater than the approximate $110 million average for Vice Presidents throughout the country; and

      d.   In the top 37th percentile (beating 63% of her peers) of Vice Presidents in Fidelity's entire Central South Region.

22.     As for Fidelity's other performance metrics, Ms. Taylor once again far exceeded Fidelity's expectations. Ms. Taylor's client transfer ratio was more than double Fidelity's goal, and her average client appointments per week (20, as compared to the goal of 15) placed her in the top 5th percentile (beating 95% of her peers) of Vice Presidents in Fidelity's entire Central South Region. In order to achieve this performance metric, Ms. Taylor utilized Fidelity's Microsoft Outlook calendar to schedule regular client appointments far in advance, and would accommodate the client's requests to meet both telephonically and at locations of the client's choosing.

23.     In short, over the course of Marshall's tenure as Branch Manager, Ms. Taylor was the longest-tenured, most senior, and highest producing Financial Consultant in the Oak Brook branch, and her performance far exceeded Fidelity's stated goals and activity metrics, as well as the performance of the vast majority of her peers.

    **C.**    **Fidelity's Unlawful Discrimination and Harassment**

24.     During his tenure as Branch Manager, and despite the foregoing, Marshall displayed unusual personal animosity toward Ms. Taylor. In every one-on-one interaction with

Ms. Taylor, Marshall was aggressive and demeaning because of Ms. Taylor's age and gender. Over time, Marshall's aggression toward Ms. Taylor increased.

25.     Marshall's discriminatory animus manifested itself in the form of increasingly severe and frequent verbal and written warnings concerning Ms. Taylor's job performance, despite the fact that Ms. Taylor was a consistently high performing Financial Consultant (and among the highest performing Financial Consultants in Fidelity's entire Central South Region).

26.     For example, on August 19, 2019, Marshall issued Ms. Taylor a written 60-day warning concerning her job performance.  A true and correct copy of the August 19, 2019 warning is attached hereto as Exhibit 1.  In this written warning, Marshall asserted that Ms. Taylor's "contribution to business results is significantly lagging others in your position."

27.     Nothing could be further from the truth:  Ms. Taylor had been awarded the annual Fidelity "achiever bonus" in recognition of her 2018 performance and, at the time Marshall issued the August 19, 2019 written warning, was on track to reach another "achiever bonus" for her performance in 2019.  When Ms. Taylor raised this discrepancy with Marshall, Marshall offered no legitimate explanation.  Instead, Marshall sharply rebuked Ms. Taylor.

28.     The written warning required biweekly meetings between Marshall and Ms. Taylor through the 60-day period.  Because Marshall harbored discriminatory animosity toward Ms. Taylor (as evidenced by his aggressive attitude and demeaning comments towards her, and because his unfair written warning was mere pretext for discrimination on account of her age and gender), Ms. Taylor complained to Fidelity's management personnel and requested the presence of her operations manager during every biweekly one-on-one meeting that was to be held with Marshall going forward.

29.     Fidelity's management acknowledged her complaint, and allowed the operations manager to sit in on Marshall's meetings with Taylor.

30.     Although Ms. Taylor performed satisfactorily during the 60-day period following the August 19, 2019 written warning (indeed, her performance continued to far outpace her peers), Marshall unlawfully retaliated against Ms. Taylor for complaining about his conduct by increasing his unlawful discrimination and harassment against her in an effort to force her out of the Company.

31.     Approximately two weeks after the 60-day warning period lapsed, Marshall escalated his efforts and issued Ms. Taylor another written 60-day warning, this time titled a "final performance warning."  A true and correct copy of the November 4, 2019 written warning is attached hereto as Exhibit 2.

32.     At the time Marshall issued the November 4, 2019 written warning, Ms. Taylor 's performance was not lagging. Indeed, Ms. Taylor was on track to reach another "achiever bonus" for her performance in 2019, and her performance continued to far outpace her peers.  Despite this, Marshall intimated that he would likely terminate Ms. Taylor on January 6, 2020, at the end of the 60-day warning period.

33.     Ms. Taylor confronted Marshall about his implicit threat and asked him whether he planned to terminate her for alleged performance reasons, even if she continued to exceed Fidelity's production and performance goals and metrics.  Marshall responded by ominously telling Ms. Taylor that he could terminate her at any time, for any reason.

34.     During this second written warning period, several financial representatives in the Oak Brook branch expressed concern to Ms. Taylor – completely unprompted by her – that

Marshall was treating Ms. Taylor "differently" or "less favorably" than other Financial Consultants who were male and/or younger than her.

35.     In fact, in late 2019, the Oak Brook operations manager – who had sat in on each of the one-on-one biweekly performance meetings between Marshall and Ms. Taylor during the 60-day warning period – told Ms. Taylor that she did not understand why Marshall was issuing warnings to Ms. Taylor about her performance.  This conversation, too, was unprompted by Ms. Taylor.

36.     Ms. Taylor successfully navigated the second 60-day written warning period, had a very strong fourth quarter 2019 production, and finished the 2019 calendar year as the highest producing Financial Consultant in the Oak Brook branch and in the Chicago region.  Ms. Taylor's performance far exceeded Fidelity's stated goals and activity metrics, as well as the performance of the vast majority of her peers – including Financial Consultants who were male and/or younger than her.

37.     Because Ms. Taylor far exceeded Fidelity's stated goals and the performance of her peers, Marshall could not – without raising eyebrows – terminate Ms. Taylor on January 6, 2020, as he had planned.  Instead, on January 9, 2020, Marshall unilaterally "extended" his final written warning by 60 days and implied to Ms. Taylor that he would terminate her employment on March 10, 2020.

38.     Specifically, Ms. Taylor inquired for a third time about the discrepancy between receiving a written warning for her alleged deficient performance, on the one hand, and her actual performance, on the other hand, and asked Marshall whether the "final written warnings" would ever end.  Marshall responded, ominously, by reading verbatim the following text on her written warning: "you may be subject to dismissal without any additional corrective action process."

39.     After a branch meeting in January of 2020, one representative confided to Ms. Taylor that "it's been made clear to most of the branch that some people are looked at less favorably by management than others, and without much explanation."

40.     Because Marshall's final written warning "extension" and ominous verbal statements did not reflect Ms. Taylor's actual job performance, and in light of Marshall's response to her inquiry as well as the information that had been conveyed to her by other representatives, Ms. Taylor knew that she would be terminated because of her age and gender, effective March 10, 2020.

**D.      Fidelity's Incentive to Unlawfully Discriminate**

41.     While having a long-tenured and high producing Financial Consultant is good for Fidelity, it is not necessarily good for an individual branch.

42.     Although Ms. Taylor was a top producer for Fidelity, she also carried the highest salary component in the Oak Brook branch.

43.     When a Financial Consultant departs, Fidelity assigns new Financial Consultants to the client accounts that were previously handled by the departing Financial Consultant.  In the case of termination of the longest-tenured Financial Consultant in the branch, those accounts (axiomatically) will be assigned to less-tenured – and less costly – Financial Consultants.  In this way, Fidelity, and an individual branch in particular, can absorb the cost of servicing client accounts without increasing its bottom-line expense.

44.     In addition, when a long-tenured Financial Consultant is terminated, the branch has an incentive to "game the system" by routinely changing Tier 3 client accounts to other Tier 3 solutions over time after the departure of the Financial Consultant.  While not necessarily an advantage to Fidelity, the advantage to the particular branch manager is that Tier 3 solutions are

measured as gross production, so any new Tier 3 business will count toward branch production, even if it was by converting a portion of an already Fidelity advisory managed Tier 3 solution into a different Tier 3 solution at Fidelity.

45.     Any time a long-tenured Financial Consultant's employment is terminated, the branch recognizes a short term "lift" in branch production numbers that are artificially inflated by "gaming" transactions.   This is a common practice at Fidelity's Oak Brook branch, and is encouraged and directed by branch management, including Marshall.

46.     Thus, branch managers can improve the branch's performance metrics – and be handsomely rewarded for doing so – by "managing out" older, more expensive, Financial Consultants, and replacing them with younger, less expensive Financial Consultants, who are guided to creatively game client accounts upon being assigned to them.

47.     Given Ms. Taylor's status as the longest-tenured and highest producing Financial Consultant in the Oak Brook office, Marshall knew that he could improve the branch's numbers (and his own performance-based compensation) by eliminating Ms. Taylor's employment and replacing her with a younger (and cheaper) financial advisor.  Marshall therefore embarked upon his Company-sponsored campaign to accomplish precisely that objective.

48.     Fidelity's Market Leader, Bill Meyers, approved of, acquiesced in, and ratified Marshall's unlawful discrimination so the Oak Brook branch could "game" client accounts to artificially inflate production numbers.

**E.     Ms. Taylor is Constructively Discharged from Fidelity**

49.     On March 6, 2020, after enduring over a year of discrimination and harassment without any recourse, Ms. Taylor was constructively discharged from Fidelity and accepted a position as a financial advisor with Fairhaven.

50.     When Ms. Taylor met with Marshall and the Oak Brook operations manager on March 6, 2020, she reminded Marshall that Fidelity was required to provide her contact information to any former clients who requested it, and left her cell phone number with Fidelity. Indeed, providing a departing Financial Consultant's new contact information to a client upon request is not only Fidelity's practice, it is also *required* by the Company's internal compliance procedures and FINRA Regulatory Notice 19-10 (regarding customer communications related to departing registered representatives).

51.     Subsequent to Ms. Taylor's constructive discharge, however, she received calls from several of her clients – including "A.G.," "J.L.," "J.G.," "M.G.," and "A.S." – who informed her that Fidelity had refused to provide them with her contact information despite their requests.

52.     Fidelity has undertaken an effort to continue retaliating against Ms. Taylor in order to harm her professional reputation by refusing to provide her contact information to the clients who have requested it. Fidelity's conduct violates the Company's own compliance policies and requirements (to say nothing of FINRA Rule 2010), and is malicious and intentional.

**F.      Fidelity's Course of Dealing With Past Departing Financial Consultants**

53.     During her near 25-year career with Fidelity, Ms. Taylor has witnessed dozens of Financial Consultants leave Fidelity to join other financial services firms (both competitive institutional brokerage firms, such as Edward Jones or Wells Fargo, as well as independent registered independent advisory firms, such as Fairhaven).

54.     Fidelity has as a matter of course permitted those departing Financial Consultants to contact their former clients to: (a) announce their departure from the Company, and (b) provide their new contact information. Each of those departing Financial Consultants had signed the same

post-employment "non-solicit" covenants that the Company required of Ms. Taylor; yet, Fidelity never filed a lawsuit or pursued legal action against them.

55.     Between 2005 and 2018, for instance, at least four male Vice Presidents left Fidelity's Oak Brook office to join other financial services firms.  Each had a book of business similar in size to, or larger than, Ms. Taylor's.  After departing Fidelity, each of these four males called former clients – during the one-year non-solicit period – to announce the job change and to provide new contact information.  Large client assets (more significant than those at issue here) followed these Vice Presidents to their new firms.  Fidelity was aware of all this activity, yet it did not file any legal action (either in Court or before FINRA) against any of the four male Vice Presidents.

### G.     Ms. Taylor Retained No Fidelity "Confidential Information" or "Trade Secrets" after Her Constructive Discharge

56.     At no time prior to Ms. Taylor's constructive discharge from Fidelity did she inform anyone – including her colleagues and clients – that she would be leaving Fidelity or that she had intended to accept a new position with Fairhaven.

57.     When Ms. Taylor's employment with Fidelity ended, Ms. Taylor did not take any Fidelity documents, files, data or information with her.

58.     At no time prior to or subsequent to Ms. Taylor's constructive discharge from Fidelity did she take, remove, misappropriate, transmit, convey, use, or disclose originals or copies of any of the Company's confidential information (including, but not limited to, trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and

marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products) or any other Fidelity documents containing or relating to the names, addresses, phone numbers, social security numbers, transactions, accounts, or financial information of the customers Ms. Taylor serviced at Fidelity. Her access to and use of such information was strictly limited to the work she performed during her employment at Fidelity, in the ordinary course of Company business, and solely for Fidelity's benefit.

59. Since Ms. Taylor's discharge from Fidelity, she has not been in possession of, or had any access to, any of Fidelity's documents, files, information, materials or data (or any copies thereof). Ms. Taylor does not have in her possession, custody or control the original or copies of any information, materials, documents, files or data containing, reflecting, or referring to any of Fidelity's confidential proprietary, client, or trade secret data or information.

60. Following Ms. Taylor's constructive discharge, she used only publicly-available information to contact her clients, ***solely*** for the limited purpose of informing those clients that she was no longer affiliated with Fidelity (as expressly authorized by law, and consistent with the practice of countless departing Financial Consultants before her who left Fidelity for competing financial services firms).

61. When contacting her clients, Ms. Taylor was careful to avoid engaging in any type of conduct that could be construed as a "solicitation" or "inducement" of the client. Instead, she and her administrative assistant at Fairhaven each utilized a short and carefully worded "announcement script," by which they conveyed ***only*** the following information: (a) that, as of March 6, 2020, Ms. Taylor was no longer affiliated with Fidelity; and (b) that Ms. Taylor was now affiliated with Fairhaven. That was the entire sum and substance of the information that Ms. Taylor

and her Fairhaven assistant provided to the former clients.   Once that information was provided, Ms. Taylor (and/or her Fairhaven assistant) either: (i) answered any follow-up questions posed by the client, or (ii) if the client had no follow-up questions, they terminated the call.

62.     Ms. Taylor has ***never*** solicited, attempted to solicit, induced, or encouraged any Fidelity clients to transfer or divert accounts or assets to Fairhaven, open new accounts at Fairhaven, or cease or curtail their business relationship with Fidelity  in any respect.

63.     Marshall, in his capacity as Ms. Taylor's supervisor, took repeated and continuing employment actions against her which were unfounded and detrimental to her career.   Those actions included unjustifiably issuing formal written warnings to Ms. Taylor, unjustifiably scrutinizing Ms. Taylor's performance and comparing same to unwritten and ambiguous metrics, despite her performance meeting Fidelity's goals and being exceptional compared to her peers.

64.     Despite the foregoing bad acts, Ms. Taylor remained employed with Fidelity and contemporaneously sought redress by: (a) objecting to Marshall's egregious conduct; (b) reporting Marshall's discriminatory conduct and workplace harassment to Fidelity's management; and (c) requesting that any meetings with Marshall and Taylor be supervised and/or monitored.

65.     Although Ms. Taylor sought redress from Marshall's discriminatory and harassing conduct, Marshall's behavior was not addressed, corrected, or reformed, and he continued to discriminate against and harass her.

66.     Fidelity had a reasonable opportunity to address this unlawful discrimination and harassment, but refused to do so.

67.     Through his unlawful discrimination and harassment, Marshall (and, through him, Fidelity) ultimately made Ms. Taylor's working conditions so intolerable that a reasonable person would be forced to resign.

68.     In addition, Marshall – through the foregoing bad acts, threats, and unlawful conduct – acted in a manner that communicated to Ms. Taylor that her termination was both inevitable and imminent, and that she would have been terminated by Fidelity on March 10, 2020. Accordingly, Ms. Taylor was constructively discharged from Fidelity on March 6, 2020.

69.     Marshall's outrageous discriminatory and harassing conduct was purposefully designed to create a working environment that would be intolerable and unbearable for Ms. Taylor, thereby forcing her to quit.

70.     One of the primary reasons Marshall wanted to force Ms. Taylor (an experienced financial advisor with a large book of business) to quit was to transfer her client accounts to younger financial advisors, who would then engage in "gaming" transactions to artificially inflate the "new revenue" production metrics of the Oak Brook office, thereby increasing his own incentive compensation as the Oak Brook branch manager.

71.     Marshall's purposeful misconduct was unlawful, in direct violation of Illinois law and public policy, and constitutes wrongful termination as a matter of law.

72.     As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's unlawful constructive discharge and wrongful termination.

### FIRST AFFIRMATIVE DEFENSE
#### WAIVER AND ESTOPPEL

73.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 73.

74.     As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation

expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's unlawful constructive discharge and wrongful termination.

75.     Plaintiff is barred by the doctrines of waiver and estoppel from pursuing claims against Taylor, when Plaintiff's former employees (each of whom signed the same post-employment restrictive covenants that Plaintiff seeks to enforce against Taylor) have habitually and openly engaged in the same conduct allegedly engaged in by Taylor – with Plaintiff's full knowledge and consent – but Plaintiff has never sought to enforce its restrictive covenants or otherwise pursued legal action against those employees.

**SECOND AFFIRMATIVE DEFENSE**
**FIRST BREACH**

76.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 76.

77.     Plaintiff is barred from recovering any damages, and any failure of performance by Defendant is excused, pursuant to the doctrine of first breach.

**THIRD AFFIRMATIVE DEFENSE**
**PROMISSORY ESTOPPEL**

78.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 78.

79.     Defendant provides its financial consultants, including Taylor, with assurances that upon her departure, it would advise her clients of her updated contact information.

80.     Taylor relied on Defendant's assurances in this regard, but Defendant has failed to provide the information to Taylor's clients.

81.     Defendant is therefore precluded due to the doctrine of promissory estoppel from pursuing claims against Taylor based upon her contact with clients to discuss those issues.

### FOURTH AFFIRMATIVE DEFENSE
### PLAINTIFF'S CONDUCT BARS ITS CLAIMS

82.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 82.

83.     Plaintiff's Complaint is barred, in whole or in part, by the doctrines of waiver, laches, estoppel and ratification.

### FIFTH AFFIRMATIVE DEFENSE
### UNCLEAN HANDS

84.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 84.

85.     Plaintiff is barred from recovering any damages pursuant to the doctrine of unclean hands.

### SIXTH AFFIRMATIVE DEFENSE
### FAIR COMPETITION

86.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 86.

87.     Taylor cannot be held liable, and Plaintiff's claims must be dismissed, because the conduct alleged is non-actionable under the privilege of fair competition.

### SEVENTH AFFIRMATIVE DEFENSE
### RESTRAINT OF TRADE

88.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 88.

89.     Plaintiff's Complaint must be dismissed because the June 30, 2011 Employee Agreement at issue is an unfair restraint on trade, contrary to public policy, and unenforceable as a matter of law.

### EIGHTH AFFIRMATIVE DEFENSE
### FAILURE TO STATE A CLAIM

90.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 90.

91.     Plaintiff's Complaint should be dismissed, in whole or in part, because Plaintiff has failed to state a claim upon which relief may be granted.

### NINTH AFFIRMATIVE DEFENSE
### CONTRIBUTORY NEGLIGENCE

92.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 92.

93.     To the extent Plaintiff suffered any damages, those purported damages were not proximately caused by Defendant, and instead are a result of Plaintiff's own negligent conduct.

### TENTH AFFIRMATIVE DEFENSE
### SET OFF

94.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 94.

95.     To the extent Plaintiff suffered any damages proximately caused by Defendant (and it did not), then the amount of those damages may only be applied as set-off against the far greater sums of money that Plaintiff owes to Defendant because of its unlawful conduct.

### ELEVENTH AFFIRMATIVE DEFENSE
### NO DAMAGES

96.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 96.

97.     Plaintiff has suffered no damages or injury whatsoever as a result of Taylor's alleged conduct.

## TWELFTH AFFIRMATIVE DEFENSE
### FAILURE TO MITIGATE

98.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 98.

99.     Plaintiff has failed to mitigate any damages it purportedly sustained as a result of the conduct alleged in its Complaint.

## THIRTEENTH AFFIRMATIVE DEFENSE
### DISCHARGE OF DUTIES

100.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 100.

101.     Plaintiff's State of Claim must be dismissed because Defendant performed and discharged all contractual duties owed by her.

## FOURTEENTH AFFIRMATIVE DEFENSE
### NO TRADE SECRETS

102.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 102.

103.     Plaintiff's claim against Taylor for trade secret misappropriation fails as a matter of law because the documents, information, data and materials allegedly at issue do not constitute an enforceable "trade secret" as a matter of law.

## FIFTEENTH AFFIRMATIVE DEFENSE
### NO BREACH

104.     Defendant asserts and incorporates by reference the facts alleged in Paragraphs 1 through 72 of her Affirmative Defenses, inclusive, as and for this Paragraph 104.

105.     Plaintiff's Complaint is barred, in whole or in part, pursuant to the express language of its contractual agreement with Taylor.

### PRESERVATION OF AFFIRMATIVE DEFENSES AND CLAIMS

106.    Defendant expressly reserves her rights to assert any additional defenses as they

become known or available during the pendency of this matter.

107.    Defendant further reserves her right to file counterclaims and third-party claims in

this action, consistent with the exhaustion of administrative remedies, as applicable.

WHEREFORE, Defendant Jennifer Taylor respectfully requests that the Court enter an

Order:

A.    Dismissing Plaintiff's Complaint in its entirety, *with prejudice*;

B.    Denying all relief sought by Plaintiff in its Complaint;

C.    Awarding to Defendant all of her costs and attorneys' fees incurred in connection with this proceeding; and

D.    Awarding to Defendant any such other and further relief as the Court deems just.

Dated: July 10, 2020                    Respectfully submitted,

**JENNIFER TAYLOR, Defendant**

By:  /s/ *Christopher S. Griesmeyer*
          One of Her Attorneys

Christopher S. Griesmeyer (# 6269851)
Zachary Mulcrone (# 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2020, I electronically filed the foregoing *Answer and Affirmative Defenses to Plaintiff's Complaint,* with the Clerk of the Court via the CM/ECF System, which will send notification of such filing to those registered to receive electronic notices via email transmission, including Plaintiff's counsel listed below:

Joel W. Rice
Franklin Z. Wolf
FISHER & PHILLIPS, LLC
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
jrice@fisherphillips.com
fwolf@fisherphillips.com

Susan M. Guerette
FISHER & PHILLIPS, LLC
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
sguerette@fisherphillips.com

*/s/ Christopher S. Griesmeyer*
Christopher S. Griesmeyer (# 6269851)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Bus: (312) 428-2750
Fax: (312) 332-2781
cgriesmeyer@grglegal.com