**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-2133 |
| | ) | |
| JENNIFER TAYLOR, FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| JENNIFER TAYLOR, FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**FAIRHAVEN WEALTH MANAGEMENT, LLC'S
COUNTERCLAIM, ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFF'S AMENDED COMPLAINT**

Defendant/Counter-Plaintiff Fairhaven Wealth Management, LLC ("Fairhaven" or the "Company"), by and through its undersigned counsel, for its Counterclaim against Plaintiff/Counter-Defendant Fidelity Brokerage Service, LLC ("Fidelity"), and for its Answer and Affirmative Defenses to Fidelity's Amended Complaint (Dkt. No. 61), states as follows:

**COUNTERCLAIM**

Fairhaven, for its Counterclaim against Fidelity, alleges as follows:

**NATURE OF THE CASE**

1.      Fidelity has, *inter alia*, breached its fiduciary duties, tortiously interfered with, and unfairly competed against one of its own institutional clients (Fairhaven).

2.     Fairhaven, a small registered investment advisor ("RIA"), has had a long and fruitful relationship with Fidelity.  Indeed, Fidelity serves as the custodian for all of Fairhaven's client accounts.

3.     Earlier this year, Co-Defendant Jennifer Taylor ("Taylor") joined Fairhaven after Fidelity discriminated against her on the basis of her sex and age, retaliated against her, and constructively discharged her.  Fidelity continued its campaign of retaliation against Ms. Taylor even after her termination and, unfortunately, has now roped Fairhaven into it.

4.     After joining Fairhaven, Ms. Taylor learned that Fidelity was refusing to provide her contact information to former clients who asked for it.  This violated both Fidelity's internal policies and FINRA rules.  Fidelity was required to provide this information, yet it refused to do so because of the discriminatory animus it holds toward Ms. Taylor.

5.     Fidelity's refusal to provide Ms. Taylor's contact information upon request posed a significant risk to Ms. Taylor's professional reputation and to the economic welfare of the clients to whom she owed fiduciary duties (especially considering the need for those clients to speak to their trusted financial advisor during the chaotic markets and economic crisis of this past spring).

6.     At Fairhaven, Ms. Taylor called several of her former clients to announce her departure from Fidelity.  During these calls, Ms. Taylor conveyed only the following information: (a) that, as of March 6, 2020, she was no longer affiliated with Fidelity; and (b) that she was now affiliated with Fairhaven.  Once that information was provided, Ms. Taylor either: (i) answered any follow-up questions posed by the client, or (ii) if the client had no follow-up questions, terminated the call.

7.     Ms. Taylor made the calls using a list that she created after she left Fidelity, based upon her recollection of generalized information that she remembered (but did not "memorize" or

"commit to memory") by virtue of her 25+ year relationship with her clients. The list contained no "Fidelity" information, and she did not use any Fidelity resources to create the list. The list was comprised of the names, and corresponding states of residence, of approximately 20% of Ms. Taylor's clients at Fidelity – many of whom Ms. Taylor had been working with for upwards of 25 years. Ms. Taylor then used public sources to identify the contact information for those individuals.

8.      At all times, Ms. Taylor scrupulously complied with the duties she owed to Fidelity. Indeed, Fairhaven required Ms. Taylor to do so as a condition of her employment.

9.      Nevertheless, in April 2020, Fidelity sued Ms. Taylor, alleging breaches of Ms. Taylor's non-solicitation agreement (despite that announcement phone calls do not constitute improper solicitation) and the misappropriation of trade secret information (despite that Ms. Taylor's knowledge of the names of certain clients she serviced for decades is not a trade secret).

10.      Perhaps recognizing that it is unlikely to obtain a preliminary injunction on the merits, Fidelity began attempting to extort Fairhaven into requiring Ms. Taylor to voluntarily enter into a stipulated injunction. More specifically, Fidelity threatened that if Ms. Taylor refused to entered into a stipulated injunction, Fidelity would (i) sue Fairhaven, (ii) kick Fairhaven off of Fidelity's investment platform, and (iii) cease doing business with Fairhaven.

11.      Because Ms. Taylor has done nothing wrong, and because there is no valid basis for the entry of an injunction, Ms. Taylor refused to agree to a stipulated injunction.

12.      On November 4, 2020, Fidelity followed through on its threats. Fidelity sued Fairhaven and informed Fairhaven that it was terminating their business relationship, that it was kicking Fairhaven off of its investment platform, and that it planned to try and convert Fairhaven clients to Fidelity clients.

13.     Fidelity's actions are not merely a continuation of the retaliation Ms. Taylor faced at Fidelity, but further retaliation for Ms. Taylor having filed an EEOC charge against Fidelity after her separation of employment.

14.     Fidelity's bad faith conduct is actionable.  Fidelity's threats and eventual action against Ms. Taylor and Fairhaven constitute tortious interference and unfair competition.  (Count I).  Fidelity's refusal to inform its clients of Ms. Taylor's contact information also violates both the Consumer Fraud and Deceptive Business Practices Act and the Uniform Deceptive Trade Practices Act.  (Counts II & III).  In addition, by kicking Fairhaven off its investment platform and refusing to do business with Fairhaven, Fidelity breached the contractual arrangement between it and Fairhaven.  (Count IV).  Further, by using the accounts Fairhaven entrusted to Fidelity as leverage in a dispute with a former employee, and by using that client information to solicit Fairhaven's clients, Fidelity has breached its fiduciary duties to Fairhaven.  (Count V).  And, finally, to the extent that there is no remedy at law for Fidelity's improper conduct, Fidelity has been unjustly enriched.  (Count VI).

## THE PARTIES

15.     Fairhaven is a small registered investment advisor located in Wheaton, Illinois.

16.     Fidelity is a Delaware limited liability company that provides financial brokerage services.

17.     Ms. Taylor is a financial advisor with Fairhaven.  She is domiciled in, and a citizen of, Illinois.

## JURISDICTION

18.     Fairhaven's counterclaims are compulsory counterclaims under the Federal Rules of Civil Procedure because they arise out of the transaction or occurrence that is the subject matter

4

of Fidelity's Amended Complaint, and they do not require adding another party over whom the Court cannot acquire jurisdiction.

19.     The Court has diversity jurisdiction over Fairhaven's counterclaims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because the controversy is between citizens of different states.

**FACTUAL BACKGROUND**

**A.     Fairhaven's Relationship with Fidelity**

20.     Fairhaven is an independent, privately owned investment and wealth management firm serving select families and small to mid-sized businesses.

21.     The U.S. Securities and Exchange Commission requires RIAs like Fairhaven to use a "qualified custodian" like a bank or a registered broker-dealer to hold client assets. Thus, Fairhaven does not (and cannot) hold any client accounts or assets; rather, the clients maintain accounts at broker-dealers (such as Fidelity), and the advisor at Fairhaven is given discretionary authority by the client to manage that account on the client's behalf.

22.     Fairhaven's relationship with Fidelity began in early 2015.

23.     On or about January 13, 2015, Fairhaven and Fidelity entered into an "Investment Advisor Representation and Indemnification Letter" concerning Fidelity's provision of services for Fairhaven.

24.     On or about June 15, 2016, Fairhaven and Fidelity entered into a Support Services Agreement, by which Fidelity agreed to provide Fairhaven with certain services "intended to support [Fairhaven] in conducting its business and serving the best interests of its clients."

25.     Fairhaven and Fidelity entered into a series of additional contracts and agreements regarding Fidelity's custodial relationship, Fidelity' provision of compliance and clearinghouse

services, and Fairhaven's access to Fidelity's investment platform (Fairhaven will refer to these, collectively, as the "Custody Agreement").

26.     For several years, Fairhaven and Fidelity had a close-knit and fruitful relationship. Indeed, just last year, Fidelity's Midwest IWS Relationship Management Team named Fairhaven as the number one destination firm for advisors joining Fidelity, and those looking for a succession/continuity partner.

27.     Fidelity soured on this relationship, however, when Ms. Taylor joined Fairhaven in 2020.

### B.     Ms. Taylor's Career with Fidelity

28.     Before Fairhaven, Ms. Taylor was employed by Fidelity for 25 years, until she was constructively discharged on March 6, 2020.

29.     Ms. Taylor first became interested in working at Fidelity through her participation in Fidelity's co-op program while she was attending college at Louisiana State University. That was in the year 1994.

30.     After that first indication of interest, Ms. Taylor finished her college education with her sights on working in the financial sector and, more specifically, working for Fidelity. The Company's reputation in the industry and the supportive culture she had experienced first-hand while in the co-op program are what fueled Ms. Taylor's passion and desire to assimilate into Fidelity, and she knew she would be able to grow her career and achieve success in the financial services industry.

31.     Ms. Taylor worked her way up from a Customer Service representative for Fidelity in 1995, where she greeted customers upon entry and handled service and operations requests, to becoming an Associate Representative ("Junior Consultant") in Fidelity's Oak Brook

office in 1997, to being promoted to a Financial Consultant in December of 1998, where she worked tirelessly on behalf of her clients and enjoyed a successful and rewarding career, until she was constructively discharged on March 6, 2020.

32.     Over the course of her 25-year career with Fidelity, Ms. Taylor had many supervisors who recognized her passion and ability, and the fact that she took pride in her work. Ms. Taylor was a high-performing and high-achieving Financial Consultant, and her clients maintained deep and personal relationships with her as their personal financial advisor.

33.     As Ms. Taylor's book of business grew throughout her career, her work generated large profits for Fidelity, and also translated into her individual success as a Financial Consultant with Fidelity.  Ms. Taylor's managers and colleagues recognized that she was, by all accounts, an asset to Fidelity.

34.     Unfortunately, Ms. Taylor's most recent manager, Mr. Marshall (who began supervising Ms. Taylor when he was appointed Branch Manager of Fidelity's Oak Brook office on or about August 10, 2018), immediately took issue with Ms. Taylor – not because of her performance (which was high by Fidelity's own metrics, and far outpaced her peers), but because she was a female over the age of 40.

### C.     Fidelity's Goals and Activity Metrics

35.     The most important performance metrics to Fidelity are: (a) "Tier 3" production, which concerns revenue on managed accounts, managed account referrals, and annuities; and (b) asset "Flows," which measure the amount of money coming into Fidelity versus the amount of money leaving the Company.

36.     During Marshall's tenure as Branch Manager, Ms. Taylor generated approximately $140 million of Tier 3 revenue.  Specifically, Ms. Taylor's Tier 3 production was:

    a.   Approximately double her sales goal;

    b.   $40 million above the approximate $100 million average for Vice Presidents in Fidelity's Central South Region;

    c.   $45 million above the approximate $95 million average for Vice Presidents throughout the country;

    d.   $25 million more than the next highest producing Financial Consultant in the Oak Brook office;

    e.   $70 million above the average for all financial advisors in Fidelity's Central South Region; and

    f.   In the top 10th percentile (beating 90% of her peers) of the approximate 200 Vice Presidents in Fidelity's entire Central South Region.

37.    During this same time period, Ms. Taylor also generated more than $115 million of net "Flow." Specifically, Ms. Taylor's net asset flow was:

    a.   More than 11% greater than her sales goal;

    b.   Nearly $10 million greater than the approximate $107 million average for Vice Presidents in Fidelity's Central South Region;

    c.   More than $5 million greater than the approximate $110 million average for Vice Presidents throughout the country; and

    d.   In the top 37th percentile (beating 63% of her peers) of Vice Presidents in Fidelity's entire Central South Region.

38.    As for Fidelity's other performance metrics, Ms. Taylor once again far exceeded Fidelity's expectations. Ms. Taylor's client transfer ratio was more than double Fidelity's goal, and her average client appointments per week (20, as compared to the goal of 15) placed her in the top 5th percentile (beating 95% of her peers) of Vice Presidents in Fidelity's entire Central South Region. In order to achieve this performance metric, Ms. Taylor utilized Fidelity's Microsoft Outlook calendar to schedule regular client appointments far in advance, and would accommodate the client's requests to meet both telephonically and at locations of the client's choosing.

8

39.     In short, over the course of Marshall's tenure as Branch Manager, Ms. Taylor was the longest-tenured, most senior, and highest producing Financial Consultant in the Oak Brook branch, and her performance far exceeded Fidelity's stated goals and activity metrics, as well as the performance of the vast majority of her peers.

D.      **Fidelity's Unlawful Discrimination, Harassment and Retaliation**

40.     During his tenure as Branch Manager, and despite the foregoing, Marshall displayed unusual personal animosity toward Ms. Taylor.  In every one-on-one interaction with Ms. Taylor, Marshall was aggressive and demeaning because of Ms. Taylor's age and gender. Over time, Marshall's aggression toward Ms. Taylor increased.

41.     Marshall's discriminatory animus manifested itself in the form of increasingly severe and frequent verbal and written warnings concerning Ms. Taylor's job performance, despite the fact that Ms. Taylor was a consistently high performing Financial Consultant (and among the highest performing Financial Consultants in Fidelity's entire Central South Region).

42.     Marshall, in his capacity as Ms. Taylor's supervisor, took repeated and continuing employment actions against her which were unfounded and detrimental to her career.  Those actions included unjustifiably issuing formal written warnings to Ms. Taylor, unjustifiably scrutinizing Ms. Taylor's performance and comparing same to unwritten and ambiguous metrics, despite her performance meeting Fidelity's goals and being exceptional compared to her peers.

43.     For example, on August 19, 2019, Marshall issued Ms. Taylor a written 60-day warning concerning her job performance.  (A true and correct copy of the August 19, 2019 warning is attached hereto as **Exhibit 1**).  In this written warning, Marshall asserted that Ms. Taylor's "contribution to business results is significantly lagging others in your position."

44.     Nothing could be further from the truth:  Ms. Taylor had been awarded the annual Fidelity "achiever bonus" in recognition of her 2018 performance and, at the time Marshall issued the August 19, 2019 written warning, was on track to reach another "achiever bonus" for her performance in 2019.  When Ms. Taylor raised this discrepancy with Marshall, Marshall offered no legitimate explanation.  Instead, Marshall sharply rebuked Ms. Taylor.

45.     The written warning required biweekly meetings between Marshall and Ms. Taylor through the 60-day period.  Because Marshall harbored discriminatory animosity toward Ms. Taylor (as evidenced by his aggressive attitude and demeaning comments towards her, and because his unfair written warning was mere pretext for discrimination on account of her age and gender), Ms. Taylor complained to Fidelity's management personnel and requested the presence of her operations manager during every biweekly one-on-one meeting that was to be held with Marshall going forward.

46.     Thus, despite the foregoing malicious acts by her supervisor, Ms. Taylor remained employed with Fidelity and contemporaneously sought redress by: (a) objecting to Marshall's egregious conduct; (b) reporting Marshall's discriminatory conduct and workplace harassment to Fidelity's management; and (c) requesting that any meetings with Marshall and Taylor be supervised and/or monitored.

47.     Fidelity's management acknowledged her complaint, and allowed the operations manager to sit in on Marshall's meetings with Taylor.

48.     Fidelity had a reasonable opportunity to address Marshall's unlawful discrimination and harassment; ultimately, however, Marshall's behavior was not addressed, corrected, or reformed, and he continued to harass, discriminate, and retaliate against her.

10

49.    Although Ms. Taylor performed satisfactorily during the 60-day period following the August 19, 2019 written warning (indeed, her performance continued to far outpace her peers), Marshall unlawfully retaliated against Ms. Taylor for complaining about his conduct by increasing his unlawful discrimination and harassment against her in an effort to force her out of the Company.

50.    Approximately two weeks after the 60-day warning period lapsed, Marshall escalated his efforts and issued Ms. Taylor **another** written 60-day warning, this time titled a "final performance warning."  (A true and correct copy of the November 4, 2019 written warning is attached hereto as **Exhibit 2**).

51.    At the time Marshall issued the November 4, 2019 written warning, Ms. Taylor's performance was not lagging. Indeed, Ms. Taylor was on track to reach another "achiever bonus" for her performance in 2019, and her performance continued to far outpace her peers.  Despite this, Marshall intimated that he would likely terminate Ms. Taylor on January 6, 2020, at the end of the 60-day warning period.

52.    Ms. Taylor confronted Marshall about his threat and asked him whether he planned to terminate her for alleged performance reasons, even if she continued to exceed Fidelity's production and performance goals and metrics.  Marshall responded by ominously telling Ms. Taylor, "I can terminate you at any time, for any reason."

53.    During this second written warning period, several financial representatives in the Oak Brook branch expressed concern to Ms. Taylor – completely unprompted by her – that Marshall was treating Ms. Taylor "differently" and "less favorably" than other Financial Consultants who were male and/or younger than her.

54.     In fact, in late 2019, the Oak Brook operations manager – who had sat in on each of the one-on-one biweekly performance meetings between Marshall and Ms. Taylor during the 60-day warning period – told Ms. Taylor that she did not understand why Marshall was issuing warnings to Ms. Taylor about her performance.  This conversation, too, was unprompted by Ms. Taylor.

55.     Ms. Taylor successfully navigated the second 60-day written warning period, had a very strong fourth quarter 2019 production, and finished the 2019 calendar year as the highest producing Financial Consultant in the Oak Brook branch and in the Chicago region.  Once again, Ms. Taylor's performance far exceeded Fidelity's stated goals and activity metrics, as well as the performance of the vast majority of her peers – including Financial Consultants who were male and/or younger than her.

56.     Because Ms. Taylor far exceeded Fidelity's stated goals and the performance of her peers, Marshall could not – without raising eyebrows – terminate Ms. Taylor on January 6, 2020, as he had planned.  Instead, on January 9, 2020, Marshall unilaterally "extended" his final written warning by 60 days and made it clear to Ms. Taylor that he would terminate her employment on March 10, 2020.

57.     Specifically, Ms. Taylor inquired for a third time about the discrepancy between receiving a written warning for her alleged deficient performance, on the one hand, and her actual performance, on the other hand, and asked Marshall whether the "final written warnings" would ever end.  Marshall responded, ominously, by reading verbatim the following text on her written warning: "you may be subject to dismissal without any additional corrective action process."

58. After a branch meeting in January of 2020, one representative confided to Ms. Taylor that "it's been made clear to most of the branch that some people are looked at less favorably by management than others, and without much explanation."

59. Because Marshall's final written warning "extension" and ominous verbal statements did not reflect Ms. Taylor's actual job performance, and in light of Marshall's response to her inquiry as well as the information that had been conveyed to her by other representatives, Ms. Taylor knew that she would be terminated because of her age and gender (and in retaliation for her complaints about workplace harassment and discrimination), effective March 10, 2020.

60. Marshall – through the foregoing bad acts, threats, and unlawful conduct – acted with malice and in a manner that communicated to Ms. Taylor that her termination was both inevitable and imminent, and that she would have been terminated by Fidelity on March 10, 2020. Accordingly, Ms. Taylor was constructively discharged from Fidelity on March 6, 2020.

**E.** **Fidelity's Incentive to Unlawfully Discriminate**

61. While having a long-tenured and high producing Financial Consultant is good for Fidelity, it is not necessarily good for an individual branch.

62. Although Ms. Taylor was a top producer for Fidelity, her senior status also carried the highest salary component in the Oak Brook branch.

63. When a Financial Consultant departs, Fidelity assigns new Financial Consultants to the client accounts that were previously handled by the departing Financial Consultant. In the case of termination of the longest-tenured Financial Consultant in the branch, those accounts (axiomatically) will be assigned to less-tenured – and less costly – Financial Consultants. In this way, Fidelity, and an individual branch in particular, can absorb the cost of servicing client accounts without increasing its bottom-line expense.

13

64.     In addition, when a long-tenured Financial Consultant is terminated, the branch has an incentive to "game the system" by routinely changing Tier 3 client accounts to other Tier 3 solutions over time after the departure of the Financial Consultant.  While not necessarily an advantage to Fidelity, the advantage to the particular branch manager is that Tier 3 solutions are measured as gross production, so any new Tier 3 business will count toward branch production, even if it was by converting a portion of an already Fidelity advisory managed Tier 3 solution into different Tier 3 solution at Fidelity.

65.     Any time a long-tenured Financial Consultant's employment is terminated, the branch recognizes a short term "lift" in branch production numbers that are artificially inflated by "gaming" transactions.  This is a common practice at Fidelity's Oak Brook branch, and is encouraged and directed by branch management, including Marshall.

66.     Thus, branch managers can improve the branch's performance metrics – and be handsomely rewarded for doing so – by "managing out" older, more expensive, Financial Consultants, and replacing them with younger, less expensive Financial Consultants, who are guided to creatively game client accounts upon being assigned to them.

67.     Given Ms. Taylor's status as the longest-tenured and highest producing Financial Consultant in the Oak Brook office, Marshall knew that he could improve the branch's numbers (and his own performance-based compensation) significantly by eliminating Ms. Taylor's employment and replacing her with a younger (and cheaper) financial advisor.  Marshall therefore embarked upon his Company-sponsored campaign to accomplish precisely that objective.

68.     Fidelity's Market Leader, Bill Meyers, approved of, acquiesced in, and ratified Marshall's unlawful discrimination so the Oak Brook branch could "game" client accounts to artificially inflate production numbers.

14

**F.** **Fidelity Retaliates, Constructively Discharges Ms. Taylor from Fidelity, and Continues Retaliatory Conduct After Ms. Taylor's Constructive Discharge**

69.     On March 6, 2020, after enduring over a year of discrimination, harassment and retaliation without any recourse, and immediately before her inevitable and impending termination by Marshall, Ms. Taylor was constructively discharged from Fidelity and accepted a position as a financial advisor with Fairhaven.

70.     When Ms. Taylor met with Marshall and the Oak Brook operations manager on March 6, 2020, she reminded Marshall that Fidelity was required to provide her contact information to any former clients who requested it, and left her cell phone number with Fidelity. Indeed,  providing a departing Financial Consultant's new contact information to a client upon request is not only Fidelity's practice, it is also *required* by the Company's internal compliance procedures and FINRA Regulatory Notice 19-10 (regarding customer communications related to departing registered representatives).

71.     Subsequent to Ms. Taylor's constructive discharge, however, she received calls from several of her clients – including "A.G.," "J.L.," "J.G.," "M.G.," and "A.S." – who informed her that Fidelity had refused to provide them with her contact information despite their requests.

72.     In addition, on March 16, 2020, Fidelity employee Andy Moreau informed client "J.C." that he was "not sure where/what Jennifer is doing." On March 17, 2020, Fidelity employee Douglas Phillips informed client "R.G." that he "did not know where [Ms. Taylor] went"; the client was "disappointed" that Mr. Phillips did not know. On April 21, 2020, client "L.Z." asked Mr. Moreau if he knew anything about Ms. Taylor's departure and Mr. Moreau "let her know [he] believe[d] she may have stayed in the industry, but [was] not sure about why or where she went."

73.     These representations were false. Fidelity knew Ms. Taylor's contact information, as she provided it to Fidelity in her termination letter expressly for this purpose. Fidelity also knew

15

that Ms. Taylor had joined Fairhaven, as Fidelity copied Fairhaven on a March 20, 2020 letter to Ms. Taylor.

74.     Fidelity has undertaken a malicious effort to continue retaliating against Ms. Taylor in order to harm her professional reputation by refusing to provide her contact information to the clients who have requested it.  More specifically, Fidelity refused to provide Ms. Taylor's contact information to clients in retaliation for (i) Ms. Taylor having complained about Mr. Marshall's sex and age discrimination and retaliation, (ii) Ms. Taylor's then-anticipated EEOC charge of discrimination concerning Fidelity's Title VII violations, and/or (iii) Ms. Taylor having cross-filed her Charge of Discrimination against Fidelity with the EEOC and IDHR.  Fidelity's conduct in this regard violates the Company's own compliance policies and requirements (to say nothing of Title VII, ADEA, and the IHRA), and is malicious and intentional.

75.     In addition to the foregoing, Fidelity has acted with malice and further retaliated against Ms. Taylor by:  (a) filing this lawsuit against Ms. Taylor, even though she has not breached any obligation owed to Fidelity, and even though other financial advisors (male, younger) who have left the Oak Brook office actually breached their contractual obligations to Fidelity and Fidelity took no action (legal or otherwise) against them; and (b) interfering with her employment with Fairhaven in retaliation for Ms. Taylor's cross-filing her Charge of Discrimination with the EEOC and IDHR, causing strain on her employment relationship and emotional distress to Ms. Taylor.

### G.     <u>Fidelity's Course of Dealing With Past Departing Financial Consultants</u>

76.     During her near 25-year career with Fidelity, Ms. Taylor has witnessed dozens of Financial Consultants leave Fidelity to join other financial services firms (both competitive

institutional brokerage firms, such as Edward Jones or Wells Fargo, as well as independent registered independent advisory firms, such as Fairhaven).

77.     Fidelity has as a matter of course permitted those departing Financial Consultants to contact their former clients to: (a) announce their departure from the Company, and (b) provide their new contact information.  Each of those departing Financial Consultants had signed the same post-employment "non-solicit" covenants that the Company required of Ms. Taylor; yet, Fidelity never filed a lawsuit or pursued legal action against them.

78.     Between 2005 and 2018, for instance, at least four male Vice Presidents left Fidelity's Oak Brook office to join other financial services firms.  Each had a book of business similar in size to, or larger than, Ms. Taylor's.  After departing Fidelity, each of these four males called former clients – during the one-year non-solicit period – to announce the job change and to provide new contact information.  Large client assets (more significant than those at issue here) followed these Vice Presidents to their new firms.  Fidelity was aware of all this activity, yet it did not file any legal action against any of the four male Vice Presidents.

**H.      Ms. Taylor Retained No Fidelity "Confidential Information" or "Trade Secrets" after Her Constructive Discharge**

79.     At no time prior to Ms. Taylor's constructive discharge from Fidelity did she inform anyone – including her colleagues and clients – that she would be leaving Fidelity or that she had intended to accept a new position with Fairhaven.

80.     When Ms. Taylor's employment with Fidelity ended, Ms. Taylor did not take any Fidelity documents, files, data or information with her.

81.     At no time prior to or subsequent to Ms. Taylor's constructive discharge from Fidelity did she take, remove, misappropriate, transmit, convey, use, or disclose originals or copies of any of the Company's confidential information (including, but not limited to, trade secrets;

secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products) or any other Fidelity documents containing or relating to the names, addresses, phone numbers, social security numbers, transactions, accounts, or financial information of the customers Ms. Taylor serviced at Fidelity. Her access to and use of such information was strictly limited to the work she performed during her employment at Fidelity, in the ordinary course of Company business, and solely for Fidelity's benefit.

82.     Since Ms. Taylor's discharge from Fidelity, she has not been in possession of, or had any access to, any of Fidelity's documents, files, information, materials or data (or any copies thereof). Ms. Taylor does not have in her possession, custody or control the original or copies of any information, materials, documents, files or data containing, reflecting, or referring to any of Fidelity's confidential proprietary, client, or trade secret data or information.

83.     After leaving Fidelity, Ms. Taylor created a list of **<u>some</u>** of her most long-standing relationships – people she has known for 25+ years. Given Ms. Taylor's general, non-specialized knowledge, and the fact that she associated with these people so frequently and for such a long period of time, she naturally remembered (but did not "memorize" or "commit to memory") their names, state of residence, and some of their phone numbers (other phone numbers were obtained through publicly available sources).

84.     Following Ms. Taylor's constructive discharge, she used only publicly-available information to contact her clients, *solely* for the limited purpose of informing those clients that she was no longer affiliated with Fidelity (as expressly authorized by law, and consistent with the practice of countless departing Financial Consultants before her who left Fidelity for competing financial services firms).

85.     When contacting her clients, Ms. Taylor was careful to avoid engaging in any type of conduct that could be construed as a "solicitation" or "inducement" of the client.  Instead, utilized a short and carefully worded "announcement script," by which she conveyed *only* the following information:  (a) that, as of March 6, 2020, Ms. Taylor was no longer affiliated with Fidelity; and (b) that Ms. Taylor was now affiliated with Fairhaven.  That was the entire sum and substance of the information that Ms. Taylor provided to her former clients.  Once that information was provided, Ms. Taylor either: (i) answered any follow-up questions posed by the client, or (ii) if the client had no follow-up questions, she terminated the call.

86.     Ms. Taylor has *never* solicited, attempted to solicit, induced, or encouraged any clients, former clients, or prospective clients of Fidelity to transfer or divert accounts or assets to Fairhaven, open new accounts at Fairhaven, or cease or curtail their business relationship with Fidelity in any respect.

I.      **Fidelity Continues to Retaliate Against Ms. Taylor and Interferes with Ms. Taylor's Employment Relationship, Business Expectancy/Economic Advantage, and Business and Contractual Relations**

87.     Despite the foregoing, Fidelity filed this lawsuit, and sought and obtained "expedited discovery" from Ms. Taylor relating to its allegations that Ms. Taylor "solicited" her former clients at Fidelity.

88.     On June 2, 2020, Ms. Taylor fully responded and produced documents responsive to Fidelity's First Set of Requests for Production pursuant to Fed. R. Civ. P. 34, none of which established or even supported that Ms. Taylor violated her employment agreement with Fidelity in any respect.

89.     To the contrary, and consistent with her production of documents, Ms. Taylor has repeatedly maintained that she has not solicited, attempted to solicit, induced, or encouraged any clients, former clients, or prospective clients of Fidelity to transfer or divert accounts or assets to Fairhaven, to open new accounts at Fairhaven, or to cease or otherwise curtail their business relationship with Fidelity in any respect.

90.     Ms. Taylor has, however, worked to develop substantial new client relationships and accounts while employed with Fairhaven.  Following her arrival at Fairhaven, Ms. Taylor has contracted to provide financial advisory services with clients, including new clients, while employed with Fairhaven.

91.     As part of its business model, Fidelity provides clearing, custody, trading, technology, and practice management consulting to banks, broker-dealers, family offices, and registered investment advisors.

92.     Fairhaven utilizes the Fidelity platform for certain client account custody solutions and services, and compensates Fidelity for providing such solutions and services.

93.     One of the reasons Ms. Taylor joined Fairhaven (after being constructively discharged from Fidelity), as opposed to another registered investment advisory firm, was because Fairhaven maintained a custodial relationship with Fidelity, whereby Fairhaven utilizes the Fidelity platform and Fidelity provides certain client account custody services to Fairhaven's clients for the benefit of Fairhaven, Fairhaven's financial advisors, and Fairhaven's clients.

94.     Having worked for Fidelity for 25 years, Ms. Taylor is familiar with and knowledgeable about the Fidelity platform, and Fairhaven's custodial relationship with Fidelity is an important piece of Ms. Taylor's continuing success and ability to make a living.

95.     All of Fairhaven's client accounts, including the accounts for all of Ms. Taylor's clients, are custodied at Fidelity and utilize the Fidelity platform.

96.     As an active financial advisor for Fairhaven, Ms. Taylor has a reasonable expectation of entering into new client relationships, which includes opening new client accounts, having such accounts custodied on the Fidelity platform, and utilizing the Fidelity platform for all of the custody solutions and services provided for by such platform.

97.     Fidelity knows that Fairhaven, and thus Ms. Taylor, utilize the Fidelity platform for certain client account custody solutions and services, and that Ms. Taylor expects to be able to maintain her client accounts and custody those accounts on the Fidelity platform.

98.     Fidelity knows that Fairhaven, and thus Ms. Taylor, utilize the Fidelity platform for certain client account custody solutions and services, and that Ms. Taylor expects to be able to open new client accounts and custody those accounts on the Fidelity platform.

99.     Fidelity has taken purposeful, direct action to interfere with Ms. Taylor's employment relationship, as well as her business expectancy and relations with Fairhaven and with Ms. Taylor's clients, as further described below

**J.      Fidelity's Extortion of Fairhaven**

100.    During the course of this lawsuit, Fidelity attempted to extort Fairhaven into requiring Ms. Taylor to voluntarily enter into a stipulated injunction that would prohibit her from contacting any former clients.

21

101.     More specifically, Fidelity threatened to sue Fairhaven, to terminate its relationship with Fairhaven, and to kick Fairhaven off of Fidelity's investment platform if Ms. Taylor did not voluntarily enter into a stipulated injunction prohibiting her from reaching out to her former clients to announce her departure from Fidelity.

102.     Because Ms. Taylor has done nothing wrong, and because there is no valid basis for the entry of an injunction, Ms. Taylor refused to agree to a stipulated injunction.

103.     On October 23, 2020, Fairhaven sent a letter to Abigail Johnson, Fidelity's CEO, seeking an amicable business resolution of this dispute.

104.     On November 4, 2020, Dennis Hawley, the Director of Fidelity Clearing & Custody Solutions, responded to that letter on behalf of Ms. Johnson, stating that the parties were "unable to come to an amicable resolution of the matter." (A true and correct copy of this letter is attached hereto as **Exhibit 3**).

105.     The letter continued, informing Fairhaven that Fidelity was to follow through on its threats and terminate its relationship with Fairhaven. Mr. Hawley, on behalf of Ms. Johnson, stated, "given the adversarial nature of recent events, Fidelity has made a business decision to discontinue its relationship with Fairhaven pursuant to the terms of the Investment Advisory and Indemnification Letter between Fidelity and Fairhaven. This business decision will be communicated to Fidelity affiliates with which you may do business."

106.     Fidelity's November 4, 2020 letter also provided a timeline regarding the termination of the relationship. Fidelity stated that, effective November 4, 2020, Fidelity would no longer accept applications for new accounts and, effective January 4, 2021, Fidelity would (i) remove access to accounts, (ii) remove all third-party advisors from Fairhaven's customer

accounts, (iii) no longer accept trading instructions, and (iv) no longer accept power of attorney authorizations.

107.    Fidelity also took it upon itself to "notify all of [Fairhaven's] clients that [Fairhaven's] relationship with Fidelity has been discontinued…."

108.    Incredibly, Fidelity also asserted in the November 4, 2020 letter that it plans to solicit Fairhaven's clients and convert them into Fidelity clients:  "Fidelity … may refer [Fairhaven's clients] to another advisor on the Fidelity platform."

109.    On November 4, 2020, Fidelity further followed through on its threats by suing Fairhaven in this matter.  (Dkt. 61).

110.    Fidelity's bad faith termination of its custodial relationship with Fairhaven is maliciously designed to harm Ms. Taylor's employment relationship with Fairhaven as well as her and Fairhaven's business expectancy and relationship with clients.  Fidelity has propagated its unfounded claims against Ms. Taylor relating to her alleged solicitation of Fidelity's customers and cited Ms. Taylor's alleged conduct as the motivation for Fidelity's bad faith actions.

111.    Fidelity's bad faith termination of its custodial relationship with Fairhaven is maliciously designed to harm Ms. Taylor's and Fairhaven's business relationship and ongoing business expectancy with Ms. Taylor's clients and prospective clients at Fairhaven.

112.    Fidelity's bad faith termination of its custodial relationship with Fairhaven is maliciously designed to convert Ms. Taylor's and Fairhaven's existing clients to Fidelity financial advisors operating on the Fidelity platform.

113.    Fidelity's bad faith refusal to accept applications for new accounts unlawfully interferes with and is maliciously designed to forestall Ms. Taylor's ability to make a living, to harm Ms. Taylor's employment and business expectancy at Fairhaven, to harm Fairhaven's

business interests due to its association with Ms. Taylor, and to provide Fidelity with an unfair advantage in the marketplace.

114.    Fairhaven adopts and incorporates by reference the facts that Ms. Taylor alleges in her Counterclaim.

**COUNT I**

**TORTIOUS INTERFERENCE / UNFAIR COMPETITION**

115.    Fairhaven incorporates by reference Paragraphs 1 through 114 of its Counterclaim.

*Fidelity Prevented Clients From Contacting Ms. Taylor*

116.    Fidelity tortiously interfered with Fairhaven's business, and unfairly competed against Fairhaven, by trying to prevent Ms. Taylor's former clients from contacting her once she became employed at Fairhaven.

117.    After Fidelity constructively discharged Ms. Taylor, several of her former clients called Fidelity seeking her contact information.  Fidelity's internal compliance procedures and FINRA Regulatory Notice 19-10 required Fidelity to provide this information.  Nevertheless, Fidelity refused to do so.

118.    Fidelity's refusal to provide Ms. Taylor's contact information was a continuation of Fidelity's retaliation against Ms. Taylor.

119.    When RIAs hire financial advisors, it is expected that a certain percentage of the new hire's former client base will follow the advisor from firm to firm, without any solicitation on the part of the advisor or the new employer.  Accordingly, by hiring Ms. Taylor, Fairhaven reasonably anticipated that it would enter into valid business relationships with a certain percentage of Ms. Taylor's former client base (without any solicitation on the part of Ms. Taylor or Fairhaven).

120.     Fidelity knew that if it provided Ms. Taylor's contact information to her former clients upon request, more of Ms. Taylor's former clients would have unilaterally reached out to Fairhaven, and more of Ms. Taylor's former clients would have unilaterally transferred to Fairhaven (without any solicitation on the part of Ms. Taylor or Fairhaven).

121.     Accordingly, in refusing to provide Ms. Taylor's contact information to her former clients, Fidelity injured Fairhaven by causing fewer clients to transfer to Fairhaven than otherwise would have.  Fidelity, thus, tortiously interfered with Fairhaven's business expectancy.

*Fidelity Prevented Ms. Taylor from Contacting Clients*

122.     Fidelity also tortiously interfered with Fairhaven's business, and unfairly competed against Fairhaven, by attempting to prevent Ms. Taylor from reaching out to her former clients to inform them of her departure.

123.     On March 20, 2020, Fidelity sent Ms. Taylor a letter threatening to sue her for having "contacted" clients, even though she was not contractually prohibited from <u>contacting</u> anyone.  (A true and correct copy of this letter is attached hereto as **<u>Exhibit 4</u>**).

124.     On April 3, 2020, Fidelity filed the instant lawsuit against Ms. Taylor and a corresponding arbitration before FINRA, alleging that Ms. Taylor having reached out to several of her former clients to announce her departure is somehow wrongful and actionable.

125.     During the course of this lawsuit, Fidelity attempted to extort Fairhaven into requiring Ms. Taylor to voluntarily enter into a stipulated injunction that would prohibit her from contacting any former clients.  More specifically, Fidelity threatened to sue Fairhaven and to kick Fairhaven off of Fidelity's investment platform if Ms. Taylor did not voluntarily enter into a stipulated injunction prohibiting her from reaching out to her former clients to announce her

departure. This was meant both to coerce Fairhaven, and to coerce Ms. Taylor by putting a significant strain on her employment relationship with Fairhaven.

126. On November 4, 2020, Fidelity followed through on its threats and sued Fairhaven in this matter, alleging that *Fairhaven* is liable for Ms. Taylor's allegedly improper solicitation. (Dkt. 61).

127. Each of Fidelity's actions constitutes continued retaliation against Ms. Taylor. Further, each of Fidelity's actions was designed to strain Ms. Taylor's employment relationship with Fairhaven in order to prevent Ms. Taylor from contacting former employees to inform them that she had joined Fairhaven. Fidelity understood that the fewer clients Ms. Taylor informed about her position at Fairhaven, the fewer clients that would unilaterally (*i.e.*, without any solicitation from Ms. Taylor or Fairhaven) transfer their accounts to Fairhaven.

128. Fidelity succeeded, through its improper conduct and threats, in reducing the number of former clients that Ms. Taylor told about her new position. This caused fewer of Ms. Taylor's former clients to transfer their accounts to Fairhaven than otherwise would have.

129. Fidelity's actions also negatively impacted Ms. Taylor's reputation as a diligent financial advisor who is dedicated to the financial well-being of her clients. This, in turn, caused fewer clients to unilaterally (and without solicitation) transfer their accounts to Fairhaven.

130. Fidelity's actions injured Fairhaven by causing fewer of Ms. Taylor's clients to join Fairhaven than otherwise would have. Fidelity, thus, tortiously interfered with Fairhaven's business expectancy.

*Fidelity Impeded Fairhaven's Ability to Serve Its Clients*

131. In addition, Fidelity tortiously interfered with Fairhaven's business, and unfairly competed against Fairhaven, by impeding Fairhaven's ability to serve its clients.

132.     Fidelity's institutional platform uses a technology called Wealthscape, which enables advisors to manage their clients' accounts.  Because all of Fairhaven's clients' accounts are custodied through Fidelity, Fairhaven advisors need Wealthscape to effectively manage their clients' accounts.  Fidelity, however, cut off Ms. Taylor's access to Wealthscape once she joined Fairhaven.  Accordingly, Ms. Taylor was unable to service her existing Fairhaven clients as effectively as she otherwise would have.  This injured Fairhaven by negatively affecting Fairhaven's relationships with the affected clients.

133.     Fidelity further hampered Fairhaven's ability to serve its clients by terminating its business relationship with Fairhaven and kicking Fairhaven off of its investment platform.

134.     On November 4, 2020, following through on its numerous threats, Fidelity sent Fairhaven a letter notifying Fairhaven that it (i) is terminating the business relationship, and (ii) is kicking Fairhaven off the Fidelity investment platform.  This caused several forms of injury to Fairhaven.

135.     Fairhaven (by definition) has business relationships with its current clients.  Fairhaven had a reasonable expectation that its relationships with its current clients would continue into 2021 and beyond.  Fairhaven, further, had an expectation that it would gain additional clients in the future, based on the "network" effect of its current client base.

136.     Clients choose their advisors, in part, based on the seamlessness of the advisory process, and the familiarity of the services offered.  Fairhaven's current clients have been using the Fidelity platform ever since they joined Fairhaven.  Fairhaven has invested significant time and resources ensuring that its clients understand Fidelity's platform and its offerings.  That investment is now worthless.  Further, when Fairhaven is forced to transfer its clients to a different

custodian, this will not only be very costly for Fairhaven, but it will burden Fairhaven's clients to such a degree that many are likely to seek out another RIA.

137.    The transition away from Fidelity will further burden Fairhaven's clients as Fidelity's unilateral January 4, 2021 relationship termination date appears specially chosen to maximize the disruption to Fairhaven's clients, who need to be able to access and issue their 2020 tax reporting documents from Fidelity's platform.

138.    The burden associated with these changes has made and will continue to make Fairhaven's clients less likely to refer their family and friends to Fairhaven.

*Fidelity Plans to Solicit and Convert Fairhaven's Clients*

139.    In its November 4, 2020 letter, Fidelity threatened to solicit Fairhaven's clients and transfer them to Fidelity's advisors.

140.    Fidelity, however, owes Fairhaven fiduciary duties by virtue of Fairhaven having placed its client accounts and client information in Fidelity's custody.

141.    It would be wrong for Fidelity to use the client accounts and client information that Fairhaven entrusted to Fidelity in order to solicit clients away from Fairhaven.

142.    Were Fidelity to follow through on that threat and attempt to solicit Fairhaven's clients, it would constitute tortious interference with Fairhaven's business relationships.  If any solicited clients left Fairhaven, that would injure Fairhaven.

143.    As to each category of tortious interference identified in this Count, Fidelity is well-aware of Fairhaven's business expectancies by virtue of having custody over Fairhaven's client accounts and information.

144.    Further, as to each category of tortious interference identified in this Count, Fidelity is acting with ill-will, in retaliation for Ms. Taylor having complained about workplace sex and

age discrimination and retaliation at Fidelity, and in retaliation for Ms. Taylor having filed an

EEOC charge concerning Fidelity's Title VII violations.

WHEREFORE, for the reasons set forth above, Fairhaven respectfully requests that

judgment be entered in favor of Fairhaven and against Fidelity, and that the Court enter an Order:

A. Awarding to Fairhaven compensatory damages in an amount to be determined at trial equal to, at a minimum, (i) the revenue/profits that Fairhaven would have received had Fidelity not prevented its clients from contacting Ms. Taylor, (ii) the revenue/profits that Fairhaven would have received had Fidelity not caused Ms. Taylor to contact fewer former clients than she otherwise would have, (iii) the fees Fairhaven has paid Fidelity to date, (iv) the costs Fairhaven has incurred in adopting Fidelity's platform, (v) the cost of finding and transferring client accounts to a new custodian, including training costs, (vii) the cost differences in fees between custodians, if any, (viii) the lost revenue/profits from any clients who leave Fairhaven due to Fidelity's actions, (ix) the lost revenue/profits from any clients who would have joined Fairhaven but for Fidelity's actions, (x) the reputational harm Fairhaven has suffered and will suffer, and (xi) if Fidelity's decision destroys Fairhaven, the value of Fairhaven as an entity;

B. Awarding to Fairhaven its actual costs and attorneys' fees incurred in connection with this proceeding;

C. Awarding to Fairhaven punitive damages in an amount sufficient to deter such conduct by Fidelity in the future; and

D. Awarding to Fairhaven any such other and further relief the Court deems just.

## COUNT II

### CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/2)

145. Fairhaven incorporates by reference Paragraphs 1 through 114 of its Counterclaim.

146. Fidelity violated the Consumer Fraud and Deceptive Business Practices Act, 815

ILCS 510/2, by refusing to provide Ms. Taylor's contact information to her former clients.

147. After Fidelity constructively discharged Ms. Taylor, several of Ms. Taylor's former

clients asked Fidelity for her new contact information.

148.     Fidelity's internal compliance procedures and FINRA Regulatory Notice 19-10 required Fidelity to provide Ms. Taylor's contact information to any of her former clients who asked for it.

149.     Fidelity knew Ms. Taylor's cell phone number (which she had provided to Fidelity in her resignation letter for this very purpose), yet Fidelity willfully refused to provide Ms. Taylor's contact information to her former clients.  Indeed, Fidelity falsely informed Ms. Taylor's former clients that Fidelity "did not know" Ms. Taylor's contact information.

150.     Moreover, Fidelity knew that Ms. Taylor had joined Fairhaven, yet Fidelity told Ms. Taylor's former clients that it "did not know" which firm she had joined.

151.     Fidelity's refusal to provide this information to Ms. Taylor's former clients constitutes "unfair methods of competition and unfair or deceptive acts or practices" under 815 ILCS 505/2.  Fidelity, in refusing to provide contact information to Ms. Taylor's former clients, relied upon the "misrepresentation or the concealment, suppression or omission of material fact[s]" – namely Ms. Taylor's contact information, the identify of her new employer, the fact that she was diligent about leaving her contact information upon her separation of employment, and the fact that she was open to receiving calls from former clients.

152.     Fidelity's refusal to provide this information to Ms. Taylor's former clients also misleadingly implied that Ms. Taylor had not provided any contact information through which her former clients could contact her and, thus, implied that Ms. Taylor did not care about the financial health of her former clients.

153.     Fidelity meant for consumers to rely on these misrepresentations and concealments so that they would not contact Ms. Taylor.  Fidelity's acts occurred through a course of conduct involving commerce.

154.     Fidelity's actions implicate consumer protection concerns.  Ms. Taylor had been advising many of her clients for upwards of 25 years.  Ms. Taylor left Fidelity's employ on March 6, 2020 – at the beginning of the ongoing COVID-19 pandemic, when financial markets were in turmoil and when many jobs were in jeopardy.  Due to Fidelity's actions, however, these consumers were unable to speak to their trusted financial advisor, Ms. Taylor, during one of the most stressful, chaotic, and consequential market events in a lifetime.  Worse still, Fidelity was unable to adequately come up to speed on years or decades of client interactions in order to properly advise Ms. Taylor's clients in a timely manner.  Numerous consumers reported being distressed that Ms. Taylor had left Fidelity, and several were vocal about their displeasure with the replacement advisors Fidelity had assigned to their accounts.

155.     Fidelity's refusal to provide Ms. Taylor's contact information to her former clients caused actual confusion, caused fewer former clients to reach out to Ms. Taylor than otherwise would have reached out to her, and caused permanent damage to Ms. Taylor's reputation.  This, in turn, caused actual pecuniary damages to Fairhaven because it reduced Fairhaven's exposure to consumers and it reduced the number of clients who otherwise would have transferred their accounts to Fairhaven (without any solicitation on the part of Ms. Taylor or Fairhaven).

156.     The relief Fairhaven requests below would benefit all consumers by giving financial firms such as Fidelity a financial incentive not to conceal the contact information of any former employees when consumers request it.

WHEREFORE, for the reasons set forth above, Fairhaven respectfully requests that judgment be entered in favor of Fairhaven and against Fidelity, and that the Court enter an Order:

A.      Entering an injunction against Fidelity requiring it to provide Ms. Taylor's contact information to each and every person who has asked for it, and each and every person who asks for it in the future;

B.    Awarding to Fairhaven damages in an amount to be determined at trial, including, but not limited to, the revenue/profits that Fairhaven would have received had Fidelity not prevented its clients from contacting Ms. Taylor;

C.    Awarding to Fairhaven its actual costs and attorneys' fees incurred in connection with this proceeding;

D.    Awarding to Fairhaven punitive damages in an amount sufficient to deter such conduct by Fidelity in the future; and

E.    Awarding to Fairhaven any such other and further relief the Court deems just.

## COUNT III

### UNIFORM DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/2)

157.    Fairhaven incorporates by reference Paragraphs 1 through 114 of its Counterclaim.

158.    Fidelity violated the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2(a), by refusing to provide Ms. Taylor's contact information to her former clients.

159.    After Fidelity constructively discharged Ms. Taylor, several of Ms. Taylor's former clients asked Fidelity for her new contact information.

160.    Fidelity's internal compliance procedures and FINRA Regulatory Notice 19-10 required Fidelity to provide Ms. Taylor's contact information to any of her former clients who asked for it.

161.    Fidelity knew Ms. Taylor's cell phone number (which she had provided to Fidelity in her resignation letter for this very purpose), yet Fidelity willfully refused to provide Ms. Taylor's contact information to her former clients. Indeed, Fidelity falsely informed Ms. Taylor's former clients that Fidelity "did not know" Ms. Taylor's contact information.

162.    Moreover, Fidelity knew that Ms. Taylor had joined Fairhaven, yet Fidelity told Ms. Taylor's former clients that it "did not know" which firm she had joined.

163.    Fidelity's refusal to provide this information to Ms. Taylor's former clients caused a "likelihood of confusion or of misunderstanding as to [the] affiliation" of Ms. Taylor with Fairhaven.  This constitutes a deceptive trade practice under 815 ILCS 510/2(a)(3).

164.    Fidelity's refusal to provide this information to Ms. Taylor's former clients implicitly disparaged the services of Ms. Taylor by misleadingly implying that Ms. Taylor did not provide contact information through which her former clients could contact her.  This negatively affected Ms. Taylor's reputation and constitutes a deceptive trade practice under 815 ILCS 510/2(a)(8).

165.    Fidelity's refusal to provide this information also constitutes a deceptive trade practice under 815 ILCS 510/2(a)(12) because it created a likelihood of confusion or misunderstanding regarding Ms. Taylor's contact information, the identity of her current employer, whether she had left her contact information upon her separation of employment, and her willingness to take calls from former clients.

166.    Fidelity meant for consumers to rely on these misrepresentations and concealments so that they would not contact Ms. Taylor.

167.    Fidelity's refusal to truthfully provide Ms. Taylor's contact information to her former clients caused actual confusion, and caused fewer former clients to reach out to Ms. Taylor than otherwise would have reached out to her.  This, in turn, caused actual pecuniary damage to Fairhaven because it reduced Fairhaven's exposure to consumers, and it reduced the number of clients who would have otherwise transferred their accounts to Fairhaven (without any solicitation on the part of Ms. Taylor or Fairhaven).

168.     Fairhaven is entitled to an injunction requiring Fidelity to provide Ms. Taylor's contact information to each and every person who has asked for it, and each and every person who asks for it in the future.

WHEREFORE, for the reasons set forth above, Fairhaven respectfully requests that judgment be entered in favor of Fairhaven and against Fidelity, and that the Court enter an Order:

A.     Entering an injunction against Fidelity requiring it to provide Ms. Taylor's contact information to each and every person who has asked for it, and each and every person who asks for it in the future;

B.     Awarding to Fairhaven damages in an amount to be determined at trial, including, but not limited to, the revenue/profits that Fairhaven would have received had Fidelity not prevented its clients from contacting Ms. Taylor;

C.     Awarding to Fairhaven its actual costs and attorneys' fees incurred in connection with this proceeding;

D.     Awarding to Fairhaven punitive damages in an amount sufficient to deter such conduct by Fidelity in the future; and

E.     Awarding to Fairhaven any such other and further relief the Court deems just.

## COUNT IV

### BREACH OF CONTRACT

169.     Fairhaven incorporates by reference Paragraphs 1 through 114 of its Counterclaim.

170.     A valid contract existed between Fairhaven and Fidelity by virtue of the Custody Agreement.

171.     Fairhaven performed all obligations under the Custody Agreement.

172.     Every contract, including the Custody Agreement, imposes a duty of good faith and fair dealing.  This is an embodiment of a mutual understanding that neither party to a contract shall do anything that will have the effect of destroying the right of the counterparty to receive the fruits of the contract.

173.     For an RIA like Fairhaven, choosing a custodian for its client accounts is a long-term investment in the custodian's brand, the custodian's technology, the custodian's offerings, and the custodian itself.

174.     Here, Fairhaven expended a great deal of effort and resources championing the Fidelity platform to its clients, and ensuring that Fairhaven's customers and employees were familiar with the platform and its offerings.  Fairhaven's decision to use Fidelity's platform was immediately a great financial benefit to Fidelity.

175.     The benefit to an RIA, by contrast, is more long-term.  If an RIA sticks with a single custodian for the long term, it typically reduces the RIA's costs and increases business efficiency, ease of use, and customer familiarity.

176.     The industry standard among custodians and RIAs is that if an RIA chooses to use a particular custodian, that custodian will continue to do business with the RIA for as long as the custodian desires.  This standard reflects a recognition of the steep cost associated with changing custodians.

177.     In addition, for custodians that have both an institutional platform and a retail advisory business (like Fidelity does), the industry standard is that the custodian will not attempt to convert an RIA's clients into its own retail advisory clients.

178.     Fidelity has destroyed the right of Fairhaven to receive the fruits of the contract. Fairhaven spent significant time and money investing in Fidelity's platform, but Fidelity is not allowing Fairhaven to reap the long-term benefits of that investment.  Instead, Fidelity has decided to terminate its business relationship with Fairhaven and kick Fairhaven off of Fidelity's investment platform.  Moreover, Fidelity has represented that it plans to convert Fairhaven customers into Fidelity customers.

179.    Fidelity made this decision for bad faith reasons.   More specifically, Fidelity decided to terminate its business with Fairhaven and kick Fairhaven off its investment platform to (i) further retaliate against Ms. Taylor for reporting workplace sex and age discrimination and retaliation at Fidelity, (ii) improperly coerce Ms. Taylor to voluntarily enter into a stipulated injunction, and/or (iii) to capture Fairhaven's clients for itself.

180.    Fidelity's conduct does not conform to the parties' reasonable understanding of performance obligations.

181.    To the extent that Fidelity had any discretion regarding when to terminate the contract, it terminated the contract in bad faith, thereby violating the implied duty of good faith and fair dealing.

182.    Fairhaven has been, and will continue to be, damaged by Fidelity's termination of the contract.  Fairhaven is entitled to damages in an amount equal to, at a minimum, (i) the fees it has paid Fidelity to date, (ii) the costs it has incurred in adopting Fidelity's platform, (iii) the cost of finding and transferring client accounts to a new custodian, including training costs, (iv) the cost differences in fees between custodians, if any, (v) the lost revenue/profits from any clients who leave Fairhaven because of Fidelity's actions, (vi) the lost revenue/profits from any clients who would have joined Fairhaven but for Fidelity's actions, (vii) the reputational harm Fairhaven has suffered and will suffer, and (viii) if Fidelity's decision destroys Fairhaven, the value of Fairhaven as an entity.

WHEREFORE, for the reasons set forth above, Fairhaven respectfully requests that judgment be entered in favor of Fairhaven and against Fidelity, and that the Court enter an Order:

    A.    Awarding to Fairhaven compensatory damages in an amount to be determined at trial equal to, at a minimum, (i) the fees it has paid Fidelity to date, (ii) the costs it has incurred in adopting Fidelity's platform, (iii) the cost of finding and transferring client accounts to a new custodian, including training costs, (iv) the cost differences

in fees between custodians, if any, (v) the lost revenue/profits from any clients who leave Fairhaven because of Fidelity's actions, (vi) the lost revenue/profits from any clients who would have joined Fairhaven but for Fidelity's actions, (vii) the reputational harm Fairhaven has suffered and will suffer, and (viii) if Fidelity's decision destroys Fairhaven, the value of Fairhaven as an entity;

B.      Awarding to Fairhaven its actual costs and attorneys' fees incurred in connection with this proceeding, under the bad faith exception to the American Rule; and

C.      Awarding to Fairhaven any such other and further relief the Court deems just.

## COUNT V

### BREACH OF FIDUCIARY DUTY

183.    Fairhaven incorporates by reference Paragraphs 1 through 114 of its Counterclaim.

184.    Fairhaven has entrusted its clients' accounts – and thus, significant amounts of information concerning its clients – with Fidelity.  Because Fairhaven placed its trust and confidence in Fidelity with respect to its client accounts and information, Fidelity owes fiduciary duties to Fairhaven.

185.    Fidelity has breached its fiduciary duties in several ways.

186.    During the course of this lawsuit, Fidelity attempted to coerce Fairhaven into requiring Ms. Taylor to voluntarily enter into a stipulated injunction that would prohibit her from contacting any former clients.  More specifically, Fidelity began threatening to sue Fairhaven and to kick Fairhaven off of Fidelity's investment platform if Ms. Taylor did not voluntarily enter into a stipulated injunction prohibiting her from reaching out to her former clients to announce her departure.

187.    Using the Fairhaven client accounts in Fidelity's custody to obtain leverage in a restrictive covenant dispute with a former employee is an obscene breach of Fidelity's fiduciary duties to Fairhaven.

37

188.     Worse still, Fidelity sought to obtain that leverage against Ms. Taylor for purposes of continued retaliation against her for having complained about workplace sex and age discrimination and retaliation at Fidelity, and for having filed an EEOC charge against Fidelity. Using Fairhaven's client accounts for this purpose is grossly improper, and constitutes a grave breach of the fiduciary duties Fidelity owes to Fairhaven.

189.     On November 4, 2020, following through on its numerous threats, Fidelity sent Fairhaven a letter notifying Fairhaven that it (i) is terminating the business relationship, and (ii) is kicking Fairhaven off the Fidelity investment platform.

190.     In the November 4, 2020 letter, Fidelity also stated that "Fidelity will notify all of your clients that your relationship with Fidelity has been discontinued and may refer them to another advisor on the Fidelity platform."  In other words, Fidelity is using the fact that Fairhaven entrusted its client accounts to Fidelity in order to convert those client accounts away from Fairhaven to other advisors at Fidelity.  But because Fairhaven entrusted its client accounts and data to Fidelity, Fidelity had a fiduciary duty not to misuse those accounts or data to Fairhaven's detriment.  Accordingly, this, too, will constitute a breach of Fidelity's fiduciary duties to Fairhaven if Fidelity goes through with it.

191.     Fidelity's breaches of fiduciary duty have proximately caused Fairhaven harm. Fairhaven, for instance, invested significant resources helping its clients acclimate themselves to Fidelity's platform and offerings.  That investment is now worthless.  Moreover, transferring its client accounts to another custodian will cause Fairhaven reputational harm with its clients. Indeed, because the process is so burdensome, Fairhaven expects some clients to transfer to another RIA.  In addition, Fairhaven must now find and transfer its client accounts to a new

custodian – a costly process (and even more costly if the new custodian's transaction prices are higher than Fidelity's).

WHEREFORE, for the reasons set forth above, Fairhaven respectfully requests that judgment be entered in favor of Fairhaven and against Fidelity, and that the Court enter an Order:

A.  Awarding to Fairhaven compensatory damages in an amount to be determined at trial equal to, at a minimum, (i) the costs Fairhaven incurred in adopting Fidelity's platform, (ii) the cost of finding and transferring client accounts to a new custodian, including training costs, (iii) the cost differences in fees between custodians, if any, (iv) the reputational harm Fairhaven has suffered and will suffer, (v) the lost revenue/profits from any clients who leave Fairhaven because of Fidelity's actions, (vi) the lost revenue/profits from any clients who would have joined Fairhaven but for Fidelity's actions, and (vii) if Fidelity's decision destroys Fairhaven, the value of Fairhaven as an entity;

B.  Requiring Fidelity to disgorge to Fairhaven (i) the fees Fidelity has received from Fairhaven to date, and (ii) the revenue/profits Fidelity obtains from any clients who leave Fairhaven and remain at Fidelity because of Fidelity's actions;

C.  Awarding to Fairhaven its actual costs and attorneys' fees incurred in connection with this proceeding;

D.  Awarding to Fairhaven punitive damages in an amount sufficient to deter such conduct by Fidelity in the future; and

E.  Awarding to Fairhaven any such other and further relief the Court deems just.

## COUNT VI
### UNJUST ENRICHMENT

192.  Fairhaven incorporates by reference Paragraphs 1 through 114 of its Counterclaim, and asserts this equitable claim in the alternative to its statutory and contract claims.

193.  Fidelity's decision to terminate its relationship with Fairhaven and to kick Fairhaven off Fidelity's investment platform was meant to further retaliate against Ms. Taylor for reporting workplace sex and age discrimination and retaliation at Fidelity, and for Ms. Taylor having filed an EEOC charge against Fidelity.

194. Fidelity's actions will likely lead to Fairhaven client loss. Any clients Fairhaven loses may join Fidelity (especially considering that Fidelity has made no secret of the fact that it plans to solicit Fairhaven's clients).

195. Were any of Fairhaven's clients to transfer their accounts to advisors at Fidelity, Fidelity's retention of any benefits from those clients would violate the fundamental principles of justice, equity, and good conscience.

196. Accordingly, were that to happen (and to the extent there is no remedy provided by law), Fairhaven would be entitled to a judgment against Fidelity for unjust enrichment, and damages equal to the amount of revenue/profits that any clients who transfer to Fidelity generate for Fidelity.

WHEREFORE, for the reasons set forth above, Fairhaven respectfully requests that judgment be entered in favor of Fairhaven and against Fidelity, and that the Court enter an Order:

A. Awarding to Fairhaven compensatory damages in an amount to be determined at trial equal to, at a minimum, the revenue/profits that any Fairhaven clients who transfer to Fidelity generate for Fidelity;

B. Awarding to Fairhaven its actual costs and attorneys' fees incurred in connection with this proceeding, under the bad faith exception to the American Rule; and

C. Awarding to Fairhaven any such other and further relief the Court deems just.

## JURY DEMAND

Fairhaven hereby demands a jury trial on all matters alleged in its Counterclaim.

## DEFENDANT/COUNTER-PLAINTIFF FAIRHAVEN'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Fairhaven hereby submits the following Answer and Affirmative Defenses to Fidelity's Amended Complaint:

**PREFATORY STATEMENT:** Plaintiff Fidelity Brokerage Services LLC ("Fidelity") files this Amended Complaint against Defendants, its former employee Jennifer Taylor ("Taylor") and her new employer Fairhaven Wealth Management, LLC ("Fairhaven") (collectively "Defendants"). Taylor has used and misused Fidelity's confidential and trade secret customer information, which she obtained knowledge of and access to only as a result of her employment with Fidelity, to solicit Fidelity customers to transfer their Fidelity accounts to her at Fairhaven. Further, not only has Taylor taken and misused Fidelity's confidential customer information but she shared that confidential, trade secret customer information with Fairhaven and its employees for the specific purpose of enabling Fairhaven personnel to misuse it. Fairhaven employees then did exactly that, using Fidelity's customer information to aggressively and systematically solicit Fidelity customers to transfer their investment management business to Taylor at Fairhaven. Taylor's conduct violates her Employment Agreement with Fidelity, and Fairhaven has tortiously interfered with that contract. Both Defendants have misappropriated and misused Fidelity's trade secret customer information in violation of Illinois law and the Defend Trade Secrets Act. Defendants have engaged in unfair competition and conspired to take and misuse Fidelity's information in order to divert Fidelity's customers to their firm.

      **ANSWER:** Denied.

      1.    Plaintiff Fidelity Brokerage Services LLC is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts. Fidelity is a member firm of FINRA.

      **ANSWER:** Fairhaven, on information and belief, admits the allegations in this paragraph.

2.      Defendant Jennifer Taylor is a former Vice President, Financial Consultant of Fidelity's Oak Brook, Illinois office. She is an adult citizen and resident of Illinois. Taylor was registered with FINRA during her employment with Fidelity.

**ANSWER:**    Fairhaven, on information and belief, admits the allegations in this paragraph.

3.      Fairhaven Wealth Management, LLC is an Illinois Limited Liability Company, with a principal place of business located in Wheaton, Illinois.

**ANSWER:**    Admitted.

4.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 *et seq. See* 18 U.S.C. § 1836(c) (West 2017) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."). This Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. § 1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy. Notably, both Defendants used Fidelity's trade secret customer information to solicit Fidelity customers.

**ANSWER:**    Denied, however Fairhaven does not challenge jurisdiction.

5.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Indeed, Defendants' conduct threatens approximately 425 Fidelity client households, representing in excess of $1.18 billion in client assets under Fidelity management. Through their illegal conduct, Defendants have already diverted almost $60 million in client assets to Taylor at Fairhaven.

42

**ANSWER:**     Denied, however Fairhaven does not challenge jurisdiction.

6.      Venue is proper in this District because (a) Taylor lives and works in this District, (b) most or all of the conduct alleged in this Amended Complaint occurred within this District, and (c) Fairhaven conducts business in this District.

**ANSWER:**     Denied; however, Fairhaven does not contest venue.

7.      Taylor, a former Fidelity Vice President, Financial Consultant, has used Fidelity's confidential and trade secret customer information, that she had access to solely by virtue of her employment with Fidelity, to unlawfully solicit Fidelity customers to transfer their business to her new firm.  Taylor has also shared Fidelity's confidential and trade secret customer information with Fairhaven, and Fairhaven personnel used that information to further aggressively solicit Fidelity customers to transfer their investment management business to Taylor and Fairhaven. Defendants' illegal conduct has resulted in almost the investment management business for more than $60 million in Fidelity customer assets being diverted to Taylor and Fairhaven.

**ANSWER:**     Denied.

8.      On March 6, 2020, Taylor resigned from Fidelity and immediately thereafter joined Fairhaven Wealth Management, a registered investment adviser firm (RIA), and began providing competing services.

**ANSWER:**     Denied.

9.      In connection with her resignation, Taylor was sent a letter from Fidelity's HR department reminding her of her post-employment obligations pursuant to her Employee Agreement, and enclosing a copy of her Employee Agreement.  A copy of the March 14, 2020 letter is attached to the Declaration of Scott Marshall as Exhibit F.

**ANSWER:** Fairhaven, on information and belief, admits the allegations in this paragraph.

10. Despite her post-employment obligations, since Taylor resigned she has aggressively and blatantly misappropriated Fidelity's confidential and trade secret customer information and used, and continues to use, that information to unlawfully target and solicit Fidelity customers to transfer their accounts to her new firm, as set forth more fully below.

**ANSWER:** Denied.

11. Fidelity seeks a preliminary injunction requiring Defendants to return to Fidelity any and all records and/or documents in any form, received or removed from Fidelity by Defendant, containing information pertaining to customers Taylor served or whose names became known to Taylor while in the employ of Fidelity, including, but not limited to, any customer list or documents replicated or recreated by Taylor from memory or otherwise, and from using Fidelity's confidential and trade secret information concerning Fidelity's customers. This injunctive relief is necessary to end Defendants' unlawful activities, which include misuse of Fidelity's trade secrets and unfair competition.

**ANSWER**: Denied.

12. Fidelity and Taylor are obligated to arbitrate the merits of this dispute consistent with the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200. Accordingly, concurrently with the filing of its Motion for a Preliminary Injunction, Fidelity also filed a Statement of Claim with FINRA Dispute Resolution, Inc. seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2).

**ANSWER:** The allegations of this paragraph are not directed at Fairhaven (and the first sentence of this paragraph constitutes a legal conclusion), and therefore no answer is required. To

the extent the allegations of this paragraph can be construed as stating facts against Fairhaven, then upon information and belief Fairhaven admits that Fidelity filed a Statement of Claim before FINRA against Defendant Taylor, as well as a motion for preliminary injunction.

13. Although the merits of this case against Taylor are to be resolved in arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed. Preliminary injunctive relief, therefore, is required to preserve the *status quo* until the merits of this case can be adjudicated by FINRA.

**ANSWER:** Denied.

14. Fidelity and its affiliates provide a variety of financial services—such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships. Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

15. Fidelity is unique in the retail brokerage field because Fidelity does not have its Financial Consultants, such as Taylor, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

16. Instead, Fidelity requires its Financial Consultants to develop service relationships based upon leads that Fidelity provides.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

17. Fidelity provides leads to its Financial Consultants from two primary sources.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

18. First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

19. Fidelity and its affiliates devote tens of millions of dollars per year towards attracting customers to Fidelity's various businesses in a variety of means. Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

20. A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

21.     Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship, when those customers experience "triggering events," such as Fidelity 401(k) distributable events, which may lead to interest in Fidelity's retail financial services.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

22.     In addition, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position. Moreover, Fidelity clients may be serviced by multiple Fidelity representatives depending upon the clients' needs and service offerings in which they opt to participate at Fidelity.

**ANSWER:** Fairhaven, on information and belief, admits the allegations in this paragraph.

23.     A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.

**ANSWER:** Fairhaven, on information and belief, admits the allegations in this paragraph.

24.     Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

25. Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Taylor, is also directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

26. Fidelity's trade secret customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

27. Although certain portions of such information might be publicly available — such as an individual's name or published home telephone numbers — only a limited number of Fidelity employees know who among the general public are Fidelity customers who have demonstrated a specific need and desire for investment services.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

28. Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

29. Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will

maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

30. Fidelity derives substantial economic value from preserving its customer data as a trade secret.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

31. Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to or specific knowledge of Fidelity's trade secret customer data. In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

**ANSWER:** Denied.

32. Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information. Fidelity does not provide its trade secret customer data to competitors.

**ANSWER:** Denied.

33. Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

49

34.     Fidelity maintains and advises its employees of a Global Policy on Information Protection that is displayed on Fidelity's intranet. A true and correct copy of Fidelity's Global Policy on Information Protection is attached to the Marshall Declaration as Exhibit A. Fidelity periodically reminds its employees of this policy and provides employees with a Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information. A true and correct copy of Fidelity's QRC is attached to the Marshall Declaration as Exhibit B.

**ANSWER:**     Fairhaven, on information and belief, admits the allegations in this paragraph.

35.     Fidelity also preserves trade secret customer data by requiring employees, including Taylor, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity, and not to solicit Fidelity customers.

**ANSWER:**     Fairhaven, on information and belief, denies the allegations in this paragraph.

36.      Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity. Furthermore, as discussed more fully below, Fidelity is required by federal law to prevent the disclosure to third-parties of nonpublic customer information, including customers' contact information and financial information. *See* 15 U.S.C. § 6801, *et seq.*; 17 C.F.R. § 248.1, *et seq.*

**ANSWER:**     Denied.

37.     At the time of her resignation on March 6, 2020, Taylor was a Vice President, Financial Consultant in Fidelity's branch office in Oak Brook, Illinois.  While working at Fidelity, Taylor was assigned clients to service on behalf of Fidelity.

**ANSWER:**     Admitted.

38.     In order for Taylor to service the customers' accounts she was assigned to service, Taylor required access to the customers' confidential personal and financial information.

**ANSWER:**     Fairhaven, on information and belief, admits the allegations in this paragraph.

39.     Taylor specifically acquired access to and knowledge of the names, contact information and confidential financial data for numerous Fidelity clients. By the time of her departure, she had daily access to and had gained knowledge of confidential Fidelity information relating to approximately 425 households, representing in excess of $1.18 billion in client assets under Fidelity management. Moreover, throughout her employment at the Oak Brook branch, the confidential information to which Taylor was given access was continually updated as clients were added, new accounts were opened, client assets and investments changed value, clients' financial goals evolved, and as a result Taylor was provided with ongoing access to a pool of continually updated and evolving confidential information about the Fidelity clients she was assigned to service.

**ANSWER:**     Fairhaven, on information and belief, generally admits the allegations in this paragraph, but denies that client names and publicly-available information are confidential information.

40.    Fidelity protects its customers' information by, among other things, requiring each employee who will have access to that information to execute a standard Fidelity Employee Agreement.

**ANSWER:**    Fairhaven, on information and belief, denies the allegations in this paragraph.

41.    Fidelity records indicate that Taylor executed the Employment Agreement on September 20, 1999. Taylor then renewed her commitment to the provisions by signing it again on June 30, 2011. Copies of Taylor's signed September 20, 1999 and June 30, 2011 Employee Agreements are attached to the Marshall Declaration as Exhibits C and D.

**ANSWER:**    Fairhaven, on information and belief, denies the allegations in this paragraph.

42.    In her Employee Agreement, Taylor acknowledged the confidentiality of Fidelity's records, including Fidelity's customer lists and customer information. *See* Marshall Declaration Exhibits C and D at ¶ 1.

**ANSWER:**    Fairhaven, on information and belief, denies the allegations in this paragraph.

43.    Taylor promised to use Fidelity's trade secrets only in the course of her employment with Fidelity and not to divulge Fidelity's trade secrets to third parties. *Id.*

**ANSWER:**    Fairhaven, on information and belief, admits the allegations in this paragraph.

44.    Taylor promised that, upon termination of employment, she would "return all company property … including but not limited to Confidential Information." *Id.* at ¶ 3.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

45. Taylor also promised that following termination of employment she would not use Fidelity's Confidential Information to solicit Fidelity's clients. *Id.* at ¶ 6.

**ANSWER:** Fairhaven, on information and belief, admits the allegations in this paragraph.

46. Taylor further promised that for a period of one year following termination of her employment she would not directly or indirectly solicit in any manner or induce or attempt to induce any customer or prospective customer with whom she had personal contact or about whom she otherwise learned during the course of her employment with the Fidelity. *Id.*

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

47. Taylor agreed that any violation of the Employee Agreement—including after her termination—would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information. *Id.* at ¶ 10 (Ex. C) and ¶ 11 (Ex. D).

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

48. As consideration for the Employee Agreements Taylor executed, Fidelity hired her, promoted her, provided her with ongoing access to continually updated confidential business information, compensated her throughout her employment, and provided her with introductory and continuing on-the-job training, and promotions. Fidelity assigned Taylor customers with higher assets to service on behalf of Fidelity and provided Taylor with leads to enable her to succeed at

Fidelity. Fidelity further provided Taylor with support services; paid for facilities, computer equipment, market reporting services, and all other business expenses; and registered Taylor with the Financial Industry Regulatory Authority and the New York Stock Exchange. Fidelity provided Taylor with sales assistance, research, the benefit of Fidelity advertising, goodwill and name recognition, access and use of experts in asset management, tax, estate planning and insurance, and with promotional marketing and sales support.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

49. Despite her contractual obligations and her obligations under Illinois law, Taylor misappropriated Fidelity's trade secret customer information and has used and continues to use Fidelity's trade secret customer information to solicit Fidelity customers.

**ANSWER:** Denied.

50. Since Taylor resigned from Fidelity, Fidelity has been receiving reports that she—and personnel of her new firm, Fairhaven, acting on her behalf—have been soliciting Fidelity customers to transfer their business to Fairhaven.

**ANSWER:** Denied.

51. In fact, one client reported that Taylor solicited him, and set up an appointment for him to come meet with her at her new firm, <u>before she even resigned</u>. After Taylor resigned Fidelity representatives were assigned to service the customers that were previously serviced by Taylor. In a meeting with the new Financial Consultant, the customer reported that during his last meeting with Taylor, while she was employed at Fidelity, she set up a meeting for him at her new firm. Taylor also told the client that he would be able to leave his assets at Fidelity but Taylor

would be able to add her name to their account and provide financial advice. *See* Marshall Declaration at ¶ 16.

**ANSWER:** Denied.

52.     Accordingly, Fidelity's in-house counsel sent Taylor a letter reminding her of her contractual obligations, enclosing a copy of her Employee Agreement, and demanding that she cease any further solicitation of Fidelity customers. Fidelity also enclosed an affidavit for her to sign attesting that she did not have, or had returned, any of its customer information. A copy of the March 20, 2020 letter is attached to the Marshall Declaration as Exhibit G.

**ANSWER:** Denied.

53.     Taylor never responded to the letter and never returned the signed affidavit. *See* Marshall Declaration at *¶* 18.

**ANSWER:** Denied.

54.     Fidelity has since learned that Taylor has continued to use Fidelity's trade secret customer information to aggressively solicit customers to transfer their accounts to her new firm. *Id.* at ¶ 19

**ANSWER:** Denied.

55.     Since Fidelity's March 20, 2020 letter to Taylor, another client reported to her new Financial Consultant that she received a call from the firm that Taylor joined and the person said that she was calling on Taylor's behalf. The employee from Taylor's new firm, Fairhaven, then asked the Fidelity client to consolidate her assets and transfer them to Taylor at her new firm. The client was not happy that someone called her and wanted to make sure that Fidelity was aware that this was being done by Taylor and her new firm. *Id.* at ¶ 20.

**ANSWER:** Denied.

56.     Other clients have also reported to Fidelity that Taylor was contacting them about doing business with her at her new firm. *Id.* at ¶ 21.

**ANSWER:**    Denied.

57.     The only way Taylor could have known that these particular individuals were customers of Fidelity and how to contact them is by exploiting the ongoing access she was given to Fidelity's constantly updated confidential and trade secret information, and using her knowledge of that confidential information about Fidelity's clients to identify and target Fidelity clients for her own benefit, and the benefit of her new firm.

**ANSWER:**    Denied.

58.     After resigning, Taylor provided a list of Fidelity customers that she serviced on behalf of Fidelity to Fairhaven.  Fairhaven then shared that information with its personnel. Fairhaven personnel then began initiating contact with the customers on that list and soliciting them to meet with Taylor and move their business to Fairhaven.

**ANSWER:**    Denied.

59.     Fairhaven records show that Fairhaven personnel systematically contacted customers previously serviced by Taylor through customer information provided by Taylor.

**ANSWER:**    Denied.

60.     Fairhaven personnel invited Fidelity customers to meet with Taylor at Fairhaven.

**ANSWER:**    Fairhaven admits that its personnel informed certain Fidelity customers that they could meet with Ms. Taylor at Fairhaven after they unilaterally expressed an interest in doing so.  Fairhaven denies that it solicited any of Ms. Taylor's former Fidelity clients, and denies the remainder of the allegations in this paragraph.

61.     A Fairhaven employee called Fidelity customers and told them that Taylor would be able to provide service to them now that she was at Fairhaven.

**ANSWER:**     Fairhaven admits that its employee told Fidelity customers that Ms. Taylor is now employed at Fairhaven.  Fairhaven admits that its employee told certain Fidelity customers, after the customers unilaterally expressed their interest in Ms. Taylor continuing to service them, that Ms. Taylor could potentially provide service to them at Fairhaven.  Fairhaven denies that it solicited any of Ms. Taylor's former Fidelity clients, and denies the remainder of the allegations in this paragraph.

62.     A Fairhaven employee called Fidelity customers and told them that Taylor had a whole team behind her now that she was at Fairhaven and that Fairhaven was "known for [its] customer service!"

**ANSWER:**     Fairhaven admits that it informed certain Fidelity customers about Fairhaven after those individuals unilaterally expressed interest in learning more about Fairhaven. Fairhaven denies the remainder of the allegations in this paragraph.

63.     The report from Fidelity customers and the evidence obtained in this case to date confirm that both Taylor and Fairhaven have misappropriated and misused Fidelity's trade secret information to solicit and divert Fidelity customers to Taylor at Fairhaven.

**ANSWER:**     Denied.

64.     The theft and misuse of Fidelity's trade secret customer information to solicit and unfairly compete with Fidelity causes Fidelity both monetary and irreparable harm.  Defendants' conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing goodwill, losing future business or referrals, as well as losing trust and confidence in

securing inherently-private information, which cannot be calculated with precision and cannot be adequately compensated.

**ANSWER:** Denied.

65. Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations. The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a) (2012). The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent. 17 C.F.R. § 248.10 (2017). Nonpublic personal information is defined to include customer lists from financial institutions, *even if those lists contain only names of Fidelity customers* because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017). Indeed, these regulations also protect a customer's account information. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

**ANSWER:** Denied.

66. Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their identities, contact information, net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. Thus, customers understandably are concerned when former Fidelity employees, such as Taylor, have access to their information and are using it to solicit their business to a new and different securities firm.

**ANSWER:** Denied.

67. In other words, the damage to Fidelity's customer relationships has already occurred, is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage caused when Defendants took and improperly misused confidential and trade secret customer information on behalf of a competing business.

**ANSWER:** Denied.

68. Based on all the foregoing facts and conduct, Fidelity believes and thereon alleges that Defendants prepared to engage in, is engaging in, and plans to continue to engage in the following wrongful acts:

- use and/or disclosure of Fidelity's trade secret customer information and misappropriation of the trade secret information contained in confidential Fidelity business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information of Fidelity customers;

- transmission verbally, in writing or in another manner for the use of a Fidelity competitor, customers' contact and financial information contained in Fidelity's records; and

- solicitation of Fidelity customers on behalf of Taylor and Fairhaven.

**ANSWER:** Denied.

69. Fidelity has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of customers and customer goodwill caused by Defendants' misappropriation and misuse of Fidelity's trade secret customer information and solicitation of Fidelity's customers in violation of Taylor's Employee Agreement and in violation of Illinois law.

**ANSWER:** Denied.

70. Denial of injunctive relief would also leave Fidelity vulnerable to the same conduct from other employees.

**ANSWER:** Denied.

71.     Fidelity asks for the Court's assistance in protecting that information and requiring it to be returned to Fidelity.

**ANSWER:**     Fairhaven admits only that Fidelity seeks assistance, but denies that Fidelity is entitled to any such assistance, or any other relief or protection.

**FIRST CAUSE OF ACTION**
**(Injunctive Relief – Against All Defendants)**

72.     Fidelity hereby realleges and incorporates by reference the allegations of the Amended Complaint above, inclusive, as though set forth in full.

**ANSWER:**     Fairhaven adopts and incorporates by reference its answers to the allegations listed above.

73.     In doing the acts described herein, Defendants have harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of federal and Illinois law, to give Taylor a competitive edge over Fidelity, attempting to poach Fidelity's customer accounts, and diminishing Fidelity's reputation and goodwill.

**ANSWER:**     Denied.

74.     Unless the Defendants are enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a)     Disclosure of trade secrets, customer lists, and other confidential information that is solely the property of Fidelity and its clients;

(b)     Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(c)     Potential future economic loss, which is presently incalculable.

**ANSWER:**    Denied.

75.    Thus, Fidelity is entitled to preliminary injunctive relief.

**ANSWER:**    Denied.

**SECOND CAUSE OF ACTION**
**(Breach of Contract – Against Taylor)**

76.    The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**    Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven.  To the extent a response is required from Fairhaven, Fairhaven adopts and incorporates by reference its answers to the allegations above as though fully set forth herein.

77.    Taylor's Employee Agreements are valid contracts supported by adequate consideration.

**ANSWER:**    Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven.  To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

78.    In the Employee Agreements, Taylor acknowledged that as a consequence of her employment with Fidelity, and in order to assist her in performing the duties of a Financial Consultant, Taylor would be given access to Confidential Information about Fidelity's clients. *See* Exhibits D and E to the Marshall Declaration at ¶ 1.

**ANSWER:**    Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven.  To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

79. Pursuant to the terms of her Employee Agreements, Taylor agreed to keep Fidelity's records, including particularly Fidelity's customer lists and customer information, confidential. Exhibits D and E to the Marshall Declaration at ¶ 1.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

80. Taylor promised to use Fidelity's customer information only in the course of her employment with Fidelity and promised not to divulge Fidelity's customer information to third parties such as her new firm. Exhibits D and E to the Marshall Declaration at ¶ 1.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

81. Taylor violated the confidentiality and non-disclosure provisions of her Employee Agreements by using Fidelity's confidential customer information on behalf of herself and Fairhaven, including by using that information to solicit Fidelity clients to transfer their business.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

82. Taylor also promised to return any of Fidelity's customer information in her possession to Fidelity upon termination of her employment. Exhibits D and E to the Marshall Declaration at ¶ 3. She instead used that information and provided it to Fairhaven.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

83. Taylor sought to circumvent and in fact breached this provision of her Employee Agreements by, on information and belief, either taking the Confidential Information, or creating or recreating the Confidential Information from memory for competitive use at her new firm.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

84. Taylor also promised that she would not solicit Fidelity customers for a period of one year after her termination. Exhibits D and E to the Marshall Declaration at ¶ 6.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

85. Taylor breached the non-solicitation provision of her Employee Agreements by using her knowledge of Fidelity's customer information to solicit Fidelity customers to transfer their business to Taylor at Fairhaven.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven denies the allegations in this paragraph.

86. Taylor is violating her contractual obligations and will continue to violate these obligations in the future.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven denies the allegations in this paragraph.

87. As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven denies the allegations in this paragraph.

88. In her Employee Agreement, Taylor expressly agreed that "violation of this Agreement will cause irreparable damage" to Fidelity. Exhibits D and E to the Marshall Declaration at ¶ 10.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven, on information and belief, denies the allegations in this paragraph.

89. Unless Taylor is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a) Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b) Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c) Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(d)     Potential future economic loss, which is presently incalculable.

**ANSWER:**     Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven.  To the extent a response is required from Fairhaven, Fairhaven denies the allegations in this paragraph.

### THIRD CAUSE OF ACTION

**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1831 *et seq*. – Against All Defendants)**

90.     The allegations above are incorporated hereby by reference with the same force and effect as if set forth in full below.

**ANSWER:**     Fairhaven adopts and incorporates by reference its answers to the allegation above as though fully set forth herein.

91.     The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Defendants pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, in one or more of the following respects.

**ANSWER:**     Denied.

92.     Fidelity's above-described trade secrets, including the contact and confidential financial and account information of Fidelity customers, are the subject of reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality. Fidelity's customer information is not generally known to the public or to competitors who could profit from its use or disclosure.

**ANSWER:**     Fairhaven, on information and belief, denies the allegations in this paragraph.

93.     Defendants have used Fidelity's customer information without Fidelity's consent. Defendants engaged in this conduct despite the fact that Taylor acquired this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which

duty Taylor owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity. Fairhaven for its part acquired its access to Fidelity's trade secrets from Taylor, who Fairhaven knew had acquired it under circumstances given rise to a duty to maintain the information' secrecy, and to limit its use and disclosure to any third party, including especially a competitor.

**ANSWER:** Denied.

94. Such information is also protected as "non-public" information under federal securities Regulation S-P. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u). Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account information such as that misappropriated by Defendants is not disclosed to third parties without consent. 17 C.F.R. § 248.10.

**ANSWER:** Denied.

95. Fidelity derives a significant economic benefit from the above-described trade secrets, including a benefit from the fact that its competitors do not have access to this information through any proper means.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

96. Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Defendant's ongoing misappropriation and misuse of Fidelity's trade secret customer information.

**ANSWER:** Denied.

97. Unless Defendants are preliminarily, and thereafter permanently, enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a)    Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b)    Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c)    Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(d)    Potential future economic loss, which is presently incalculable.

**ANSWER:**    Denied.

98.    Defendants' conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

**ANSWER:**    Denied.

## FOURTH CAUSE OF ACTION
**(Misappropriation of Trade Secrets and Misuse of Confidential Information in Violation of the Illinois Trade Secret Act, 765 Ill. Comp. Stat. 1065 – Against All Defendants)**

99.    The allegations above are incorporated hereby by reference with the same force and effect as if set forth in full below.

**ANSWER:**    Fairhaven adopts and incorporates by reference its answers to the allegations above as though fully set forth herein.

100.    As described above, Fidelity possessed trade secrets, including the contact and confidential financial and account information of Fidelity customers, which are subject to reasonable efforts by Fidelity to maintain its secrecy and/or confidentiality.

**ANSWER:** Fairhaven, on information and belief, denies the allegations in this paragraph.

101. Defendants have used Fidelity's trade secret customer information without Fidelity's consent. Defendants engaged in this conduct despite a duty to maintain the information's secrecy and limit its use, or receiving it from a person who had that duty.

**ANSWER:** Denied.

102. Plaintiff derives economic value from this confidential information, due to it not being generally known to other persons who could obtain economic value from its disclosure or use.

**ANSWER:** Denied.

103. Plaintiff has made efforts that are reasonable under the circumstances to maintain the secrecy of such information.

**ANSWER:** Denied.

104. Defendants are misusing this information to unfairly compete with Plaintiff and to injury Plaintiff's relationships with its client and/or divert the investment advisory business of such clients to Fairhaven.

**ANSWER:** Denied.

105. The disclosure and use of such information constitutes a misappropriation of trade secrets in violation of applicable law, including the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065.

**ANSWER:** Denied.

106. Defendants' conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets and has caused Plaintiff irreparable harm and loss.

**ANSWER:** Denied.

## FIFTH CAUSE OF ACTION
### (Unfair Competition – Against All Defendants)

107. The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:** Fairhaven adopts and incorporates by reference its answers to the foregoing allegations as though fully set forth herein.

108. Defendants' conduct as described above constitutes an unfair method of competition.

**ANSWER:** Denied.

109. As a direct and proximate result of Defendants' conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

**ANSWER:** Denied.

## SIXTH CAUSE OF ACTION
### (Breach of Duty of Loyalty – Against Taylor)

110. The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven adopts and incorporates by reference its answers to the allegations above as though fully set forth herein.

111. Taylor had, and continues to have, a common law duty of loyalty arising as a result of her relationship as an employee, agent and/or representative of Fidelity.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven denies the allegations in this paragraph.

112. Taylor had a confidential relationship with Fidelity.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven denies the allegations in this paragraph.

113. Taylor is now using for her own benefit the customer information she gained as a result of her employment with Fidelity, and is doing so for the improper purpose of commercially exploiting that information to enable herself and other Fairhaven personnel to solicit Fidelity clients to transfer their investment advisory business to Fairhaven..

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven denies the allegations in this paragraph.

114. As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm and loss.

**ANSWER:** Because these allegations are directed only at Ms. Taylor, no response is required from Fairhaven. To the extent a response is required from Fairhaven, Fairhaven denies the allegations in this paragraph.

## SEVENTH CAUSE OF ACTION
### (Tortious Interference with Existing Business Relations – Against Fairhaven)

115. The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:** Fairhaven adopts and incorporates by reference its answers to the foregoing allegations as though fully set forth herein.

116. Defendant Fairhaven either knew or reasonably should have known that Taylor had an employment agreement with Fidelity.

**ANSWER:** This paragraph states a legal conclusion to which no response is required.

117. Fairhaven tortiously interfered with Fidelity's employment agreements and relationship with Taylor by encouraging, assisting and inducing her to breach her agreements by taking customer information, disclosing it to Fairhaven, and using it to solicit Fidelity's customers to transfer their accounts to Fairhaven. Fairhaven further instructed and/or permitted its employee to misuse that misappropriated information to solicit Fidelity client on behalf of and in concert and participation with Taylor, aiding and abetting Taylor's breach of her obligations to Fidelity.

**ANSWER:** Denied.

118. As a direct and proximate result of Fairhaven's conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information as well as the loss of proprietary firm information and trade secrets.

**ANSWER:** Denied.

## EIGHTH CAUSE OF ACTION

**(Tortious Interference with Existing Business Relations – Tortious Interference)**

119. The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:** Fairhaven adopts and incorporates by reference its answers to the allegations above as though fully set forth herein

120.     Defendants tortiously interfered with Fidelity's client relationships by planning to and in fact soliciting clients to move their accounts to Taylor at Fairhaven, including through the wrongful use of Fidelity's confidential information and trade secrets.

**ANSWER:**     Denied.

121.     As a direct and proximate result of Defendants' conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

**ANSWER:**     Denied.

122.     Fidelity is entitled to preliminary injunctive relief, and thereafter permanent injunctive relief, enjoining Defendants from further acts of tortious interference.

**ANSWER:**     Denied.

**NINTH CAUSE OF ACTION**
**(Unjust Enrichment – Against All Defendants)**

123.     The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**     Fairhaven adopts and incorporates by reference its answers to the allegations above as though fully set forth herein.

124.     Defendants misappropriated Fidelity's trade secrets and confidential information, Taylor violated her Employee Agreements, and both Defendants unfairly competed with Fidelity thereby wrongfully benefitting from her actions.

**ANSWER:**     Denied.

125.     As a result of Defendants' wrongful and illegal conduct, she has benefitted in the form of the diversion of the investment management business of numerous Fidelity customers to

Taylor at Fairhaven. Also as a result of the Defendant's wrongful and illegal conduct, Fidelity has suffered harm.

**ANSWER:** Denied.

126. Allowing Defendants or to benefit from such conduct would be unfair and should be prohibited.

**ANSWER:** Denied.

## TENTH CAUSE OF ACTION
### (Civil Conspiracy – Against All Defendants)

127. The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:** Fairhaven adopts and incorporates by reference its answers to the allegations above as though fully set forth herein.

128. Defendants formed and operated a malicious combination with a common purpose to injury Fidelity by performing unlawful acts by violating Fidelity's statutory and common law rights as described above.

**ANSWER:** Denied.

129. The foregoing conduct was malicious and willful; it was performed with the specific intent to injury Fidelity.

**ANSWER:** Denied.

130. One or both of the Defendants in fact engaged in several overt unlawful acts, set forth above, and conduct violative of Fidelity's statutory and common law rights described above, causing actual harm to Fidelity.

**ANSWER:** Denied.

131.    As a consequence of the foregoing, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

**ANSWER:**    Denied.

### GENERAL DENIAL

Fairhaven has endeavored to address all of the allegations directed at it in the Amended Complaint.  To the extent Fairhaven has not specifically mentioned or directly responded to any of Fidelity's allegations, Fairhaven respectfully denies those allegations.

WHEREFORE, for all of the reasons set forth above, Fairhaven respectfully requests that this Court enter judgment in its favor and against Fidelity and enter an Order:

A.    Dismissing Fidelity's Amended Complaint in its entirety, *with prejudice*;

B.    Denying all relief sought by Fidelity in its Amended Complaint;

C.    Awarding to Fairhaven its actual costs and attorneys' fees incurred in connection with this action; and

D.    Awarding to Fairhaven any such other and further relief as the Court deems just.

### AFFIRMATIVE DEFENSES

Fairhaven, in addition to the affirmative matters set forth in its Answer (*supra*), and incorporating by reference the allegations of fact set forth in Paragraphs 1 through 144 of Fairhaven's Counterclaim (*supra*), respectfully asserts the following affirmative defenses to Fidelity's Amended Complaint:

### AFFIRMATIVE DEFENSE NO. 1
### FAILURE TO STATE A CLAIM

Fidelity's Amended Complaint should be dismissed, in whole or in part, because it has failed to state a claim upon which relief may be granted.

### AFFIRMATIVE DEFENSE NO. 2
### NO DUTY

Fidelity's claims against Fairhaven are barred in whole or in part because Fairhaven owes Fidelity no duties.

### AFFIRMATIVE DEFENSE NO. 3
### OUTSIDE OF SCOPE OF EMPLOYMENT

To the extent that Fidelity's claims against Fairhaven are based on *respondeat superior*, Fidelity's claims against Fairhaven are barred in whole or in part because if Ms. Taylor had performed the improper acts alleged in the Amended Complaint (and she did not), those acts would have been outside of Ms. Taylor's scope of employment at Fairhaven.

### AFFIRMATIVE DEFENSE NO. 4
### FULL PERFORMANCE / NO BREACH

Fidelity is barred from recovering any damages because Ms. Taylor fully performed and discharged all duties under her contract with Fidelity, and Ms. Taylor did not breach any contracts with Fidelity.

### AFFIRMATIVE DEFENSE NO. 5
### FIRST BREACH

Fidelity is barred from recovering any damages, and any failure of performance is excused, pursuant to the doctrine of first breach.

### AFFIRMATIVE DEFENSE NO. 6
### ADEQUATE REMEDY AT LAW

Fidelity's equitable claims are barred to the extent it has an adequate remedy at law.

### AFFIRMATIVE DEFENSE NO. 7
### EXISTENCE OF EXPRESS CONTRACT

Fidelity's equitable claims are barred to the extent an express contract governed the acts at issue.

## AFFIRMATIVE DEFENSE NO. 8
### LACK OF INEQUITABLE CONDUCT

Fidelity's equitable claims are barred because Fairhaven did not act inequitably towards Fidelity.

## AFFIRMATIVE DEFENSE NO. 9
### UNCLEAN HANDS

Fidelity, pursuant to the doctrine of unclean hands, is barred from recovering any damages.

## AFFIRMATIVE DEFENSE NO. 10
### SET OFF

To the extent Fidelity suffered any damages proximately caused by Fairhaven (and it did not), then the amount of those damages may only be applied as set-off against the far greater sums of money that Fidelity owes to Fairhaven because of the conduct set forth in Fairhaven's Counterclaim, *supra*.

## AFFIRMATIVE DEFENSE NO. 11
### PROMISSORY ESTOPPEL

Fidelity provided Ms. Taylor with assurances that upon her departure, it would advise her clients of her updated contact information. Ms. Taylor relied on Fidelity's assurances in this regard, but Fidelity has failed to provide that information to Ms. Taylor's former clients. Accordingly, Fidelity is precluded, under the doctrine of promissory estoppel, from pursuing claims based upon Ms. Taylor's outreach to her former clients.

## AFFIRMATIVE DEFENSE NO. 12
### FAILURE TO MITIGATE

Fidelity has failed to mitigate any damages it purportedly sustained as a result of the conduct alleged in the Amended Complaint. Indeed, by terminating its business relationship with Fairhaven, Fidelity has greatly exacerbated any damages it purportedly sustained.

### AFFIRMATIVE DEFENSE NO. 13
#### NO DAMAGES

Fidelity has suffered no damages or injury whatsoever as a result of the conduct alleged in the Amended Complaint.

### AFFIRMATIVE DEFENSE NO. 14
#### WAIVER AND ESTOPPEL

Fidelity is barred by the doctrines of waiver and estoppel from pursuing claims based on Ms. Taylor's conduct. Fidelity's former employees (each of whom signed the same post-employment restrictive covenants that Fidelity seeks to enforce against Ms. Taylor) have habitually and openly engaged in the same conduct allegedly engaged in by Ms. Taylor – with Fidelity's full knowledge and consent – yet Fidelity has never sought to enforce its restrictive covenants, and has never otherwise pursued legal action, against those employees.

### AFFIRMATIVE DEFENSE NO. 15
#### NO PROXIMATE CAUSE

Fidelity's claims against Fairhaven are barred in whole or in part because Fairhaven did not proximately cause any of the harm that Fidelity alleges. On the contrary, other intervening factors – including Fidelity's own conduct – are the cause of any alleged harm to Fidelity.

### AFFIRMATIVE DEFENSE NO. 16
#### RESTRAINT OF TRADE

Fidelity's claims against Fairhaven are barred in whole or in part because the June 30, 2011 Employee Agreement at issue is an unfair restraint on trade, contrary to public policy, and unenforceable as a matter of law.

### AFFIRMATIVE DEFENSE NO. 17
#### PREEMPTION

Fidelity's common law claims against Fairhaven are barred under the doctrine of preemption to the extent they are based on the same facts as Fidelity's statutory trade secret claims.

### AFFIRMATIVE DEFENSE NO. 18
### NO TRADE SECRETS

Fidelity's claims against Fairhaven for trade secret misappropriation are barred because the documents, information, data, and materials allegedly at issue do not constitute a protectable "trade secret."

### AFFIRMATIVE DEFENSE NO. 19
### NO INTRA-COMPANY CONSPIRACY

Fidelity's conspiracy claim is barred by the intra-company conspiracy doctrine – *i.e.*, an employer cannot, as a matter of law, conspire with an employee.

### AFFIRMATIVE DEFENSE NO. 20
### PRIVILEGE OF COMPETITION

Fidelity's claims against Fairhaven are barred, in whole or in part, by the privilege of competition.

### INCORPORATION OF MS. TAYLOR'S AFFIRMATIVE DEFENSES

To the extent that Fidelity's claims against Fairhaven are based on Ms. Taylor's actions and her duties to Fidelity (if any), Fairhaven incorporates by reference Ms. Taylor's Affirmative Defenses to the Amended Complaint.

### RESERVATION OF AFFIRMATIVE DEFENSES

Fairhaven expressly reserves its rights to assert any additional defenses as they become known or available during the pendency of this matter.

### JURY DEMAND

Fairhaven hereby demands a jury trial on all matters alleged in the Amended Complaint.

WHEREFORE, for all of the reasons set forth above Fairhaven respectfully requests that this Court enter judgment in its favor and against Fidelity, and enter an Order:

A.    Dismissing Fidelity's Amended Complaint in its entirety, *with prejudice*;

B.      Denying all relief sought by Fidelity in its Amended Complaint;

C.      Awarding to Fairhaven its actual costs and attorneys' fees incurred in connection
with this action; and

D.      Awarding to Fairhaven any such other and further relief as the Court deems just.


Dated: November 18, 2020                        Respectfully submitted,

                                                **FAIRHAVEN WEALTH**
                                                **MANAGEMENT, LLC,**
                                                **Defendant/Counter-Plaintiff**


                                                By: /s/ *Christopher S. Griesmeyer*
                                                        One of Its Attorneys

Christopher S. Griesmeyer (# 6269851)
Zachary Mulcrone (# 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 W. Randolph Street, Suite 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2020, I electronically filed the foregoing *Fairhaven Wealth Management, LLC's Counterclaim, Answer and Affirmative Defenses to Amended Complaint,* with the Clerk of the Court via the CM/ECF System, which will send notification of such filing to those registered to receive electronic notices via email transmission at the email addresses provided by them including Plaintiff's counsel listed below:

Joel W. Rice
Franklin Z. Wolf
FISHER & PHILLIPS, LLC
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
jrice@fisherphillips.com
fwolf@fisherphillips.com

Susan M. Guerette
FISHER & PHILLIPS, LLC
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
sguerette@fisherphillips.com

/s/ Christopher S. Griesmeyer
Christopher S. Griesmeyer (# 6269851)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Bus: (312) 428-2750
Fax: (312) 332-2781
cgriesmeyer@grglegal.com

# EXHIBIT 1



# MEMO

☐  Fidelity Internal
☐  Fidelity Confidential
■  Fidelity Highly Confidential

**To:** Jennifer Taylor
**Corp Id:** A058309
**From:** Scott Marshall
**cc:** Bill Meyers
**Date:** 08/19/2019
**Subject:** Written Warning for a period of 60 days through

This memo is to inform you that you have been placed on written warning, effective today. This action is being taken as a result of my concerns about your job performance. The purpose of this warning is to provide you a course of action to assist you in improving your performance to a level that consistently meets all expectations for your position.

We previously discussed your overall performance over the past several months. Our discussions have focused on business drivers, business results, and utilization of SalesForce.

Detailed below are the specific areas of performance and the expectations that must be met and maintained:

## Areas Which Require Improvement
- Consistent and daily use of salesforce to capture client interactions and building out the pipeline that support the clients' needs.
- Because of persistent gaps in these areas our clients are not receiving the optimal service and experience and your contribution to business results is significantly lagging others in your position.

## Action Plan
- All different types of client interaction are captured in salesforce on a daily basis. Examples include left message, phone call out, phone call in, meeting, and substantial emails.
- All flows and solutions are captured in salesforce on a daily basis.
- The total amount of tasks completed on a weekly basis will represent the success of your book engagement.
- All head of households will be contacted and documented in salesforce in regards to contact preference.
- You are to partner with your RM to schedule the majority of your appointments in the CAS tool in advance, which will lead to more targeted and productive meetings.
- Have your RPC or I join your meetings to help you build a strategy to have more targeted and productive meetings.
- Effectively organize and manage your lead management, sales process, tasks and pipeline through Salesforce on a daily basis as has been described to you in recent meetings with myself.

Failure to meet these expectations or any other requirements of your position not specifically mentioned here may result in further disciplinary action, which may include dismissal. If you succeed in meeting these expectations and continue to do so, your



MEMO

☐ Fidelity Internal
☐ Fidelity Confidential
■ Fidelity Highly Confidential

overall performance will be returned to a satisfactory level, which you will be expected to maintain thereafter.

Jennifer, during this performance warning period, I will meet with you biweekly to review your progress and I will monitor and evaluate your performance. I trust you understand the seriousness of this matter and will work diligently to bring about the necessary improvement.

Both HR Solutions and I are here to assist you. Our objective is for the outcome of this period to be successful. Please feel free to discuss any concerns you may have with me or by calling a member of HR Solutions at 1-800-835-5099, Option 2.

Please sign below to indicate that you have read and understand the contents of this document. Signing this memorandum does not indicate agreement, and in no way alters the agreement that your employment at Fidelity is at will and may be terminated by you or Fidelity at any time.

Jennifer Taylor

[date]

# EXHIBIT 2



# MEMO

☐ Fidelity Internal
☐ Fidelity Confidential
■ Fidelity Highly Confidential

**To:** Jennifer Taylor
**Corp Id:** A058309
**From:** Scott Marshall
**cc:** Bill Meyers
**Date:** 11/04/2019
**Subject:** Final Performance Warning for a period of 60 days through January 6, 2020

This memo is to inform you that you have been placed on final performance warning, effective today, November 4, 2019. Your final performance warning will be in effect for 60 days, through January 6, 2020. This action is being taken as a result of my continuing concerns about your job performance as outlined in your recent written warning on August 19, 2019. The purpose of this final warning is to provide you a course of action to assist you in improving your performance to a level that consistently meets all expectations for your position.

We previously discussed your overall performance over the past several months. Our discussions have focused on business drivers, business results, and utilization of SalesForce.

**Areas that have improved:**

- Consistency documenting client interacts
- Client contact preference

Detailed below are the specific areas of performance and the expectations that must be met and maintained:

**Areas Which Require Improvement**
- Continued consistency with daily use of salesforce to capture client interactions. Consistency building out all pipeline opportunities that support the clients' needs.
- Because of persistent gaps in these areas our clients are not receiving the optimal service and experience and your contribution to business results is significantly lagging others in your position.

**Action Plan**
- Continued documentation of all different types of client interaction are captured in salesforce on a daily basis. Examples include left message, phone call out, phone call in, meeting, and substantial emails.
- All flows and solutions are captured in salesforce on a daily basis.
- The total amount of tasks completed and execution of your pipeline on a weekly basis will represent the broad success of your book engagement.
- Partner with your RM to schedule the majority of your appointments in the CAS tool in advance, which will lead to more targeted and productive meetings.
- Have your RPC or I join your meetings to help you build a strategy to have more targeted and productive meetings.
- Effectively organize and manage your lead management, sales process, tasks and pipeline through Salesforce on a daily basis as has been described to you in recent meetings with me.



**MEMO**

☐ Fidelity Internal
☐ Fidelity Confidential
■ Fidelity Highly Confidential

It is expected that you will meet the requirements of the action plan and any other requirements of your position not specifically mentioned here. Unless your job performance improves significantly and unless that improvement is sustained, you may be subject to dismissal either during or at the end of this period. If you successfully complete your final performance warning period, you will be expected to maintain satisfactory performance thereafter. If you do not maintain satisfactory performance for one year following conclusion of the final performance warning period, then you may be subject to dismissal without any additional corrective action process.

Jennifer, during this final performance warning period, I will meet with you biweekly to review your progress and I will monitor and evaluate your performance. I trust you understand the seriousness of this matter and will work diligently to bring about the necessary improvement.

Both HR Solutions and I are here to assist you. Our objective is for the outcome of this period to be successful. Please feel free to discuss any concerns you may have with me or by calling a member of HR Solutions at 1-800-835-5099, Option 2.

Please sign below to indicate that you have read and understand the contents of this document. Signing this memorandum does not indicate agreement, and in no way alters the agreement that your employment at Fidelity is at will and may be terminated by you or Fidelity at any time.

Jennifer Taylor

[date] 11/4/2019

# EXHIBIT 3

**Fidelity**
INVESTMENTS®

November 4, 2020

Marc Horner
Fairhaven Wealth Management
104 E. Roosevelt Rd.
Suite 100
Wheaton, IL 60187

Dear Mr. Horner,

Your letter dated October 23, 2020 to our Chairman and CEO, Abigail Johnson regarding Fairhaven Wealth Management and Jennifer Taylor was forwarded to me for review and response. I appreciate the opportunity to respond. As you are aware, Fidelity has engaged with Fairhaven and your counsel numerous times over the last several months in effort to resolve concerns regarding solicitation of Fidelity customers and the activities of Ms. Taylor and Fairhaven. Despite those efforts, it is clear that we disagree as to the nature of the issues and that we are unable to come to an amicable resolution of the matter.

As a result, and given the adversarial nature of recent events, Fidelity has made a business decision to discontinue its relationship with Fairhaven pursuant to the terms of the Investment Advisory and Indemnification Letter between Fidelity and Fairhaven. This business decision will be communicated to Fidelity affiliates with which you may do business.

Fidelity will work with you to ensure a transfer to a new custodian within the next sixty (60) days. The following schedule has been established to facilitate an orderly transition:

| **Effective immediately:** | • Fidelity will no longer accept applications for new accounts.<br>• Fidelity will process transfer requests in accordance with customer instruction.<br>• Fidelity will continue to accept trading and other instructions from you on behalf of your customers pursuant to customer authorization until January 4, 2021. |
|---|---|
| **After January 4, 2021:** | • Your access to accounts will be removed and trading instructions will no longer be accepted from you.<br>• The designation of trading or power of attorney authorization to you by a customer will no longer be accepted by Fidelity including by Fidelity's retail organization.<br>• Fidelity will notify all of your clients that your relationship with Fidelity has been discontinued and may refer them to another advisor on the Fidelity platform.<br>• If you have authorized third party advisors to provide services to your customers' Fidelity accounts, they also will be removed from customer accounts on this date. You are responsible for notifying these advisors that they will be removed from these accounts and that they should discontinue all trading/activity in the accounts on or before this date. |

Thank you for your attention to this matter. Please contact your Relationship Manager with any questions.

Sincerely,

Dennis Hawley
Director, Fidelity Clearing & Custody Solutions

Fidelity Clearing & Custody Solutions provides clearing, custody or other brokerage services through National Financial Services LLC or Fidelity Brokerage Services LLC, Members NYSE, SIPC.

# EXHIBIT 4

**Meredith A. Faro**
Attorney

FMR LLC Legal Department

155 Seaport Blvd, ZW9A, Boston, MA 02110
Phone: (617) 392-8136  Fax: (617) 850-8335
meredith.faro@fmr.com



March 20, 2020

**<u>Via Overnight Delivery</u>**

Jennifer Taylor
606 Prairie Ave.
Glen Ellyn, IL  60137

Dear Ms. Taylor:

It has come to our attention that after you left your position as Financial Consultant in Fidelity Brokerage Services LLC's Oak Brook, IL Branch, you accepted a position with Fairhaven Wealth Management, LLC.

Fidelity has reason to believe that you may be contacting Fidelity customers for the purpose of soliciting their business.  The Employee Agreement ("the Agreement") you signed while in Fidelity's employ (copy attached) prohibits such solicitation of Fidelity's customers.  This letter constitutes a formal demand that any such activity cease immediately.  Furthermore, all of Fidelity's customer and prospect lists and all information concerning Fidelity's customers, including names, addresses, telephone numbers, email addresses and account information, are confidential and proprietary.  Pursuant to the Agreement and general principles of law, you are obligated to maintain all of Fidelity's confidential and proprietary information in strictest confidence.  This includes information that you have in your memory.  You may not disclose this information or make any use of it for yourself or for others, including your present or future employers.

Please return to Fidelity any confidential or proprietary information belonging to Fidelity in your possession, such as records, electronic data, computer files, lists, screen prints, or computer discs pertaining to Fidelity clients or individuals or entities you became aware of through your employment at Fidelity, including but not limited to names, phone numbers, addresses and/or email addresses, whether in original, copied, computerized, handwritten or any other form.  To the extent these exist in electronic form, you must not delete it or alter it in any way, but instead must refrain from using it, accessing it or transferring it to anyone, and you must contact us or have your counsel contact us to coordinate its preservation as evidence, and its return to us, in a forensically sound manner.  It is important to understand that deleting or altering such electronically stored information without taking forensically sound steps to preserve it will be viewed as intentional destruction of evidence, and there can be serious sanctions that result from such destruction.  Please verify that you have complied in full as set forth above by signing the enclosed affidavit and returning it to me by Monday, March 30, 2020.

Also, as a condition of your employment with Fidelity, you were obligated to comply with Fidelity's Compliance Policy for Electronic Communications, Social Media and Systems Usage (the "Social Media Policy").  Pursuant to the Social Media Policy, you were strictly prohibited

Jennifer Taylor
Page 2

from connecting with any Fidelity clients on LinkedIn or any other similar networking platforms, unless you had a pre-existing personal relationship with that client from prior to your employment with Fidelity. If you have violated this policy by connecting with any Fidelity clients on LinkedIn or other networking platforms, then Fidelity demands that you delete any such connections and refrain from (a) initiating any communications with such client(s) through LinkedIn or any other similar platform's messaging function, and (b) updating your place of employment in a manner that will result in a notification being pushed out to such client(s), or which will be captured by a routine periodic push of updates to such client(s) through regular operation of LinkedIn or other platforms' systems. If you have updated your information since resigning or otherwise engaged in contacts or communications with Fidelity clients via LinkedIn or other similar platform, then you must take steps to preserve evidence prior to any deletion, consistent with the instructions set forth above.

Please be advised that if Fidelity does not hear from you by Monday, March 30, 2020, the company will pursue all necessary and appropriate remedies that it may have against you, which may include seeking monetary damages, injunctive relief, and/or its attorneys' fees and costs.

I am also sending a copy of this letter to Marc Horner, President of Fairhaven Wealth Management, who, we assume, may want to take steps to ensure that you are not put in a situation that would require or allow you to breach the terms of the Agreement or your other obligations to Fidelity.

Further, you are hereby given notice of your obligation to preserve evidence that you know, or should know, may be relevant to any potential lawsuit regarding the matters set forth in this letter. You should not destroy, conceal, or alter any evidence related to any claims or defenses regarding this matter, including without limitation any evidence in paper or electronic files, or other data generated by and/or stored on any smart phones or computers, including home computers and laptops, or contained in email, text message, or voicemail.

If you have any questions, please let me know.

Very truly yours,

Meredith A. Faro

Enclosures

cc: Marc Horner, President
Fairhaven Wealth Management, LLC
104 E. Roosevelt Road, Suite 100
Wheaton, IL 60187

## AFFIDAVIT OF JENNIFER TAYLOR

JENNIFER TAYLOR, being first duly sworn, states as follows:

1.      My name is Jennifer Taylor and I am over the age of 18.  Except where otherwise indicated, the statements contained herein are based on my personal knowledge.  I was employed by Fidelity Brokerage Services LLC ("Fidelity") until my employment ended effective March 6, 2020.

2.      I hereby state that I do not have in my possession, custody or control customer lists (including any Christmas or holiday card or gift mailing lists), records, electronic data, computer files, or documents pertaining to Fidelity clients or prospective clients I worked with or  became aware of through my employment at Fidelity, including but not limited to names, phone numbers, addresses and/or e-mail addresses, whether in original, copied, computerized, handwritten, photographed, maintained on an iPhone or iPad or other personal device, or any other form.  This includes any documents created either during or after I left my employment with Fidelity that contain information pertaining to Fidelity clients or prospective clients that I worked with or became aware of through my employment at Fidelity, including information recreated through the use of memory, or by using information in memory to recreate information from public sources.  To the extent I had any such information in hard copy, I have returned the hard copy documents to Meredith Faro, along with this affidavit.  To the extent I had any such information in an electronically stored format, I or my counsel has engaged with Fidelity's counsel to arrange for forensically sound preservation, prior to removal, return to Fidelity and deletion from my possession, of any such electronically stored information.

3.      I have not given any of the above documents or information or copies thereof to any other person or entity.

Pursuant to 28 USC §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on _____, 2020        _____

                                                 Jennifer Taylor

Sworn to and subscribed before me
this _____ day of _____, 2040


_____
Notary Public