IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) |
| Plaintiff/Counter-Defendant, | ) |
| v. | ) Case No. 1:20-cv-2133 |
| JENNIFER TAYLOR, FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) |
| Defendants/Counter-Claimants. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF FIDELITY BROKERAGE SERVICES LLC'S MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Fidelity Brokerage Services LLC ("Fidelity") files this Memorandum of Law in Support of its Motion for a Preliminary Injunction against Defendants Jennifer Taylor and Fairhaven Wealth Management, LLC ("Defendants"). Fidelity brought its motion for injunctive relief almost ten months ago. However, due to the Defendants' intentional and coordinated efforts to obstruct discovery and prevent Fidelity from obtaining the evidence of their misconduct, it is only now that Fidelity is able to present the Court with the evidence demonstrating Defendants' theft and misappropriation of Fidelity's customer information and their solicitation and diversion of customers in violation of Taylor's contractual obligations. Unfortunately, Defendants have successfully delayed injunctive relief so long that this application is only being heard on the eve of the expiration of the one-year non-solicitation restraint in Taylor's employment agreement. As such, it no longer is practical for Fidelity to ask the Court to enjoin solicitation. What remains is the more modest but important relief of an order requiring return of Fidelity's customer and other confidential information so that Defendants will be unable to continue to misuse that information to aid their campaign to divert Fidelity customers to Fairhaven.

FP 39687424.3

## RELEVANT FACTS

Defendants made every effort to frustrate and delay discovery, with Taylor hiding behind Fairhaven, which had all the relevant documents, and Fairhaven purporting to be a loyal business partner of Fidelity's when it was instead conspiring with a former employee to steal Fidelity's business. But when the Court forced the Defendants to produce responsive documents, they revealed the depth and extent of Defendants' wrongdoing.

The documents and depositions show a carefully orchestrated plan to divert Fidelity's business to Fairhaven, with Defendants conspiring to take Fidelity's customer list and information and to use it to move customers' advisory services to Fairhaven, all while assuring clients that their assets would stay safely custodied with Fidelity. The Defendants' plan relied in part on the fact that, because assets would not actually leave Fidelity, Defendants believed it would be harder for Fidelity to detect or demonstrate its lost business, while Defendants collect client advisory fees.

Taylor began her plan to leave Fidelity and steal its business by compiling customer information on her personal cell phone. Although she denies having the information on her cell phone until after she resigned, evidence suggests otherwise. Taylor admits she purchased a new iPhone shortly after her resignation, but throughout the litigation and while delaying discovery, Taylor consistently denied moving information from her old phone to her newly-purchased phone. But when her deposition was finally taken, she admitted that she did have the contact system moved from her old phone to her new phone after she resigned. *See* Excerpts from Transcript of Deposition of Jennifer Taylor, attached hereto as **Exhibit A**, at 46:3-20.

There is no doubt that Taylor had Fidelity customer information before she resigned and did not find that information solely through memory and public sources as she claims.[1] Taylor

---

[1] Although Fidelity is not claiming that Taylor should have somehow returned information in her memory upon resigning, it was her use of that information to solicit customers that constituted

testified at deposition that, after she resigned, she sat down in front of her personal computer, and in one sitting remembered the names of 160 Fidelity customers, then looked up and found their information via Google searches. Ex. A, Taylor Dep. at 65:4-14. Taylor testified that she did not use any resources from Fairhaven or any specially-purchased services to assist in her searches. *Id.* at 65:22-66:1. Setting aside the question whether Taylor could, in one sitting, recite the names of 160 customers from memory, the spreadsheet of customer information she claims she created from memory contains at least fifty-four mobile phone numbers for Fidelity customers.[2] Mobile phone numbers are very rarely publicly-available through simple Google searches. Therefore, it is unlikely Taylor could have found the fifty-four cell phone numbers she had in her spreadsheet, which she then used to contact and solicit Fidelity customers to move their advisory business to Fairhaven. Fidelity also knows that Taylor possessed and used Fidelity customer cellphone numbers shortly after she resigned because she called and texted them on those numbers.[3]

Discovery revealed that not only did Taylor misappropriate customer information for over 160 customers, but she also provided that information to Fairhaven so it could have its employees assist in soliciting those customers. It is critical that Fidelity be granted the injunctive relief requiring Defendants to return Fidelity's customer information because discovery has confirmed that Defendants have not been truthful about the information taken from Fidelity and shared with

---

misappropriation and misuse of Fidelity's trade secrets and breach of her contract. Taylor has admitted that she used the list of Fidelity customers to contact them about her new firm. Ex. A, Taylor Dep. at 66:2-12.

[2] Even if Taylor's unlikely story were true, it simply would mean that she misappropriated Fidelity's trade secret customer list and information in her memory, by immediately disgorging that list from her memory for the sole purpose of using it to divert Fidelity clients' advisory business to her at Fairhaven.

[3] Taylor's text messages with Fidelity's customers are the subject of a separate motion for spoliation sanctions as Taylor had numerous exchanges with Fidelity customers after resigning but has failed to produce the vast majority of those messages, so neither Fidelity nor the Court is able to see what was said during those exchanges.

3

Fairhaven, and Fairhaven must have more information than it has produced. Specifically, Defendants have both insisted that the only information provided by Taylor to Fairhaven was a customer spreadsheet of information produced at Taylor 72-77. Yet, the notes of calls made by Fairhaven employee, Jean Lyon, and which she sent to Taylor when she reported on her calls to Fidelity's customers, confirm that she contacted multiple clients who were *not* on the list produced, which both Defendants insist was the only information given to Lyon. There is no way that Lyon would have known to call at least three additional Fidelity customers, who were otherwise unknown to her, unless Taylor provided additional customer information. Taylor was asked about this discrepancy during her deposition and had no explanation. Ex. A, Taylor Dep. at 162:4-164:7. In light of these misstatements, it is important that the Court issue an order requiring Defendants to return all information relating to Fidelity's customers because, without the threat of contempt, Defendants will continue to hide evidence and retain Fidelity's customer information.

Defendants' plan to divert customers did not stop with misappropriating Fidelity's confidential and trade secret customer information. Defendants then exploited that information to facilitate solicitation of Fidelity's customers. No doubt the Court will hear from Taylor that she "merely" followed a script in which she claims she called clients, gave them her new contact information and limited herself to answering their questions. Of course, this is nothing more than an admission that she exploited the client list she misappropriated from Fidelity by using it to divert Fidelity client advisory business to Fairhaven. Moreover, Taylor's story is belied by a mountain of evidence to the contrary. First, Taylor claims that every single one of the at least eighty Fidelity customers that she contacted specifically asked her to continue contacting them and to commence sending them information from Fairhaven. Ex. A, Taylor Dep. at 118:24-119:19. This is her explanation for why the evidence shows she did not make just the one phone call to

4

clients, as she claims, but repeatedly texted and/or called them. Quite a few of those clients she contacted repeatedly did not transfer their business, yet Taylor claims that she was not peppering them with follow-up calls and text messages, but rather that they all supposedly asked her to keep contacting them even though they remained at Fidelity. Taylor has not produced the script nor any evidence that she followed a script, nor did she provide the contact information she was using in writing. Instead she called every customer, in many cases multiple times, and now conveniently claims every single one wanted follow-up calls, emails and texts (but of course many of those texts are now missing).

Even more significant are the emails which Defendants ultimately were forced to produce. True and correct copies of emails produced by Defendants are attached hereto as **Exhibit B**. These emails show how aggressively Taylor solicited Fidelity customers, telling clients that:

- She looked forward to continuing her relationship with them. Ex. B at Bates FAIRHAVEN-0002258; FAIRHAVEN-0002637; FAIRHAVEN-0002664.

- She would work hard to make sure that she was adding value for them. Ex. B at Bates FAIRHAVEN-0002258; FAIRHAVEN-0002661.

- She enjoyed working with them. Ex. B at Bates FAIRHAVEN-0002295.

- She was hoping to continue her relationship with them at Fairhaven. Ex. B at Bates FAIRHAVEN-0002295.

- That she would welcome the opportunity to continue to work with them as she had for many years. Ex. B at Bates FAIRHAVEN-0002607; FAIRHAVEN-0002626; FAIRHAVEN-0002637.

- That she invites them to schedule an appointment with her to discuss their situation and what it would be like to continue their relationship with her at Fairhaven. Ex. B at Bates FAIRHAVEN-0002607.

Taylor claims that each and every one of these statements was made in response to a question from a customer. Although that is unbelievable, it also does not make sense, as there is no likely question that would elicit these statements (is it likely a client asked, "Gee, Ms. Taylor, are you

hoping to continue your relationship with me at Fairhaven?"). Logic dictates the contrary conclusion. These are solicitous statements made to convince customers to transfer their business.[4]

The fact that Taylor was soliciting during her phone calls is further confirmed by a "recap" email she sent to a client, reminding him of all of the things she said during their call, including:

- that there were differences between a smaller investment advisory firm versus a larger investment advisory firm and that smaller firms, like Fairhaven, could quickly and easily make decisions;

- that smaller firms, like Fairhaven, could more quickly and easily implement changes;

- that smaller firms, like Fairhaven, could give advice that is very tailored to the client's specific situation or in anticipation of market shifts;

- that a smaller firm, like Fairhaven, would be nimble and swift;

- that these differences translated into better and highly disciplined investment returns at a small firm like Fairhaven, verses a larger investment advisory firm like Fidelity;

- that keeping client to representative ratios lower at a firm like Fairhaven ensures that they would have a depth to their relationships;

- that at Fairhaven she would be able to keep service personalized by having more contact and accountability;

- that the average financial and investment experience of each team member at Fairhaven is over 20 years;

- that she had over 20 years of experience;

- that she would base portfolios at Fairhaven on an asset allocation process and would be able to use individual stocks, individual bonds, mutual funds and ETF's to create a diversified, tax efficient portfolio;

- that she was not tied to a particular product at Fairhaven and that this allowed her to give unbiased fiduciary advice;

- that there were benefits to working with an Independent Registered Investment Advisor;

- that at Fairhaven she had various specialties among her fellow advisors, such as an attorney

---

[4] Taylor's claims that these calls were not solicitations also sheds light on the likely content of spoliated text messages. It is fair to presume they were at least this clearly solicitous, if not worse.

6

    for contract review or estate planning and a Medicare and aging care specialist;

- that all of the services she would provide at Fairhaven were included in her very competitive annual advisory fee;

- that she would love to continue her financial relationship with them;

- that she would always try to add value to them and their loved ones in any way that you could.

*See* Ex. B at Bates FAIRHAVEN-0002501.  The Court will hear Taylor claim that every one of these statements was in response to a specific question from the client, and that the same was the case with other clients she similarly solicited.  Yet, there is no way this client, or others would have asked questions that would elicit those responses (is it likely a client said, "But Ms. Taylor, will you always be adding value for me and my loved ones?").  Even if that were believable, these were not neutral answers to questions but were targeted to negatively compare Fidelity to Fairhaven, which is the essence of solicitation.

    Taylor did not stop with soliciting Fidelity customers during her calls to them, she even solicited customers who contacted her for other purposes.  For example, a customer contacted Taylor to ask if she could recommend a new advisor at Fidelity.  Instead of recommending someone, she told the client that the Branch Manager could find someone else but then said "of course, my hope would be for us to explore whether we can continue to work together, as we have for many years." Ex. B at Bates FAIRHAVEN-0002644.  She then invited the client to "reach out when you would like to schedule some time to talk in more depth." *Id.*  This was clearly solicitous and not in response to the client's question.

    Likewise, even when clients indicated that they did NOT want to move their business to Fairhaven, Taylor continued to solicit them.  One client indicated that she did not want to transfer but Taylor kept at it, trying to convince her to move.  *See* Ex. B at Bates FAIRHAVEN-0002658.

7

She told this client that if they moved their business, their accounts would continue to stay at Fidelity and "the statements, tax forms, website, etc. would all be from Fidelity, just as they are now." *Id.* She also told the Fidelity client that if they changed their mind and wanted "to continue to work with [her] as we have for the last several years," to just call her. She continued saying no matter what they decided, she was happy that she had been able to meet with them quarterly and help guide them through their personal financial decisions. *Id.* Again, these were not answers to questions but were solicitations of a customer who had indicated that she did not want to transfer.

With regard to Fairhaven, there can be no doubt that the calls from Ms. Lyon to Fidelity's customers were to solicit their business. Taylor also knew exactly what Ms. Lyon was doing and saying to customers and that it went well beyond announcing. Ms. Lyon reported back to Taylor on how her calls to Fidelity customers were going and would confirm that she made the "at least ten" calls a day that they planned. In her reports to Taylor, Lyon would tell her that that the clients were "interested and said he'll call you," that she "thinks she got him to come to the office for a visit when this virus thing calms down!," that the customer said "Not a good time to move right now," "they like the new Fidelity rep. No thank you," "live across from Fidelity in Oakbrook – already have new rep. NTY," "No right to do call and poach Fidelity's business – calling Fidelity," and "would prefer to stay with new Fidelity rep." *See* Ex. B at Bates FAIRHAVEN-0001387-0001388, and FAIRHAVEN-0001390. Customers would not have been providing these types of responses to calls that merely provided them with Taylor's new contact information. In fact, there is undisputed evidence that a Fidelity customer was so upset about being contacted by a third party and solicited that she called Fidelity to report the incident. She even asked to speak with a Fidelity manager so she could elevate the issue because she was so concerned about the misuse of her confidential information. *See* Declaration of Scott Marshall, Dkt. 5-1 at ¶ 17. Although an

8

injunction against solicitation no longer makes sense because of the impending expiration of Taylor's non-solicitation covenant, the lengths to which Defendants have gone to mislead Fidelity and the Court about their solicitous conduct further illustrates that their claims of innocence are entitled to no weight, that their assertions that they have no Fidelity client lists are not credible, and that the injunctive relief Fidelity seeks is essential.

Finally, discovery has also confirmed that Taylor violated her fiduciary duty of loyalty to Fidelity and facilitated her plan to divert customers to Fairhaven by scheduling meetings with customers, but not putting that information into Fidelity's contact management system, where Taylor admitted those items should go. Ex. A, Taylor Dep. at 133:19-134:5. This meant that Taylor was scheduling meetings with Fidelity clients but not making that obvious to Fidelity, resulting in either Fidelity not knowing the client was expecting a meeting, or even more reprehensively, Taylor then kept the meeting with the client to talk about doing business with them at Fairhaven at the scheduled time. Taylor admitted to doing this and but has argued, in essence, that because she was being disciplined at Fidelity for failing to put notes in the Salesforce contact management system, therefore Fidelity should have known that she was an incompetent employee in this regard and presumably Fidelity should have assumed there were multiple appointments not recorded in the system. Ex. A, Taylor Dep. at 135:8-136:11. Taylor argues Fidelity should have known to have its new representatives scour her personal calendar entries for information that she knew she was supposed to put into Salesforce. Taylor should not be permitted to intentionally violate her duty of loyalty to Fidelity and then use those violations to further promote her plan to divert clients from Fidelity.

Based on these facts, and the law set forth below and in Fidelity's initial Memorandum of Law in Support of its Motion for Injunctive Relief, Fidelity requests that the Court issue injunctive

9

relief requiring Defendants to return all of Fidelity's confidential and trade secret information, specifically including its customer information, excluding information relating customers who already transferred their business to Defendants. Fidelity also asks that Defendants be ordered to identify any documents or information that would have been the subject to this order, but which Defendants now claim no longer exist, and to specify when, how and by whom the information was destroyed or otherwise rendered unavailable for return and production in this case.

## ARGUMENT

To obtain a preliminary injunction, a party must satisfy three requirements: 1) absent an injunction, it will suffer irreparable harm in the interim prior to final resolution; 2) traditional legal remedies would be inadequate; and 3) it has some likelihood of success on the merits. *Valencia v. City of Springfield*, 883 F. 3d 959, 965-66 (7th Cir. 2018). If the movant satisfies these requirements, in a balancing phase the Court weighs irreparable harm the movant faces absent an injunction against any irreparable harm the defendant would suffer if the court grants relief. *Id.*

### I. Fidelity Will Suffer Irreparable Harm Absent Injunctive Relief

In this case, Fidelity will suffer irreparable harm if its customer information is not returned and purged from Defendants' possession. In fact, there is a presumption of irreparable harm in cases of trade secret misappropriation. *Jano Justice Sys., Inc. v. Burton*, 636 F. Supp. 2d 763, 767 (C.D. Ill. 2009); *IDS Fin. Servs., Inc. v.* Smithson, 843 F. Supp. 415, 418 (N.D. Ill. 1994). Moreover, this is not a case where the information at issue will become stale – the information for the 160 Fidelity clients that Taylor misappropriated is valuable today and will be valuable in six months or two years. These are high net worth clients who have been culled out of the public at large, and found to be interested in, and willing to pay for, the exact type of advisory services that Fidelity – and Fairhaven – offers. If this information is not returned, Defendants will be able to further misuse it to divert clients. Even assuming that Taylor remembered the names of the 160

clients whose information she used at Fairhaven, and even accepting her story that she recreated this customer list by writing it down soon after leaving Fidelity, the same list could not likely be reconstituted to the same effect a full year later. As such, even a list recreated from memory shortly after her arrival, and anything derived from that, must be returned.

Defendants' continued possession of Fidelity's trade secret customer information causes Fidelity irreparable harm because a competitor's possession and exploitation of that information will make monetary damages difficult, if not impossible, to calculate. *See E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F. 3d 700, 705 (7th Cir. 2005). Fidelity's profits cannot be quantified to a reasonable level of precision by analyzing profits lost on a particular product as a result of Defendants' misuse of Fidelity's information. Rather, it is undisputed that in the securities industry, clients tend to stay with firms for many years. In fact, Taylor solicited clients by pointing out that she had worked with them for many years at Fidelity. By Taylor misusing Fidelity's trade secret and confidential information – and continuing to do so if it is not returned - Fidelity will not just lose clients for a year, but will lose their business for one, five or twenty years, depending on how long they would have stayed otherwise, which is unknown. Further, securities clients do not use the same services or generate the same fees year after year. Instead they have different events, such as taking money out of their investments to pay for college or inheriting money or selling a business. Therefore, the "profits" on accounts vary from year to year and evolve over time. Finally, as both sides have testified, clients often refer new clients to their advisor. Taylor herself testified that a number of the clients that she serviced for Fidelity were referred to her by other Fidelity clients. Ex. A, Taylor Dep. at 32:1-34:9. It is impossible to determine, if Taylor had not used Fidelity's trade secret information to divert its clients, how many referrals it would have received. The business that Fidelity would have generated from these

11

referral sources in the future is incalculable, thereby creating irreparable harm.

Finally, in the financial services industry, client confidence is critical to maintaining those relationships. When advisors take customer information to competing firms and use it to solicit customers who entrusted their information to Fidelity, client confidence and good will is eroded. As referenced previously, Fidelity had a client call to complain about this exact conduct by Taylor. Under Illinois law, "harm to reputation or goodwill cannot be adequately remedied by payment of damages, there is no adequate remedy of law." *Market Track, LLC v. Efficient Collaborative Retail Mktg.,* LLC, 2015 WL 3637740 at * 23 (N.D. Ill. 2015). This is a further basis to require Defendants to return Fidelity's customer information to prevent continuing irreparable harm. In a similar case involving financial advisors engaging in similar misconduct, the Seventh Circuit found irreparable harm and affirmed a preliminary injunction, stating that " the available evidence — indicating that Salvano and Coon took various documents and information pertaining to Merrill Lynch's clients and used that information to solicit Merrill Lynch customers — sufficiently supports the court's determinations regarding irreparable harm and the inadequacy of Merrill Lynch's legal remedy." *Merrill Lynch v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993) (citing and quoting *Merrill Lynch v. Patinkin,* 1991 WL 83163 at *6, 1991 U.S. Dist. LEXIS 6210 at *16 (N.D. Ill. May 3, 1991) (noting that Merrill Lynch "suffers irreparable harm from the solicitation and loss of its clients, and that this is a harm for which there is no adequate legal remedy").

**II.     Fidelity is Likely to Succeed on the Merits of Its Claims.**

Although a movant "must only show that [its] chances to succeed on [its] claims are better than negligible," here Fidelity has a strong likelihood of success. *Whitaker v. Kemosha Unified Sch. Dist. No. 1,* 858 F.3d 1034, 1044 (7th Cir. 2017) (internal quotations and citations omitted). In addition to enforceable agreements, which were violated, Fidelity's customer information is a trade secret under the Illinois Trade Secrets Act and the Defend Trade Secrets Act. *See Fidelity's*

12

*Initial Brief (Dkt.5), section II(B) re the trade secret status of its customer information.*

Fidelity's customer list is the lifeblood of its business and has been created over many years of effort and expense. It is incredibly valuable to a competitor who could use it to divert clients, and it cannot be duplicated without considerable time, effort and expense. *Stampede Tool Warehouse v. May*, 651 N.E.2d 209, 215 (Ill. App. Ct. 1995). Further, Fidelity has taken more than reasonable security measures to protect this information. *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 2005). Fidelity's policies, procedures and training in this regard are detailed in the Declaration of William Duserick. In addition, Fidelity requires its advisors to sign agreements providing that they will not use or disclose this information, which specifically includes customer lists and other financial and personal information regarding its customers. Further, Fidelity sent two letters to Taylor after she resigned enclosing the Agreements and reminding her of her obligations. *See* Exs. F and G to Declaration of Scott Marshall (Dkt.5-1).

Defendants will try to argue that this client data is exempt under both Taylor's Agreement and the trade secrets acts because it is "known to the public," however, this argument is factually and legally incorrect.[5] First, while many names on the client list Taylor misappropriated may in fact appear in public directories, they are proverbial needles in the haystack. They are names buried in mountains of data on the internet. Just as Taylor could not search the internet to find the names of customers being serviced by a Merrill Lynch nearby, she was only able to find the contact information for Fidelity's customers because she was entrusted with their information by Fidelity. Indeed, Taylor admitted that she could not name even ten clients of another Fidelity financial consultant with whom she previously worked and that she would not know where to look to find

---

[5] Defendants argue that because Taylor's Agreements exclude information that is "not generally known to the public," from the definition, that Fidelity's customer list is not covered. Again, this is an incorrect reading as Fidelity's customer list as a compilation, and is not publicly-available anywhere, either in whole or in any meaningful part.

13

any public source identifying the names of Fidelity clients other than those she worked with at Fidelity. Ex. A, Taylor Dep. at 217:16-219:5. Fidelity has developed its compilation of names of customers through enormous cost, through years of advertising and contacts, millions of dollars of effort and expense, to distill them from the millions of names among the public at large. This is the essence of a trade secret.

In *Financial Bank v. Bauknecht*, the Court assessed similar circumstances and concluded that the customer information was a trade secret and was misappropriated through the defendant's conduct. *First Financial Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 845 (C.D. Ill. 2014). Like Taylor, the defendant there testified that he created his customer list by remembering the names of the customers and then was able to "open up a phone book" to look up their names. *Id.* He argued that it was publicly-available information because he was able to look up their names through memory and public sources. The Court rejected that argument: "But this argument does not speak to how easy it might be to recreate the list without prior knowledge of its contents." *Id.* at 841. The Court understood that once the defendant knew the contents, he could recreate them, but without that prior knowledge, the information could not be found publicly. The same is true here.

The Court also rejected the defendant's argument that he did not misappropriate trade secrets because he allegedly took information in his memory. Longstanding Illinois law provides that taking a trade secret in memory still constitutes misappropriation. *See Stampede*, 651 N.E.2d at 217 ("taking does not have to be physical taking by actually copying the names. A trade secret can be misappropriated by physical copying or by memorization."); *Schulenburg v. Signatrol, Inc.*, 212 N.E.2d 865, 869 (Ill. 1965), *affirming*, 200 N.E.2d 615 (4th Dist.), *cert. denied*, 383 U.S. 959 (1966) ("It should, moreover, make no difference whether the information contained in the blueprints, if it qualified as a trade secret (which in our judgment it does), has been pilfered by

14

tracing the blueprints themselves, as some testimony herein indicates, or has been memorized by someone with a photographic memory, or has been committed to memory by constant exposure to the prints while in the employ of plaintiffs."); *E*TRADE Fin. Corp. v. Pospisil*, No. 18 C 5908, 2018 WL 4205401, at *4 (N.D. Ill. Sept. 4, 2018) ("Using memorization to rebuild a trade secret does not transform that trade secret from confidential information into non-confidential information"). The *Bauknecht* Court on similar facts found that "no reasonable jury could conclude that [defendant's] actions do not constitute misappropriation of [his employer's] customer lists." *Id.* Taylor violated her Agreement by retaining and misusing customer information, and both Defendants' misappropriated and misused Fidelity's trade secret customer information, and it must be returned.

### III. There Will Be No Harm To Defendants or the Public Through the Granting of the Preliminary Injunctive Relief Requested.

In this case, there will be no harm to Defendants if they are required to return and purge information regarding Fidelity's customers. Fidelity is carving out from its request any information for customers who have already transferred their business. Further, Taylor has admitted she already contacted – in many cases repeatedly – the clients on the list that she took. Ex. A, Taylor Dep. at 66:2-12. *See also Merrill Lynch v. Salvano*, 999 F.2d at 215 (balance of harms favored Merrill Lynch even where injunction broadly prohibited solicitation). Any clients who want to reach out to her are fully able to do so. In fact, even had she not solicited clients, Taylor can be found through a simple Google search and nothing in the requested order would stop customers from reaching out to her, or transferring their business to her, if they chose to do so.[6]

---

[6] Documents produced in discovery also establish that Taylor gave Fidelity customers her personal cell phone number before she resigned as in at least two cases, the phone records that the Defendants produced show that the Fidelity customer reached out to Taylor on her personal cell phone prior to her calling them.

15

## **RELIEF REQUESTED**

For the reasons asserted above, Fidelity respectfully submits that the Court grant the Preliminary Injunctive Relief as requested in its proposed Preliminary Injunction Order.


Dated: February 5, 2021

Respectfully submitted,

FISHER & PHILLIPS LLP

/s/ *Susan M. Guerette*
Susan M. Guerette (admitted *pro hac vice*)
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
TEL: (610) 230-2133
FAX: (610) 230-2151
sguerette@fisherphillips.com

Joel W. Rice
Franklin Z. Wolf
10 South Wacker Drive, Suite 3450
Chicago, IL 60606
TEL: (312) 346-8061
FAX: (312) 346-3179
jrice@fisherphillips.com
fwolf@fisherphillips.com

*Attorneys for Plaintiff*

# **CERTIFICATE OF SERVICE**

      I hereby certify that on this 5th day of February, 2021, the foregoing document was filed via the Court's electronic filing system, which sent notice to the following:

Christopher Griesmeyer
Zachary Mulcrone
Greiman, Rome & Griesmeyer, LLC
Two N. LaSalle, Suite 1601
Chicago, Illinois 60602

COUNSEL FOR DEFENDANTS

                                            */s/ Joel Rice*
                                            Attorney for Plaintiff