**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 1:20-cv-2133** |
| v. | ) | |
| | ) | **REDACTED VERSION FILED** |
| JENNIFER TAYLOR, FAIRHAVEN WEALTH | ) | **PURSUANT TO LOCAL RULE 26.2** |
| MANAGEMENT, LLC, | ) | |
| | ) | **HEARING REQUESTED** |
| Defendants. | ) | |

**DEFENDANTS' OMNIBUS RESPONSE BRIEF
IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR
PRELIMINARY INJUNCTION AND DISCOVERY SANCTIONS**

Defendants, Jennifer Taylor and Fairhaven Wealth Management, LLC, by and through their undersigned counsel, respectfully submit this omnibus response brief in opposition to Plaintiff, Fidelity Brokerage Services, LLC's motion for preliminary injunction (Dkt. 4), including Fidelity's memoranda of law dated April 3, 2020 (Dkt. 5) and February 5, 2021 (Dkt. 82), and to Fidelity's motion for discovery sanctions (Dkt. 84). Defendants respectfully request a hearing and oral arguments before the Court – either in-person or via videoconference – on these motions.

GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
(312) 428-2750

Christopher S. Griesmeyer
cgriesmeyer@grglegal.com

Zachary Mulcrone
zmulcrone@grglegal.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND ............................................................................... 4

FIDELITY'S DECLARATIONS ........................................................................... 9

LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS ............................... 13

ARGUMENT IN OPPOSITION TO PRELIMINARY INJUNCTION MOTION ...................... 13

    I.    FIDELITY WILL SUFFER NO HARM (BUT, IF IT DID, MONEY DAMAGES WOULD SUFFICE) ...........................................................................................14

        A.    No harm is threatened. ...................................................... 14

        B.    No imminent harm is threatened. ........................................ 16

        C.    Money damages can remedy any possible harm. ...................... 17

        D.    There is no presumption of irreparable harm here. ................... 20

    II.    FIDELITY HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS ....................20

        A.    Fidelity has no likelihood of success on its claim for breach of the confidentiality provision. .......................................................... 23

            1.    The confidentiality provision is unenforceable, whether or not it purports to protect client names. ................................. 23

            2.    If names of former clients are confidential, then the confidentiality provision is unenforceable. ........................ 25

        B.    Fidelity has no likelihood of success on its trade secret claim. ................. 26

            1.    Fidelity does not identify precisely what trade secret is at issue. . 26

            2.    Fidelity has done nothing to keep its customer names a secret. ... 27

                a.    Mr. Duserick's declaration does not establish secrecy. ........ 27

                b.    Fidelity does not prohibit clients from disclosing the relationship .......................................................... 28

                c.    Fidelity has not kept client names secret in this lawsuit. ...... 29

            3.    Fidelity's customer names are not trade secrets, whether or not Fidelity kept them secret. ........................................... 30

                a.    Fidelity admits names alone are not trade secrets. .............. 30

                b.    Fidelity customers are not a "needle in a haystack." ........... 30

            4.    Ms. Taylor has not misappropriated any trade secrets. ................. 31

        C.    Fidelity has no likelihood of success on a breach of loyalty theory. .......... 32

        D.    Fidelity's claim for breach of the non-solicitation covenant is irrelevant here.......................................................................................... 33

            1.    The non-solicitation covenant is unenforceable. ......................... 34

            2.    Fidelity has offered no evidence of solicitation............................. 35

III.    THE BALANCE OF HARMS WEIGHS AGAINST AN INJUNCTION .....................................37

IV.    THE COURT SHOULD NOT ENJOIN FAIRHAVEN ................................................................39

OPPOSITION TO SANCTIONS MOTION ....................................................................... 39

I.    MS. TAYLOR DID NOT SPOLIATE ANY TEXT MESSAGES ...............................................39

    A.    Fidelity offers no evidence of spoliation. ................................................. 40

    B.    Text messages with clients are irrelevant to this proceeding...................... 40

    C.    Fidelity has not shown the discovery cannot be replaced........................... 41

    D.    Fidelity has not shown "intent to deprive" under Rule 37(e)(2)................. 41

II.    MS. TAYLOR DID NOT SPOLIATE CONTACT CREATION DATES .....................................41

    A.    Fidelity never asked Ms. Taylor to produce phone contact creation dates.. 42

    B.    Rule 37(e) applies only when a party fails to take "reasonable steps" to preserve information. .................................................................................... 42

    C.    Contact creation dates fall outside of Rule 26. ............................................ 43

    D.    Fidelity has not shown any "intent to deprive."........................................... 43

CONCLUSION................................................................................................................ 44

# TABLE OF AUTHORITIES

**Rules**

FED. R. CIV. P. 26(b)(1) ............................................................................................. 43, 46

FED. R. CIV. P. 37(e)(2)......................................................................... 42, 43, 44, 45, 46

**Statutes**

18 U.S.C. § 1839(3)(A)...................................................................................................... 27

765 ILCS 1065/2(d)(2) ...................................................................................................... 27

**Cases**

*Arjo, Inc. v. Handicare USA, Inc*., No. 18 C 2554, 2018 WL 5298527
(N.D. Ill. Oct. 25, 2018)............................................................................................... 17, 18

*AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863............................................ 23, 25

*Atkins v. Robbins, Salomon & Patt, Ltd*., 2018 IL App (1st) 161961............................................. 18

*Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc*., 199 Ill. 2d 325 (Ill. 2002)................ 19

*Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437 (1st Dist. 2007).. 23

*Carlson Group, Inc. v. Davenport*, No. 16-CV-10520, 2016 WL 7212522
(N.D. Ill. Dec. 13, 2016) ...................................................................................................... 24

*Chase Bank USA, N.A. v. Swanson*, No. 10-CV-06972, 2011 WL 529487
(N.D. Ill. Feb. 4, 2011)......................................................................................................... 35

*Cincinnati Tool Steel Co. v. Breed*, 136 Ill. App. 3d 267 (2d Dist. 1985)................................... 23

*Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263 (7th Cir. 1992)............. 27

*D.U. v. Rhoades*, 825 F.3d 331 (7th Cir. 2016) ........................................................................ 18

*Dev. Services, Inc. v. Haarmann*, 389 Ill. App. 3d 561 (5th Dist. 2009)................................... 31

*E\*TRADE Fin. Corp. v. Pospisil*, No. 18 C 5908, 2018 WL 4205401 (N.D. Ill. Sept. 4, 2018) . 31

*E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co*., 414 F.3d 700
(7th Cir. 2005)...................................................................................................................... 20

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)........................................................ 20

*Fed. Trade Comm'n v. Lifewatch Inc.*, 176 F. Supp. 3d 757 (N.D. Ill. 2016)............................ 10

*First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819 (C.D. Ill. 2014) ............................ 30, 31

*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)....................................................... 20

*Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439
(N.D. Ill. Dec. 15, 2014) ...................................................................................... 18, 19, 23

*Glass v. Allied Waste Transp., Inc*., No. 15 C 10041, 2016 WL 6568071
(N.D. Ill. Nov. 3, 2016)........................................................................................................... 6

*GlobalTap LLC v. Elkay Mfg. Co*., No. 13 C 632, 2015 WL 94235 (N.D. Ill. Jan. 5, 2015)....... 28

*Graham v. Med. Mut. of Ohio*, 130 F.3d 293 (7th Cir. 1997)...................................................... 13

*Harlan v. Scholz*, 866 F.3d 754 (7th Cir. 2017)......................................................................... 13

*Harper v. United States Beef Corp*., No. 15-CV-3112, 2018 WL 3863526777
(C.D. Ill. July 23, 2018) ........................................................................................................ 36

*H-D U.S.A., LLC v. Guangzhou Tomas Crafts Co., Ltd*., No. 16-CV-10096, 2017 WL 6733685
(N.D. Ill. Dec. 18, 2017) ...................................................................................................... 10

*Hickman v. Taylor* 329 U.S. 495 (1947) ................................................................................... 41

*ISC-Bunker Ramo Corp. v. Altech, Inc*., 765 F. Supp. 1310 (N.D. Ill. 1990)............................. 20

*Jano Justice Sys., Inc. v. Burton*, 636 F. Supp. 2d 763 (C.D. Ill. 2009) .................................... 20

*Larson v. Bank One Corp*., No. 00 C 2100, 2005 WL 4652509 (N.D. Ill. Aug. 18, 2005)......... 41

*Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir. 1986) .......................................... 19

iv

*Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265 (1st Dist. 2005) ..................................... 28

*McDavid Knee Guard, Inc. v. Nike USA, Inc*., 683 F. Supp. 2d 740 (N.D. Ill. 2010)................. 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618 (N.D. Ill. 2000)...... 38

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211 (7th Cir. 1993) ............. 15

*Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011)................................ 17

*Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957,
2015 WL 3637740 (N.D. Ill. June 11, 2015) ................................................................ 19

*N. Am. Paper Co. v. Unterberger*, 172 Ill. App. 3d 410 (1st Dist. 1988)................................... 25

*Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059 (N.D. Ill. 2020)........................ 18

*Park v. City of Chicago*, 297 F.3d 606 (7th Cir. 2002)............................................................ 24, 39

*Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc*., 149 F.3d 722 (7th Cir. 1998) ....... 38

*Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871 ...................................................... 23, 35

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984).................................... 13

*Schulenburg v. Signatrol, Inc*., 33 Ill. 2d 379 (Ill. 1965)............................................................ 31

*Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580 (1st Dist. 1995) .......................... 31

*In re Teknek, LLC*, 343 B.R. 850  (Bankr. N.D. Ill. 2006) ........................................................ 34

*Traffic Tech, Inc. v. Kreiter*, No. 14-CV-7528, 2015 WL 9259544 (N.D. Ill. Dec. 18, 2015)..... 27

*United Asset Coverage, Inc. v. Avaya Inc*., 409 F. Supp. 2d 1008 (N.D. Ill. 2006) ................... 16

*Wiggins v. Baldwin*, No. 17-CV-583-DRH-DGW, 2017 WL 6334369 (S.D. Ill. Dec. 12, 2017) 34

*Winkler v. Eli Lilly & Co*., 101 F.3d 1196 (7th Cir. 1996) ........................................................ 35

*Woodfield Group, Inc. v. DeLisle*, 295 Ill. App. 3d 935 (1st Dist. 1998).................................... 15

## PRELIMINARY STATEMENT

Jennifer Taylor worked as a financial advisor at Fidelity for more than 23 years. During that time, she developed very close, personal relationships with many of her clients, whom Fidelity recognized and openly referred to as "her clients." Despite her longstanding tenure with Fidelity (and her desire to continue working at Fidelity until her retirement), Ms. Taylor learned in early 2020 that her employment with the company would soon be terminated. Left with no choice, she scrambled to secure alternate employment, which she found at small investment advisory firm called Fairhaven Wealth Management, on March 6, 2020. Her break from Fidelity was perfectly "clean" – she did not take any files, client lists, account information, or documents from Fidelity. When Ms. Taylor arrived at Fairhaven, she brought nothing except the generalized knowledge that she had accumulated during her 23-year career at Fidelity.

Ms. Taylor's forced departure from Fidelity could not have come at a worse time. As the Court will recall, March of 2020 was the start of the "COVID-19" pandemic. State and local authorities issued emergency "shelter-in-place" mandates; businesses across the country were ordered to close; unemployment skyrocketed overnight; and the economic turmoil precipitated a global financial meltdown. The financial markets were thrown into chaos. Ms. Taylor's clients (many of whom had worked with and trusted her for nearly a quarter-century) were panicked and desperately trying to reach her. Fidelity, however, ***refused*** to provide Ms. Taylor's clients with her new contact information. This was not only a violation of FINRA regulations, but also of Fidelity's own compliance policies.

Several resourceful clients tracked Ms. Taylor down at Fairhaven, and informed her that Fidelity was refusing to provide them with her new contact information. Ms. Taylor recognized that she had a professional and fiduciary to ensure that any client who wanted to reach her would be able to do so. Accordingly, more than two weeks after she had left Fidelity, Ms. Taylor created

– *from memory* – a list of her closest and most long-standing clients (approximately 10% of her total client book). She then used public online resources to locate the contact information for these clients. (**Exhibit 1**). Ms. Taylor used that list to systematically make "announcement calls" to inform those clients that she had left Fidelity and, if requested by a client, provide her new contact information.

Ms. Taylor's employment agreement with Fidelity did not prohibit her from calling her clients to announce her departure from the company. Such "announcement calls" are routine in the financial services industry; and Ms. Taylor knew that in making her calls, she behaved no differently than every other departing advisor from Fidelity's Oak Brook branch. Ms. Taylor made her last announcement call nearly a year ago – on April 6, 2020 – and neither she nor anyone at Fairhaven have reached out to any of her clients since then.

The original focus of Fidelity's preliminary injunction motion was to enjoin Ms. Taylor from soliciting Fidelity customers. Instead of proceeding expeditiously on its motion, however, Fidelity pursued extensive third-party discovery, which resulted in Fidelity's motion not being fully briefed until after Ms. Taylor's one-year non-solicitation period had already expired. Because Fidelity's delay rendered the issue of solicitation moot, Fidelity is no longer seeking to enjoin Ms. Taylor's "solicitation" of customers. Instead, Fidelity now requests an injunction prohibiting Ms. Taylor and Fairhaven from using the list of client names that Ms. Taylor created after she had left Fidelity; and Fidelity also seeks a mandatory injunction requiring Ms. Taylor and Fairhaven to destroy that list. ***That's all.*** Fidelity has taxed the Court's resources and put Defendants through a year of litigation to stop Ms. Taylor from using a list containing the names of people that she knows by heart.

Despite all of this litigation and its far-reaching discovery, Fidelity cannot establish any of the factors necessary for an injunction. First, there is no threat of irreparable harm. Enjoining Ms.

Taylor from looking at a list of names that she knows by heart (and could re-create again using her general memory and publicly available information) could not possibly prevent any harm to Fidelity. But, if any harm were actually threatened, it could be easily remedied through an award of money damages. Fidelity also has no likelihood of success on the merits. Fidelity can present no evidence to suggest Ms. Taylor took any documents or trade secrets; even after a year of litigation, Fidelity's motion is premised almost entirely on vague assertions of wrongdoing, rooted in nothing more than speculation and conjecture. All Fidelity can show is what Ms. Taylor has admitted since this lawsuit began:

- Several weeks after she left Fidelity, Ms. Taylor created a list of her closest and most long-standing clients.

- Ms. Taylor did not use any Fidelity documents or information to create that list; nor did she need to. Ms. Taylor has worked with these clients for more than 20 years, and knows their names by heart.

- Ms. Taylor then used publicly available information on the Internet to find the contact information for these clients.

None of this is actionable. Having failed to satisfy the heavy burden required to obtain an injunction, Fidelity asks the Court to make several adverse inferences against Ms. Taylor. Fidelity alleges that when Ms. Taylor purchased a new iPhone, she spoliated certain text messages and "contact creation" data that resided on her old "Samsung" (Android) cell phone. But text messages would bear no relevance to this preliminary injunction proceeding, which is now limited to Fidelity's allegation that Ms. Taylor misappropriated trade secrets – ***not*** any alleged solicitation. As to "contact creation dates," Fidelity never requested their production. Even if it were possible to spoliate documents that are irrelevant or which the movant never requested (and, it is not), Fidelity has still failed to establish the "bad faith intent" necessary to make an adverse inference.

## FACTUAL BACKGROUND

### I.   MS. TAYLOR RESIGNED FROM FIDELITY AND JOINED FAIRHAVEN

On March 6, 2020, Ms. Taylor was constructively discharged from Fidelity, where she had worked as a financial advisor for more than 23 years.  (**Exhibit 2**, Marshall at 52:21-53:15).  Ms. Taylor never wanted to resign, but was forced to quickly find another job after receiving discriminatory threats from her manager, Scott Marshall ("Marshall").   On March 6, 2020, she started a new job at Fairhaven, a small registered investment advisor, without the benefit of any employment agreement, without any guaranteed salary or benefits, and without a dedicated full-time assistant.  (**Exhibit 3**, Taylor at 27:15-28:2; 34:10-18).

When Ms. Taylor resigned, she left all customer information with Fidelity.  (Ex. 3, Taylor at 58:16-61:1).  She did not take any customer lists, download any confidential information, put any information on a USB drive, print any files for herself, forward any emails to herself, have any customer contacts in her cell phone, or possess *anything* with the names of Fidelity clients on it.  (*Id*. at 41:11-42:1, 42:14-21, 57:19-58:1, 59:3-61:1).  There is no evidence to the contrary.

### II.   WHEN MS. TAYLOR JOINED FAIRHAVEN, THE MARKETS WERE IN TURMOIL

Ms. Taylor's forced departure from Fidelity coincided with the onset of the COVID-19 pandemic.  Economic activity shut down quite literally overnight, roiling the financial markets and sending them into free-fall.  On March 9, 2020, the Dow Jones Industrial Average dropped 8%; just three days later, on March 12th, the Dow fell 10% (the largest single-day drop in history); on March 16th, the Dow fell another 12% (eclipsing the previous record set just four days prior), and both the NASDAQ and S&P 500 dropped 12-13%.[1]  Financial experts opined that it was the start of an economic downturn that could rival, if not eclipse, the Great Depression.[2]

---

[1] *See* https://en.wikipedia.org/wiki/2020_stock_market_crash.

[2] https://www.cnbc.com/2020/03/20/analyst-anticipates-worst-crisis-since-1929-amid-recession-fears.html.

Consequently, Ms. Taylor's clients – many of whom she had worked with for 20 to 25 years – were panicking, desperate to get ahold of her for advice, and upset she left Fidelity. (*See* Ex. 2, Marshall 111:16-112:14). Fidelity's internal records confirm this:



### III.   MS. TAYLOR ANNOUNCED HER DEPARTURE FROM FIDELITY

Due to the volatile state of the financial markets, her professional obligations as a trusted advisor, and her longstanding relationships with many of her clients, Ms. Taylor understood she had a fiduciary duty to make sure her clients knew: (a) that she had left Fidelity, and (b) how to reach her, if they wanted to. (Ex. 3, Taylor at 73:11-14, 156:12-20). Thus, once she was at Fairhaven, Ms. Taylor began making the industry-standard "announcement calls" to her closest and most longstanding clients. (**Exhibit 5**, Taylor Dec. at ¶ 31).

There was nothing untoward about these announcement calls. In 2011, Ms. Taylor signed Fidelity's Employee Agreement – a form contract that all advisors were required to sign. (Dkt.

84-1 at 5-6).[3]  The Employee Agreement includes a one-year non-solicitation covenant and a confidentiality provision.  (*Id*.).  It ***does not***, however, include a "non-compete" covenant; nor does the agreement prohibit Ms. Taylor from: (i) accepting business from her clients; (ii) contacting clients or speaking with them in general; (iii) responding to inquiries or answering questions from clients; or (iv) or announcing her departure from Fidelity.  (*Id*.; Ex. 2, Marshall at 159:10-17, 163:4-9).  Ms. Taylor knew that "announcement calls" are standard practice in the financial services industry; indeed, no less than four (4) departing Vice Presidents from Fidelity's Oak Brook branch told her that they made announcement calls after leaving Fidelity, without any complaint.  (Ex. 3, Taylor at 190:14-192:22).

During her announcement calls, Ms. Taylor was extremely careful to avoid any "solicitation" or "inducement" of her clients.  (Ex. 3, Taylor at 68:23-69:4; Ex. 5, Taylor Dec. at ¶ 32).  She stuck to a short and carefully-worded announcement script:  "I'm calling to let you know I'm no longer with Fidelity Investments.  Would you like my new contact information?"  (Ex. 3 at 78:17-21, 119:20-23, 120:24-121:4).[4]  If the client answered "yes," then Ms. Taylor asked how they would like to receive her information (most said "e-mail" and provided their addresses).  (*Id*. at 121:11-13).  However, if the client said "no," then Ms. Taylor would have politely ended the call.  (*Id*. at 114:14-15, 118:12-19).  Not surprisingly – especially given Ms. Taylor's long-term relationship with her clients, and the tenuous financial markets – every single client Ms. Taylor talked to asked her questions (usually about the markets and their investments), and every single client she talked to, as far as she could recall, asked her to send them her new contact information.  (*Id*. at 118:12-119:19, 121:2-122:9).  Ms. Taylor sent a follow-up e-mail if – *and*

---

[3] This superseded a similar agreement (Dkt. 5-1 at 21-23) she signed in 1999.  *See Glass v. Allied Waste Transp., Inc*., No. 15 C 10041, 2016 WL 6568071, at *2 (N.D. Ill. Nov. 3, 2016) (elements of supersession).

[4] Fidelity asserts that Ms. Taylor did not produce this script, misleadingly implying she withheld documents. (Dkt. 82 at 5).  Fidelity ignores the fact that it was not a "written" script.  (Ex. 3, Taylor at 120:4-12).

*only if* – the client specifically requested it during their call. (*Id.* at 93:23-94:8, 96:5-10, 118:16-19). Ms. Taylor never solicited any of her clients, and never sent any unsolicited e-mails.

## IV. FIDELITY WRONGFULLY REFUSED TO PROVIDE MS. TAYLOR'S NEW CONTACT INFORMATION TO CLIENTS WHO REQUESTED IT

Shortly after leaving Fidelity, Ms. Taylor learned that Fidelity was violating its own rules and FINRA regulations by refusing to provide her contact information to clients. FINRA Regulatory Notice 19-10 requires member firms to "provide customers with timely and complete answers, if known, when the customer asks questions about a departing registered representative." (**Exhibit 6**). In recognition of this regulation, Fidelity instituted a compliance policy requiring Fidelity to ██████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████ (**Exhibit 7**; Ex. 2, Marshall at 65:8-73:10, 76:2-16; **Exhibit 8**, Meyers at 107:20-108:11).

When Ms. Taylor resigned, she provided her cell phone number so that Fidelity could give it to any clients who sought her contact information. (Ex. 3, Taylor at 35:15-35:3; Ex. 2, Marshall at 70:10-13; Dkt. 5-1 at 28). Fidelity was, thus, ***required*** to provide Ms. Taylor's contact information to any customers who asked for it. Nevertheless, Fidelity's internal records show that, in mid-March 2020 (during the height of the COVID-19 market volatility), several clients asked for Ms. Taylor's contact information but Fidelity refused to provide it.[5] Several other clients, including ██████████████████████████████████████████████████, also

---

[5] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

informed Ms. Taylor that Fidelity refused to provide them with her contact information. (Ex. 3, Taylor at 153:18-154:11, 164:22-165:16, 166:9-23, 167:3-12, 167:16-168:1).[6]

Knowing full-well that Ms. Taylor's clients were panicked about the markets and desperate to get ahold of her, Fidelity did not merely violate FINRA regulations (and its own compliance policy) by withholding her contact information, Fidelity deceived clients by actively creating the false impression that Ms. Taylor *still worked at Fidelity*. On March 13, 2020 – one week after Ms. Taylor's departure – Fidelity circulated an e-mail blast to Ms. Taylor's clients, using an e-mail account under Ms. Taylor's name (JenniferATaylor.team@fidelity.com), under her signature. (Ex. 2, Marshall at 102:4-23; **Exhibit 9**). This was carefully designed to make it appear to Ms. Taylor's clients that she still worked at Fidelity, and that they should contact Fidelity if they wanted to reach her; understandably, this confused Ms. Taylor's clients. (*See* Ex. 9)██████████████
████████████████████████████████████

## V.   MS. TAYLOR MADE A LIST OF CLIENTS WHOSE NAMES SHE KNOWS BY HEART

When Ms. Taylor learned that Fidelity was refusing to provide her contact information to clients who requested it, she decided to ask an assistant at Fairhaven to help her make announcement calls. To aid in that process, Ms. Taylor sat down at her home computer on March 22, 2020, and created a list of her closest and most long-standing clients. (Ex. 3, Taylor at 61:11-64:19; Ex. 1). The completed list contained 160 names, representing less than 15% of her book of approximately 1,200 clients. (*Id*. at 122:16-123:1, 211:22-212:13; Ex. 1).[7] The only source of this

---

[6] Fidelity did not produce any documents indicating that it ever provided Ms. Taylor's contact information to these individuals. Mr. Marshall testified that if Fidelity had provided these clients with Ms. Taylor's contact information, that interaction would have been documented in Fidelity's "Salesforce" notes. But Fidelity did not (and cannot) produce any Salesforce notes to show it provided Ms. Taylor's contact information to these clients. (Ex. 2, Marshall at 88:11-16, 97:20-98:1).

[7] Fidelity alleges Ms. Taylor's client book consisted of 435 client *households*; each household has several client names associated with it, and 435 households would equate to approximately 1,200 client names.

information was Ms. Taylor's indelible memory of having worked with certain clients for years or decades. (*Id*. at 65:9-14). After typing out the list of names, Ms. Taylor looked up the clients' phone numbers using public sources available on the Internet, and added those numbers (along with the states she believes the clients reside in) to the list. (*Id*. at 53:19-54:8; Ex. 1).

Ms. Taylor's list of client names is attached hereto as **Exhibit 1**. Despite that this list forms the very basis of its motion, Fidelity does not bother to attach it as an exhibit. Presumably, Fidelity does not want the Court to see that it is not a Fidelity document, it does not include any financial information, it is not any sort of official customer or client list, and it was not created using any Fidelity documents or information. It is merely a compilation of Ms. Taylor's generalized knowledge of the names of people with whom she has closely worked for more than 20 years, and information she found on the Internet.

Ms. Taylor printed two copies of this list and gave one to Jean Lyon ("Lyon"), an administrative assistant at Fairhaven who provides part-time support. Ms. Taylor gave Ms. Lyon strict instructions to ***only*** (i) announce Ms. Taylor's departure from Fidelity, and (ii) ask if the client wanted Ms. Taylor's new contact information. (Ex. 3, Taylor at 120:16-20, 153:13-154:20, 160:6-19). If the answer was "yes," then Ms. Lyon was to answer any questions the client may have had. If the answer was "no," then Ms. Lyon was to politely end the call. (*Id*. at 154:14-155:1). Ms. Lyon made calls between March 23 and April 6, 2020. Neither Ms. Lyon nor Ms. Taylor have reached out to any clients since April 6, 2020. (*Id*. at 209:20-210:5).[8]

## FIDELITY'S DECLARATIONS

Fidelity supports its preliminary injunction motion with three declarations: the declaration of Charles Meyers ("Meyers") (Dkt. 1-1); the declaration of Mr. Marshall (Dkt. 5-1); and the

---

[8] Ms. Lyon no longer has this list, and Fairhaven has no copies of it. (*See* Dkt. 65; Dkt. 67; Dkt. 70).

February 5, 2021 declaration of William Duserick ("Duserick") (Dkt. 82-2). The Court should give no weight to any of these declarations.

The Marshall and Meyers declarations are unreasonably vague and ambiguous. This could be because they executed their declarations on or before April 3, 2020, when Fidelity did not have the benefit of discovery.[9] Much of the vagueness is deliberate. For instance, when Mr. Marshall states that Fidelity has been receiving reports that Ms. Taylor has been soliciting customers, he provides no information about the specific clients who provided the reports, the financial advisors who received them, or anything else. (Dkt. 5-1 at ¶¶ 15-18). This is insufficient to satisfy Fidelity's burden.

Moreover, the assertions about solicitation and Ms. Taylor's customer interactions are all hearsay – sometimes double or triple hearsay. While courts may consider hearsay when ruling on preliminary injunctions, hearsay goes to the weight the Court should afford the evidence. *Fed. Trade Comm'n v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 762 (N.D. Ill. 2016). These relaxed evidentiary standards reflect that most injunctions proceed apace, without the benefit of much (if any) discovery. Here, however, Fidelity conducted *eight (8) months* of discovery, and could have obtained declarations directly from the customers or any of the advisors who spoke to them. If it was unable to do that, Fidelity should have at least included in its declarations names, dates, and specific details of conversations. Instead, Fidelity offers nothing more than summary descriptions

---

[9] It is unclear when Mr. Meyers and Mr. Marshall executed their declarations. The declarations are undated, and they testified that they do not know when they signed them. (Ex. 8, Meyers at 25:15-18; Ex. 2, Marshall at 25:2-4). Because they are undated, the declarations would be inadmissible on summary judgment, and should be given no weight here. *H-D U.S.A., LLC v. Guangzhou Tomas Crafts Co., Ltd.*, No. 16-CV-10096, 2017 WL 6733685, at *1 (N.D. Ill. Dec. 18, 2017) ("[28 U.S.C.] Section 1746 requires a dated signature. Accordingly, this Court does not consider the undated declaration as evidence."). Mr. Marshall also could not explain the curious fact that all of his declaration is double-spaced, except one single-spaced page. (Ex. 2, Marshall at 28:15-30:22; Dkt. 5-1 at 5-6). These facts suggest there is something about the dates the declarations were originally drafted, revised, and executed that Fidelity does not want to disclose.

of its financial advisors' descriptions of its clients' descriptions of their conversations with Ms. Taylor or her administrative assistant. This is not reliable.

On deposition, Mr. Marshall and Mr. Meyers could not remember even basic details about their declarations. For instance, in Paragraph 15 of Mr. Marshall's declaration, he states that Fidelity had been receiving reports that Ms. Taylor was soliciting customers to transfer their business to Fairhaven. (Dkt. 5-1 at ¶ 15). During his deposition, Mr. Marshall did not know how many such reports Fidelity had received. When asked if Fidelity had received more than 1,000 reports, he responded with a concerning lack of candor: "I don't recall. I don't think it was 1,000." (Ex. 2, Marshall at 171:9-20). When pressed on specific names, Mr. Marshall responded, "I don't recall specific names at this point." (*Id*. at 171:22-172:5).

Mr. Meyers' testimony is similarly problematic. He states in his declaration, "I understand that Taylor has been, and continues, to directly compete with Fidelity and use Fidelity's trade secret customer information to aggressively solicit customers to transfer their accounts to her new firm, Fairhaven." (Dkt. 1-1 at ¶ 14). When asked how he had such an understanding, Mr. Meyers testified: "I do not have that understanding. I do not run the Oak Brook branch." (Ex. 8, Meyers at 83:13-84:14). Similarly, in his declaration, Mr. Meyers references "Capital Forensics, the firm which maintains and stores the Protocol" for Broker Recruiting. (Dkt. 1-1 at ¶ 13). Mr. Meyers testified, however, that he does not know what Capital Forensics is, and that he is "not familiar with that part of the declaration." (Ex. 8, Meyers at 124:15-127:22). When asked why he would put that in his declaration if he is not familiar with it, he responded, "I'm confident in Fidelity's legal team." (*Id*.).

The defects in the Marshall and Meyers declarations also plague the new declaration by Mr. Duserick. For example, Mr. Marshall and Mr. Meyers declare they have personal knowledge of Fidelity's protection of trade secrets and confidential information. (Dkt. 5-1 at 1-2, ¶¶ 1, 6, 8;

Dkt. 1-1 at ¶¶ 1, 12).[10]  Accordingly, at their depositions, Ms. Taylor expected to be able to examine the methods that Fidelity supposedly uses to protect its trade secrets.  Both Mr. Marshall and Mr. Meyers testified, however, that they ***do not*** have personal knowledge regarding Fidelity's data protection methods.  Mr. Marshall stated "that's not my expertise," and admitted he did not know how Fidelity monitors employee access to confidential data, whether trade secrets could be printed, whether anyone monitors the download of customer data, or even whether an employee ***could*** download data.  (Ex. 2, Marshall at 40:21-42:1, 42:18-43:7, 44:22-45:22, 46:15-20, 47:2-52:20).  Similarly, Mr. Meyers testified that because he is not part of the security department, he does not know about Fidelity's ability to monitor employees.  (Ex. 8, Meyers at 136:9-141:1).

 Despite having prevented Ms. Taylor from examining Fidelity's trade secret protection methods on deposition, Fidelity attaches to its memorandum a new declaration by Mr. Duserick (an employee in the cybersecurity division of Fidelity's parent company) purporting to explain Fidelity's trade secret protection methods.  (Dkt. 82-2).  Fidelity never produced this declaration in discovery.  Fidelity could have done so, but withheld it until now so that Ms. Taylor would have no opportunity to depose Mr. Duserick, or any ability to question Mr. Marshall and Mr. Meyers about the matters raised in his declaration.  This gamesmanship violates the letter of Fidelity's discovery obligations and the spirit in which expedited discovery was meant to proceed.[11]

The Court should afford no weight to Mr. Duserick's declaration.  But if it does, the Court should note what is glaringly absent:  Fidelity's cybersecurity expert fails to mention the steps that he took – ***if any*** – to determine whether Ms. Taylor misappropriated anything from Fidelity.

---

[10] Mr. Marshall, for instance, stated on "personal knowledge" that "Fidelity vigilantly preserves its trade secret customer data" and that "Fidelity further protects this confidential information by using various safeguards for its computer system…."  (Dkt. 5-1 at 2, ¶¶ 6, 8).

[11] A declaration concerning Fidelity's protection of trade secrets "relates to the … trade secret information that Fidelity contends Ms. Taylor has misappropriated."  Fidelity was, thus, required to produce Mr. Duserick's declaration under Request for Production No. 1.  (*See* Dkt. 44-2 at 4-5).

## LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

"'[T]he granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984). "In order to obtain a preliminary injunction, a plaintiff must show three things: (1) without such relief, he will suffer irreparable harm before his claim is finally resolved; (2) he has no adequate remedy at law; and (3) he has some likelihood of success on the merits." *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017). If the plaintiff is able to meet that burden, the Court must then balance the harms to Defendants and the public. *Id.*

Fidelity's test here is even more stringent. Fidelity is seeking a mandatory preliminary injunction because it is asking the Court to command Defendants to take an affirmative action – *i.e.*, to "return" (or destroy) a non-Fidelity list of Ms. Taylor's clients that she created (from memory and public sources) after she left Fidelity. Mandatory injunctions are "cautiously viewed and sparingly issued," while "interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (quotations omitted).

## ARGUMENT IN OPPOSITION TO PRELIMINARY INJUNCTION MOTION

Fidelity originally moved to enjoin Ms. Taylor from soliciting Fidelity's customers. (Dkt. 4; Dkt. 5). As Fidelity recognizes, it can no longer seek to enjoin solicitation because the one-year non-solicitation period (if it were ever enforceable) expired on March 6, 2021. (Dkt. 82 at 1; Dkt. 84-1 at 5-6, ¶ 6). Fidelity therefore dropped its request to enjoin solicitation, and now asks the Court to (a) enjoin Defendants from "using" or "possessing" the names of Fidelity's clients, and (b) order Defendants "to return to Fidelity and purge from their possession" any documents containing the names of Fidelity's clients. (Dkt. 82 at 1; Dkt. 82-1 at 2). Fidelity has not established any harm (let alone irreparable harm); it has not established a likelihood of success on the merits; and the balance of harms weighs against an injunction.

13

## I.    FIDELITY WILL SUFFER NO HARM (BUT, IF IT DID, MONEY DAMAGES WOULD SUFFICE)

Fidelity seeks an order requiring Ms. Taylor to "return" a physical list of names that never belonged to Fidelity, and an injunction prohibiting her from using that list. Ms. Taylor worked closely with these clients for more than 20 years, and knows their names by heart. Allowing her to keep a list of those names (which, again, she created solely from her own memory) could not possibly harm Fidelity. While Fidelity *suggests* that Ms. Taylor *might* refer to the list if she makes more announcement calls, the undisputed evidence reveals she completed her announcement calls on April 6, 2020; she has not reached out to any of her clients since then. Moreover, any possible harm could be remedied through money damages.

### A.    No harm is threatened.

Defendants have already produced to Fidelity all documents that could possibly be covered by the proposed injunction.[12] Nevertheless, Fidelity does not bother to explain precisely which of those documents it wants "returned," nor does it specify the harm it would suffer from the use of any specific document. (This, in itself, demonstrates that Fidelity has not met its heavy burden.) The only document at issue appears to be the list that Ms. Taylor created on March 22, 2020. Fidelity could not possibly suffer harm from Ms. Taylor's mere possession of a list of names of some of her former clients, much less one she created from memory.

---

[12] Fidelity suggests that Fairhaven is withholding documents because Ms. Lyon contacted some clients not on the list Ms. Taylor gave her (implying that there exists another list). Fidelity pretends there is no way Ms. Taylor could have simply told Ms. Lyon to contact clients orally, ignoring their physical proximity to one another in Fairhaven's office. (Dkt. 82 at 4.) Fidelity claims that it needs an injunction because "the threat of contempt" will cause Defendants to produce the documents Fidelity speculates they are withholding. (Dkt. 82 at 4.) But Ms. Taylor *is already* under an obligation to produce such documents, and Fairhaven *is already* under the threat of contempt. (Dkt. 67.) Defendants simply do not have the documents Fidelity thinks they do. In any event, Fidelity's "threat of contempt" argument is effectively a concession that the alleged harm is purely speculative, as any harm is dependent upon the existence of documents that Fidelity speculates exist. If the standard for an injunction were lowered from "irreparable harm" to "speculates opposing party has unproduced documents," then every litigant would be able to obtain an injunction at will.

Rather than grapple with how it might ***actually*** suffer harm, Fidelity relies on *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993), for the general proposition that failing to require a financial advisor to return documents to a former employer would result in irreparable harm. (Dkt. 82 at 12). Harm, however, is fact-specific and not easily established through citation to general principles. The irreparable harm in *Salvano* involved solicitation; but in this case, Fidelity is not seeking to enjoin solicitation, so *Salvano* does not speak to the harm that might arise if the Court does not enter an injunction here. Moreover, unlike Ms. Taylor, the advisor in *Salvano* actually ***took documents*** from his former employer, depriving the employer of their use. That never happened in this case. Thus, *Salvano* does not speak to any harm Fidelity might suffer from Ms. Taylor's continued possession of her March 22, 2020 list.

The simple fact is that Fidelity ***cannot*** be harmed by Defendants' possession of client names.[13] A person's name, without more, is not Fidelity's property – it is public information. And memories of having worked with someone for 20+ years is generalized knowledge that one cannot be compelled to erase from memory. *See Woodfield Group, Inc. v. DeLisle*, 295 Ill. App. 3d 935, 938 (1st Dist. 1998) ("[o]ne who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience.") (quotations omitted).

Moreover, the Employee Agreement states that its non-solicitation period is limited to one year. Now that one year has passed, the Employee Agreement does not prohibit Ms. Taylor from using Fidelity's "Confidential Information" to solicit customers away from Fidelity, nor does it prohibit her from soliciting "any customer … with whom [Ms. Taylor] had personal contact."

---

[13] Fidelity has not argued that mere announcement calls are improper or that they would harm Fidelity. Indeed, Mr. Meyers could not explain what harm would come to Fidelity if Ms. Taylor notified her former clients of her departure when Fidelity itself was required to provide customers with her contact information anyway. (Ex. 8, Meyers at 95:9-102:7).

(Dkt. 84-1 at 5-6, ¶ 6). Thus, even if Ms. Taylor's list of client names somehow constituted Fidelity's "Confidential Information" (and it does not), at this point Ms. Taylor would not be prohibited from using that information to solicit any Fidelity customers. Consequently, *Fidelity's injunction request is moot*. Fidelity could not possibly be harmed if the Court were to deny a moot injunction request.

### B. No imminent harm is threatened.

"[A] plaintiff's entitlement to preliminary injunctive relief requires it, in addition to showing that its harm is irreparable, to show that the harm is 'imminent' as well." *United Asset Coverage, Inc. v. Avaya Inc*., 409 F. Supp. 2d 1008, 1041 (N.D. Ill. 2006); *see also Unite Here Health v. La Plaza Secaucus, LLC*, No. 13 C 237, 2014 WL 287447, at *2 (N.D. Ill. Jan. 27, 2014) (denying preliminary injunction due to failure to show "immediate jeopardy").

The protracted nature of this proceeding highlights the lack of any imminent harm. Fidelity's preliminary injunction motion has been pending since *April 3, 2020*. Were imminent harm truly a threat, Fidelity would have moved for a TRO from the start. At the very least, Fidelity would have conducted only limited first-party discovery and briefed the preliminary injunction motion in June 2020, after Ms. Taylor completed her document production. Incredibly, Fidelity blames Defendants for that delay and alleges they "intentional[ly] … obstruct[ed] discovery." (Dkt. 82). In reality, the delay was caused by Fidelity's litigation strategy of seeking expansive discovery, and by moving to compel even after Fairhaven confirmed it had no additional documents to produce.[14]

---

[14] In response to that motion, the Court ordered Fairhaven to produce any documents it was withholding or confirm in writing that it had no additional documents to produce. (Dkt. 67). Fairhaven, in fact, had no additional documents, as it had repeatedly told Fidelity. (Dkt. 70). Defendants set forth a timeline of Fidelity's delay in their response to Fidelity's motion for leave to amend its Complaint, and in their response to Fidelity's motion to compel. (Dkt. 59 at 6-8; Dkt. 65 at 2-3).

More substantively, Fidelity has not offered evidence that Ms. Taylor plans to *ever* use the written list again, let alone imminently. *See McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 748 (N.D. Ill. 2010) (denying injunction due to lack of evidence of likely use of information). Ms. Taylor has not made any announcement calls since April 6, 2020, and has no plans to start again – a year after she left. (Ex. 3, Taylor at 209:20-210:5). Fidelity has not suggested otherwise.[15] In fact, Fidelity points out in its own brief that Ms. Taylor has *already contacted the clients on her list*. (Dkt. 82 at 15). Fidelity thus concedes that Ms. Taylor is unlikely to make more announcement calls. "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) (quotations omitted).

In reality, Fidelity is alleging *past harm* – that Ms. Taylor did something wrong by writing down the names of her closest clients, after her employment with Fidelity had terminated. "If 'the damage is done,' allegations of past irreparable harm, no matter how plausible, are insufficient to support a preliminary injunction." *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at *9 (N.D. Ill. Oct. 25, 2018).

### C. Money damages can remedy any possible harm.

A plaintiff does not suffer "irreparable harm" where, as here, "money damages could make [it] whole again." *D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016).

---

[15] Fidelity's witnesses did not know the last date Ms. Taylor or anyone at Fairhaven reached out to Ms. Taylor's clients, so they would have no basis to suggest she has made any announcement calls recently. (Ex. 2, Marshall at 186:5-187:15; Ex. 8, Meyers at 87:10-22). Mr. Marshall admitted, however, that it has "been a few months" since Fidelity allegedly received any reports of Ms. Taylor contacting clients. (*Id.* at 173:2-6). When asked why Fidelity needs an injunction if Ms. Taylor has not reached out to any clients in months, Mr. Marshall answered, "we are still within that one year timeframe" of the non-solicitation agreement. (*Id.* at 190:18-192:15). Even if we were still within that timeframe (and we are not), the mere existence of a restrictive covenant does not establish irreparable harm.

Fidelity argues that, without an injunction, it will be harmed by the diversion of clients. (Dkt. 82 at 10). Fidelity, however, can easily determine whether any of Ms. Taylor's clients have stayed at Fidelity or have transferred their assets elsewhere, and then estimate any alleged damages. (Ex. 2, Marshall at 194:14-195:12). *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1078 (N.D. Ill. 2020); *see also Arjo,* 2018 WL 5298527, at *10 ("[T]o the extent the defendants are allegedly still luring business away from [plaintiff], it offers no reason that money damages in the amount of lost profits would not be an adequate remedy."); *Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *10 (N.D. Ill. Dec. 15, 2014) (holding that money damages may be sufficient to remedy any harm caused by ongoing efforts to lure away customers).[16] Fidelity proposes that such an estimate would be impossible because customers choose different services every year.[17] (Dkt. 82 at 11). It does not cite any evidence suggesting that the clients at issue here have historically generated fees so volatile that they are incapable of estimation. *See Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 361 (Ill. 2002) (lost profits need not be proven with mathematical certainty).

Fidelity also argues that it will be harmed by loss of client confidence and goodwill. This dispute does not implicate Fidelity's stature in the marketplace generally, but rather (at most) 160

---

[16] Until recently, Fairhaven custodied ***all*** of its client's assets at Fidelity. (Ex. 2, Marshall at 197:15-198:2). Thus, even if any clients transferred their advisory relationships to Ms. Taylor at Fairhaven, ***all their assets remained on Fidelity's platform and they remained Fidelity clients.*** (In other words, a move from Fidelity to Fairhaven would be tantamount to moving from the kitchen to the living room – it all happens under the same roof). Because of Fidelity's unique position as both a retail advisor and an institutional custodian, Fidelity would not have needed to use historical revenues and trends to estimate alleged damages – it could have looked directly to the client accounts themselves, as they remained in Fidelity's custody. Fidelity, however, recently kicked Fairhaven off of its custodial platform. (*Id.*). Thus, if Fidelity now claims it is irreparably harmed because it cannot calculate damages, that "irreparable harm" is of its own making. (Moreover, Fidelity kicking Fairhaven off its investment platform establishes Fidelity's wholesale refusal to mitigate alleged damages.)

[17] Fidelity also suggests that damages are not ascertainable because it does not know how long a customer might stay with Fidelity. In Illinois, however, lost profits damages accrue only during the restrictive covenant period (here, one year). *Atkins v. Robbins, Salomon & Patt, Ltd.*, 2018 IL App (1st) 161961, ¶ 85. Moreover, there is no reason that Fidelity could not use historical trends to estimate this.

specific client relationships. Loss of customer goodwill "would be adequately compensated in lost profit damages since any injury would presumably not extend beyond the insular salesperson-customer relationship to the corporation in general." *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1441 (7th Cir. 1986); *see also Fleetwood*, 2014 WL 7146439, at *10 (quoting *Lawson*).[18] If a particular client does not divert his or her business away from Fidelity, then there is no monetary loss associated with the loss of that customer's confidence. If a client does divert his or her business away from Fidelity, then, as noted above, Fidelity could easily calculate the damages from that lost client relationship.

In any event, Fidelity has not offered evidence to establish ***any*** threatened loss of client confidence or goodwill. Fidelity has never explained how a former advisor who created a list of clients from memory would somehow cause clients to think their information has been misappropriated. Nor has Fidelity explained how making announcements to people whose contact information is publicly available online would cause them to think their information has been misappropriated. ████████████████████████████ ████████████████████████ (Dkt. 82 at 8). Fidelity's self-serving interpretation of this client interaction is not credible.[19] ██████████████████

---

[18] Fidelity, quoting *Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *23 (N.D. Ill. June 11, 2015), argues that because harm to reputation cannot be remedied by the payment of damages, there is no adequate remedy at law. (Dkt. 82 at 12). That case was decided in the context of the Lanham Act, where misleading statements were directed to the marketplace generally. Here, any alleged "reputational harm" would be limited to the handful of clients on Ms. Taylor's list.

[19] Fidelity cites Mr. Marshall's declaration, but he was not a participant in the supposed conversation between ████████████████████. (Dkt. 82 at 8). Instead, Fidelity relies on two levels of hearsay: the client's description to Mr. Marshall of Ms. Taylor's assistant's statements, and then Mr. Marshall's description of the client's description of Ms. Taylor's assistant's statements. There is also no indication that Mr. Marshall's declaration, which includes only his generalized summary description instead of quotes, is accurate. On deposition, Mr. Marshall could not even remember the name of the Fidelity advisor who initially reported this to him, or the name of the client who allegedly complained about the issue, until Fidelity's counsel later reminded him that ████████████████. (Ex. 2, Marshall at 176:19-177:7).

██████████████████████████████████████████████

█████████████████████████████████████  That she would be upset about

someone calling her on that number beggars belief.

Fidelity also argues it will be harmed by the loss of referrals.  Referrals, by their nature,

are purely speculative; Fidelity has not (and could not) put forth any evidence suggesting

otherwise.  "[A] plaintiff cannot obtain a preliminary injunction by speculating about hypothetical

future injuries."  *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co*., 414 F.3d

700, 705–06 (7th Cir. 2005) (reversing entry of preliminary injunction where harm "elude[d]

calculation because it [was] speculative, not because, if it occurred, it could not be quantified.").

### D.  There is no presumption of irreparable harm here.

Fidelity argues that there is a rebuttable presumption of irreparable harm in trade secret

misappropriation cases.[20]  (Dkt. 82 at 10).  No actual trade secrets are at issue, so this premise is

wholly inapplicable.  (*See infra* at Section II.B.).  Moreover, if any presumption applied here,

Defendants have handily rebutted it for the several reasons described above (not least of which is

the uncontested evidence that Ms. Taylor has not called any clients since April 6, 2020).

### II.  FIDELITY HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

After eight months of first and third-party discovery, Fidelity continues to equivocate about

what information Ms. Taylor supposedly took from Fidelity.  Fidelity's February 5, 2021

---

[20] Fidelity has the law wrong.  The decision it cites, *Jano Justice Sys., Inc. v. Burton*, 636 F. Supp. 2d 763, 767 (C.D. Ill. 2009) (emphasis added), holds that a presumption of harm exists in "trade secret misappropriation ***and copyright infringement***" cases.  The use of the conjunctive in that holding is important because all the other decisions we have found concerning a presumption of harm in trade secret cases are traceable back to copyright infringement cases.  *See, e.g., ISC-Bunker Ramo Corp. v. Altech, Inc*., 765 F. Supp. 1310, 1329 (N.D. Ill. 1990) (analyzing copyright separate from trade secret, and applying presumption only to copyright component).  Because the instant case does not involve copyright, no presumption applies.  In addition, the Supreme Court has rejected the presumption of harm, and the Seventh Circuit applied that principle in the context of copyright infringement.  *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012) (applying *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006)).

preliminary injunction brief is littered with vague references to "customer information," "trade secrets," "client data" and "client lists." (*See generally* Dkt. 82). Conspicuously absent is any explanation of what comprises that information. The closest Fidelity comes to explaining its theory is by suggesting Ms. Taylor misappropriated the "list of Fidelity customers" that she has in her memory (and which she wrote down after leaving Fidelity). (Dkt. 82 at 2-3 n.1 & n.2). Fidelity also speculates that Ms. Taylor took customer phone numbers. (Dkt. 82 at 3). Thus, as best we can tell, at issue are only customer names and phone numbers.

Ms. Taylor testified under oath that she obtained all phone numbers on her list by searching the Internet. (Ex. 3, Taylor at 63:12-64:17). Fidelity – ignoring the wealth of contact information available online from data aggregators – implies that it is "unlikely" Ms. Taylor was able to find 54 cell phone numbers though publicly available online sources, and presumes she took them from Fidelity. (Dkt. 82 at 3). Rank speculation is insufficient to establish a likelihood of success on the merits, particularly after eight months of discovery. Fidelity does not provide any evidence regarding which of the 54 numbers correspond to cell phones, any evidence that Fidelity originally had those numbers in its possession (such that Ms. Taylor even *could* have taken them), or any information whatsoever refuting Ms. Taylor's sworn testimony.[21]

Ms. Taylor also testified under oath that she took no documents or customer information from Fidelity. (Ex. 3, Taylor at 58:16-61:1). Fidelity cites no evidence contradicting that testimony. Mr. Marshall could not answer whether Ms. Taylor had ever sent confidential information from Fidelity to an outside email account, whether she downloaded any confidential

---

[21] Fidelity also relies on innuendo. Fidelity states that it "knows that Taylor possessed and used Fidelity customer cellphone numbers shortly after she resigned because she called and texted them on those numbers." (Dkt. 82 at 3). This is meant to insinuate that Ms. Taylor took cell phone numbers with her from Fidelity. But Ms. Taylor had those numbers "shortly after she resigned" because she found them on publicly available sources shortly after she resigned, ***not*** because she took them from Fidelity.

21

information, or whether she printed any confidential information.[22] (Ex. 2, Marshall at 47:21-48:13). Similarly, Mr. Meyers did know whether anyone searched Ms. Taylor's computer or otherwise investigated whether she took information from Fidelity. (Ex. 8, Meyers at 136:9-141:1). And Mr. Duserick – who executed his declaration *after* Mr. Meyers and Mr. Marshall testified to their lack of knowledge – does not give any indication that Fidelity ever attempted to investigate whether Ms. Taylor actually accessed or took Fidelity's Confidential Information. (Dkt. 82-2). Fidelity either conducted no investigation to find out what (if anything) Ms. Taylor actually took (in which case, Fidelity cannot characterize that information as a "trade secret"), or Fidelity investigated and found no evidence of wrongdoing.

Fidelity's lack of evidence is underscored by its discovery responses. When Ms. Taylor requested the production of all documents that related to the "information that Fidelity contends Ms. Taylor has misappropriated," Fidelity did not produce any documents in response, so Ms. Taylor moved to compel. The Court ordered Fidelity to produce "documents containing Fidelity's confidential information that Taylor took with her when she resigned," and noted that if Fidelity has nothing to produce in response, Ms. Taylor "can hardly complain about Fidelity's inability to produce materials that would provide evidentiary support for its claims." (Dkt. 53 at 2). Fidelity, in fact, had nothing to produce in response and has no evidentiary support for its claims.

Thus, Fidelity is left with what Ms. Taylor has admitted all along: she knows by heart the names of her closest and most long-standing clients, wrote them down two weeks after leaving Fidelity, and then looked up their phone numbers online. This is not actionable under either a breach of contract or trade secret theory.

---

[22] Indeed, Mr. Marshall did not know whether it was *possible* to print out a client list or download information onto a USB drive. (Ex. 2, Marshall at 38:20-40:21, 46:15-20). He also did not know about Fidelity's surveillance capabilities generally, or whether Fidelity's IT department actually undertook any type of investigation to determine whether Ms. Taylor absconded with any confidential information when she left. (*Id.* at 40:23-42:7, 44:22-45:22, 48:14-49:23, 51:18-52:20).

### A.    Fidelity has no likelihood of success on its claim for breach of the confidentiality provision.

The confidentiality provision in the Employee Agreement is unenforceable.  If it were enforceable, it would not protect the names of Ms. Taylor's clients.

### 1.    The confidentiality provision is unenforceable, whether or not it purports to protect client names.

"Postemployment restrictive covenants operate as partial restrictions on trade, so they are scrutinized carefully…."  *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 447 (1st Dist. 2007).  "An employer seeking to enforce a restrictive covenant bears the burden of demonstrating that the full extent of the restraint is necessary for protecting its interests."  *Id*. Confidentiality agreements are subject to the same reasonableness requirements as non-competes. *Cincinnati Tool Steel Co. v. Breed*, 136 Ill. App. 3d 267, 275 (2d Dist. 1985).[23]

"[U]nder Illinois law, [a confidentiality provision] must be reasonably limited in scope (geographical and durational) in order to mitigate its potentially anticompetitive effects." *Fleetwood*, 2014 WL 7146439, at *8; *see also Carlson Group, Inc. v. Davenport*, No. 16-CV-10520, 2016 WL 7212522, at *5 (N.D. Ill. Dec. 13, 2016) ("Illinois courts have invalidated confidentiality agreements lacking [durational and geographic] limitations.").  The confidentiality provision here lacks geographical and express durational limitations.[24]   (Dkt. 84-1 at 5-6). Accordingly, it represents an unreasonable restriction on trade and is unenforceable.

But even if the confidentiality provision included reasonable geographic and durational limitations, the breadth of the information it purports to protect would still render it unenforceable.

---

[23] Under Illinois law, "[a] restrictive covenant … is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor; and (3) is not injurious to the public."  *Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶ 17.  Furthermore, the activity restrictions must be reasonable. *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, ¶ 32.

[24] The confidentiality obligation purports to continue until the information "becomes known to the general public."  (Dkt. 84-1 at 6, ¶ 10).

The confidentiality provision provides:

> Confidential Information consists of all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public at the time made known to Employee.

(Dkt. 84-1 at 5, ¶ 1). It is difficult to imagine a broader restriction than this. The provision purports to restrict all manner of information that would not implicate Fidelity's legitimate business interests even though it is not generally known (for instance, the color of the walls at the Oak Brook office, the number of parking spaces at the Highland Park office, etc.). It would purport to even restrict the "use" of general business skills an employee picked up on the job. This provision is patently overbroad and, thus, unenforceable.

This court analyzed the enforceability of a similar confidentiality provision in *Carlson Group,* 2016 WL 7212522, at *6 – one which "purport[ed] to protect 'all information of or concerning the business of Company,' including without limitation, 'information relating to the Company's products and services,' its various 'plans,' the 'identities' of its customers, and the 'contact information' of its employees." *Id*., at *4. The court denied a preliminary injunction because that confidentiality provision raised "enforceability concerns" which "preclude[d] [the employer] from demonstrating 'some likelihood of success' on its contract claim." *Id.* As here, the confidentiality provision in *Carlson Group* carved out information that "has become generally or publicly known outside the Company." *Id.* That carve-out did not, however, render it enforceable, as "'[t]here is a great deal of information that is not 'generally' known to the public; not all of it merits protection under a confidentiality provision.'" *Id.* (quoting *AssuredPartners*, 2015 IL App (1st) 141863, ¶ 48).

Similarly, in *AssuredPartners*, the Illinois Appellate Court analyzed the enforceability of a confidentiality provision that purported to prohibit the use of any information "concerning 'the business or affairs' of every company affiliated with [the employer]." 2015 IL App (1st) 141863,

¶ 46. This "include[d] virtually every fact, plan, proposal, data, and opinion that [the employee] became aware of during the time he was employed by [the employer] – without regard as to whether such information was in any way proprietary or confidential in nature, or whether he in fact obtained the information through a source outside of his work." *Id.* The court concluded such a covenant "'purport[ed] to protect virtually every kind of information that [the employee] learned during the period of his employment even if non-confidential, and [went] far beyond any possible legitimate protectable interest of [the employer].'" *Id.* at ¶ 45 (quoting *N. Am. Paper Co. v. Unterberger*, 172 Ill. App. 3d 410, 416 (1st Dist. 1988)). Characterizing the confidentiality provision as "patently overbroad," the Illinois Appellate Court held that it was void as a matter of law and refused to "blue pencil" it. *Id.* at ¶¶ 46, 52.[25]

### 2. If names of former clients are confidential, then the confidentiality provision is unenforceable.

Whether or not the confidentiality provision is generally unenforceable (as argued above), there is no question it would be unenforceable if knowledge of the names of former clients were considered "Confidential Information."[26] The confidentiality provision prohibits the "use" of Confidential Information after termination, and purports to restrict that use indefinitely. (Dkt. 84-1 at 5, ¶¶ 1, 10). If calling one's former customers is considered improperly "using" Confidential

---

[25] The Court should not "blue pencil" the confidentiality provision here. Fidelity has not asked the Court to narrow the provision and has not provided any reason for the Court to do so. As in *AssuredPartners*, the deficiencies are "too great to permit modification." 2015 IL App (1st) 141863, ¶ 52.

[26] In its April 2020 memorandum, Fidelity argues that there are federal Privacy of Consumer Financial Information regulations concerning the "non-public information ('NPI') of financial services customers." (Dkt. 5 at 11). Fidelity does not seek relief under those regulations, and the existence of such regulations has no bearing on the enforceability of the confidentiality provision at issue. Further, NPI does not include mere names alone, but names and addresses together. Fidelity also claims that NPI includes the fact that a person was a former client, but the list Ms. Taylor made from memory did not include any indication whether the person was or was not a former client. Fidelity also ignores that the confidentiality provision defines "Confidential Information" to mean something that is capable of being returned. (*See infra*).

Information, then the confidentiality provision would effectively operate as an unbounded (and, thus, unenforceable) non-solicitation covenant.[27]

Moreover, if the names of former clients were considered "Confidential Information," then performance would be impossible. The agreement provides that the Employee will "return" and "will not retain" any Confidential Information upon termination of his or her employment, and will not "in any way access Confidential Information without authorization." (Dkt. 84-1 at 5, ¶ 1). It is impossible for employees to "return" or purge client names from their casual memories (or to refrain from "accessing" those memories in their minds), particularly for an employee like Ms. Taylor who worked with some of the same clients for over twenty years. Fidelity concedes there is no way for Ms. Taylor to have purged or "returned" those memories – and, therefore, they cannot be considered "Confidential Information." (Ex. 2, Marshall at 130:20-131:3, 143:23-144:18).

Accordingly, either client names are not considered "Confidential Information" or the confidentiality provision is unenforceable. Either way, Fidelity has no likelihood of success.

**B.  Fidelity has no likelihood of success on its trade secret claim.**

Fidelity has no likelihood of success on its trade secret claim because (i) it does not identify precisely what the trade secret is, (ii) it has done nothing to keep customer names a secret, and (iii) the names of Ms. Taylor's clients would not be trade secrets even if Fidelity had kept them secret.

**1.  Fidelity does not identify precisely what trade secret is at issue.**

Fidelity was required to produce the trade secret at issue. (Dkt. 53 at 2). It did not do so, and does not even identify precisely what the trade secret is. Instead, Fidelity vaguely asserts that

---

[27] Indeed, because there is no way to solicit a customer without "using" or "possessing" the customer's name, the Employee Agreement necessarily allows Ms. Taylor to now "use" and "possess" the names of Fidelity's customers. Enjoining the "use" of client names would function as a *de facto* injunction against solicitation, even though Fidelity recognizes that it is not entitled to such an injunction.

Ms. Taylor misappropriated "customer information" and "trade secrets." Speaking in generalities does not suffice – it is Fidelity's burden to "connect the dots" and single out the specific trade secret at issue. *Traffic Tech, Inc. v. Kreiter*, No. 14-CV-7528, 2015 WL 9259544, at *20 (N.D. Ill. Dec. 18, 2015); *see also Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("The plaintiff must show concrete secrets."). Because Fidelity has failed to produce, or even identify, its alleged trade secret, its claim is unlikely to succeed.[28]

### 2. Fidelity has done nothing to keep its customer names a secret.

A trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d)(2); *see also* 18 U.S.C. § 1839(3)(A). Fidelity does not keep customer names secret.

#### a. Mr. Duserick's declaration does not establish secrecy.

As explained above, the Court should give no weight to Mr. Duserick's declaration. (*See supra* at pp. 11-12). However, were the Court to consider Mr. Duserick's declaration, it would do little to help Fidelity's trade secret claim. Mr. Duserick uses only vague terms like "customer information," "other proprietary information," "personal information" and "customer lists," without any explanation of what these terms mean. (Dkt. 82-2). "The court cannot analyze … whether [plaintiff] took reasonable efforts to keep information secret without first knowing, with particularity, what information comprises the secret." *GlobalTap LLC v. Elkay Mfg. Co*., No. 13 C 632, 2015 WL 94235, at *6 (N.D. Ill. Jan. 5, 2015).

The two times Mr. Duserick provides specifics, he makes clear that Fidelity does ***not*** protect client names unless those names are bundled with other information. As an example of

---

[28] If the list Ms. Taylor created from memory does not exist in some form at Fidelity, then it is not a trade secret. If it does exist in some form, Fidelity was required to produce it. A trade secret is not simply "whatever an ex-employee happens to remember." Ms. Taylor was entitled to compare the information on the list she created from memory to the supposed trade secret to determine the extent of overlap, if any.

highly confidential information, he cites "[c]ustomer personally identifiable information (PII) (e.g., name ***with*** external IP address, email, phone number, HR data, HIPAA data or account number)."[29] (Dkt. 82-2 at 2, ¶ 8) (emphasis added). He also notes that "personally identifiable customer information (such as a name ***with*** a telephone number)" is highly confidential. (*Id*. at 2, ¶ 9) (emphasis added). He does not explain how, or if, Fidelity protects client names alone.

Mr. Duserick also states that "customer lists" are highly confidential, but never explains what comprises this highly confidential "customer list." Is it Fidelity's complete list of 32 million customers? The list of customers in a particular region? In a particular office? Are only names on the lists, or other information as well? Because Mr. Duserick never specifies precisely what constitutes the "customer list" Fidelity allegedly protects, there is no indication that Fidelity protects the information it alleges Ms. Taylor misappropriated (whatever that might be).

### b. *Fidelity does not prohibit clients from disclosing the relationship.*

Fidelity places no restrictions on customers revealing that they have a relationship with Fidelity. Indeed, "Fidelity clients talk about being Fidelity clients." (Ex. 3, Taylor at 220:8-9). If any customer is free to divulge the putative "trade secret" at will, it is not a trade secret.

Moreover, Fidelity actively works to make it ***easier*** for third parties – even competing financial institutions – to identify a Fidelity client. Fidelity has partnered with some of its competitors to create a data aggregation platform called "Akoya" that allows Fidelity customers to "shar[e] financial data between financial institutions," *including other financial institutions* such as JPMorgan Chase (a Fidelity competitor). (**Exhibit 13; Exhibit 14**). Fidelity also offers a service called "Full View," which allows Fidelity customers to consolidate financial data from

---

[29] Fidelity cites *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265 (1st Dist. 2005), in support of its assertion that it has taken reasonable security measures to protect its confidential information. (Dkt. 82 at 13). The alleged trade secret at issue in *Liebert* was a bundle of consumer information. *Liebert*, therefore, does not speak to the measures that would suffice to protect the mere name of a client, standing alone.

"Fidelity and non-Fidelity accounts." (**Exhibit 15**). This account aggregation service is operated by eMoneyAdvisor, LLC, a company that helps financial advisors by "connect[ing] accounts from hundreds of financial institutions across the country to automatically power your platform—and your advice." (**Exhibit 16**). Offering these types of aggregation services is common for Fidelity's competitors. Schwab, for instance, offers a data aggregation tool that can aggregate accounts across "15,000+ financial institutions." (**Exhibit 17**). Thus, if a customer has a Schwab account and uses the Akoya system to aggregate her Fidelity account information into Schwab's "dashboard," then every single financial advisor at Schwab will instantly know that this person is a "Fidelity client." Were the Fidelity-client relationship truly a trade secret, Fidelity would not *encourage* clients to give third parties access to the financial information in their Fidelity accounts.

Further, Fidelity's business model appears to **rely on** customers divulging to others that they are Fidelity clients. Fidelity claims that it will be harmed if clients follow Ms. Taylor to Fairhaven, as they will no longer refer others to Fidelity. (Dkt. 82 at 11). Fidelity cannot expect clients to refer people to Fidelity **and** claim as a trade secret the fact that a client relationship exists.

### c. *Fidelity has not kept client names secret in this lawsuit.*

Fidelity has not even kept client names and phone numbers secret *in this lawsuit*. On February 5, 2021, Fidelity attached to its sanctions motion excerpts from the transcript of Ms. Taylor's deposition. (Dkt. 84-4). In those excerpts, Fidelity introduces the names and telephone numbers of two of its clients. (*Id*. at 10, 13, Taylor at 142:3-21; 145:7-12). Fidelity did not file this transcript under seal or redact the names and telephone numbers before publicly filing it. Because Fidelity has made no effort whatsoever to keep the names of its clients or their telephone numbers a secret, they cannot possibly be considered "confidential" (much less a trade secret).

### 3. Fidelity's customer names are not trade secrets, whether or not Fidelity kept them secret.

#### a. Fidelity admits names alone are not trade secrets.

In its initial memorandum, Fidelity explains, "Fidelity's trade secret *is not simply a list of names*. It includes far more information, including contact and financial information such as customer statements, investment goals and history, assets, income, and net worth…." (Dkt. 5 at 13) (emphasis added). Similarly, Mr. Meyers testified that the confidential "client information" is "a long list of details about the client and their financial situation and their assets," which includes current client assets, current investment products that the client owns, age, employment information, investment objectives, and tax information. (Ex. 8, Meyers at 46:20-48:24). Client names, by themselves, do not qualify – even when they are remembered by a former advisor.

#### b. Fidelity customers are not a "needle in a haystack."

Fidelity relies heavily on *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 840–41 (C.D. Ill. 2014), which concerns a former bank employee who memorized a list of clients (his own clients and another employee's) that needed agricultural loans, and then contacted those clients when he left for a new job. (Dkt. 82 at 14-15). That ruling hinged on the fact that the bank served "diffuse customers that have particular needs," *i.e.*, those in the market for a particular agricultural loan. *Id.* at 841. The court distinguished that from a scenario where, as here, "customers are easily identifiable because of broad and non-specific needs," in which case customer lists would not be protectable. *Id.* at 840.

Fidelity attempts to analogize its customer base to that of the bank in *Bauknecht* by arguing that its clients' names are not known to the public, as the names of people in need of financial planning are "proverbial needles in the haystack." (Dkt. 82 at 13). But Fidelity has *32 million*

*customers*, and there are only 255 million adults in the U.S.[30]  (Ex. 3, Taylor at 217:2-5).  If you open the phonebook for any affluent suburb, a large percentage of listings will, thus, be comprised of the names and phone numbers of Fidelity customers.  The names of these clients are not trade secrets.  *See Sys. Dev. Services, Inc. v. Haarmann*, 389 Ill. App. 3d 561, 575 (5th Dist. 2009) (holding that the customer list of a computer network company was not a trade secret because "[i]n today's modern world, computers and computer networks are common business tools," so "[l]ocating potential customers is merely a matter of identifying businesses in a particular town, county, or area and looking up their contact information").

### 4.  Ms. Taylor has not misappropriated any trade secrets.

Fidelity cites several decisions for the proposition that memorization can qualify as misappropriation of a trade secret.  (Dkt. 82 at 14-15).  These cases are distinguishable because they involve intentional memorization, or the taking of actual documents.  *See Bauknecht*, 71 F. Supp. 3d 819 ("improperly took a customer list through memorization"); *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 585 (1st Dist. 1995) ("deliberately memorized"); *Schulenburg v. Signatrol, Inc*., 33 Ill. 2d 379, 381 (memorized blueprints); *E*TRADE Fin. Corp. v. Pospisil*, No. 18 C 5908, 2018 WL 4205401, at *4 (N.D. Ill. Sept. 4, 2018) ("downloaded an extensive list of client information.").   Ms. Taylor never ***intentionally memorized*** client information and never purposely committed it to memory – rather, she happens to know and remember, as part of her generalized knowledge developed over her 23-year career at Fidelity, the names of people with whom she has worked closely for more than 20 years.  (Ex. 3, Taylor at 210:6-211:21).  There is a stark difference between the intentional memorization of information, and remembering generalized knowledge developed over time.  Fidelity even concedes that it

---

[30] https://data.census.gov/cedsci/table?q=United%20States&g=0100000US&tid=ACSDP1Y2019.DP05

would have been okay for Ms. Taylor to remember confidential information. (Ex. 2, Marshall at 142:15-22).

### C. **Fidelity has no likelihood of success on a breach of loyalty theory.**

As an apparent afterthought, Fidelity asserts that Ms. Taylor breached her duty of loyalty to Fidelity by virtue of not placing meetings into Fidelity's calendar system far enough in advance. (Dkt. 82 at 9). Fidelity's actual breach of loyalty claim has nothing to do with calendaring, so Fidelity has not established any likelihood of success. (*See* Dkt. 61 at ¶¶ 110-114). Even if calendaring were at issue, it plainly would not support a cause of action for breach of loyalty.

Fidelity claims that Ms. Taylor did not calendar well enough and was, thus, "incompetent." (Dkt. 82 at 9). Directly at odds with its assertion of incompetence, Fidelity vaguely suggests that Ms. Taylor was *purposely* keeping appointments off the Salesforce appointment system so that when she went to Fairhaven, clients (who did not have Ms. Taylor's cell phone number) would somehow keep their previously-scheduled meetings with Ms. Taylor.[31] (Dkt. 82 at 9). Fidelity does not provide any specifics, let alone cite any evidence supporting this serious allegation. Nor could it, as Ms. Taylor was not hiding any appointments. Like many advisors in Fidelity's Oak Brook branch, Ms. Taylor calendared all of her upcoming appointments on her <u>Fidelity</u> Outlook calendar; this was a ***shared*** Outlook calendar, which everyone in the Oak Brook office – *including*

---

[31] This baseless assertion echoes Fidelity's assertion in its initial memorandum that Ms. Taylor was asking clients to join Fairhaven before she resigned Fidelity. (Dkt. 5 at 6) (citing Dkt. 5-1 at ¶¶ 16-17). During his deposition, Mr. Marshall admitted that this was based on three levels of hearsay: his description of a Fidelity advisor's description of the client's description of Ms. Taylor's statements. (Ex. 2, Marshall at 163:12-164:5, 173:9-177:7). He admitted he had no idea whether the advisor's description was correct. (*Id*. at 255:15-256:20). When asked which advisor it was, Mr. Marshall could not remember. (*Id*. at 173:9-177:7). When asked the name of the client, he could not remember. (*Id*.). Later in the deposition, when questioned instead by Fidelity's counsel, Mr. Marshall remembered that ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

*Mr. Marshall* – could access, read, and edit.  (Ex. 3, Taylor at 129:15-136:17; Ex. 2, Marshall at 212:17-24).

Fidelity's "calendaring" theory was also roundly refuted on deposition, as Mr. Marshall had no actual knowledge of any malfeasance, only speculation.  (Ex. 2, Marshall at 163:12-165:5, 213:10-215:24, 219:2-225:9, 235:7-239:6).   Indeed, Mr. Marshall admitted he **did not know** whether alleged mis-calendaring meant that Ms. Taylor was trying hide any appointments from Fidelity.  (*Id*. at 231:16-232:6).  Ms. Taylor, by contrast, confirmed that when she scheduled meetings for after March 6, 2020, she expected to take those meetings **at Fidelity** because she had not planned to leave.  (Ex. 3, Taylor at 198:11-206:16).

Another major issue with Fidelity's "calendaring" theory is that Fidelity did not produce calendar entries with "Start Dates" after March 6, 2020, so Ms. Taylor now lacks the opportunity to direct the Court to particular calendar entries proving that she did, in fact, document her future meetings.[32]

### D.  Fidelity's claim for breach of the non-solicitation covenant is irrelevant here.

Fidelity dropped its solicitation injunction request, rendering its claim for breach of the non-solicitation provision irrelevant to the instant motion.  *See In re Teknek, LLC*, 343 B.R. 850, 868–69 (Bankr. N.D. Ill. 2006) (looking to the character of the claim that corresponds to the injunctive relief requested); *Wiggins v. Baldwin*, No. 17-CV-583-DRH-DGW, 2017 WL 6334369, at *2 (S.D. Ill. Dec. 12, 2017) (denying injunction for failure to establish likelihood of success on the only claim that related to the requested injunction, out of four total claims).  Nevertheless, out of an abundance of caution, we will briefly address Fidelity's likelihood of success on that claim.

---

[32] Moreover, Marshall admitted to relying on the "Date Created" field to try and establish Ms. Taylor's alleged solicitation.  (Ex. 2, Marshall at 222:1-12).  Yet, many of the calendar entries that Fidelity produced were modified or even *created* weeks after Ms. Taylor left Fidelity.  (*Id*. at 216:1-217:22, 222:1-12, 239:16-241:9; *see, e.g.*, **Exhibit 18** & **Exhibit 19**).

### 1. The non-solicitation covenant is unenforceable.

The non-solicitation covenant is generally unenforceable for the reasons already discussed above – *i.e.*, if Ms. Taylor is never allowed to use her client's names to solicit business, then the non-solicitation covenant is effectively unlimited in duration and geographic scope. The non-solicitation covenant is also unenforceable because its language is ambiguous.

The first sentence of the non-solicitation provision does not prohibit solicitation; rather, it prohibits the use of "Confidential Information" to accomplish solicitation:

> during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, ***Employee will not <u>use any Confidential Information</u>***…to directly or indirectly…solicit in any manner or induce or attempt to induce any customer or prospective customer … ***to divert or take away all or any portion of his/her/its business***….

(Dkt. 84-1 at 5, ¶ 6) (emphasis added). Stated differently, this sentence merely prohibits the use of Confidential Information to solicit customers away from Fidelity, it does not prohibit solicitation itself. As explained above, Ms. Taylor did not use any Confidential Information, so this sentence does not apply to her conduct. (*See supra*).

The second sentence of the non-solicitation provision is ambiguous:

> During this same period [i.e., one year following separation from Fidelity], ***Employee will not*** directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, ***solicit in any manner or induce or attempt to induce any customer or prospective customer* [to do what?]** with whom Employee had personal contact or about whom Employee otherwise learned during the course of Employee's employment with the Fidelity Companies.

(Dkt. 84-1 at 5, ¶ 6) (emphasis added). Unlike the first sentence, which clearly prohibits the use of Confidential Information to solicit clients to divert or take away their business from Fidelity, the second sentence raises the question: "Solicit or induce a customer ***to do what***?" Donate to charity? Buy Girl Scout cookies? Vote Republican? The Employee Agreement does not say. All we know is that it ***could <u>not</u>*** mean solicit or induce "to divert or take away all or any portion of

his/her/its business from," or this sentence would have used the same phrasing as the first sentence. This sentence is ambiguous.[33]  Because the Employee Agreement is a contract of adhesion, any ambiguity is construed strictly against the drafter:  Fidelity.[34]  *Chase Bank USA, N.A. v. Swanson*, No. 10-CV-06972, 2011 WL 529487, at *5 (N.D. Ill. Feb. 4, 2011).  Accordingly, this provision is not enforceable against Ms. Taylor.

### 2. Fidelity has offered no evidence of solicitation.

Despite dropping its request to enjoin solicitation, Fidelity spends much of its brief attempting to establish that Ms. Taylor solicited clients.  Fidelity, however, offers no proof, only speculation and layer upon layer of unsound inference.  "[A]n injunction based on nothing but speculation and conjecture is as much an abuse of discretion as an injunction based on clearly erroneous facts."  *Winkler v. Eli Lilly & Co*., 101 F.3d 1196, 1204 (7th Cir. 1996).

When Ms. Taylor announced her departure from Fidelity, her clients all asked follow-up questions (often about the condition of the market, about Fairhaven, or whether they could continue the advisory relationship), and Ms. Taylor would send follow-up emails if they asked her to.  (*See supra* at pp. 6-7).  These follow-up emails often included pleasantries, which Fidelity contends "does not make sense," so it must have been solicitation.  (Dkt. 82 at 5-6).  On the contrary, it makes perfect sense that Ms. Taylor would make such statements to the customers who asked her for information about potentially continuing their advisory relationship.  Fidelity's argument is nothing more than conjecture.  *See Harper v. United States Beef Corp*., No. 15-CV-

---

[33] Alternatively, this restrictive covenant is broader than required for the protection of a legitimate business interest and, thus, unenforceable.  *Reliable*, 2011 IL 111871, ¶ 17.

[34] Mr. Meyers testified that employees are not able to revise or negotiate the terms of the contact.  (Ex. 8, Meyers at 82:22-83:5).  Mr. Marshall was not aware of any employee ever negotiating a change of the language.  (Ex. 2, Marshall at 138:19-22).

3112, 2018 WL 3863526, at *5 (C.D. Ill. July 23, 2018) ("An inference equally likely to another inconsistent inference is speculation or conjecture").

In addition, Fidelity asserts that Ms. Taylor must have solicited clients because she called some of them several times.[35] (Dkt. 82 at 4-5). Ms. Taylor made multiple calls to clients whom she was unable to reach, or who had a series of questions for Ms. Taylor, but that does not mean she solicited them.

Fidelity also cites a recap email Ms. Taylor sent to a client, and argues that all the factual statements Ms. Taylor made in the email represent solicitation because "there is no way this client … would have asked questions that would elicit those responses." (Dkt. 82 at 6-7; Dkt. 82, Ex. B. at FAIRHAVEN-0002501). On the contrary, no reasonable factfinder could read the exchange and believe that Ms. Taylor was *not* simply answering the client's questions. Indeed, the email indicates ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████ (Dkt. 82, Ex. B. at FAIRHAVEN-0002501).

Further, Fidelity asserts that after a customer emailed Ms. Taylor seeking a recommendation for a new advisor at Fidelity, "instead of recommending someone," Ms. Taylor said she wanted to continue working with the customer. (Dkt. 82 at 7). Fidelity fails to mention that Ms. Taylor's email was a follow-up to a *telephone call*, and Ms. Taylor's statement about potentially working together in the future was in response to comments the client made during that call. (Dkt. 82, Ex. B at FAIRHAVEN-0002644). ███████████████████████████████

████████████████████████████████████████████████████████████████

---

[35] For instance, Fidelity suggests that "One client indicated that she did not want to transfer but Taylor kept at it, trying to convince her to move." (Dkt. 82 at 7-8). But the actual email Fidelity cites tells a different story. It shows that *the client reached out to Ms. Taylor*, had asked Ms. Taylor questions about potentially transferring to Fairhaven, and indicated that she may wish to do so in the future. (Dkt. 82, Ex. B at FAIRHAVEN-0002658).

████████████████████████████ The evidence is undisputed that every client who received an announcement call from Ms. Taylor engaged her in a discussion, asked her questions, and requested her to send follow-up e-mails during the market turmoil of 2020.

Fidelity also accuses Ms. Taylor's administrative assistant, Ms. Lyon, of having solicited clients. (Dkt. 82 at 8). Ms. Lyon merely followed the instructions Ms. Taylor provided her (*i.e.*, to announce Ms. Taylor's departure from Fidelity and ask if the client wanted Ms. Taylor's new contact information), and then she sent Ms. Taylor short summaries of each call. (Ex. 3, Taylor at 120:16-20, 153:13-154:20, 160:6-19). When Ms. Lyon asked the customer if he or she wanted Ms. Taylor's new contact information, some clients asked for Ms. Taylor to call them back, and others said they were not interested in Ms. Taylor's new contact information because they would prefer to stay with Fidelity. Fidelity cites some of Ms. Lyon's call summaries to Ms. Taylor, but none indicate that Ms. Lyon disregarded Ms. Taylor's instructions not to deviate from the script.[36]

### III.    THE BALANCE OF HARMS WEIGHS AGAINST AN INJUNCTION

By narrowing its injunction request to seek only the destruction of a list of client names that Ms. Taylor created from memory, Fidelity appears to be hoping the Court will think an injunction presents little harm, and make that its primary consideration. However, the entry of ***any*** injunction (no matter how anemic) will result in immediate and very real harm to Ms. Taylor. The entry of a preliminary injunction here will trigger a series of procedures before FINRA that would not otherwise apply. (*See* Dkt. 18 at 8-9) (explaining the relevant FINRA procedures). An injunction would, therefore, result in Ms. Taylor being forced to immediately expend additional attorneys' fees defending an expedited FINRA Rule 13804(b) injunction hearing.

---

[36] Had Ms. Lyon solicited any clients, it would have been outside of her authority. Fidelity knows of no facts suggesting otherwise. (Ex. 2, Marshall at 242:18-243:6, 251:9-252:15).

Another consideration is that granting an injunction will also harm Fidelity's own clients, who have a strong interest in maintaining contact with their longtime advisor. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618 (N.D. Ill. 2000). In *O'Connor*, the plaintiff-employer sought an injunction that would have prevented a financial advisor from calling his former clients to provide them with his new contact information. The court analyzed the competing harms and explained that "the relationship between broker and client is, in many cases at least, personal and, ***particularly in a time of uncertain markets***, they may be harmed, or feel that they will be harmed, by being deprived of that relationship." *Id.* at 619 (internal quotations omitted) (emphasis added). The court continued,

> It would be unlawful, as well as unreasonable, for Merrill Lynch to seek to prohibit [its former employee] from giving his former customers an announcement of his intent to move to other employment and notice where he could be reached should the customers wish to contact him …. ***otherwise customers with longstanding trust in their brokers with immediate need of advice would not be able to contact them***.
>
> *Id.* at 620 (emphasis in original).[37]

This sentiment is particularly apt, given the ongoing pandemic and economic volatility.

Denial of an injunction will also benefit the public generally, as "courts have generally recognized that the public substantially benefits from competition." *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). Fidelity uses its financial strength to restrict trade and competition through lawsuits like this. Indeed, Fidelity has forced Defendants to spend a lot of money defending against a preliminary injunction, despite that it is seeking only the destruction of an innocuous list that Ms. Taylor created from memory.

---

[37] Mr. Marshall even confirmed that it is in a client's best interest to be able to reach a financial advisor he or she has worked with for 20 years. (Ex. 2, Marshall at 83:2-19).

## IV.   THE COURT SHOULD NOT ENJOIN FAIRHAVEN

Fidelity seeks drastic relief against Fairhaven, yet it does not devote even one sentence to explain why Fairhaven – which owes Fidelity no duties – should be subject to an injunction.

## OPPOSITION TO SANCTIONS MOTION

The merits of Fidelity's claim against Ms. Taylor will be adjudicated before a FINRA arbitration panel, in a proceeding not subject to the Federal Rules.  Nevertheless, in its February 5, 2021 sanctions motion, Fidelity effectively asks this Court to rule on the merits of its claim by way of adverse inference, based on Ms. Taylor having allegedly spoliated (a) certain text messages with clients, and (b) the dates on which she entered contacts into her cell phone.  (Dkt. 84).

The sanctions motion is baseless.  Text messages with clients bear no relevance to the instant preliminary injunction action and, in any event, the two text messages Fidelity claims were spoliated were sent one-to-two weeks *before* Fidelity ever sent Ms. Taylor a perseveration notice. As to the cell phone contact creation dates Fidelity claims spoliated, Fidelity never requested their production.

Even if it were possible to spoliate documents that are irrelevant or which the movant never requested, Fidelity has failed to establish a critical element of its claim: bad faith.  Adverse inferences are one of the most "severe" sanctions and so require a finding that the party "destroyed the documents in bad faith."  *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002); FED. R. CIV. P. 37(e)(2), 2015 Amendment Advisory Committee Notes.  Fidelity has offered no evidence concerning Ms. Taylor's intentions.  Fidelity has not come close to meeting its burden.

## I.   MS. TAYLOR DID NOT SPOLIATE ANY TEXT MESSAGES

In April 2020, Ms. Taylor replaced her old Samsung phone with a new iPhone.  Fidelity asserts that because Ms. Taylor did not produce client texts that were on her old Samsung phone, Ms. Taylor spoliated those text messages.  Not so.

### A.   Fidelity offers no evidence of spoliation.

Fidelity asserts that after cross-matching client phone numbers with the text message log Ms. Taylor produced, it discovered "numerous" texts with clients that Ms. Taylor did not produce. (Dkt. 84 at 3-4). Fidelity fails to substantiate this grandiose claim. In reality, Fidelity cites only two text messages that Ms. Taylor did not produce. (Dkt. 84-4 at 12-13, Taylor at 144:7-145:24). Importantly, these text messages were sent on March 12 and March 14, 2020 – approximately one week *before* Fidelity sent its March 20, 2020 preservation letter (which Ms. Taylor did not receive until several days later). Ms. Taylor did not produce the March 12 and March 14, 2020 text messages because she did not have them on her Samsung phone when she received Fidelity's March 20, 2020 preservation letter. Ms. Taylor testified under oath that she produced and preserved all the text messages that she had on her phone. (Dkt. 84-4 at 12, Taylor at 144:18-24). Fidelity, which had the opportunity to question Ms. Taylor about this, cites no evidence that Ms. Taylor failed to produce any texts that were in her possession *after* a preservation duty arose.[38]

### B.   Text messages with clients are irrelevant to this proceeding.

Ms. Taylor's text messages with clients bear no relevance to this preliminary injunction proceeding, as Fidelity has dropped its request to enjoin solicitation. If documents are irrelevant to this proceeding, they are outside the scope of discovery (and, consequently, cannot possibly be spoliated). FED. R. CIV. P. 26(b)(1).

---

[38] Based on Fidelity's procedural gamesmanship throughout this proceeding, Ms. Taylor expects Fidelity, on reply, to claim that Ms. Taylor spoliated some entirely different text messages, thereby preventing Ms. Taylor from explaining whether the text was: actually sent to or from a client; sent before Ms. Taylor received a preservation letter; sent before or after the individual became a Fairhaven client (as Defendants were not asked to produce documents created after the Fairhaven client relationship was established); etc.

### C.    __Fidelity has not shown the discovery cannot be replaced.__

Rule 37 sanctions are available only when the electronic discovery at issue "cannot be restored or replaced through additional discovery." FED. R. CIV. P. 37(e). Fidelity included a finding in its proposed order that the "text message communications cannot be replaced," but has never explored whether they are available from the clients or T-Mobile. (Dkt. 84-6 at 1).

### D.    __Fidelity has not shown "intent to deprive" under Rule 37(e)(2).__

Fidelity seeks an adverse inference, which is governed by Rule 37(e)(2) and requires a "finding that the party acted with the intent to deprive another party of the information's use in the litigation."[39] FED. R. CIV. P. 37(e)(2). "Negligent or even grossly negligent behavior does not logically support [an adverse] inference." FED. R. CIV. P. 37(e), 2015 Amendment Advisory Committee Notes. Yet, Fidelity does not attempt to show any intent to deprive – it relies solely on the alleged deprivation itself rather than on Ms. Taylor's state of mind.

### II.    MS. TAYLOR DID NOT SPOLIATE CONTACT CREATION DATES

Fidelity also argues that when Ms. Taylor got a new iPhone in April 2020, she spoliated evidence by disposing of the contact creation dates on her old Samsung phone.[40] Fidelity speculates that these would have shown that Ms. Taylor had client contact information in her phone at the time of her March 6, 2020 departure. Again, Fidelity has not shown spoliation.

---

[39] To the extent Fidelity is moving under Rule 37(e)(1) and seeking something lesser than an adverse inference, it could not possibly establish the requisite "prejudice." Fidelity cites two decisions – neither involving a preliminary injunction or expedited discovery – for the proposition that a party is prejudiced if it is unable to use "all available relevant evidence" or "all the relevant facts" in prosecuting its case. (Dkt. 84 at 12-13) (citing *Larson* and *Hickman*). "All available relevant evidence" is never available in deciding a preliminary injunction. Moreover, text messages with clients would have no impact on whether Fidelity is entitled to a preliminary injunction to enjoin the use of client names.

[40] Fidelity believes Ms. Taylor had confidential information on her phone upon termination. (Dkt. 84 at 5 n.2). Fidelity does not cite any evidence for this accusation; it is mere speculation, and soundly refuted by Ms. Taylor's sworn testimony. (Ex. 3, Taylor at 41:11-42:1, 42:14-21).

### A.    Fidelity never asked Ms. Taylor to produce phone contact creation dates.

On May 25, 2020, Fidelity issued a document request to Ms. Taylor requesting:

> All Documents *containing the names, or other identifying information*, of any Fidelity Customers in the possession of Taylor, including documents or information created by using Taylor's memory to access publicly available information, and information contained in contact management databases, notes, emails, text messages, on social media sites, LinkedIn, Facebook, and on electronic devices, including in cellular telephones.

(Dkt. 84-3 at 6) (emphasis added).  The Request makes clear that the only "information" requested was the "names or other identifying information" of Fidelity customers.  The Request *did **not*** seek the contact creation date, and it *did **not*** seek a forensic image of an entire iPhone.[41]  It is self-evident that a party cannot spoliate documents that it was never asked, let alone ordered, to produce.[42]

### B.    Rule 37(e) applies only when a party fails to take "reasonable steps" to preserve information.

Rule 37(e) does not apply every time information is lost, but only when it is lost "because a party failed to take reasonable steps to preserve it."  FED. R. CIV. P. 37(e).  Ms. Taylor took reasonable preservation steps by asking T-Mobile to transfer her contacts from the old phone to the new phone.  (Ex. 3, Taylor at 45:7-46:20).  Ms. Taylor had no reason to suspect (and no way to know) that any data would be lost when T-Mobile transferred her contacts from one phone to

---

[41] In granting expedited discovery, the Court ordered, "All document requests should be *narrowly targeted*…" (Dkt. 29 at 3) (emphasis added).  Fidelity's spoliation theory, however, relies on an expansive post-hoc reading of its discovery requests – one that would render its discovery requests all-encompassing rather than narrowly targeted.

[42] Fidelity asserts that its March 20, 2020 preservation letter gave notice to Ms. Taylor to preserve "any data generated by and/or stored on any smart phones or computers." (Dkt. 84 at 2).  Not so.  The letter did not require Ms. Taylor to preserve "any data" on the phone – only "confidential or proprietary information belonging to Fidelity in [Ms. Taylor's] possession." (Dkt. 84-2 at 2).  The date on which Ms. Taylor added a contact to her phone is not Fidelity's confidential information, so the preservation letter would not have required her to preserve that information.

another. The date that a contact is entered into a phone is not information available to the end-user; rather, it is an operating system-level detail only accessible by forensic technicians. Indeed, this information is so obscure that Fidelity's own forensic expert was not entirely certain whether it would transfer between phones. (Dkt. 84 at 6).

Ms. Taylor also testified under oath that she had no client information in her phone at the time she left Fidelity. (Ex. 3, Taylor at 42:14-21). Because contacts added to her phone *after* her departure from Fidelity could not establish that she took any information *while at* Fidelity, Ms. Taylor had no reason to think that her contact creation dates would be relevant to this proceeding.

###   C.   Contact creation dates fall outside of Rule 26.

Electronically stored information is exempt from discovery if it is "not reasonably accessible because of undue burden or cost." FED. R. CIV. P. 26(b)(2)(B). Operating system-level files of a cell phone are not reasonably accessible, and certainly not during expedited discovery.

###   D.   Fidelity has not shown any "intent to deprive."

Again, to obtain an adverse inference under Rule 37(e)(2), there must be a finding of "intent to deprive."[43] FED. R. CIV. P. 37(e)(2). To establish an intent to deprive, Fidelity would have had

---

[43] If Fidelity were, instead, moving under Rule 37(e)(1), it could never establish the requisite "prejudice." The only relief Fidelity seeks in this preliminary injunction hearing is the return of confidential information it claims Ms. Taylor misappropriated. In reality, this means "deletion," as Fidelity is not claiming it is without use of any of the information at issue. But if Ms. Taylor already deleted confidential information, as Fidelity claims she did, then Fidelity would have already obtained the very relief it is seeking in this proceeding. In an attempt to establish prejudice where it does not exist, Fidelity falsely asserts that Ms. Taylor "has even gone so far as to state that the new iPhone Contacts prove that" she did not have Fidelity information in her possession. (Dkt. 84 at 6). Fidelity misconstrues the record. In Fidelity's June 16, 2020 response to Ms. Taylor's motion to compel, it falsely asserted that "documents already produced by Taylor indicate that she had retained extensive Fidelity confidential customer information in her personal cell phone at the time she resigned." (Dkt. 49 at 1-2). In her reply, Ms. Taylor termed this an "egregious misrepresentation" because her iPhone contacts did not establish that she took any information from Fidelity. (Dkt. 50 at 15). Denying that her contacts establish she took any information from Fidelity is far different than suggesting they "prove" she did not take any information from Fidelity.

to show, at a minimum, that Ms. Taylor knew her phone saved contact creation dates in the underlying operating system files.  It did not do so.

## **CONCLUSION**

For all these reasons, the Court should deny Fidelity's preliminary injunction motion and its sanctions motion in full.


Dated: March 12, 2021                                    Respectfully submitted,

                                                                    **JENNIFER TAYLOR and FAIRHAVEN**
                                                                    **WEALTH MANAGEMENT, LLC,**
                                                                    **Defendants / Counter-Plaintiffs**

                                                                    By: /s/ *Christopher S. Griesmeyer*
                                                                              One of Their Attorneys

Christopher S. Griesmeyer (# 6269851)
Zachary Mulcrone (# 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

### CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2021, I electronically filed the foregoing the ***Redacted Version*** **of** ***Defendants' Omnibus Response Brief In Opposition To Plaintiff's Motions For Preliminary Injunction And Discovery Sanctions*** with the Clerk of the Court via the CM/ECF System, which will send notification of such filing to those registered to receive electronic notices via email transmission at the email addresses provided by them including:

Joel W. Rice
Franklin Z. Wolf
FISHER & PHILLIPS, LLC
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
jrice@fisherphillips.com
fwolf@fisherphillips.com

Susan M. Guerette
FISHER & PHILLIPS, LLC
150 N. Radnor Chester Road, Suite C300
Radnor, PA 19087
sguerette@fisherphillips.com

    */s/  Christopher S. Griesmeyer*
Christopher S. Griesmeyer (ARDC No. 6269851)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
Bus: (312) 428-2750
Fax: (312) 332-2781
cgriesmeyer@grglegal.com