# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **FIDELITY BROKERAGE SERVICES LLC,**<br>**900 Salem Street**<br>**Smithfield, RI 02917,** | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **CASE NO.: 1:20-cv-02133** |
| | : | |
| **FAIRHAVEN WEALTH MANAGEMENT,**<br>**LLC**<br>**104 E. Roosevelt Road**<br>**Suite 100**<br>**Wheaton, IL 60187,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## SECOND AMENDED COMPLAINT

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") files this Second Amended Complaint against Defendant Fairhaven Wealth Management, LLC ("Fairhaven"). Defendant Fairhaven hired Fidelity's former employee, Jennifer Taylor ("Taylor"), and encouraged and facilitated Taylor's misuse of Fidelity's confidential and trade secret customer information, which she obtained knowledge of and access to only as a result of her employment with Fidelity, to solicit Fidelity customers to transfer their Fidelity accounts to her at Fairhaven. Further, not only has Taylor taken and misused Fidelity's confidential customer information but she shared that confidential, trade secret customer information with Fairhaven and its employees for the specific purpose of enabling Fairhaven personnel to misuse it. Fairhaven employees then did exactly that, using Fidelity's customer information to aggressively and systematically solicit Fidelity customers to transfer their investment management business to Taylor at Fairhaven. Taylor's conduct violates her Employment Agreement with Fidelity, and Fairhaven has tortiously interfered with

that contract. Both Taylor and Fairhaven have misappropriated and misused Fidelity's trade secret customer information in violation of Illinois law and the Defend Trade Secrets Act. Fairhaven has also engaged in unfair competition and conspired to take and misuse Fidelity's information in order to divert Fidelity's customers to their firm.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Fidelity Brokerage Services LLC is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts. Fidelity is a member firm of FINRA.

2.      Fairhaven Wealth Management, LLC is an Illinois Limited Liability Company, with a principal place of business located in Wheaton, Illinois.

3.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 *et seq. See* 18 U.S.C. § 1836(c) (West 2017) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."). This Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. § 1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy.

4.       This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Indeed, Defendant's conduct threatens approximately 425 Fidelity client households, representing in excess of $1.18 billion in client assets under Fidelity management.

Through their illegal conduct, Taylor and Fairhaven have already diverted almost $60 million in client assets to Taylor at Fairhaven.

5.    Venue is proper in this District because (a) most or all of the conduct alleged in this Second Amended Complaint occurred within this District, and (b) Fairhaven conducts business in this District.

## NATURE OF THE CASE

6.    Taylor, a former Fidelity Vice President, Financial Consultant, has used Fidelity's confidential and trade secret customer information, that she had access to solely by virtue of her employment with Fidelity, to unlawfully solicit Fidelity customers to transfer their business to her new firm.  Taylor has also shared Fidelity's confidential and trade secret customer information with Fairhaven, and Fairhaven personnel used that information to further aggressively solicit Fidelity customers to transfer their investment management business to Taylor and Fairhaven. Defendant's illegal conduct has resulted in almost the investment management business for more than $60 million in Fidelity customer assets being diverted to Taylor and Fairhaven.

7.    On March 6, 2020, Taylor resigned from Fidelity and immediately thereafter joined Fairhaven Wealth Management, a registered investment adviser firm (RIA), and began providing competing services.

8.    In connection with her resignation, Taylor was sent a letter from Fidelity's HR department reminding her of her post-employment obligations pursuant to her Employee Agreement, and enclosing a copy of her Employee Agreement.  A copy of the March 14, 2020 letter is attached to the Declaration of Scott Marshall as Exhibit F.

9.    Despite her post-employment obligations, since Taylor resigned she has aggressively and blatantly misappropriated Fidelity's confidential and trade secret customer

3

information and used, and continues to use, that information to unlawfully target and solicit Fidelity customers to transfer their accounts to her new firm, as set forth more fully below.

10.     Fidelity seeks injunctive relief requiring Defendant to return to Fidelity any and all records and/or documents in any form, received or removed from Fidelity by Taylor, containing information pertaining to customers Taylor served or whose names became known to Taylor while in the employ of Fidelity, including, but not limited to, any customer list or documents replicated or recreated by Taylor from memory or otherwise, and from using Fidelity's confidential and trade secret information concerning Fidelity's customers.  This injunctive relief is necessary to end Defendant's unlawful activities, which include misuse of Fidelity's trade secrets and unfair competition.

11.     Fidelity and Taylor are obligated to arbitrate the merits of this dispute consistent with the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200.

12.     Fairhaven is not a FINRA member and therefore it is not required to submit to arbitration before FINRA Dispute Resolution, Inc.

### FACTS COMMON TO ALL COUNTS

#### Fidelity's Unique Customer Development Practices

13.     Fidelity and its affiliates provide a variety of financial services—such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships.  Fidelity offers individual investors a broad assortment

of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies.

14.     Fidelity is unique in the retail brokerage field because Fidelity does not have its Financial Consultants, such as Taylor, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity.

15.     Instead, Fidelity requires its Financial Consultants to develop service relationships based upon leads that Fidelity provides.

16.     Fidelity provides leads to its Financial Consultants from two primary sources.

17.     First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.

18.     Fidelity and its affiliates devote tens of millions of dollars per year towards attracting customers to Fidelity's various businesses in a variety of means. Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit.

19.     A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

20.     Second, Fidelity forwards information to its representatives regarding customers, with whom Financial Consultants such as Taylor are the face of Fidelity, responsible for developing and sustaining the customer relationships for assigned customers.

FP 43401885.2

21.     Fidelity's lead-based approach to supporting its Financial Consultants distinguishes Fidelity from other full-service brokerages where individual brokers, rather than the firm, are responsible for establishing customer relationships.

22.     Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers.

23.     For example, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position.  Moreover, Fidelity clients may be serviced by multiple Fidelity representatives depending upon the clients' needs and service offerings in which they opt to participate at Fidelity.

### Fidelity's Trade Secret Customer Information

24.     Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Taylor, is also directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.

25.     Fidelity's trade secret customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.

26.     Although certain portions of such information might be publicly available — such as an individual's name or published home telephone numbers — only a limited number of Fidelity employees know who among the general public are Fidelity customers who have demonstrated a specific need and desire for investment services.

FP 43401885.2

27.     Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.

28.     Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence.

29.     Fidelity derives substantial economic value from preserving its customer data as a trade secret.

30.     Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to or specific knowledge of Fidelity's trade secret customer data.  In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

**<u>Fidelity's Efforts to Preserve the Confidentiality of Its Customer Data</u>**

31.     Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information.  Fidelity does not provide its trade secret customer data to competitors.

32.     Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access.

33.     Fidelity maintains and advises its employees of a Global Policy on Information Protection that is displayed on Fidelity's intranet.  A true and correct copy of Fidelity's Global Policy on Information Protection is attached to the Marshall Declaration as Exhibit A.  Fidelity

periodically reminds its employees of this policy and provides employees with a Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information. A true and correct copy of Fidelity's QRC is attached to the Marshall Declaration as Exhibit B.

34.     Fidelity also preserves trade secret customer data by requiring employees, including Taylor, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity, and not to solicit Fidelity customers.

35.     Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity. Furthermore, as discussed more fully below, Fidelity is required by federal law to prevent the disclosure to third-parties of nonpublic customer information, including customers' contact information and financial information. *See* 15 U.S.C. § 6801, *et seq.*; 17 C.F.R. § 248.1, *et seq.*

### Taylor Agreed to Protect the Confidentiality of Fidelity's Trade Secret Customer Information and Not to Solicit Fidelity Customers

36.     At the time of her resignation on March 6, 2020, Taylor was a Vice President, Financial Consultant in Fidelity's branch office in Oak Brook, Illinois. While working at Fidelity, Taylor was assigned clients to service on behalf of Fidelity.

37.     In order for Taylor to service the customers' accounts she was assigned to service, Taylor required access to the customers' confidential personal and financial information.

38.     Taylor specifically acquired access to and knowledge of the names, contact information and confidential financial data for numerous Fidelity clients. By the time of her departure, she had daily access to and had gained knowledge of confidential Fidelity information relating to approximately 425 households, representing in excess of $1 billion in client assets under

Fidelity management. Moreover, throughout her employment at the Oak Brook branch, the confidential information to which Taylor was given access was continually updated as clients were added, new accounts were opened, client assets and investments changed value, clients' financial goals evolved, and as a result Taylor was provided with ongoing access to a pool of continually updated and evolving confidential information about the Fidelity clients she was assigned to service.

39.     Fidelity protects its customers' information by, among other things, requiring each employee who will have access to that information to execute a standard Fidelity Employee Agreement.

40.     Fidelity records indicate that Taylor executed the Employment Agreement on September 20, 1999. Taylor then renewed her commitment to the provisions by signing it again on June 30, 2011. Copies of Taylor's signed September 20, 1999 and June 30, 2011 Employee Agreements are attached to the Marshall Declaration as Exhibits C and D.

41.     In her Employee Agreement, Taylor acknowledged the confidentiality of Fidelity's records, including Fidelity's customer lists and customer information. *See* Marshall Declaration Exhibits C and D at ¶ 1.

42.     Taylor promised to use Fidelity's trade secrets only in the course of her employment with Fidelity and not to divulge Fidelity's trade secrets to third parties. *Id.*

43.     Taylor promised that, upon termination of employment, she would "return all company property … including but not limited to Confidential Information." *Id.* at ¶ 3.

44.     Taylor also promised that following termination of employment she would not use Fidelity's Confidential Information to solicit Fidelity's clients. *Id.* at ¶ 6.

9

45.     Taylor further promised that for a period of one year following termination of her employment she would not directly or indirectly solicit in any manner or induce or attempt to induce any customer or prospective customer with whom she had personal contact or about whom she otherwise learned during the course of her employment with the Fidelity.  *Id.*

46.     Taylor agreed that any violation of the Employee Agreement—including after her termination—would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information.  *Id.* at ¶ 10 (Ex. C) and ¶ 11 (Ex. D).

47.     As consideration for the Employee Agreements Taylor executed, Fidelity hired her, promoted her, provided her with ongoing access to continually updated confidential business information, compensated her throughout her employment, and provided her with introductory and continuing on-the-job training, and promotions.  Fidelity assigned Taylor customers with higher assets to service on behalf of Fidelity and provided Taylor with leads to enable her to succeed at Fidelity.  Fidelity further provided Taylor with support services; paid for facilities, computer equipment, market reporting services, and all other business expenses; and registered Taylor with the Financial Industry Regulatory Authority and the New York Stock Exchange.  Fidelity provided Taylor with sales assistance, research, the benefit of Fidelity advertising, goodwill and name recognition, access and use of experts in asset management, tax, estate planning and insurance, and with promotional marketing and sales support.

### Taylor Misappropriated Fidelity's Trade Secret Customer Information <br> And Is Using It For The Benefit Of Herself and Fairhaven

48.     Despite her contractual obligations and her obligations under Illinois law, Taylor misappropriated Fidelity's trade secret customer information and has used and continues to use Fidelity's trade secret customer information to solicit Fidelity customers.

49.     Since Taylor resigned from Fidelity, Fidelity has been receiving reports that she—and personnel of her new firm, Fairhaven, acting on her behalf—have been soliciting Fidelity customers to transfer their business to Fairhaven.

50.     In fact, one client reported that Taylor solicited him, and set up an appointment for him to come meet with her at her new firm, before she even resigned from Fidelity.  After Taylor resigned, Fidelity representatives were assigned to service the customers that were previously serviced by Taylor.  In a meeting with the new Financial Consultant, the customer reported that during his last meeting with Taylor, while she was employed at Fidelity, she set up a meeting for him at her new firm.  Taylor also told the client that he would be able to leave his assets at Fidelity but Taylor would be able to add her name to their account and provide financial advice.

51.     Accordingly, Fidelity's in-house counsel sent Taylor a letter reminding her of her contractual obligations, enclosing a copy of her Employee Agreement, and demanding that she cease any further solicitation of Fidelity customers.  Fidelity also enclosed an affidavit for her to sign attesting that she did not have, or had returned, any of its customer information. A copy of the March 20, 2020 letter is attached to the Marshall Declaration as Exhibit G.

52.     Taylor never responded to the letter and never returned the signed affidavit.

53.     Fidelity has since learned that Taylor has continued to use Fidelity's trade secret customer information to aggressively solicit customers to transfer their accounts to her new firm.

54.     Since Fidelity's March 20, 2020 letter to Taylor, another client reported to her new Financial Consultant that she received a call from the firm that Taylor joined and the person said that she was calling on Taylor's behalf.  The employee from Taylor's new firm, Fairhaven, then asked the Fidelity client to consolidate her assets and transfer them to Taylor at her new firm.  The

client was not happy that someone called her and wanted to make sure that Fidelity was aware that this was being done by Taylor and her new firm

55.     Other clients have also reported to Fidelity that Taylor was contacting them about doing business with her at her new firm.

56.     The only way Taylor could have known that these particular individuals were customers of Fidelity and how to contact them is by exploiting the ongoing access she was given to Fidelity's constantly updated confidential and trade secret information, and using her knowledge of that confidential information about Fidelity's clients to identify and target Fidelity clients for her own benefit, and the benefit of her new firm.

### Taylor Conspired with Fairhaven, Provided Fairhaven With Fidelity Customer Information and Fairhaven Further Solicited Fidelity Customers

57.     After resigning, Taylor provided a list of Fidelity customers that she serviced on behalf of Fidelity to Fairhaven.  Fairhaven then shared that information with its personnel. Fairhaven personnel then began initiating contact with the customers on that list and soliciting them to meet with Taylor and move their business to Fairhaven.

58.     Fairhaven records show that Fairhaven personnel systematically contacted customers previously serviced by Taylor through customer information provided by Taylor.

59.     Fairhaven personnel invited Fidelity customers to meet with Taylor at Fairhaven.

60.     A Fairhaven employee called Fidelity customers and told them that Taylor would be able to provide better service to them now that she was at Fairhaven.

61.     A Fairhaven employee called Fidelity customers and told them that Taylor had a whole team behind her now that she was at Fairhaven and that Fairhaven was "known for [its] customer service!"

62.     The reports from Fidelity customers and the evidence obtained in this case to date confirm that both Taylor and Fairhaven have misappropriated and misused Fidelity's trade secret information to solicit and divert Fidelity customers to Taylor at Fairhaven.

**The Threat of Irreparable Harm
Fidelity Faces from Defendants' Conduct**

63.     The theft and misuse of Fidelity's trade secret customer information to solicit and unfairly compete with Fidelity causes Fidelity both monetary and irreparable harm.  Defendant's conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing goodwill, losing future business or referrals, as well as losing trust and confidence in securing inherently-private information, which cannot be calculated with precision and cannot be adequately compensated.

64.      Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations.  The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."  15 U.S.C. § 6801(a) (2012).  The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent.  17 C.F.R. § 248.10 (2017).  Nonpublic personal information is defined to include customer lists from financial institutions, *even if those lists contain only names of Fidelity customers* because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations.  17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017).  Indeed, these regulations also protect a customer's account information.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

65.     Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their identities, contact information, net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. Thus, customers understandably are concerned when former Fidelity employees, such as Taylor, have access to their information and are using it to solicit their business to a new and different securities firm like Fairhaven.

66.     In other words, the damage to Fidelity's customer relationships has already occurred, is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage caused when Defendants took and improperly misused confidential and trade secret customer information on behalf of a competing business.

67.     Based on all the foregoing facts and conduct, Fidelity believes and thereon alleges that Defendant, together with Taylor, prepared to engage in, is engaging in, and plans to continue to engage in the following wrongful acts:

- use and/or disclosure of Fidelity's trade secret customer information and misappropriation of the trade secret information contained in confidential Fidelity business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information of Fidelity customers;

- transmission verbally, in writing or in another manner for the use of a Fidelity competitor, customers' contact and financial information contained in Fidelity's records; and

- solicitation of Fidelity customers on behalf of Taylor and Fairhaven.

68.     Fidelity has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of customers and customer goodwill caused by Defendant's misappropriation and misuse of Fidelity's trade secret customer information and solicitation of Fidelity's customers in violation of Taylor's Employee Agreement and in violation of Illinois law.

14

69.     Denial of injunctive relief would also leave Fidelity vulnerable to the same conduct from other employees.

70.     Fidelity asks for the Court's assistance in protecting that information and requiring it to be returned to Fidelity.

## FIRST CAUSE OF ACTION
### (Injunctive Relief)

71.     Fidelity hereby realleges and incorporates by reference the allegations of the Amended Complaint above, inclusive, as though set forth in full.

72.     In doing the acts described herein, Defendant has harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of federal and Illinois law, to give Defendant a competitive edge over Fidelity, attempting to poach Fidelity's customer accounts, and diminishing Fidelity's reputation and goodwill.

73.     Unless Defendant is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

      (a)     Disclosure of trade secrets, customer lists, and other confidential information that is solely the property of Fidelity and its clients;

      (b)     Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

      (c)     Potential future economic loss, which is presently incalculable.

74.     Thus, Fidelity is entitled to injunctive relief.

## SECOND CAUSE OF ACTION

### (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*)

75.     The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

76.     The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Defendant in violation of the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, in one or more of the following respects.

77.     Fidelity's above-described trade secrets, including the contact and confidential financial and account information of Fidelity customers, are the subject of reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality.  Fidelity's customer information is not generally known to the public or to competitors who could profit from its use or disclosure.

78.     Defendant has used Fidelity's customer information without Fidelity's consent. Defendant engaged in this conduct despite the fact that Taylor acquired this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Taylor owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity.  Fairhaven for its part acquired its access to Fidelity's trade secrets from Taylor, who Fairhaven knew had acquired it under circumstances giving rise to a duty to maintain the information's secrecy, and to limit its use and disclosure to any third party, including especially a competitor.

79.     Such information is also protected as "non-public" information under federal securities Regulation S-P.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u).  Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account

16

information such as that misappropriated by Defendants is not disclosed to third parties without consent. 17 C.F.R. § 248.10.

80. Fidelity derives a significant economic benefit from the above-described trade secrets, including a benefit from the fact that its competitors do not have access to this information through any proper means.

81. Fidelity faces a threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Defendant's ongoing misappropriation and misuse of Fidelity's trade secret customer information.

82. Unless Defendant is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

 (a) Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

 (b) Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

 (c) Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

 (d) Potential future economic loss, which is presently incalculable.

17

Defendant's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

### **THIRD CAUSE OF ACTION**

**(Misappropriation of Trade Secrets and Misuse of Confidential Information in Violation of the Illinois Trade Secret Act, 765 Ill. Comp. Stat. 1065)**

83.     The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

84.     As described above, Fidelity possessed trade secrets, including the contact and confidential financial and account information of Fidelity customers, which are the subject of reasonable efforts by Fidelity to maintain its secrecy and/or confidentiality.

85.     Defendant has used Fidelity's trade secret customer information without Fidelity's consent.  Defendant engaged in this conduct despite having a duty to maintain the information's secrecy and limit its use, or receiving it from a person who had that duty.

86.     Plaintiff derives economic value from this confidential information, due to it not being generally known to other persons who could obtain economic value from its disclosure or use.

87.     Plaintiff has made efforts that are reasonable under the circumstances to maintain the secrecy of such information.

88.     Defendant is misusing this information to unfairly compete with Plaintiff and to injure Plaintiff's relationships with its clients and/or divert the investment advisory business of such clients to Fairhaven.

89.     The disclosure and misuse of such information constitutes a misappropriation of trade secrets in violation of applicable law, including the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065.

90.     Defendant's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets and has caused Plaintiff irreparable harm, loss and damages.

## FOURTH CAUSE OF ACTION
### (Unfair Competition)

91.     The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

92.     Defendant's conduct as described above constitutes an unfair method of competition.

93.     As a direct and proximate result of Defendant's conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

## FIFTH CAUSE OF ACTION
### (Tortious Interference with Contract)

94.     The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

95.     Defendant Fairhaven either knew or reasonably should have known that Taylor had an employment agreement with Fidelity.

96.     Fairhaven tortiously interfered with Fidelity's employment agreements and relationship with Taylor by encouraging, assisting and inducing her to breach her agreements by taking customer information, disclosing it to Fairhaven, and using it to solicit Fidelity's customers to transfer their accounts to Fairhaven.   Fairhaven further instructed and/or permitted its employee to misuse that misappropriated information to solicit Fidelity clients on behalf of and in concert and participation with Taylor, aiding and abetting Taylor's breach of her obligations to Fidelity.

19

97.     As a direct and proximate result of Fairhaven's conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

### SIXTH CAUSE OF ACTION
**(Tortious Interference with Existing Business Relations)**

98.     The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

99.     Defendant tortiously interfered with Fidelity's client relationships by planning to and in fact soliciting clients to move their accounts to Taylor at Fairhaven, including through the wrongful use of Fidelity's confidential information and trade secrets.

100.    As a direct and proximate result of Defendant's conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

101.    Fidelity is entitled to injunctive relief, enjoining Defendant from further acts of tortious interference.

### SEVENTH CAUSE OF ACTION
**(Unjust Enrichment)**

102.    The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

103.    Defendant misappropriated Fidelity's trade secrets and confidential information and unfairly competed with Fidelity, thereby wrongfully benefitting from its actions.

104.    As a result of Defendant's wrongful and illegal conduct, it has benefitted in the form of the diversion of the investment management business of numerous Fidelity customers to

Taylor at Fairhaven. Also, as a result of the Defendant's wrongful and illegal conduct, Fidelity has suffered harm.

105.    Allowing Defendant to benefit from such conduct would be unfair and inequitable, and should be prohibited.

## EIGHTH CAUSE OF ACTION

### (Civil Conspiracy)

106.    The allegations above are incorporated herein by reference with the same force and effect as if set forth in full below.

107.    Fairhaven and Taylor formed and operated a malicious combination with a common purpose to injure Fidelity by performing unlawful acts by violating Fidelity's statutory and common law rights as described above.

108.    The foregoing conduct was malicious and willful; it was performed with the specific intent to injure Fidelity.

109.    Defendant in fact engaged in several overt unlawful acts, set forth above, and conduct violative of Fidelity's statutory and common law rights as described above, causing actual harm to Fidelity.

110.    As a consequence of the foregoing, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

## PRAYER FOR RELIEF

For the reasons set forth above, Fidelity respectfully requests that the Court grant:

1.    Injunctive relief (a) prohibiting any further misuse or commercial exploitation by Defendant of Fidelity's confidential trade secret customer information;

2. Injunctive relief ordering Defendant and anyone acting in concert with Defendant to return to Fidelity (a) any and all records, information and/or documents in any form containing information pertaining to customers or prospective customers of Fidelity whom Taylor served or whose name became known to Taylor while in the employ of Fidelity, (b) any and all copies of the foregoing, (c) all records, information or documents, in any form, created by Taylor, or anyone acting in concert with her, based on documents or information that were received or removed from Fidelity by Taylor, (d) any list of Fidelity customer names that may have been created or recreated by Taylor from memory, and (e) any documents or information derived from a list created or recreated by Taylor from memory, or derived from any of the documents or information described in items (a) through (c) of this paragraph 2;

3. Awarding against Fairhaven and in favor of Fidelity (a) compensatory damages, (b) punitive damages, (c) exemplary damages as authorized by statute, and (d) attorneys' fees and costs as authorized by statute and/or contract; and

4. Any and all additional relief the Court deems just and equitable under the circumstances.

Dated: March 9, 2022

Respectfully submitted,

FISHER & PHILLIPS LLP

/s/ *Susan M. Guerette*
Susan M. Guerette (admitted *pro hac vice*)
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
TEL: (610) 230-2133
FAX: (610) 230-2151

22

sguerette@fisherphillips.com

Joel W. Rice
Franklin Z. Wolf
10 South Wacker Drive, Suite 3450
Chicago, IL 60606
TEL: (312) 346-8061
FAX: (312) 346-3179
jrice@fisherphillips.com
fwolf@fisherphillips.com

*Attorneys for Plaintiff*

23