**IN THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-2133 |
| | ) | |
| JENNIFER TAYLOR and | ) | |
| FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants/Counter-Claimants. | ) | |
| | ) | |

**PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT OF**
**MOTION FOR STAY PENDING ARBITRATION**

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") files this Reply Brief in further support of its Motion for Stay (Doc. 114; the "Motion") of its claims against Fairhaven Wealth Management, LLC ("Fairhaven"), as well as the counterclaims filed by Fairhaven and by Jennifer Taylor ("Taylor," and together with Fairhaven, "Counterclaimants"), pending the outcome of Fidelity's claims against Taylor and Taylor's counterclaims against Fidelity asserted and actively pending in arbitration proceedings before FINRA Dispute Resolution, Inc. (the "FINRA Action").[1]

**INTRODUCTION**

Counterclaimants' Opposition boils down to three arguments: (a) the FINRA arbitrators' rulings will have no preclusive effect on this Court; (b) a stay will prejudice Taylor and Fairhaven; and (c) Fidelity allegedly has applied the wrong legal standard. As Fidelity explains below, all of these arguments are wrong, and none provides a legal basis to deny Fidelity's Motion. Further,

---

[1] On April 26, 2022, Counterclaimants filed a "Supplement to Counterclaimants' Response in Opposition to Motion to Stay" (Doc. 121, the "Supplement") without first seeking leave of Court to file past the April 13, 2022, deadline set by the Court or to exceed the 15-page limit set by Local Rule 7.1. For these reasons, the Court should ignore Counterclaimants' Supplement entirely. However, should the Court decide to consider Counterclaimants' improper Supplement, Fidelity provides a brief reply to the Supplement for the Court's consideration at the end of this Reply Brief.

while Counterclaimants' Opposition attempts to downplay the most important point made by Fidelity in its moving papers—that the risk of inconsistent findings and duplicative efforts is unavoidable absent a stay because the claims asserted among the three parties to this litigation are inextricably intertwined, factually and legally, with the claims currently proceeding in the FINRA Action—Taylor admits, albeit in a casual footnote, that five of her 12 counterclaims should not proceed in this action because Taylor is pursuing identical claims in the FINRA Action. (Doc. 119 at n.2.) Fairhaven and Taylor, however, do not take that concession far enough: Taylor's remaining seven counterclaims, along with Fairhaven's six counterclaims and Fidelity's claims against Fairhaven, also arise out of the same nucleus of facts and involve many of the same factual and legal issues as the claims currently proceeding apace in arbitration. Thus, to avoid duplicative litigation and the significant risk of inconsistent results, the Court should stay all remaining claims pending in this action until the parties have had the opportunity to arbitrate.

## ARGUMENT

### A. The FINRA Action Will Have a Preclusive Effect on These Proceedings Under the Doctrine of Collateral Estoppel

Counterclaimants argue that the arbitration panel's rulings will have no preclusive effect in this Court because: (1) Taylor's statutory discrimination claims "can only be resolved in this Court" and "[t]he causes of action by and against Fairhaven are not identical to those that will be arbitrated before FINRA"; (2) "Fairhaven is neither an identical party nor in privity with Ms. Taylor"; and (3) "[m]ost FINRA awards provide no factual findings, no legal analysis, no breakdown of which legal theories or causes of action prevailed, or reasoning of any kind." (Doc. 119 at pp. 7-8.) These arguments fail because all of the elements necessary to invoke the doctrine of collateral estoppel will be present upon completion of the FINRA Action and nearly all of the

factual and legal issues that must be resolved to adjudicate the claims before this Court will be resolved through arbitration.

The doctrine of collateral estoppel, also known as issue preclusion, "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Coleman v. Donahoe*, 667 F.3d 835, 853 (7th Cir. 2012) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). "Generally, arbitration awards have the same *res judicata* and collateral estoppel effect as court judgments." *Pepper Constr. Co. v. Palmolive Tower Condominiums, LLC*, 59 N.E.3d 41, 63 (Ill. App. 1st Div. 2016) (quoting *Peregrine Financial Grp., Inc. v. Martinez*, 712 N.E.2d 861, 867 (Ill App. 1st Dist. 1999)); *see also Taylor v. Peoples Gas Light & Coke Co.,* 656 N.E.2d 134, 140 (Ill. 1995) (noting that an arbitration award has the same preclusive effect as a court judgment unless the arbitration proceeding was unfair or the result unreliable or giving the award preclusive effect would be incompatible with other legal or contractual policies).

Collateral estoppel is designed to prevent needless relitigation and to bring finality to litigation. Issue preclusion applies where (1) the party against whom collateral estoppel is asserted was fully represented in the prior litigation; (2) the issue sought to be precluded is identical to an issue involved in the prior litigation; (3) the issue was actually litigated and decided on the merits in the prior litigation; and (4) the resolution of that issue was necessary to the court's judgment. *Mondelez Glob. LLC v. Int'l Union of Operating Eng'rs Local 399*, No. 1:18 C 2112, 2019 WL 216738, at * 3 (N.D. Ill. Jan. 16, 2019) (citing *Gray v. Lacke*, 885 F.2d 399, 406 (7th Cir. 1989)).

## 1. The Remaining Claims and Counterclaims Arise Out of the Same Facts as Those Before the Arbitration Panel

Counterclaimants spend much time trying to convince the Court that the remaining claims pending in the instant action are not identical to those that will be arbitrated in the FINRA Action.

3

In making this argument, Counterclaimants completely ignore the fact that the causes of action need not be identical in order for collateral estoppel to apply. Whether the issues are identical for purposes of collateral estoppel analysis turns on whether "they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *FW Assocs. LLC v. WM Assocs. LLC*, Case No. 18 C 5081, 2019 WL 354953, at \*4 (N.D. Ill. Jan. 28, 2019) (citing *Squires-Cannon v. Forest Preserve Dist.*, 897 F.3d 797, 804 n.4 (7th Cir. 2018)). Counterclaimants try to downplay the factual crossover between this action and the FINRA Action but admit in a footnote that the fact section of Taylor's FINRA counterclaims "is similar to her federal counterclaims." (Doc. 119 at n.3.) To be clear, the fact sections are not just *similar*, they are virtually *identical*. That is because adjudication of Taylor's claims in each action requires consideration of and resolution of the same exact factual issues—*i.e.*, the circumstances surrounding Taylor's departure from Fidelity; Taylor's possession and use of Fidelity's confidential customer information; Taylor's solicitation of Fidelity's customers; Fairhaven's knowledge and assistance in soliciting and Fidelity's response to the same.[2] Indeed, many of the same factual allegations appear, verbatim, in Fairhaven's counterclaims against Fidelity. Thus, there can be no doubt that the salient issues in both this action and the FINRA Action arise from a single group of operative facts.

In attempting to minimize the risk of inconsistent rulings between this action and the FINRA Action, Counterclaimants argue, for instance, that there is no possibility of an inconsistent

---

[2] Under FINRA Rule 13201, the arbitration panel could decide Taylor's statutory employment claims if the parties agreed to have it do so. Fidelity consents to arbitrating Taylor's statutory discrimination claims and believes doing so would be most efficient for the parties and this Court. The fact that Taylor refuses to arbitrate her statutory employment claims and that, therefore, those claims must ultimately be resolved by this Court, is unfortunate, but has no bearing on the preclusion analysis. Those claims do arise out of the same facts as the claims pending in the FINRA Action, which means that the factual and legal issues underlying those claims may be subject to collateral estoppel.

ruling with respect to whether Fairhaven tortiously interfered in Fidelity's contractual relationship with Taylor. (Doc. 119 at p. 13). But Fidelity's tortious interference claim against Fairhaven alleges that Fairhaven intentionally and unjustifiably induced Taylor's breach of her contract. Thus, the claim is derivative of Fidelity's breach of contract claim against Taylor and Fairhaven cannot be liable for tortious interference with contract if Taylor is found not liable for breach of contract herself. The risk of inconsistent rulings on this issue is unmistakable, but this is just one of many instances where the risk of inconsistent rulings is evident. Other examples include:

- *Whether Fidelity needed justification to terminate its custodial relationship with Fairhaven?* Taylor and Fairhaven allege in their counterclaims that Fidelity terminated its custodial relationship with Fairhaven in bad faith because Taylor would not agree to enter into a stipulated injunction. (Doc. 71 at ¶¶ 79-101, Doc. 72 at ¶¶ 100-113). Fairhaven bases four of its counterclaims on these allegations. (Doc. 72 at Counts I, IV, V, and VI). Taylor makes these same allegations in the FINRA Action in support of several of her claims. *See* Taylor's Counterclaims, Third-Party Claims, and Answer to Statement of Claim filed in the FINRA Action, attached hereto as Exhibit A, at ¶¶ 74-94 and Counts IV-VI.[3] In order to adjudicate these claims, the FINRA arbitrators will need to hear evidence about, consider, and ultimately resolve the issue of whether Fidelity rightfully terminated its custodial relationship with Fairhaven.

- *Why Taylor was placed on written warnings?* Taylor's allegations that she suffered unjustified adverse employment actions, including verbal and written warnings, are fundamental to her age and gender discrimination and hostile work environment claims in the instant action, as well as to her wrongful termination/constructive discharge claim in the FINRA Action. *See* Doc. 71 at Counts I-VI, and Exhibit A at Count I. As part of its claims in the FINRA Action, Fidelity

---

[3] Taylor also asserted these same allegations in support of the counterclaims she has now agreed to drop in this action. *See* Doc. 71 at Counts VIII, IX, and XI.

alleges that Taylor engaged in unacceptable behavior prior to her resignation that caused management to put her on written warnings for violating Fidelity's policies and procedures. Thus, the FINRA arbitrators will need to hear evidence, consider, and ultimately resolve whether Taylor engaged in behavior in violation of Fidelity's policies and in breach of her duty of loyalty to Fidelity. FINRA's resolution of this issue will preclude relitigation of the same in this Court in connection with Taylor's claim that she was wrongfully subjected to adverse employment actions.

- *Whether Fidelity engaged in any deceptive business practices?* In the FINRA Action, Taylor asserts claims against Fidelity for violations of the Consumer Fraud and Deceptive Business Practices Act and the Uniform Deceptive Trade Practices Act based on allegations that Fidelity refused to provide Taylor's contact information to her former clients. *See* Exhibit A, at Counts II-III. Fairhaven asserts identical claims against Fidelity in this action based on identical factual allegations. (Doc. 72 at Counts II-III). Thus, FINRA's resolution of this factual issue will preclude litigation of Fairhaven's identical claims in this action.

As explained more fully below, Fairhaven's interests in these issues will be fully represented in the FINRA Action by Taylor, who shares an identical interest in the outcome and who is in privity with Fairhaven as its employee. Moreover, the same attorneys who represent Taylor and Fairhaven in this action also represent Taylor in the FINRA Action. Thus, if a stay is granted, the parties will be estopped from relitigating these issues before this Court and several of the claims currently pending may be resolved without further litigation. If a stay is not granted, however, there is a significant risk of inconsistent rulings that will not only complicate the proceedings, but also interfere with the province of the arbitrators.

### 2. As Her Employer, Fairhaven Is in Privity with Taylor

Counterclaimants next argue that Fairhaven's claims will not be subject to issue preclusion because Fairhaven is not a party to the FINRA Action. However, while it is true that Fairhaven is

not a party to the arbitration, the issues presented in Fairhaven's counterclaims are subject to collateral estoppel because Fairhaven is in privity with Taylor.

To be "in privity" for the purposes of collateral estoppel, two parties do not need to be identical, but they must be so closely aligned that they represent the same legal interest. *Degironne v. Furlong*, No. 08 C 5696, 2010 WL 1978682, at \*3 (N.D. Ill. May. 14, 2010) (citing *Kraushaar v. Flanigan*, 45 F.3d 1040, 1050 (7th Cir. 1995)). Courts within the Seventh Circuit and across the country have found that employees of a defendant in a prior suit are in privity with the defendant for the purposes of issue and claim preclusion. *See, e.g.*, *Talano v. Bonow*, No. 00 C 1208, 2002 WL 31061198, at \*2 (N.D. Ill. Sept. 16, 2002) (citing *Henry v. Farmer City State Bank,* 808 F.2d 1228, 1235 n.6 (7th Cir.1986) (holding that res judicata bars federal RICO claims against directors, officers, employees, and attorneys of bank even though the bank was the only actual party to the prior state court mortgage foreclosure proceedings); *Janusz v. Fasco Indus.,* No. 97 C 7976, 1999 WL 162793, at \*5 (N.D. Ill. Mar.12, 1999) (same). *See also*, *Guerriero v. Merit Lincoln Park, LLC*, No. 08 C 2388, 2008 WL 4696070, at \*3 (N.D. Ill. Oct. 22, 2008) ("Illinois law clearly establishes that employees, attorneys, and officers of a defendant entity in a prior suit are in privity with the defendant for purposes of res judicata."). Additionally, Illinois courts have found that "a party is in privity with a party to the prior adjudication where the parties represent the same legal interests […] Put another way, parties are in privity when a nonparty's interest are so closely aligned to those of the party that the party is the "virtual representative of that nonparty." *Halliburton v. Hockaday*, No. 2:18-CV-2081, 2019 WL 2270586, at \*5 (C.D. Ill. May 28, 2019).

In *Talano*, the plaintiff had previously filed a lawsuit against his employer alleging age discrimination based upon acts by his prior supervisor and breach of contract. The employer prevailed on a motion for summary judgment. A few months later, plaintiff filed a new lawsuit

against his prior supervisor for tortious interference. Defendant filed for summary judgment arguing that the case was barred by the doctrines of res judicata and collateral estoppel. The Court found, *inter alia*, that because the plaintiff was the same in both actions and because defendant was an employee of the defendant in the prior action, privity existed between them and thus the privity element of the preclusion analysis was satisfied. *See Talano*, 2002 WL 31061198, at * 3-4.

Here, Fairhaven is Taylor's employer and Taylor's interests in the FINRA Action are so closely aligned with Fairhaven's interests in the instant action that Taylor is a virtual representative of Fairhaven. Specifically, Taylor was a Fairhaven employee at the time of her unlawful solicitations of Fidelity customers; Taylor shared the confidential information she took from Fidelity; and Taylor conspired with other Fairhaven employees to solicit Fidelity's customers— all for the benefit of Fairhaven. Further both parties are represented by the same attorneys, and Taylor undoubtedly will have the same incentive to litigate the arbitration with the same vigor as Fairhaven has in the instant case. *See Gorski v. U.S.*, 104 Fed. Cl. 605 (Fed. Cl. 2012). Thus, Fairhaven is in privity with Taylor such that collateral estoppel will apply.

### 3. The Arbitrators Will Consider and Adjudicate All the Necessary Facts

To the extent Defendants argue that there would be no realistic way for collateral estoppel to apply because FINRA arbitrators do not "show their work," that argument is unavailing. Under Illinois law, issue preclusion applies when the issue has been "fairly, completely, and necessarily resolved in a prior proceeding." *Target Media Partners v. Owen*, No. 09C6922, 2010 WL 2364581, at *3 (N.D. Ill. June 11, 2010) (citing *Taylor v. Peoples Gas Light & Coke Co.*, 656 N.E.2d 134, 139 (Ill. 1995)). The fact that the arbitrators may not provide an explanation of their award is not fatal to the analysis because the panel will be required to actually and necessarily adjudicate the issues identified above and in Fidelity's moving papers in order to issue the arbitration award. *See Pham v. JP Morgan Securities LLC*, No. 2:20-cv-4500, 2021 WL 2712215,

at *2 (S.D. Ohio July 2, 2021) (applying res judicata and noting that "FINRA's final arbitration award establishes that there was a final decision on the merits in the arbitration"). The "full and fair opportunity" requirement is satisfied even if only a slight amount of evidence was presented on the disputed matter decided in the first suit. *King v. Burlington Northern and Santa Fe Ry Co.*, 445 F. Supp. 2d 964, 975 (N.D. Ill. 2006). Further, "actually litigated" does not mean thoroughly litigated, but only that the parties disputed the issue and the trier of fact resolved it. *Raper v. Hazelett & Erdal*, 449 N.E.2d 268, 253 (Ill. 1983).

In prosecuting their claims and defenses in the FINRA Action, Fidelity and Taylor will present evidence, testimony, and argument to the arbitration panel. FINRA Dispute Resolution, Inc. digitally records arbitration hearings and the parties may also arrange for a court reporter to be present. Thus, the Court will have a full record of the arbitration proceedings for reference in this action. Thus, because the disputed factual and legal issues between the parties will be presented to and resolved by the arbitration panel, collateral estoppel will apply.

**B. Counterclaimants Will Not Be Prejudiced Because the FINRA Action Will Resolve the Majority of the Issues Presented in the Remaining Counterclaims Expediently**

Counterclaimants argue that they will be prejudiced by a stay because the FINRA Action will take months to resolve. To support this argument, Counterclaimants provide the Court with outdated and misleading statistics and represent that the arbitration hearing in this matter will not take place until August 2023 (at the earliest) and March 2026 (at the latest). Counterclaimants make this claim based on their analysis of a select number of FINRA arbitration matters that Fidelity's counsel has handled in the past, suggesting that the "median turnaround time of Ms. Guerette's FINRA arbitrations is 18.5 months." (Doc. 119 at p. 114.) However, Counterclaimants fail to note that none of the matters they cite in support of this median number were filed in the last 10 years. Indeed, one of the cases they rely upon took place over twenty years ago.

Contrary to Counterclaimants' representations, the FINRA Action is well underway. The pleadings are closed, Fidelity has served written discovery on Taylor and requested that a subpoena *duces tecum* be issued to Fairhaven, and the Initial Pre-Hearing Conference ("IPHC") is scheduled for May 4, 2022. At the IPHC, the panel will set deadlines for completion of discovery and briefing, as well as motions deadlines, and set a date for the final hearing. FINRA Dispute Resolution provides its arbitrators with a written guide to help the arbitrators facilitate proceedings. The 2021 edition of the FINRA Dispute Resolution Services Arbitrator's Guide expressly states:

> **Scheduling the Hearing**
>
> Arbitrators should schedule dates that will expedite the process but still provide a reasonable amount of time for case preparation. FINRA encourages parties and arbitrators to schedule the hearing within six months from the date of the IPHC. FINRA also recommends setting aside extra dates to avoid delay in the arbitration process.

www.finra.org/arbitration-mediation/arbitrators-guide at page 23. There is no indication that the arbitration panel will deviate from these current guidelines. Thus, in light of the six-month recommended timeframe from IPHC to hearing date, and the fact that discovery has already commenced (and that much of the expedited discovery already conducted may be utilized in the FINRA Action), Fidelity expects this matter to go to a final arbitration hearing by the end of 2022.

Taylor and Fairhaven cannot credibly argue that they will be prejudiced by this brief delay, especially when they sat on their counterclaims for over a year after they were permitted to start taking discovery. If Counterclaimants were truly worried about lost evidence, as they claim, they could have acted to move forward with discovery over a year ago (after briefing on the preliminary injunction motion was complete).[4] But they chose not to do so.

---

[4] Counterclaimants disingenuously assert that Fidelity has already caused a 17-month delay in the prosecution of their claims. (Doc. 119 at p. 1.) To the contrary, after filing its Complaint, Fidelity diligently sought injunctive relief, which was delayed by Taylor's and Fairhaven's coordinated efforts to obstruct expedited discovery at every opportunity. After finally completing expedited discovery, Fidelity promptly briefed its Motion for a Preliminary Injunction. Any delay after that point cannot be attributed to Fidelity.

10

Further, neither Taylor nor Fairhaven can complain that a stay impairs or prejudices their ability to prosecute their claims because they both have the ability to bring their claims before FINRA immediately. As a FINRA-registered Associated Person, Taylor agreed: "to arbitrate any dispute, claim or controversy that may arise between you and your firm, or a customer, or any other person that is required to be arbitrated under the rules of the self-regulatory organizations with which you are registering." *See* FINRA Rule 2263. Thus, Taylor knows full well that she is required to arbitrate the majority of her claims. And, while she is not *required* to arbitrate her statutory discrimination claims, Taylor is *permitted* to bring those claims into the FINRA Action as well. *Supra* at n.1. As to Fairhaven, Counterclaimants take a great deal of space to argue that Fairhaven's claims are not arbitrable and that Fidelity has waived its ability to compel arbitration. Fidelity has not asked the Court to compel Fairhaven to arbitrate, so Counterclaimants' waiver argument is largely a non-sequitur. However, as set forth in Fidelity's moving papers, the Investment Advisor Representation and Indemnification letter agreement (the "Custodial Agreement") between Fidelity and Fairhaven includes an arbitration clause. Contrary to Counterclaimant's misrepresentations to the Court, that arbitration clause is *not* limited to customer disputes, but rather covers the entire relationship between Fidelity and Fairhaven ("In the event there is a dispute between us and Fidelity, such dispute shall be settled by arbitration . . . .").[5] Thus, Fairhaven contemplated and agreed to arbitrate any dispute with Fidelity when it entered into the Custodial Agreement. If Fairhaven is truly concerned about adjudicating its claims without further delay, Fairhaven can file an action with FINRA pursuant to the Custodial Agreement and have its claims joined with the already pending FINRA Action.

---

[5] The Custodial Agreement itself is not limited to customer disputes, either. Contra, Opp. at 3. It addresses a variety of issues regarding the relationship between Fidelity and Fairhaven, including notices of investigations, the recording by Fidelity of calls with Fairhaven employees, the use of Fidelity intellectual property, and, importantly, Fidelity's right to stop providing brokerage services to Fairhaven "at any time."

In any event, any prejudice that Counterclaimants may experience through the relatively short delay Fidelity is requesting is substantially outweighed by the very significant effect the FINRA Action may have on the litigation here. As set forth above, the outcome of the FINRA Action will resolve factual and legal questions coextensive with the claims remaining here and may preclude many of the disputes at issue in this litigation entirely. The two actions arise out of the same nucleus of facts, and it would be far more prejudicial to litigate both simultaneously.

The parties have already initiated discovery in the FINRA Action that will be duplicative of any additional discovery needed in this action. Even if the Court attempts to parse out and limit the discovery to be taken in this action while the FINRA Action proceeds, extensive motion practice and discovery disputes will be unavoidable as Counterclaimants have served an excessive amount of overbroad and harassing document requests and interrogatories. Counterclaimants have also already issued 21 deposition notices that will be the subject of dispute, including Fairhaven's Rule 30(b)(6) deposition notice asking for deponents with knowledge of 31 different wide-ranging subjects—not including subparts—and Taylor's Rule 30(b)(6) deposition notice with 21 different topics to be addressed. *See* Exhibit B. The Court should not allow the parties to engage in expensive and time-consuming discovery when a brief pause may save that effort and expense.

## C. The *Colorado River* Abstention Doctrine Is Not Applicable as Fidelity Is Not Asking the Court to Abstain from Exercising Its Jurisdiction Completely

Counterclaimants use the majority of their Opposition to argue that Fidelity has presented the Court with the wrong legal standard under which to analyze its Motion and advocate for application of the abstention doctrine set forth in *Colorado River Water Conserv. Dist. v. U.S.*, 424 U.S. 800 (1976), instead. This argument is misplaced in light of the procedural posture of this case.

In *Colorado River*, the Supreme Court dealt with the issue of whether a federal court may decline to exercise jurisdiction where there is a parallel state court proceeding. While the Court

stressed that federal courts ordinarily have an obligation to exercise the jurisdiction given to them, considerations of wise judicial administration, conservation of judicial resources, and comprehensive disposition of litigation may justify dismissal of a federal suit. 424 U.S. 800, 817. The standard set forth in *Colorado River* is meant to be applied in true abstention cases—*i.e.*, where a party is seeking to have a federal court divest itself of jurisdiction entirely in favor of a state court matter. Indeed, since its publication, the vast majority of opinions citing to and relying upon *Colorado River* arise out of the procedural scenario where a federal court must determine whether to completely abstain from exercising jurisdiction where there is a parallel state court proceeding already underway. That is *not* the case here.

Here, Fidelity is not asking this Court to abstain completely from exercising its jurisdiction over Taylor's and Fairhaven's remaining claims. Rather, Fidelity is simply asking the Court to follow the Seventh Circuit's long, well-established precedent of staying non-arbitrable claims when, as here, arbitrable and non-arbitrable issues are so intertwined that allowing the case to proceed simultaneously on dual litigation and arbitration tracks risks inconsistent rulings.[6] *See Volkswagen of Am. v. Sud's of Peoria*, 474 F.3d 966, 971 (7th Cir. 2007) (holding that the court must weigh "the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice that may result from delays" and that "[w]hen these factors weigh in favor of staying the entire action pending arbitration, the district court may abuse its discretion in allowing the nonarbitrable issues to proceed absent a stay."). Thus, Fidelity is not seeking to curtail this Court's jurisdiction as Counterclaimants argue. Indeed, at the end of the

---

[6] The Court's authority arises from its wide discretion to control its own docket. *See Volkswagen of Am. v. Sud's of Peoria*, 474 F.3d 966, 971 (7th Cir. 2007) ("The decision to stay the litigation of non-arbitrable claims or issues is a matter largely within the district court's discretion to control its docket.") (quoting *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 97 (4th Cir. 1996) (discussing discretion and noting that "[t]he Supreme Court has indicated its support for this interpretation of § 3 [of the Federal Arbitration Act] on at least two occasions")).

requested stay, Fidelity expects to resume prosecution and defense of the remaining claims, subject to the preclusive effect of the arbitration award.

If the standard articulated by the Seventh Circuit in *Volkswagen* is not the correct standard to be applied here, then *Colorado River* would apply every time a party sought a stay of non-arbitrable claims, and that is clearly not correct. Courts in the Seventh Circuit regularly stay litigation where there is a mix of arbitrable and non-arbitrable claims and a risk of inconsistent rulings, without ever discussing the *Colorado River* abstention doctrine. *See, e.g.*, *G&G Closed Circuit Events, LLC v. Castillo*, No. 14-CV-02073, 2017 WL 1079241 (N.D. Ill. Mar. 22, 2017) (granting motion to compel arbitration of third-party claims and staying remaining claims to allow the arbitration to run its course, which "has the added benefit of efficiently shedding light on the factual disputes in which [the parties] are embroiled here."); *WMS Gaming, Inc. v. IGT*, 31 F. Supp. 3d 974, 978 (N.D. Ill. March 25, 2014) (staying non-arbitrable claim where the arbitrable issue is too closely tied to non-arbitrable issues in the complaint); *Valentine v. WideOpen West Fin., LLC*, No. 09 C 07653, 2012 WL 1021809 (N.D. Ill. Mar. 26, 2012) (staying one count of complaint until resolution of the arbitration of remaining counts where litigation of the remaining claim would be an inefficient use of resources and would risk conflicting decisions); *Louis Berger Group, Inc. v. JPMorgan Chase Bank, N.A.*, No. 11 C 430, 2011 WL 2837462 (N.D. Ill. July 18, 2011) (granting stay until resolution of arbitration due to considerable risk of inconsistent rulings).

Likely recognizing that the *Volkswagen* case does, in fact, provide the correct standard, Counterclaimants attempt to distinguish *Volkswagen* by saying that in that case all of the parties were required to participate in the arbitration, which is not the case here. But in deciding *Volkswagen*, the Seventh Circuit expressly contemplated a scenario in which some of the parties to a federal court suit were required to arbitrate, while others were not. The Court relied upon

*Morrie Mages & Shirlee Mages Foundation v. Thrifty Corp.*, 916 F.2d 402 (7th Cir. 1990), in which the Court found that the district court had abused its discretion in refusing to stay nonarbitrable issues pending arbitration of related, arbitrable issues arising out of a purchase agreement. The Court made this determination despite the fact that the buyer's guarantor was implicated in the federal suit but had *not* executed an arbitration agreement. Thus, all parties need not be subject to an arbitration agreement in order for a stay to be appropriate under the *Volkswagen* framework.

While Fidelity maintains that it has provided the Court with the correct legal framework under Seventh Circuit precedent, and that *Colorado River* is not applicable, this Court should nonetheless issue a stay under either analysis. The *Colorado River* abstention doctrine "allows courts to conserve judicial resources by abstaining from accepting jurisdiction when there is a parallel proceeding elsewhere." *Deb v. SIRVA, Inc.*, 832 F.3d 800, 814 (7th Cir. 2016). Here, this action is parallel with the FINRA Action as "substantially the same parties are contemporaneously litigating the same issues in another forum." *Huon v. Johnson & Bell, Ltd.*, 657 F/3d 641, 646 (7th Cir. 2011). Further, there is a significant risk of piecemeal litigation, inconsistent results, and waste of judicial resources absent a stay. Essentially, it is an unnecessary waste of the parties' and the Court's resources, to conduct discovery, resolve inevitable discovery disputes, and potentially prepare for trial in two different forums, as the same time, to resolve the same factual issues.

Thus, this Court should follow the Seventh Circuit's long-standing precedent and issue a stay of these proceedings pending resolution of the parallel FINRA Action.

## CONCLUSION

For these reasons and the reasons set forth more fully in Fidelity's moving brief, Fidelity respectfully asks the Court to stay these proceedings pending the outcome of the proceedings currently pending before FINRA Dispute Resolution, Inc.

15

Dated: April 27, 2022                                Respectfully submitted,

                                                     FISHER & PHILLIPS LLP

                                                     /s/ *Susan M. Guerette*
                                                     Susan M. Guerette (admitted *pro hac vice*)
                                                     Two Logan Square, 12th Floor
                                                     100 N. 18th Street
                                                     Philadelphia, PA 19103
                                                     TEL: (610) 230-2133
                                                     FAX: (610) 230-2151
                                                     sguerette@fisherphillips.com

                                                     Joel W. Rice
                                                     Franklin Z. Wolf
                                                     10 South Wacker Drive, Suite 3450
                                                     Chicago, IL 60606
                                                     TEL: (312) 346-8061
                                                     FAX: (312) 346-3179
                                                     jrice@fisherphillips.com
                                                     fwolf@fisherphillips.com

                                                     *Attorneys for Plaintiff*

**PLAINTIFF'S REPLY TO SUPPLEMENT TO**
**COUNTERCLAIMANTS' RESPONSE IN OPPOSITION TO MOTION TO STAY**

In their improperly-filed Supplement to Counterclaimants' Response in Opposition to Motion to Stay ("Supplement"), Counterclaimants take issue with Fidelity's plan to ask the FINRA arbitration panel to issue a third-party subpoena *duces tecum* on Fairhaven. First, Counterclaimants argue that the anticipated subpoena will add "another four-to-six months, if not more, to the FINRA arbitration proceeding" because the subpoena will "likely precipitate a separate enforcement action filed in court." (Doc. 121 at pp. 1-2). This assertion greatly exaggerates what this requires as it is not difficult or time consuming to simply initiate a court action and then move to enforce the arbitration subpoena. Moreover, Fidelity can move to enforce the subpoena while simultaneously moving forward with discovery as to Taylor in the FINRA Action. Thus, there is no reason why the subpoena to Fairhaven would add any more time to the arbitration action.

Counterclaimants further argue that the subpoena contains document requests "which relate directly to this lawsuit" and it would be unfair to stay these proceedings and prevent Fairhaven from seeking discovery while Fidelity is able to obtain discovery through the FINRA Action (Doc. 121 at p. 2). Counterclaimants' argument in this regard perfectly illustrates why a stay is necessary. The claims set forth by Taylor in the FINRA action are so intertwined with those in this lawsuit that Fidelity will necessarily need discovery from Fairhaven in order to respond to Taylor's Counterclaims in the FINRA Action, which rely on the same facts as Fairhaven's Counterclaims in this action. What Counterclaimants fail to mention is that because Taylor and Fairhaven are in privity with one another, have identical interests in the outcome of the FINRA Action, and are represented by the same counsel in both actions, Fairhaven will have access to and use of the discovery obtained by Taylor in the FINRA Action. Thus, Fairhaven will suffer no prejudice by virtue of the requested stay.

1

Fidelity respectfully asks the Court to stay these proceedings pending the outcome of the proceedings currently pending before FINRA Dispute Resolution, Inc.


Dated: April 27, 2022

Respectfully submitted,

FISHER & PHILLIPS LLP

/s/ *Susan M. Guerette*
Susan M. Guerette (admitted *pro hac vice*)
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
TEL: (610) 230-2133
FAX: (610) 230-2151
sguerette@fisherphillips.com

Joel W. Rice
Franklin Z. Wolf
10 South Wacker Drive, Suite 3450
Chicago, IL 60606
TEL: (312) 346-8061
FAX: (312) 346-3179
jrice@fisherphillips.com
fwolf@fisherphillips.com

*Attorneys for Plaintiff*

2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of April 2022, the foregoing document was filed via the Court's electronic filing system, which sent notice to the following:

Christopher Griesmeyer
Zachary Mulcrone
Greiman, Rome & Griesmeyer, LLC
Two N. LaSalle, Suite 1601
Chicago, Illinois 60602

COUNSEL FOR DEFENDANTS

*/s/ Susan Guerette*
Attorney for Plaintiff

# EXHIBIT A

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## DISPUTE RESOLUTION

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES, LLC, )<br>)<br>Claimant, )<br>)<br>v. )<br>)<br>JENNIFER TAYLOR, )<br>)<br>Respondent; )<br>) | |
| JENNIFER TAYLOR, )<br>)<br>Counterclaimant, )<br>)<br>v. )<br>)<br>FIDELITY BROKERAGE SERVICES, LLC, )<br>)<br>Counter-Respondent; )<br>) | **FINRA CASE NO. 20-01110** |
| JENNIFER TAYLOR, )<br>)<br>Third-Party Claimant, )<br>)<br>v. )<br>)<br>SCOTT ELY MARSHALL, )<br>)<br>Third-Party Respondent. )<br>) | |

## RESPONDENT/COUNTERCLAIMANT JENNIFER TAYLOR'S
## COUNTERCLAIMS, THIRD-PARTY CLAIMS, AND
## ANSWER AND AFFIRMATIVE DEFENSES TO STATEMENT OF CLAIM

The Respondent, Counterclaimant and Third-Party Claimant Jennifer Taylor ("Taylor" or

"Respondent"), by and through her undersigned counsel, and pursuant to FINRA Rule 13303,

respectfully submits the following Counterclaims, Third-Party Claims, Answer and Affirmative

Defenses to the Statement of Claim filed by Claimant Fidelity Brokerage Services LLC ("Claimant," "Fidelity" or the "Company").

## RESPONDENT'S COUNTERCLAIMS
## AND THIRD-PARTY CLAIMS

Respondent Taylor, by and through her undersigned counsel, for her Counterclaims against Fidelity and her Third-Party Claims against Scott Ely Marshall ("Marshall" or "Third-Party Respondent"), alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action filed under FINRA Rule 13303(b) to address the unlawful conduct, unfair business practices, and tortious interference that Ms. Taylor suffered during the course of her employment with Fidelity, and continues to suffer following her constructive discharge from the Company.  Ms. Taylor also seeks redress for the defamatory statements and gross misconduct of both Fidelity and Marshall.

2.      Fidelity has engaged in a "scorched earth" campaign against Ms. Taylor – one of its longest-tenured and most successful financial advisors – whose only transgression was to join a small and independent registered investment advisory ("RIA") firm called Fairhaven Wealth Management ("Fairhaven") *after* Fidelity had constructively discharged her employment.

3.      While most financial advisors remain with Fidelity for only a couple of years, Ms. Taylor worked as a financial advisor at Fidelity for 25 years.  During that time, Ms. Taylor nurtured her deep and personal relationships with several clients, and became a valuable and high producing financial advisor in the Company's Oak Brook, Illinois office.

4.      Ms. Taylor very much enjoyed working at Fidelity, and had no desire (or plans) to ever leave the Company.  To the contrary, after devoting more than 25 years to Fidelity, she hoped to remain with the Company until she retired.

2

5.      Unfortunately, Fidelity's appointment of Marshall as the branch manager of the Oak Brook office ultimately destroyed any hope for Ms. Taylor's future with the Company. Shortly after his arrival in August of 2018, Marshall made it clear that he harbored an improper and unjustified animus against Ms. Taylor, as he embarked upon a pretextual campaign to terminate her employment for his own personal benefit.

6.      Although Ms. Taylor was a top-performer within the Company, Marshall seized every chance he had to formally criticize Ms. Taylor in written warnings and improvement "plans" that: (a) were ambiguously based on soft skills such as "client service style," for which there is no corresponding measurable performance metric; (b) were designed to provide Marshall with "cover" for his animus toward Taylor; and (c) would ultimately result in Ms. Taylor's constructive discharge from Fidelity.

7.      When Ms. Taylor complained about Marshall's conduct to Fidelity's management, the Company refused to conduct a proper investigation; instead, it merely provided "lip service" to her concerns by allowing a member of the operations department to sit in on her meetings with Marshall.  In response to her complaints, Marshall retaliated against Ms. Taylor by giving her an extended "final warning," and letting her know that her employment would likely be terminated.

8.      Marshall made it clear to Ms. Taylor that her days at Fidelity were numbered.  Left with no other choice, Ms. Taylor reluctantly accepted employment with Fairhaven.

9.      Importantly, Ms. Taylor never told anyone – not a single client, and not a single employee at Fidelity – that she was leaving the Company or joining Fairhaven.  Ms. Taylor was very careful to ensure that she made a "clean break" from Fidelity; consequently, she never communicated anything about her departure to any clients (or anyone else) until after her registration transfer (i.e., FINRA Form U4) was submitted by Fairhaven.

10. Equally important, Ms. Taylor did not take a single scrap of paper or single byte of Fidelity's data with her when she left. Notwithstanding her constructive discharge – and the harsh and improper treatment that she experienced at the hands of Marshall – Ms. Taylor has abided by the terms of her employment agreement with the Company in all respects.

11. Yet, Fidelity has wrongly accused Ms. Taylor of misappropriating the Company's "trade secrets" and taking its confidential information, and then using that information to solicit her former clients. The accusations Fidelity has made against Ms. Taylor are untrue, and were made recklessly and for an improper purpose – to further retaliate against her for complaining about the mistreatment she experienced at the Company.

12. Fidelity has also violated its own internal compliance policies – as well as FINRA's Regulatory Notice 19-10 (regarding customer communications to departing registered representatives) – by lying to Ms. Taylor's clients and refusing to provide them with her new contact information (despite their requests for the same) after her departure from the Company.

13. Fidelity has further engaged in unfair competition and tortiously interfered with Ms. Taylor's employment at Fairhaven by, *inter alia*:

   a. Filing a baseless lawsuit against her in the United States District Court for the Northern District of Illinois, Case No. 20-cv-2133 (the "Lawsuit"), falsely accusing her of misappropriating Fidelity's confidential and trade secret information;

   b. Continuing to seek injunctive relief against Ms. Taylor in the Lawsuit to enjoin her purported solicitation of clients, despite having no evidentiary support for its false allegation that she had improperly solicited clients;

   c. Pressuring Fairhaven to terminate Ms. Taylor's employment if she did not agree to the entry of a stipulated injunction against her;

   d. Threatening to sue Fairhaven if Ms. Taylor did not agree to the entry of a stipulated injunction against her – and then making good on that threat by adding Fairhaven as a co-defendant in the Lawsuit when Ms. Taylor refused to stipulate to the entry of an injunction against her when she had done nothing wrong; and

e. Threatening to terminate Fairhaven's access to Fidelity's investment platform (at a time when Fidelity served as the custodian for all of Fairhaven's client accounts) if Ms. Taylor did not agree to the entry of a stipulated injunction against her – and then making good on that threat by unilaterally terminating its custodial relationship, thereby forcing Fairhaven to find a new custodian for its client accounts, at great cost and expense, when Ms. Taylor refused to stipulate to the entry of an injunction against her in the Lawsuit.

14. The false claims that Fidelity has asserted against Ms. Taylor (not only in this forum, but in the pending federal court Lawsuit) run directly contrary to the Company's obligation to "observe high standards of commercial honor and just and equitable principles of trade," and constitute a clear violation of FINRA Rule 2010.

## THE PARTIES

15. Counterclaimant and Third-Party Claimant *Jennifer Taylor* is a financial advisor with Fairhaven Wealth Management, LLC ("Fairhaven"). At all relevant times, Ms. Taylor has been an "associated person" registered with FINRA (CRD No. 173771). Ms. Taylor is domiciled in and a citizen of the State of Illinois.

16. At all relevant times, Third-Party Respondent *Scott Ely Marshall* has been a registered representative and branch office manager employed by Fidelity Brokerage Services, LLC, and an "associated person" registered with FINRA (CRD No. 3203739). Upon information and belief, Mr. Marshall is domiciled in and a citizen of the State of Illinois.

17. At all relevant times, Counter-Respondent *Fidelity Brokerage Services, LLC* has been a broker-dealer engaged in the sale of securities and is a FINRA member firm (CRD No. 7784). Upon information and belief, Fidelity is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts.

JURISDICTION AND VENUE

18.     The parties are bound to arbitrate this dispute in accordance with FINRA's Code of
Arbitration Procedure and the rules promulgated thereunder pursuant to FINRA Rule IM-13000,
Rule 13100, and Rule 13200, because Taylor and Marshall are "associated persons" and Fidelity
is a "member."

19.     Ms. Taylor understands and respectfully requests that a Panel consisting of three
(3) arbitrators will be appointed to adjudicate this matter pursuant to FINRA Rule 13401(c), and
that all hearings occur in Chicago, Illinois.

FACTUAL BACKGROUND

**A.      <u>Ms. Taylor's Career with Fidelity</u>**

20.     Ms. Taylor first became interested in working at Fidelity through her participation
in Fidelity's co-op program while she was attending college at Louisiana State University.  That
was in the year 1994.

21.     After that first indication of interest, Ms. Taylor finished her college education with
her sights on working in the financial sector and, more specifically, working for Fidelity.  The
Company's reputation in the industry and the supportive culture she had experienced first-hand
while in the co-op program are what fueled Ms. Taylor's passion and desire to assimilate into
Fidelity, and she knew she would be able to grow her career and achieve success in the financial
services industry.

22.     Ms. Taylor worked her way up from a Customer Service representative for
Fidelity in 1995, where she greeted customers upon entry and handled service and operations
requests, to becoming an Associate Representative ("Junior Consultant") in Fidelity's Oak Brook
office in 1997, to being promoted to a Financial Consultant in December of 1998, where she

6

worked tirelessly on behalf of her clients and enjoyed a successful and rewarding career, until she was constructively discharged on March 6, 2020.

23.     Over the course of her 25-year career with Fidelity, Ms. Taylor had many supervisors who recognized her passion and ability, and the fact that she took pride in her work. Ms. Taylor was a high-performing and high-achieving Financial Consultant, and her clients maintained deep and personal relationships with her as their personal financial advisor.

24.     As Ms. Taylor's book of business grew throughout her career, her work generated large profits for Fidelity, and also translated into her success as a Financial Consultant. Ms. Taylor's managers and colleagues recognized that she was, by all accounts, an asset to Fidelity.

25.     Unfortunately, Ms. Taylor's most recent manager, Mr. Marshall (who began supervising Ms. Taylor when he was appointed Branch Manager of Fidelity's Oak Brook office on or about August 10, 2018), immediately took issue with Ms. Taylor – not because of her performance (which was high by Fidelity's own metrics, and far outpaced her peers), but because of his personal animosity toward her.

### B.     Fidelity's Goals and Activity Metrics

26.     The most important performance metrics to Fidelity are: (a) "Tier 3" production, which concerns revenue on managed accounts, managed account referrals, and annuities; and (b) asset "Flows," which measure the amount of money coming into Fidelity versus the amount of money leaving the Company.

27.     During Marshall's tenure as Branch Manager, Ms. Taylor generated approximately $140 million of Tier 3 revenue. Specifically, Ms. Taylor's Tier 3 production was:

    a.  Approximately double her sales goal;

    b.  $40 million above the approximate $100 million average for Vice Presidents in Fidelity's Central South Region;

    c.   $45 million above the approximate $95 million average for Vice Presidents throughout the country;

    d.   $25 million more than the next highest producing Financial Consultant in the Oak Brook office;

    e.   $70 million above the average for all financial advisors in Fidelity's Central South Region; and

    f.   In the top 10th percentile (beating 90% of her peers) of the approximate 200 Vice Presidents in Fidelity's entire Central South Region.

28.    During this same time period, Ms. Taylor also generated more than $115 million of net "Flow." Specifically, Ms. Taylor's net asset flow was:

    a.   More than 11% greater than her sales goal;

    b.   Nearly $10 million greater than the approximate $107 million average for Vice Presidents in Fidelity's Central South Region;

    c.   More than $5 million greater than the approximate $110 million average for Vice Presidents throughout the country; and

    d.   In the top 37th percentile (beating 63% of her peers) of Vice Presidents in Fidelity's entire Central South Region.

29.    As for Fidelity's other performance metrics, Ms. Taylor once again far exceeded Fidelity's expectations. Ms. Taylor's client transfer ratio was more than double Fidelity's goal, and her average client appointments per week (20, as compared to the goal of 15) placed her in the top 5th percentile (beating 95% of her peers) of Vice Presidents in Fidelity's entire Central South Region. In order to achieve this performance metric, Ms. Taylor utilized Fidelity's Microsoft Outlook calendar to schedule regular client appointments far in advance, and would accommodate the client's requests to meet both telephonically and at locations of the client's choosing.

30.    In short, over the course of Marshall's tenure as Branch Manager, Ms. Taylor was the longest-tenured, most senior, and highest producing Financial Consultant in the Oak Brook branch, and her performance far exceeded Fidelity's stated goals and activity metrics, as well as the performance of the vast majority of her peers.

C.    <u>**Fidelity's Workplace Misconduct**</u>

31.    During his tenure as Branch Manager, and despite the foregoing, Marshall displayed unusual personal animosity toward Ms. Taylor. In every one-on-one interaction with Ms. Taylor, Marshall was aggressive and demeaning to her.

32.    Marshall's personal animus manifested itself in the form of increasingly severe and frequent verbal and written warnings concerning Ms. Taylor's job performance, despite the fact that Ms. Taylor was a consistently high performing Financial Consultant (and among the highest performing Financial Consultants in Fidelity's entire Central South Region).

33.    For example, on August 19, 2019, Marshall issued Ms. Taylor a written 60-day warning concerning her job performance. In this written warning, Marshall asserted that Ms. Taylor's "contribution to business results is significantly lagging others in your position."

34.    Nothing could be further from the truth: Ms. Taylor had been awarded the annual Fidelity "achiever bonus" in recognition of her 2018 performance and, at the time Marshall issued the August 19, 2019 written warning, was on track to reach another "achiever bonus" for her performance in 2019. When Ms. Taylor raised this discrepancy with Marshall, Marshall offered no legitimate explanation. Instead, Marshall sharply rebuked Ms. Taylor.

35.    The written warning required biweekly meetings between Marshall and Ms. Taylor through the 60-day period. Because Marshall harbored personal animosity toward Ms. Taylor (as evidenced by his aggressive attitude and demeaning comments towards her, and because his unfair written warning was mere pretext), Ms. Taylor complained to Fidelity's management personnel and requested the presence of her operations manager during every biweekly one-on-one meeting that was to be held with Marshall going forward.

36.     Fidelity's management acknowledged her complaint, and allowed the operations manager to sit in on Marshall's meetings with Taylor.

37.     Although Ms. Taylor performed satisfactorily during the 60-day period following the August 19, 2019, written warning (indeed, her performance continued to far outpace her peers), Marshall unlawfully retaliated against Ms. Taylor for complaining about his conduct by increasing his misconduct against her in an effort to force her out of the Company.

38.     Approximately two weeks after the 60-day warning period lapsed, Marshall escalated his efforts and issued Ms. Taylor another written 60-day warning, this time titled a "final performance warning."

39.     At the time Marshall issued the November 4, 2019 written warning, Ms. Taylor 's performance was not lagging. Indeed, Ms. Taylor was on track to reach another "achiever bonus" for her performance in 2019, and her performance continued to far outpace her peers.  Despite this, Marshall intimated that he would likely terminate Ms. Taylor on January 6, 2020, at the end of the 60-day warning period.

40.     Ms. Taylor confronted Marshall about his implicit threat and asked him whether he planned to terminate her for alleged performance reasons, even if she continued to exceed Fidelity's production and performance goals and metrics.  Marshall responded by ominously telling Ms. Taylor that he could terminate her at any time, for any reason.

41.     During this second written warning period, several financial representatives in the Oak Brook branch expressed concern to Ms. Taylor – completely unprompted by her – that Marshall was treating Ms. Taylor "differently" or "less favorably" than other Financial Consultants in the Company.

42.     In fact, in late 2019, the Oak Brook operations manager – who had sat in on each of the one-on-one biweekly performance meetings between Marshall and Ms. Taylor during the 60-day warning period – told Ms. Taylor that she did not understand why Marshall was issuing warnings to Ms. Taylor about her performance.  This conversation, too, was unprompted by Ms. Taylor.

43.     Ms. Taylor successfully navigated the second 60-day written warning period, had a very strong fourth quarter 2019 production, and finished the 2019 calendar year as the highest producing Financial Consultant in the Oak Brook branch and in the Chicago region.  Ms. Taylor's performance far exceeded Fidelity's stated goals and activity metrics, as well as the performance of the vast majority of her peers.

44.     Because Ms. Taylor far exceeded Fidelity's stated goals and the performance of her peers, Marshall could not – without raising eyebrows – terminate Ms. Taylor on January 6, 2020, as he had planned.  Instead, on January 9, 2020, Marshall unilaterally "extended" his final written warning by 60 days and implied to Ms. Taylor that he would terminate her employment on March 10, 2020.

45.     Specifically, Ms. Taylor inquired for a third time about the discrepancy between receiving a written warning for her alleged deficient performance, on the one hand, and her actual performance, on the other hand, and asked Marshall whether the "final written warnings" would ever end.  Marshall responded, ominously, by reading verbatim the following text on her written warning: "you may be subject to dismissal without any additional corrective action process."

46.     After a branch meeting in January of 2020, one representative confided to Ms. Taylor that "it's been made clear to most of the branch that some people are looked at less favorably by management than others, and without much explanation."

47.     Because Marshall's final written warning "extension" and ominous verbal statements did not reflect Ms. Taylor's actual job performance, and in light of Marshall's response to her inquiry as well as the information that had been conveyed to her by other representatives, Ms. Taylor knew that she would be terminated by Marshall, effective March 10, 2020.

**D.      Marshall's Illicit Incentives**

48.     While having a long-tenured and high producing Financial Consultant is good for Fidelity, it is not necessarily good for an individual branch – or its branch manager.

49.     Although Ms. Taylor was a top producer for Fidelity, she also carried the highest salary component in the Oak Brook branch.

50.     When a Financial Consultant departs, Fidelity assigns new Financial Consultants to the client accounts that were previously handled by the departing Financial Consultant.  In the case of termination of the longest-tenured Financial Consultant in the branch, those accounts (axiomatically) will be assigned to less-tenured – and less costly – Financial Consultants.  In this way, Fidelity, and an individual branch in particular, can absorb the cost of servicing client accounts without increasing its bottom-line expense.

51.     In addition, when a long-tenured Financial Consultant is terminated, the branch has an incentive to "game the system" by routinely changing Tier 3 client accounts to other Tier 3 solutions over time after the departure of the Financial Consultant.  While not necessarily an advantage to Fidelity, the advantage to the particular branch manager is that Tier 3 solutions are measured as gross production, so any new Tier 3 business will count toward branch production, even if it was by converting a portion of an already Fidelity advisory managed Tier 3 solution into different Tier 3 solution at Fidelity.

52.     Any time a long-tenured Financial Consultant's employment is terminated, the branch recognizes a short term "lift" in branch production numbers that are artificially inflated by "gaming" transactions.  This is a common practice at Fidelity's Oak Brook branch, and is encouraged and directed by branch management, including Marshall.

53.     Thus, branch managers can improve the branch's performance metrics – and be handsomely rewarded for doing so – by "managing out" older, more expensive, Financial Consultants, and replacing them with younger, less expensive Financial Consultants, who are guided to creatively game client accounts upon being assigned to them.

54.     Given Ms. Taylor's status as the longest-tenured and highest producing Financial Consultant in the Oak Brook office, Marshall knew that he could improve the branch's numbers (and his own performance-based compensation) by eliminating Ms. Taylor's employment and replacing her with a younger (and cheaper) financial advisor.  Marshall therefore embarked upon his Company-sponsored campaign to accomplish precisely that objective.

55.     Fidelity's Market Leader, Bill Meyers, approved of, acquiesced in, and ratified Marshall's unlawful discrimination so the Oak Brook branch could "game" client accounts to artificially inflate production numbers.

**E.     Ms. Taylor is Constructively Discharged from Fidelity**

56.     On March 6, 2020, after enduring over a year of mistreatment without any recourse, Ms. Taylor was constructively discharged from Fidelity and accepted a position as a financial advisor with Fairhaven.

57.     When Ms. Taylor met with Marshall and the Oak Brook operations manager on March 6, 2020, she reminded Marshall that Fidelity was required to provide her contact information to any former clients who requested it, and left her cell phone number with Fidelity.

Indeed, providing a departing Financial Consultant's new contact information to a client upon request is not only Fidelity's practice, it is also **required** by the Company's internal compliance procedures and FINRA Regulatory Notice 19-10 (regarding customer communications related to departing registered representatives).

58.     Subsequent to Ms. Taylor's constructive discharge, however, she received calls from several of her clients – including "A.G.," "J.L.," "J.G.," "M.G.," and "A.S." – who informed her that Fidelity had refused to provide them with her contact information despite their requests. In addition, on March 16, 2020, Fidelity employee Andy Moreau informed client "J.C." that he was "not sure where/what Jennifer is doing." On March 17, 2020, Fidelity employee Douglas Phillips informed client "R.G." that he "did not know where [Ms. Taylor] went"; the client was "disappointed" that Mr. Phillips did not know. On April 21, 2020, client "L.Z." asked Mr. Moreau if he knew anything about Ms. Taylor's departure and Mr. Moreau "let her know [he] believe[d] she may have stayed in the industry, but [was] not sure about why or where she went."

59.     These representations were false. Fidelity knew Ms. Taylor's contact information, as she provided it to Fidelity in her termination letter expressly for this purpose. Fidelity also knew that Ms. Taylor had joined Fairhaven, as Fidelity copied Fairhaven on a March 20, 2020, letter to Ms. Taylor.

60.     Moreover, Fidelity deceived clients by actively creating the false impression that Ms. Taylor still worked at Fidelity. On March 13, 2020 – one week after Ms. Taylor's departure – Fidelity circulated an e-mail blast to Ms. Taylor's clients, using an e-mail account under Ms. Taylor's name (JenniferATaylor.team@fidelity.com), under her signature. This was carefully designed to make it appear to Ms. Taylor's clients that she still worked at Fidelity, and that they

should contact Fidelity if they wanted to reach her.  Understandably, this confused Ms. Taylor's clients.

61.     Fidelity's refusal to provide Ms. Taylor's contact information to her clients (and lying to clients about her status, implying that she may have left the financial services industry) is particularly disturbing, when one considers that this was the very beginning of the COVID-19 pandemic, when governmental "shut-down orders" and emergency "shelter-in-place mandates" had wreaked havoc on the world's financial markets.  That Fidelity would play such games with Ms. Taylor's longstanding clients, who were desperately trying to reach her and seeking her financial advice in the face of unprecedented market turmoil, is a shameful violation of FINRA Rule 2010.

62.     Fidelity has undertaken an effort to continue retaliating against Ms. Taylor in order to harm her professional reputation by refusing to provide her contact information to the clients who have requested it.  Fidelity's conduct violates the Company's own compliance policies and requirements (to say nothing of FINRA Rule 2010), and is malicious and intentional.

**F.     Fidelity's Course of Dealing with Past Departing Financial Consultants**

63.     During her near 25-year career with Fidelity, Ms. Taylor has witnessed dozens of Financial Consultants leave Fidelity to join other financial services firms (both competitive institutional brokerage firms, such as Edward Jones or Wells Fargo, as well as independent registered independent advisory firms, such as Fairhaven).

64.     Fidelity has as a matter of course permitted those departing Financial Consultants to contact their former clients to: (a) announce their departure from the Company, and (b) provide their new contact information.  Each of those departing Financial Consultants had signed the same

15

post-employment "non-solicit" covenants that the Company required of Ms. Taylor; yet, Fidelity never filed a lawsuit or pursued legal action against them.

65.     Between 2005 and 2018, for instance, at least four Vice Presidents left Fidelity's Oak Brook office to join other financial services firms. Each had a book of business similar in size to, or larger than, Ms. Taylor's. After departing Fidelity, each of these V.P.'s called former clients – during their one-year non-solicit period – to announce their job change and to provide new contact information. Large client assets (more significant than those at issue here) followed these Vice Presidents to their new firms. Fidelity was aware of all this activity, yet it did not file any legal action (either in Court or before FINRA) against any of the former V.P.'s.

### G.     Ms. Taylor Retained No Fidelity "Confidential Information" or "Trade Secrets" after Her Constructive Discharge

66.     At no time prior to Ms. Taylor's constructive discharge from Fidelity did she inform anyone – including her colleagues and clients – that she would be leaving Fidelity or that she had intended to accept a new position with Fairhaven.

67.     When Ms. Taylor's employment with Fidelity ended, Ms. Taylor did not take any Fidelity documents, files, data or information with her.

68.     At no time prior to or subsequent to Ms. Taylor's constructive discharge from Fidelity did she take, remove, misappropriate, transmit, convey, use, or disclose originals or copies of any of the Company's confidential information (including, but not limited to, trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal

information regarding customers and employees; confidential information about other companies and their products) or any other Fidelity documents containing or relating to the names, addresses, phone numbers, social security numbers, transactions, accounts, or financial information of the customers Ms. Taylor serviced at Fidelity.  Her access to and use of such information was strictly limited to the work she performed during her employment at Fidelity, in the ordinary course of Company business, and solely for Fidelity's benefit.

69.     Since Ms. Taylor's constructive discharge from Fidelity, she has not been in possession of, or had any access to, any of Fidelity's documents, files, information, materials or data (or any copies thereof).  Ms. Taylor does not have in her possession, custody or control the original or copies of any information, materials, documents, files or data containing, reflecting, or referring to any of Fidelity's confidential proprietary, client, or trade secret data or information.

70.     After leaving Fidelity, Ms. Taylor created a list of **some** of her most long-standing relationships – people she has known for 25+ years.  Given Ms. Taylor's general, non-specialized knowledge, and the fact that she associated with these people so frequently and for such a long period of time, she naturally remembered (but did not "memorize" or "commit to memory") their names and state of residence.

71.     Following Ms. Taylor's constructive discharge, she used only publicly-available information to contact her clients, ***solely*** for the limited purpose of informing those clients that she was no longer affiliated with Fidelity (as expressly authorized by law, and consistent with the practice of countless departing Financial Consultants before her who left Fidelity for competing financial services firms).

72.     When contacting her clients, Ms. Taylor was careful to avoid engaging in any type of conduct that could be construed as a "solicitation" or "inducement" of the client.  Instead,

utilized a short and carefully worded "announcement script," by which she conveyed **only** the following information: (a) that, as of March 6, 2020, Ms. Taylor was no longer affiliated with Fidelity; and (b) that Ms. Taylor was now affiliated with Fairhaven. That was the entire sum and substance of the information that Ms. Taylor provided to her former clients. Once that information was provided, Ms. Taylor either: (i) answered any follow-up questions posed by the client, or (ii) if the client had no follow-up questions, she terminated the call.

73. During her one-year non-solicitation period, Ms. Taylor **never** solicited, attempted to solicit, induced, or encouraged any clients, former clients, or prospective clients of Fidelity to transfer or divert accounts or assets to Fairhaven, open new accounts at Fairhaven, or cease or curtail their business relationship with Fidelity in any respect.

### H. <u>Fidelity Tortiously Interferes with Ms. Taylor's Employment at Fairhaven</u>

74. Despite the foregoing, Fidelity filed the federal court Lawsuit, and sought and obtained "expedited discovery" from Ms. Taylor relating to its false allegations that Ms. Taylor "solicited" her former clients at Fidelity.

75. On June 2, 2020, Ms. Taylor fully responded and produced documents responsive to Fidelity's discovery requests in the Lawsuit. None of those documents established or even supported the idea that Ms. Taylor violated her employment agreement with Fidelity in any respect.

76. To the contrary, and consistent with her production of documents, Ms. Taylor has repeatedly maintained that she never solicited, attempted to solicit, induced, or encouraged any clients, former clients, or prospective clients of Fidelity to transfer or divert accounts or assets to Fairhaven, to open new accounts at Fairhaven, or to cease or otherwise curtail their business relationship with Fidelity in any respect, at any point during her non-solicitation period.

77.    Ms. Taylor has, however, worked to develop substantial new client relationships and accounts while employed with Fairhaven.  Following her arrival at Fairhaven, Ms. Taylor has contracted to provide financial advisory services with clients, including new clients, while employed with Fairhaven.

78.    As part of its business model, Fidelity provides clearing, custody, trading, technology, and practice management consulting to banks, broker-dealers, family offices, and registered investment advisors.

79.    For years, Fairhaven utilized the Fidelity platform for client account custody solutions and services, and compensated Fidelity for providing such solutions and services.

80.    One of the reasons Ms. Taylor joined Fairhaven (after being constructively discharged from Fidelity), as opposed to another registered investment advisory firm, was because Fairhaven maintained a custodial relationship with Fidelity, whereby Fairhaven utilized the Fidelity platform and Fidelity provided certain client account custody solutions and services to Fairhaven's clients for the benefit of Fairhaven, Fairhaven's financial advisors, and Fairhaven's clients.

81.    Having worked for Fidelity for 25 years, Ms. Taylor was familiar with and knowledgeable about the Fidelity platform, and Fairhaven's custodial relationship with Fidelity was an important piece of Ms. Taylor's continuing success and ability to make a living.

82.    At the time of Ms. Taylor's constructive discharge from Fidelity, **all** of Fairhaven's client accounts, including the accounts for all of Ms. Taylor's clients, were custodied at Fidelity and utilized the Fidelity platform.

83.    As an active financial advisor for Fairhaven, Ms. Taylor had a reasonable expectation of entering into new client relationships, which includes opening new client accounts,

having such accounts custodied on the Fidelity platform, and utilizing the Fidelity platform for all of the custody solutions and services provided for by such platform.

84.     Fidelity knew that Fairhaven, and thus Ms. Taylor, utilized the Fidelity platform for certain client account custody solutions and services, and that Ms. Taylor expected to be able to maintain her client accounts, open new client accounts, and custody those accounts on the Fidelity platform in her new job at Fairhaven.

85.     Nonetheless, Fidelity has taken purposeful, direct action to interfere with Ms. Taylor's employment relationship, as well as her business expectancy and relations with Fairhaven and with Ms. Taylor's clients.

86.     Specifically, Fidelity threatened and repeatedly pressured Fairhaven to take action adverse to the interests of Ms. Taylor, unless Ms. Taylor voluntarily agreed to the entry of a broad injunction order against her in the Lawsuit (despite the fact that Ms. Taylor has never violated any obligation owed to Fidelity), by *inter alia*:

   a.  repeatedly threatening Fairhaven with expensive and time-consuming litigation, despite having no evidence to support any wrongdoing;

   b.  repeatedly threatening to terminate in bad-faith the custodial relationship Fidelity held for Fairhaven's client accounts; and

   c.  denying and withholding access to "Wealthscape" – the tool utilized by registered investment advisors to access their client's accounts on the Fidelity custodial platform.

87.     On November 4, 2020, Fidelity made good on its threats and simultaneously: (a) initiated frivolous litigation against Fairhaven by naming it as a co-defendant in the Lawsuit, and (b) terminated in bad faith Fidelity's custodial relationship with Fairhaven, where all of Ms. Taylor's customer accounts were custodied.  A true and correct copy of Fidelity's November 4, 2020, Bad-Faith Termination Letter is attached hereto as **Exhibit 1.**

88.     In connection with Fidelity's bad-faith termination of its custodial relationship with Fairhaven, Fidelity refused to accept applications for or open any new client accounts for Ms. Taylor.

89.     In addition, Fidelity stated its intent to notify all of Ms. Taylor's clients that Ms. Taylor's custodial relationship with Fidelity has ended and that Ms. Taylor is not authorized to manage their accounts on Fidelity's platform.  In connection with that communication, Fidelity referred Ms. Taylor's clients to an in-house Fidelity financial advisor.

90.     Fidelity's bad-faith termination of its custodial relationship with Fairhaven was maliciously designed to harm Ms. Taylor's employment relationship with Fairhaven as well as her business expectancy and relationship with clients and prospective clients.  Fidelity has propagated its unfounded claims against Ms. Taylor relating to her alleged solicitation of Fidelity's customers and cited Ms. Taylor's alleged conduct as the motivation for Fidelity's bad-faith actions.

91.     Fidelity's bad-faith termination of its custodial relationship with Fairhaven was maliciously designed to convert Ms. Taylor's existing clients to an in-house Fidelity financial advisor.

92.     Fidelity's bad-faith refusal to accept applications for new accounts unlawfully interferes with and is maliciously designed to forestall Ms. Taylor's ability to make a living and to harm Ms. Taylor's employment at Fairhaven as well as her business expectancy by preventing her from servicing any new clients, and it provides Fidelity with an unfair advantage in the marketplace.

93.     Fidelity's decision to sue Ms. Taylor's employer, Fairhaven, unlawfully interferes with and is maliciously designed to forestall Ms. Taylor's ability to make a living and to harm Ms. Taylor's employment at Fairhaven as well as her business expectancy.

94. Ms. Taylor has suffered and will continue to suffer damages as a direct result of Fidelity's retaliation and interference by, *inter alia*, refusing to open new accounts for Ms. Taylor's new clients and house those accounts on Fidelity's platform; creating confusion among Ms. Taylor's clients regarding Fidelity's unlawful, bad-faith termination of the custodial relationship with Fairhaven; removing Ms. Taylor's access to her client's accounts and refusing to accept trading instructions from her; revoking the acceptance of Ms. Taylor's clients' designation of trading or power of attorney authorizations, which prevents Ms. Taylor from making trades on behalf of her clients; and notifying Ms. Taylor's clients that the custodial relationship with Fidelity has ended and referring Ms. Taylor's clients to another financial advisor on the Fidelity platform.

## COUNT I
### WRONGFUL TERMINATION – CONSTRUCTIVE DISCHARGE (AGAINST FIDELITY)

95. Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 94 as if fully set forth herein.

96. Marshall, in his capacity as Ms. Taylor's supervisor, took repeated and continuing employment actions against her which were unfounded and detrimental to her career. Those actions included unjustifiably issuing formal written warnings to Ms. Taylor, unjustifiably scrutinizing Ms. Taylor's performance and comparing same to unwritten and ambiguous metrics, despite her performance meeting Fidelity's goals and being exceptional compared to her peers.

97. Despite the foregoing bad acts, Ms. Taylor remained employed with Fidelity and contemporaneously sought redress by: (a) objecting to Marshall's egregious conduct; (b) reporting Marshall's misconduct to Fidelity's management; and (c) requesting that any meetings with Marshall and Taylor be supervised and/or monitored.

98.     Although Ms. Taylor sought redress from Fidelity, Marshall's behavior was not addressed, corrected, or reformed, and he continued to mistreat her; Fidelity had a reasonable opportunity to address Marshall's misconduct, but failed to do so.

99.     Through his misconduct, Marshall (and, through him, Fidelity) ultimately made Ms. Taylor's working conditions so intolerable that a reasonable person would be forced to resign.

100.    In addition, Marshall – through the foregoing bad acts, threats, and unlawful conduct – acted in a manner that communicated to Ms. Taylor that her termination was both inevitable and imminent, and that she would have been terminated by Fidelity on March 10, 2020. Accordingly, Ms. Taylor was constructively discharged from Fidelity on March 6, 2020.

101.    Marshall's outrageous conduct was purposefully designed to create a working environment that would be intolerable and unbearable for Ms. Taylor, thereby forcing her to quit.

102.    One of the primary reasons Marshall wanted to force Ms. Taylor (an experienced financial advisor with a large book of business) to quit was to transfer her client accounts to less-seasoned (and lower compensated) financial advisors, who would then engage in "gaming" transactions to artificially inflate the "new revenue" production metrics of the Oak Brook office, thereby increasing Marshall's own incentive compensation as the Oak Brook branch manager.

103.    Marshall's purposeful misconduct was unlawful, in direct violation of Illinois law and public policy, and constitutes wrongful termination as a matter of law.

104.    As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's unlawful constructive discharge and wrongful termination.

23

WHEREFORE, for all of the reasons set forth above, Counterclaimant Taylor respectfully requests the entry of an Arbitration Award in her favor and against Counter-Respondent Fidelity:

A.  Awarding her back-pay, front-pay, and compensatory damages of not less than $800,000;

B.  Awarding her punitive damages in an amount sufficient to deter such wrongful conduct by Fidelity in the future, but not less than treble damages of $2,400,000;

C.  Awarding her actual costs and attorneys' fees incurred in this dispute and in the Lawsuit; and

D.  Awarding her such additional relief as the Panel may deem just.

### COUNT II
### UNFAIR AND DECEPTIVE BUSINESS PRACTICES (AGAINST FIDELITY)

105.    Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 104 as if fully set forth herein.

106.    Fidelity violated Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, by refusing to provide Ms. Taylor's contact information to her former clients, and lying to them about her employment at Fairhaven.

107.    After Fidelity constructively discharged Ms. Taylor, several of Ms. Taylor's former clients asked Fidelity for her new contact information.

108.    Fidelity's internal compliance procedures and FINRA Regulatory Notice 19-10 required Fidelity to provide Ms. Taylor's contact information to any of her former clients who asked for it.

109.    Fidelity knew Ms. Taylor's cell phone number (which she had provided to Fidelity in her resignation letter for this very purpose), yet Fidelity willfully refused to provide Ms. Taylor's contact information to her former clients.  Indeed, Fidelity falsely informed Ms. Taylor's former clients that Fidelity "did not know" Ms. Taylor's contact information.

110.    Moreover, Fidelity knew that Ms. Taylor had joined Fairhaven, yet Fidelity told Ms. Taylor's former clients that it "did not know" which firm she had joined.

111.    Fidelity's refusal to provide this information to Ms. Taylor's former clients constitutes "unfair methods of competition and unfair or deceptive acts or practices" under 815 ILCS 505/2.  Fidelity, in refusing to provide contact information to Ms. Taylor's former clients, relied upon the "misrepresentation or the concealment, suppression or omission of material fact[s]" – namely Ms. Taylor's contact information, the identify of her new employer, the fact that she was diligent about leaving her contact information upon her separation of employment, and the fact that she was open to receiving calls from former clients.

112.    Fidelity's refusal to provide this information to Ms. Taylor's former clients also misleadingly implied that Ms. Taylor had not provided any contact information through which her former clients could contact her and, thus, implied that Ms. Taylor did not care about the financial health of her former clients.

113.    Fidelity meant for consumers to rely on these misrepresentations and concealments so that they would not contact Ms. Taylor.  Fidelity's acts occurred through a course of conduct involving commerce.

114.    Fidelity's actions implicate consumer protection concerns.  Ms. Taylor had been advising many of her clients for upwards of 25 years.  Ms. Taylor left Fidelity's employ on March 6, 2020 – at the beginning of the ongoing COVID-19 pandemic, when financial markets were in turmoil and when many jobs were in jeopardy.  Due to Fidelity's actions, however, these consumers were unable to speak to their trusted financial advisor, Ms. Taylor, during one of the most stressful, chaotic, and consequential market events in a lifetime.  Worse still, Fidelity was unable to adequately come up to speed on years or decades of client interactions in order to

properly advise Ms. Taylor's clients in a timely manner. Numerous consumers reported being distressed that Ms. Taylor had left Fidelity, and several were vocal about their displeasure with the replacement advisors Fidelity had assigned to their accounts.

115. Fidelity's refusal to provide Ms. Taylor's contact information to her former clients caused actual confusion, caused fewer former clients to reach out to Ms. Taylor than otherwise would have reached out to her, and caused permanent damage to Ms. Taylor's reputation.

116. The relief Ms. Taylor requests below would benefit all consumers by giving financial firms such as Fidelity a financial incentive not to conceal the contact information of any former employees when consumers request it.

WHEREFORE, for all of the reasons set forth above, Counterclaimant Taylor respectfully requests the entry of an Arbitration Award in her favor and against Counter-Respondent Fidelity:

A. Awarding to Ms. Taylor consequential damages in an amount to be determined at the final hearing on the merits, including, but not limited to, the revenue that she would have received had Fidelity not prevented Ms. Taylor's clients from contacting her;

B. Awarding to Ms. Taylor her actual costs and attorneys' fees incurred in connection with this proceeding and the Lawsuit;

C. Awarding to Ms. Taylor punitive damages in an amount sufficient to deter such conduct by Fidelity in the future; and

D. Awarding her such additional relief as the Panel may deem just.

## COUNT III
### DECEPTIVE TRADE PRACTICES (AGAINST FIDELITY)

117. Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 116 as if fully set forth herein.

118. Fidelity violated the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, by refusing to provide Ms. Taylor's contact information to her former clients.

119. After Fidelity constructively discharged Ms. Taylor, several of Ms. Taylor's former clients asked Fidelity for her new contact information.

120. Fidelity's internal compliance procedures and FINRA Regulatory Notice 19-10 required Fidelity to provide Ms. Taylor's contact information to any of her former clients who asked for it.

121. Fidelity knew Ms. Taylor's cell phone number (which she had provided to Fidelity in her resignation letter for this very purpose), yet Fidelity willfully refused to provide Ms. Taylor's contact information to her former clients. Indeed, Fidelity falsely informed Ms. Taylor's former clients that Fidelity "did not know" Ms. Taylor's contact information.

122. Moreover, Fidelity knew that Ms. Taylor had joined Fairhaven, yet Fidelity told Ms. Taylor's former clients that it "did not know" which firm she had joined.

123. Fidelity's refusal to provide this information to Ms. Taylor's former clients caused a "likelihood of confusion or of misunderstanding as to [the] affiliation" of Ms. Taylor with Fairhaven. This constitutes a deceptive trade practice under 815 ILCS 510/2(a)(3).

124. Fidelity's refusal to provide this information to Ms. Taylor's former clients implicitly disparaged the services of Ms. Taylor by misleadingly implying that Ms. Taylor did not provide contact information through which her former clients could contact her. This negatively affected Ms. Taylor's reputation and constitutes a deceptive trade practice under 815 ILCS 510/2(a)(8).

125. Fidelity's refusal to provide this information also constitutes a deceptive trade practice under 815 ILCS 510/2(a)(12) because it created a likelihood of confusion or misunderstanding regarding Ms. Taylor's contact information, the identity of her current

employer, whether she had left her contact information upon her separation of employment, and her willingness to take calls from former clients.

126.     Fidelity meant for consumers to rely on these misrepresentations and concealments so that they would not contact Ms. Taylor.

127.     Fidelity's refusal to truthfully provide Ms. Taylor's contact information to her former clients caused actual confusion, and caused fewer former clients to reach out to Ms. Taylor than otherwise would have reached out to her.

WHEREFORE, for all of the reasons set forth above, Counterclaimant Taylor respectfully requests the entry of an Arbitration Award in her favor and against Counter-Respondent Fidelity:

A.  Awarding to Ms. Taylor consequential damages in an amount to be determined at the final hearing on the merits, including, but not limited to, the revenue that she would have received had Fidelity not prevented Ms. Taylor's clients from contacting her;

B.  Awarding to Ms. Taylor her actual costs and attorneys' fees incurred in connection with this proceeding and the Lawsuit;

C.  Awarding to Ms. Taylor punitive damages in an amount sufficient to deter such conduct by Fidelity in the future; and

D.  Awarding her such additional relief as the Panel may deem just.

## COUNT IV
### TORTIOUS INTERFERENCE WITH EMPLOYMENT (AGAINST FIDELITY)

128.     Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 127 as if fully set forth herein.

129.     Since March 6, 2020, Ms. Taylor has been employed as a financial advisor with Fairhaven.

130.     Fidelity was, at all times relevant, aware of the employment relationship between Ms. Taylor and Fairhaven.

131.     Fidelity was, at all times relevant, aware that Ms. Taylor, as a financial advisor with Fairhaven, was required to custody client accounts with Fidelity on the Fidelity platform.

132.     Fidelity was, at all times relevant, aware that Ms. Taylor, through Fidelity's custodial relationship with Fairhaven, relied upon Fidelity and the Fidelity platform for certain client account custody solutions and services in servicing her clients as a financial advisor at Fairhaven.

133.     Fidelity acted with malice and tortiously interfered with Ms. Taylor's employment relationship with Fairhaven and unfairly competed with Ms. Taylor by, *inter alia:* (a) terminating in bad faith its custodial relationship with Fairhaven because of false, specious allegations of wrongdoing by Ms. Taylor; (b) threatening to sue her employer, Fairhaven, for an improper purpose; (c) actually suing her employer, Fairhaven, for an improper purpose; and (d) denying her access to "Wealthscape," all of which unnecessarily strained her employment relationship with Fairhaven and caused her emotional distress.

134.     As a direct and proximate result of Fidelity's bad faith termination of its custodial relationship with Fidelity, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's tortious conduct.

WHEREFORE, for all of the reasons set forth above, Counterclaimant Taylor respectfully requests the entry of an Arbitration Award in her favor and against Counter-Respondent Fidelity:

    A.  Awarding her compensatory damages of not less than $800,000;

    B.  Awarding her punitive damages in an amount sufficient to deter such wrongful conduct by Fidelity in the future, but not less than treble damages of $2,400,000;

C.   Awarding her actual costs and attorneys' fees incurred in this dispute and the Lawsuit; and

D.   Awarding her such additional relief as the Panel may deem just.

## COUNT V
### TORTIOUS INTERFERENCE WITH
### BUSINESS RELATIONS (AGAINST FIDELITY)

135.   Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 134 as if fully set forth herein.

136.   Fidelity was, at all times relevant, aware that Ms. Taylor, as a financial advisor with Fairhaven, maintains professional relationships and is contractually bound to provide services to her clients.

137.   Fidelity was, at all times relevant, aware that Ms. Taylor, as a financial advisor with Fairhaven, housed her client accounts at Fidelity and utilized the Fidelity platform to service her clients.

138.   Fidelity was, at all times relevant, aware that Ms. Taylor, through Fidelity's custodial relationship with Fairhaven, relied upon Fidelity and the Fidelity platform for certain client account custody solutions and services in servicing her clients as a financial advisor at Fairhaven.

139.   Fidelity tortiously interfered with Ms. Taylor's business relations with her clients and unfairly competed with Ms. Taylor by denying her access to "Wealthscape" and terminating in bad faith its custodial relationship with Fairhaven, in an effort to terminate Ms. Taylor's client contracts and convert Ms. Taylor's clients to a Fidelity financial advisor.

140.   As a direct and proximate result of Fidelity's bad faith termination of its custodial relationship with Fairhaven, Ms. Taylor has suffered and will continue to suffer pecuniary losses

such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential

damages and other expenses and damages recoverable as a result of Fidelity's tortious conduct.

WHEREFORE, for all of the reasons set forth above, Counterclaimant Taylor respectfully

requests the entry of an Arbitration Award in her favor and against Counter-Respondent Fidelity:

      A.  Awarding her compensatory damages of not less than $800,000;

      B.  Awarding her punitive damages in an amount sufficient to deter such wrongful conduct by Fidelity in the future, but not less than treble damages of $2,400,000;

      C.  Awarding her actual costs and attorneys' fees incurred in this dispute and the Lawsuit; and

      D.  Awarding her such additional relief as the Panel may deem just.

## COUNT VI
### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST FIDELITY)

141.    Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1

through 140 as if fully set forth herein.

142.    Fidelity refused to provide Ms. Taylor's contact information to clients that called

and inquired about Ms. Taylor or her financial advisory services after Ms. Taylor was

constructively discharged from Fidelity.

143.    By refusing to provide Ms. Taylor's contact information to her former clients,

Fidelity interfered with Ms. Taylor's business expectancy.

144.    When financial advisors change firms, it is common and expected that a certain

percentage of their client base will follow the advisor to his or her new firm, without any

solicitation on the part of the advisor or the new employer. Accordingly, Ms. Taylor reasonably

expected that she would continue her business relationships with a certain percentage of her client

base (without any solicitation on the part of Ms. Taylor or Fairhaven).

145.     Fidelity knew that if it provided Ms. Taylor's contact information to Ms. Taylor's former clients upon their request, then more of those clients would have unilaterally reached out to Ms. Taylor, and would have unilaterally continued their relationship with Ms. Taylor (without any solicitation on the part of Ms. Taylor or Fairhaven).

146.     Accordingly, by refusing to provide Ms. Taylor's contact information to her former clients, Fidelity tortiously interfered with Ms. Taylor's business expectancy.

147.     In addition, Fidelity was, at all times relevant, aware that Ms. Taylor, through Fidelity's custodial relationship with Fairhaven, relied upon Fidelity and the Fidelity platform for certain new client account custody solutions and services in servicing new clients as a financial advisor at Fairhaven.

148.     Fidelity tortiously interfered with Ms. Taylor's business relations with her prospective clients and unfairly competed with Ms. Taylor by terminating in bad faith its custodial relationship with Fairhaven, in an effort to forestall Ms. Taylor's ability to acquire new clients and open new client accounts.

149.     As a direct and proximate result of Fidelity's interference, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's tortious conduct.

WHEREFORE, for all of the reasons set forth above, Counterclaimant Taylor respectfully requests the entry of an Arbitration Award in her favor and against Counter-Respondent Fidelity:

    A.  Awarding her compensatory damages of not less than $800,000;

    B.  Awarding her punitive damages in an amount sufficient to deter such wrongful conduct by Fidelity in the future, but not less than treble damages of $2,400,000;

    C.  Awarding her actual costs and attorneys' fees incurred in this dispute and the Lawsuit; and

    D.   Awarding her such additional relief as the Panel may deem just.

**COUNT VII**
**DEFAMATION (AGAINST MARSHALL AND FIDELITY)**

150.    Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 140 as if fully set forth herein.

151.    During the course of his employment as Ms. Taylor's manager, Marshall made and published several false statements about her.  For example:

    a.   Marshall falsely stated that Ms. Taylor's contribution to the Company's business results was significantly lagging others in her position – when, in fact, she was the most productive and highest-revenue generating financial advisor in Fidelity's Oak Brook office, and one of the top producing advisors in the entire Company.

    b.   Marshall also falsely stated that Ms. Taylor solicited her clients to leave Fidelity, and set up client meetings at Fairhaven, before she had resigned from the Company.

152.    These and other false statements about Ms. Taylor by Marshall (individually, and in his capacity as a manager at Fidelity) were not privileged, and were published (orally and in writing) by Marshall to third parties.

153.    Marshall knew (or should have known) that the statements he published about Ms. Taylor were false, and would cause damage to her reputation.

154.    As a direct and proximate result of Marshall's publication of these and other false statements that he published about Ms. Taylor – both in his individual capacity and in his capacity as a manager and authorized agent of Fidelity – Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Marshall and Fidelity's defamatory conduct.

33

WHEREFORE, for all of the reasons set forth above, Counterclaimant/Third-Party Claimant Taylor respectfully requests the entry of an Arbitration Award in her favor and against Counter-Respondent Fidelity and Third-Party Respondent Marshall, jointly and severally:

A. Awarding her compensatory damages of not less than $1,200,000;

B. Awarding her punitive damages in an amount sufficient to deter such wrongful conduct in the future, but not less than treble damages of $3,600,000;

C. Awarding her actual costs and attorneys' fees incurred in this dispute and the Lawsuit; and

D. Awarding her such additional relief as the Panel may deem just.

## COUNT VIII
### FINRA RULE 2010 VIOLATIONS (AGAINST MARSHALL AND FIDELITY)

155. Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 154 as if fully set forth herein.

156. At all times relevant, Fidelity and Marshall were subject to FINRA Rule 2010, which required each of them to "observe high standards of commercial honor and just and equitable principles of trade" in the conduct of their business.

157. At all times relevant, Marshall was acting in his capacity as a managerial employee and authorized agent of Fidelity, such that liability for his conduct is imputed to the Company.

158. As set forth above, Marshall (and, through him, Fidelity) has violated FINRA Rule 2010 by, *inter alia*:

a. Engaging in workplace misconduct against Ms. Taylor in order to force her out of the Company so her client book would be redistributed to less-seasoned (and less expensive) financial advisors who would then – at his direction and control – engage in "gaming" transactions to artificially inflate the "new production" metrics for the Oak Brook office, thereby increasing his own compensation as branch manager;

34

    b.   Publishing false and defamatory statements about Ms. Taylor in order to force her out of the Company, for the reasons set forth above;

    c.   Retaliating against Ms. Taylor for complaining about the workplace mistreatment she experienced at his hands;

    d.   Violating Fidelity's own internal compliance procedures and FINRA Regulatory Notice 19-10 by refusing to provide Ms. Taylor's contact information to her clients following the termination of her employment, despite the clients' direct requests for such information; and

    e.   Publishing false and defamatory statements about Ms. Taylor in order to damage her reputation and impair her ability to service her clients.

159.    As a direct and proximate result of these violations of FINRA Rule 2010, Ms. Taylor and her clients have suffered and will continue to suffer pecuniary losses, as described more fully above.

WHEREFORE, for all of the reasons set forth above, Counterclaimant/Third-Party Claimant Taylor respectfully requests the entry of an Arbitration Award in her favor and against Counter-Respondent Fidelity and Third-Party Respondent Marshall, jointly and severally:

    A.   Awarding her compensatory damages of not less than $1,200,000;

    B.   Awarding her punitive damages in an amount sufficient to deter such wrongful conduct in the future, but not less than treble damages of $3,600,000;

    C.   Awarding her actual costs and attorneys' fees incurred in this dispute and the Lawsuit; and

    D.   Awarding her such additional relief as the Panel may deem just.

## RESPONDENT'S ANSWER AND AFFIRMATIVE DEFENSES
## TO FIDELITY'S STATEMENT OF CLAIM

Respondent Taylor, by and through her undersigned counsel, and pursuant to FINRA Rule 13303, respectfully submits the following Answer and Affirmative Defenses to the Statement of Claim filed by Claimant Fidelity:

1.        This Statement of Claim is filed pursuant to Section 13804 of the FINRA code of Arbitration Procedure for Industry Disputes (the "Code"). An application by Fidelity for preliminary injunctive relief has simultaneously been filed in the United States District Court for the Northern District of Illinois. Because Fidelity has elected to seek interim injunctive relief in court, the arbitration should proceed pursuant to Rule 13804 of the Code.

**ANSWER:**      Taylor admits that Respondent simultaneously filed its Statement of Claim pursuant to FINRA Rule 13804 and an application in the United States District Court for the Northern District of Illinois seeking preliminary injunctive relief.  Taylor denies all non-factual legal conclusions set forth in the Preliminary Statement of Claimant's Statement of Claim, denies any and all wrongdoing on her part, and denies that Claimant is entitled to any of the relief it seeks.

2.        This dispute arises out of the resignation of Jennifer Taylor ("Taylor") from Fidelity on March 6, 2020, and her subsequent affiliation with Fairhaven Wealth Management ("Fairhaven"), a registered investment adviser firm (RIA), to provide competing services.

**ANSWER:**      Taylor admits only that her employment with Fidelity ended on March 6, 2020, when she was constructively discharged, and that she subsequently affiliated with Fairhaven Wealth Management, a registered investment adviser firm.  Taylor denies any remaining allegations in Paragraph 2 of the Statement of Claim, further denies any and all wrongdoing on her part, and denies that there is any basis for Claimant's claims.

3.        Since her resignation from Fidelity, Taylor has been, and continues to, misuse Fidelity's confidential and trade secret customer information, which she obtained  knowledge of and access to as a result of her employment with Fidelity, for the improper  purpose of soliciting and inducing Fidelity customers to transfer their Fidelity accounts to her at her new firm. Taylor's conduct, among other things, breaches her Employee Agreements with Fidelity and  violates Illinois and federal law protecting Fidelity's trade secret information.

36

**ANSWER:** Taylor admits only that she was constructively discharged from Fidelity. Taylor denies all non-factual legal conclusions set forth in Paragraph 3 of the Statement of Claim, denies any and all wrongdoing on her part, and denies any remaining allegations of fact contained therein.

4.  Plaintiff Fidelity Brokerage Services LLC is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts. Fidelity is a member firm of FINRA.

**ANSWER:** Taylor admits the allegations in Paragraph 4 of the Statement of Claim upon information and belief only.

5.  Respondent Taylor is a former Vice President, Financial Consultant for Fidelity's Oak Brook, Illinois office. She is an adult citizen and resident of the state of Illinois. Taylor is registered with FINRA.

**ANSWER:** Admitted.

6.  Fidelity and its affiliates provide a variety of financial services-such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services-to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships. Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies.

**ANSWER:** Taylor admits that Fidelity provides financial services to customers, and further states that she personally enjoys significant, long-term relationships with her clients. Taylor denies the remaining allegations in Paragraph 6 of the Statement of Claim.

7.  Fidelity is unique in the retail brokerage field because Fidelity does not have its Financial Consultants, such as Taylor, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity. Fidelity assigns clients to Financial Consultants for servicing.

**ANSWER:** Taylor admits only that Fidelity assigns some clients to its Financial Consultants. Taylor is without information or knowledge sufficient to allow her to admit or deny

the remaining allegations set forth in Paragraph 7 of the Statement of Claim and, on that basis, denies those allegations.

8.    Further, Fidelity requires its Financial Consultants to develop service relationships based upon leads that Fidelity provides.

**ANSWER:** Taylor admits only that she developed service relationships with her clients. Taylor is without information or knowledge sufficient to allow her to admit or deny the remaining allegations set forth in Paragraph 8 of the Statement of Claim and, on that basis, denies those allegations.

9.    Fidelity provides leads to its Financial Consultants from two primary sources. First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.

**ANSWER:**    Taylor admits only that Fidelity provides some potential customer leads to its Financial Consultants.  Taylor is without information or knowledge sufficient to allow her to admit or deny the remaining allegations set forth in Paragraph 9 of the Statement of Claim and, on that basis, denies those allegations.

10.    Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses in a variety of means. Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit.

**ANSWER:**    Taylor admits only that Fidelity advertises for its services, and that it maintains a web site, call center, and retail locations.  Taylor is without information or knowledge sufficient to allow her to admit or deny the remaining allegations set forth in Paragraph 10 of the Statement of Claim and, on that basis, denies those allegations.

11.    A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

38

**ANSWER**:    Taylor is without information or knowledge sufficient to allow her to admit or deny the allegations in Paragraph 11 of the Statement of Claim and, on that basis, denies the allegations.

12.    Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship, when those customers experience "triggering events," such as Fidelity 401(k) distributable events, which may lead to interest in Fidelity's retail financial services.

**ANSWER:**    Taylor is without information or knowledge sufficient to allow her to admit or deny the allegations set forth in Paragraph 12 of the Statement of Claim and, on that basis, denies the allegations.

13.    In addition, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position. Moreover, Fidelity clients may be serviced by multiple Fidelity representatives depending upon the clients' needs and service offerings in which they opt to participate at Fidelity.

**ANSWER:**    Taylor admits only that Financial Consultants were sometimes assigned to customers previously serviced by other Financial Consultants under certain circumstances.  Taylor is without information or knowledge sufficient to allow her to admit or deny the remaining allegations in Paragraph 13 of the Statement of Claim and, on that basis, denies those allegations.

14.    A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.

**ANSWER:**    Taylor is without information or knowledge sufficient to allow her to admit or deny the allegations in Paragraph 14 of the Statement of Claim and, on that basis, denies the allegations.

15.    Fidelity's lead-based approach to supporting its Financial Consultants distinguishes Fidelity from other full-service brokerages, where individual brokers, rather than the firm, are responsible for establishing customer relationships.

**ANSWER:** Denied.

16.     Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Taylor, is also directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.

**ANSWER:** Denied.

17.     Fidelity's trade secret customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.

**ANSWER:** The allegations set forth in Paragraph 17 constitute a legal conclusion to which no response is required.  To the extent the allegations in Paragraph 17 can be construed as statements of fact, Taylor denies the allegations set forth therein.

18.     Although certain portions of such information might be publicly available -  such as an individual's name or published home telephone numbers - only a limited number of Fidelity employees know who among the general public are Fidelity customers who have demonstrated a specific need and desire for investment services.

**ANSWER:**  Taylor admits that names and published telephone numbers are publicly available.  Taylor is without sufficient information or knowledge to allow her to admit or deny the remaining allegations set forth in Paragraph 18 of the Statement of Claim and, on that basis, denies those allegations.

19.     Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.

**ANSWER:**  Taylor is without sufficient information or knowledge to allow her to admit or deny the allegations set forth in Paragraph 19 of the Statement of Claim and, on that basis, denies those allegations.

20.     Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence.

**ANSWER:** Taylor is without sufficient information or knowledge to allow her to admit or deny the allegations set forth in Paragraph 20 of the Statement of Claim and, on that basis, denies those allegations.

21. Fidelity derives substantial economic value from preserving its customer data as a trade secret.

**ANSWER:** The allegations in Paragraph 21 constitute a legal conclusion to which no response is required. To the extent the allegations in Paragraph 21 can be construed as statements of fact, Taylor denies the allegations set forth therein.

22. Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to or specific knowledge of Fidelity's trade secret customer data. In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

**ANSWER:** Denied.

23. Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information. Fidelity does not provide its trade secret customer data to competitors.

**ANSWER:** The allegations of Paragraph 23 of the Statement of Claim are premised upon legal conclusions, to which no response is required. To the extent the allegations contained in Paragraph 23 can be construed as statements of fact, Taylor denies them.

24. Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access.

**ANSWER:** Denied.

25. Fidelity also maintains and advises its employees of a Global Policy on Information Protection that is displayed on Fidelity's intranet. A true and correct copy of Fidelity's Global Policy on Information Protection is attached hereto as Exhibit A. Fidelity periodically reminds its employees of this policy and provides employees with a Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information. *Id.* at Exhibit B.

41

**ANSWER:** Taylor admits only that Claimant's Global Policy on Information Protection and the Quick Reference Card ("QRC") are attached to the Statement of Claim as Exhibits "A" and "B", respectively, and further states that the terms of those documents speak for themselves. Taylor denies that Claimant has fully or accurately memorialized the information, or summarized the purpose of those documents, in its Statement of Claim. Taylor denies all non-factual legal conclusions contained in this Paragraph, and denies any remaining factual allegations in Paragraph 25 of the Statement of Claim.

26. Fidelity also preserves trade secret customer data by requiring employees, including the Respondent, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity.

**ANSWER:** Taylor admits only that she signed an Employee Agreement, but denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of her Employment Agreement, the terms of which speak for itself. Taylor denies the remaining allegations contained in Paragraph 26 of the Statement of Claim.

27. Fidelity additionally preserves trade secret customer data by requiring each employee to execute a standard Fidelity Employee Agreement. Fidelity records indicate that Defendant Taylor executed Fidelity's Employee Agreement initially on September 20, 1999. A copy of Taylor's 1999 Agreement is attached hereto as Exhibit C. Taylor renewed her promises by executing the Employee Agreement again on June 30, 2011. A copy of Taylor's June 11, 2011 Agreement is attached hereto as Exhibit D.

**ANSWER:** Taylor admits that initially she was a party to an Employee Agreement dated September 20, 1999, and further states that on June 30, 2011, she signed an updated version of the Employee Agreement, which superseded and replaced the prior version she had previously signed (which was created in April, 1997). Taylor admits that copies of the September 20, 1999 (superseded) and June 30, 2011 Employee Agreements are attached to the Statement of Claim as Exhibits "C" and "D", respectively. Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011

Employee Agreement, and further denies that she renewed any promises on June 30, 2011. Taylor

denies the remaining allegations contained in Paragraph 27 of the Statement of Claim.

28.     In her Employee Agreements, the Respondent acknowledged the confidentiality of
Fidelity's records, and defined "Confidential Information" to include Fidelity's customer lists and
customer information. Exhibits C-D at ¶ 1.

**ANSWER:**     Taylor denies that the September 20, 1999, Employee Agreement has any

force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement.

Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose,

terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for

themselves. Taylor denies any remaining allegations in Paragraph 28 of the Statement of Claim.

29.     The Respondent promised to use Fidelity's Confidential Information and trade
secrets only in the course of her employment with Fidelity and not to divulge Fidelity's trade
secrets to third parties. *Id.*

**ANSWER:**     Taylor denies that the September 20, 1999, Employee Agreement has any

force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement.

Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose,

terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for

themselves. Taylor denies the remaining allegations in this paragraph.

30.     The Respondent promised that, upon termination of employment, she would "return
all company property ... including but not limited to Confidential Information." *Id*.

**ANSWER:**     Taylor denies that the September 20, 1999, Employee Agreement has any

force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement.

Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose,

terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for

themselves. Taylor denies the remaining allegations in this paragraph.

31.     The Respondent also promised that following termination of employment she
would not use Fidelity's Confidential Information to solicit Fidelity's clients. *Id*

**ANSWER:** Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies the remaining allegations in this paragraph.

32. The Respondent further promised that for a period of one year following termination of her employment she would not "directly or indirectly ... solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of the Employee's employment with the Fidelity Companies." *Id.*

**ANSWER:** Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies the remaining allegations in this paragraph.

33. The Respondent agreed that any violation of the Employee Agreement-including after her termination-would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information. *Id.*

**ANSWER:** Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies the remaining allegations in this paragraph.

34. As consideration for the Employee Agreements the Respondent executed, Fidelity hired the Respondent, compensated her throughout her employment, promoted her, provided her with introductory and continuing on-the-job training and education, and allowed her access to confidential customer information. In addition to assigning customers to the Respondent to service, Fidelity also provides Financial Consultants, including the Respondent, with the resources to enable them to succeed at Fidelity, including support services, market reporting services, research, sales assistance, access to and use of experts in asset management, tax, estate planning and

44

insurance, and all other requirements necessary to best perform their job for Fidelity's customers. Fidelity also registered the Respondent with the New York Stock Exchange and Financial Industry Regulatory Authority ("FINRA").

**ANSWER:** Taylor denies that the consideration Claimant has described in this Paragraph 34 was in exchange for her executing any Employee Agreement, as Claimant was hired in 1999 and was compensated and promoted based on her superior performance, and not in exchange for executing any agreement. Further answering, Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Taylor denies that she was provided the resources to enable her to succeed at Fidelity, as she was constructively discharged from employment on March 6, 2020. Further answering, Taylor admits that she is registered with the New York Stock Exchange and with FINRA. Taylor denies any remaining allegations contained in this Paragraph.

35.     Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity. Furthermore, Fidelity is required by federal law to prevent the disclosure to third-parties of nonpublic customer information, including customers' contact information and financial information. *See* 15 U.S.C. § 6801, *et seq.;* 17 C.F.R. § 248.1, *et seq.*

**ANSWER:** Taylor is without information or knowledge sufficient to allow her to admit or deny the allegations contained in the first sentence of Paragraph 35 of the Statement of Claim and, on that basis, denies those allegations. The remaining allegations set forth in Paragraph 35 constitute legal conclusions to which no response is required. To the extent those remaining allegations can be construed as statements of fact, Taylor denies those allegations, and denies any remaining allegations of fact.

36.     On March 6, 2020, Taylor resigned from Fidelity. She subsequently joined her new firm Fairhaven, a direct competitor of Fidelity. A copy of Taylor's resignation letter is attached hereto as Exhibit E.

**ANSWER:** Taylor admits only that she was constructively discharged from Fidelity on March 6, 2020, immediately before her impending termination, and that she subsequently affiliated

with Fairhaven.  Further answering, Taylor admits that she provided the letter attached as Exhibit E to the Statement of Claim to Fidelity.  Taylor denies any remaining allegations contained in Paragraph 36 of the Statement of Claim.

37.    At the time that Taylor resigned, she was sent a letter from Fidelity's HR department reminding her of her post-employment obligations pursuant to her Employee Agreement and enclosing a copy of her Employee Agreement. A copy of the March 14, 2020 letter is attached hereto as Exhibit F.

**ANSWER:**    Taylor admits only that on March 14, 2020, Fidelity sent her the letter that is attached to the Statement of Claim as Exhibit F, but denies that the letter was sent at the time of her constructive discharge, denies that Claimant has fully or accurately memorialized that communication, and denies that Claimant accurately or fully recited the terms and conditions of the June 30, 2011 Employment Agreement, the terms of which speak for itself.  Taylor denies the remaining allegations contained in Paragraph 37 of the Statement of Claim

38.    Since Taylor resigned from Fidelity, Fidelity has been receiving reports that she- and representatives from her new firm acting on her behalf--have been soliciting Fidelity customers to transfer their business to Fairhaven.

**ANSWER:**    Taylor denies that she solicited any of Fidelity's customers to transfer any business to Fairhaven during her non-solicitation period.  Taylor is without information or knowledge sufficient to allow her to admit or deny whether Fidelity has received any "reports" about Taylor subsequent to her constructive discharge and, on that basis, denies the allegations in Paragraph 38 of the Statement of Claim.  Taylor denies any remaining allegations in Paragraph 38 of the Statement of Claim.

39.    In fact, one client reported that Taylor solicited him, and set up an appointment for him to come meet with her at her new firm, before she even resigned. After Taylor resigned, Fidelity representatives were assigned to service the customers that were previously serviced by Taylor. In a meeting with the new Financial Consultant, the customer reported that during his last meeting with Taylor, while she was employed at Fidelity, she set up a meeting for him at her new firm. Taylor also told the client that he would be able to leave his assets at Fidelity but Taylor would be able to add her name to their account and provide financial advice.

**ANSWER:** Taylor denies that she solicited any of Fidelity's clients to transfer any business to Fairhaven during her non-solicitation period, and denies that she had any conversations about Fairhaven with any of her clients prior to her constructive discharge from Claimant's employ on March 6, 2020. Taylor is without information or knowledge sufficient to allow her to admit or deny the allegations that Fidelity received any "reports" about Taylor and, on that basis, denies those allegations. Taylor denies any remaining allegations contained in Paragraph 39 of the Statement of Claim.

40. Another client reported to her new Financial Consultant that she received a call from the firm that Taylor joined and the person said that she was calling on Taylor's behalf. The employee from Taylor's new firm, Fairhaven, then asked the Fidelity client to consolidate her assets and transfer them to Taylor at her new firm. The client was not happy that someone called her and wanted to make sure that Fidelity was aware that this was being done by Taylor and her new firm.

**ANSWER:** Taylor denies that anyone solicited any of Fidelity's clients to transfer any business to Fairhaven at the direction or on behalf of Taylor. Taylor is without information or knowledge sufficient to allow her to admit or deny the allegations that Fidelity received any "reports" regarding Taylor or the content of any alleged conversations Fidelity has had about Taylor and, on that basis, denies those allegations. Taylor denies any remaining allegations contained in Paragraph 40 of the Statement of Claim.

41. Other clients have also reported to Fidelity that Taylor was contacting them about doing business with her at her new firm.

**ANSWER:** Taylor denies that she solicited any of Fidelity's clients to transfer business to Fairhaven during her non-solicitation period. Taylor is without information or knowledge sufficient to allow her to admit or deny the allegations that Fidelity received any "reports" regarding Taylor or the content of any alleged conversations Fidelity has had about Taylor and, on that basis, denies those allegations. Taylor denies any remaining allegations contained in Paragraph 41 of the Statement of Claim.

42.     Accordingly, Fidelity's in-house counsel sent Taylor a letter reminding her of her contractual obligations, enclosing a copy of her Employee Agreement, and demanding that she cease any further solicitation of Fidelity customers. Fidelity also enclosed an affidavit for her to sign attesting that she did not have, or had returned, any of its customer information.  A copy of the March 20, 2020 letter is attached hereto as Exhibit G.

**ANSWER:**     Taylor admits only that Fidelity sent her the letter attached as Exhibit G to the Statement of Claim, the content of which speaks for itself.  Taylor denies that Claimant has fully or accurately memorialized the contents or summarized the purpose of the letter in its Statement of Claim.  Taylor denies any remaining allegations in Paragraph 42 of the Statement of Claim.

43.     Taylor never responded to the letter and never returned the affidavit attesting that she did not have or had returned Fidelity's customer information.

**ANSWER:**     Taylor denies the premise upon which this allegation is based, and further denies that any response to the letter or the execution of any affidavit was required or warranted. Taylor denies any remaining allegations in Paragraph 43 of the Statement of Claim.

44.     Despite Fidelity's letters reminding the Respondent of her legal obligations, Taylor has continued to use Fidelity's trade secret customer information to aggressively solicit customers to transfer their accounts to her new firm and has failed to return Fidelity's customer information.

**ANSWER:**     Denied.

45.     The only way Taylor could have known that these particular individuals were customers of Fidelity and how to contact them is by exploiting the ongoing access she was given to Fidelity's constantly updated confidential and trade secret information, and using her knowledge of that confidential information about Fidelity's clients to identify and target  Fidelity clients for her own benefit, and the benefit of her new firm.

**ANSWER:**     Denied.

46.     The fact that Taylor is blatantly soliciting clients raises substantial concern for Fidelity that she has also removed or retained a list of Fidelity clients following termination of her employment with Fidelity, and that she is using that list in further violation of the non-disclosure and confidentiality obligations in the Employee Agreement.

**ANSWER:**     Taylor denies that she has solicited any of Fidelity's clients to transfer any business to Fairhaven during her non-solicitation period.  Further answering, Taylor denies that

48

she has any list of Fidelity clients, and denies that she has violated any obligations contained in the June 30, 2011 Employee Agreement. Taylor denies any remaining allegations contained in Paragraph 46 of the Statement of Claim.

47. Fidelity asks for the Panel's assistance in protecting that information and stopping Respondent's knowing and intentional wrongful conduct.

**ANSWER:** The allegations in Paragraph 47 constitute a legal conclusion, to which no response is required. To the extent the allegations in Paragraph 47 can be construed as statements of fact, Taylor denies the allegations set forth therein.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

48. The allegations of Paragraphs 1 through 47 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:** As and for her answer to Paragraph 48, Taylor adopts and incorporates by reference her answers to Paragraphs 1 through 47 of the Statement of Claim, as well as the allegations of fact set forth in Paragraphs 1 through 159 of her Counterclaims and Third-Party Claims, as if fully set forth herein.

49. Taylor's Employee Agreements are valid contracts supported by adequate consideration.

**ANSWER:** Denied.

50. In the Employee Agreements, Taylor acknowledged that as a consequence of her employment with Fidelity, she would be given access to Confidential Information about Fidelity's clients. See Exhibits C-D at ¶1. As described above, this information was provided to Taylor not only at the outset of her employment, but she also was provided with continuing access to an evolving and nearly continually updated pool of information about the Fidelity clients she was assigned to service, all of which was essential to her ability to perform her job duties.

**ANSWER:** Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose,

terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies any and all wrongdoing on her part, and denies any remaining allegations in this Paragraph.

51.     Pursuant to the terms of her Employee Agreements, Taylor agreed to keep Fidelity's records, including particularly Fidelity's customer lists and customer information, confidential. Exhibits C-D at ¶ 1.

**ANSWER:**     Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies any and all wrongdoing on her part, and further denies any remaining allegations in Paragraph 51 of the Statement of Claim.

52.     Taylor promised to use Fidelity's customer information only in the course of her employment with Fidelity, and promised not to divulge Fidelity's customer information to third parties. Exhibits C-D at ¶ 1.

**ANSWER:**     Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies any and all wrongdoing on her part, and further denies any remaining allegations in Paragraph 52 of the Statement of Claim.

53.     Taylor violated the confidentiality and non-disclosure provisions of her Employee Agreements by using Fidelity's confidential customer information on behalf of herself, including by using that information to solicit Fidelity clients to follow her to her new firm.

**ANSWER:**     Denied.

54.     Taylor also promised to return any of Fidelity's customer information in her possession to Fidelity upon termination of her employment. Exhibits C-D at ¶ 3.

**ANSWER:** Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies any and all wrongdoing on her part, and further denies any remaining allegations in Paragraph 54 of the Statement of Claim.

55. Taylor sought to circumvent and in fact breached this provision of her Employee Agreements by, on information and belief, either taking the Confidential Information, or creating or recreating the Confidential Information from memory for competitive use at her new firm.

**ANSWER:** Denied.

56. Taylor also promised that she would not solicit Fidelity customers for a period of one year after her termination. Exhibits C-D at ¶ 6.

**ANSWER:** Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies any and all wrongdoing on her part, and further denies any remaining allegations in Paragraph 56 of the Statement of Claim.

57. Taylor breached the non-solicitation provision of her Employee Agreements by using her knowledge of Fidelity's customer information to solicit Fidelity customers to transfer their business to her.

**ANSWER:** Denied.

58. Taylor continues to violate her contractual obligations and will continue to violate these obligations in the future unless enjoined.

**ANSWER:** Denied.

59. As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.

**ANSWER:** Denied.

60. In her Employee Agreement, Taylor expressly agreed that "violation of this Agreement will cause irreparable damage" to Fidelity. Exhibits C-D at ¶ 10.

**ANSWER:** Taylor denies that the September 20, 1999, Employee Agreement has any force or effect, as it was superseded and replaced by the June 30, 2011 Employee Agreement. Further answering, Taylor denies that Claimant has fully or accurately memorialized the purpose, terms and conditions of the June 30, 2011 Employee Agreement, the terms of which speak for themselves. Taylor denies any and all wrongdoing on her part, and further denies any remaining allegations in Paragraph 60 of the Statement of Claim.

61. Unless Taylor is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

    (a) Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

    (b) Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

    (c) Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

    (d) Potential future economic loss, which is presently incalculable.

**ANSWER:** Denied.

**SECOND CAUSE OF ACTION**
**(Misappropriations of Trade Secrets in Violation of the**
**Defend Trade Secrets Act - 18 U.S.C. § 1831 *et seq.*)**

62. The allegations of Paragraphs 1 through 61 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:** As and for her answer to Paragraph 62, Taylor adopts and incorporates by reference her answers to Paragraphs 1 through 61 of the Statement of Claim, as well as the allegations of fact set forth in Paragraphs 1 through 159 of her Counterclaims and Third-Party Claims, as if fully set forth herein.

63. The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Respondent pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.,* in one or more of the following respects.

**ANSWER:** Denied.

64. Fidelity's above-described trade secrets, including the contact and confidential financial and account information of Fidelity customers, are subject to reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality. Fidelity's customer information is not generally known.

**ANSWER:** Denied.

65. Respondent has used Fidelity's customer information without Fidelity's consent. Taylor engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Taylor owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity.

**ANSWER:** Denied.

66. Such information is also protected as "non-public" information under federal securities Regulation S-P. 17 C.F.R. § 248.3(t)(l ); 17 C.F.R. § 248.3(u). Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account information such as that misappropriated by the Respondent is not disclosed to third parties without consent. 17 C.F.R. § 248.10.

**ANSWER:** Denied.

67. Fidelity derives a significant economic benefit from the above-described trade secrets.

**ANSWER:** Denied.

68. Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Respondent's ongoing misappropriation and misuse of Fidelity's trade secret customer information.

**ANSWER:** Denied.

69. Unless the Respondent is permanently enjoined from the foregoing conduct, Fidelity will be irreparably harmed by.

    (a) Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers,

    (b) Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

    (c)    Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

    (d)    Potential future economic loss, which is presently incalculable.

**ANSWER:**    Denied.

70.    Respondent's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

**ANSWER:**    Denied.

71.    Thus, Fidelity is entitled to permanent injunctive relief, restitution, compensatory and exemplary damages, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836.

**ANSWER:**    Denied.

## THIRD CAUSE OF ACTION
### (Misappropriations of Trade Secret and Misuse of Confidential Information in Violation of the Illinois Trade Secret Act, 765 Ill. Comp. Stat. 1065)

72.    The allegations of Paragraphs 1 through 71 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**    As and for her answer to Paragraph 72, Taylor adopts and incorporates by reference her answers to Paragraphs 1 through 71 of the Statement of Claim, as well as the allegations of fact set forth in Paragraphs 1 through 159 of her Counterclaims and Third-Party Claims, as if fully set forth herein.

73.    The books, files and records of Fidelity, the confidential information contained therein, and especially the data pertaining to Fidelity customers, including customers' names and addresses, as well as additional information such as customers' social security numbers, account numbers, financial status, financial statements, investment objectives and preferences, assets and/or securities held by these customers, and other highly confidential personal and financial information, are trade secrets of Fidelity subject to protection under Illinois trade secret law.

**ANSWER:**    Denied.

74.    This information derives independent economic value by not being accessible, through proper means, to competitors, which can profit from its use or disclosure. The identities of Fidelity's clients are not readily available to the public or to Fidelity's competitors. Fidelity has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

**ANSWER:**    Denied.

75.    Fidelity has taken more than adequate measures under the circumstances  to maintain the secrecy of this information, including assigning computer access passwords to  be used to access Fidelity computer systems and records, restricting access to its business premises, and having employees, including Taylor, sign agreements which expressly prohibit the use and disclosure of such information outside of Fidelity.

**ANSWER:**    Denied.

76.    The foregoing conduct of the Respondent constitutes a conversion and misappropriation and misuse of Fidelity's confidential, trade secret information in violation of Illinois law, including the Illinois Trade Secrets Act, 765 Ill. Comp. Stat.  1065,  because Taylor has used and/or disclosed Fidelity's customer information without Fidelity's consent and despite the fact that Taylor acquired knowledge of this information under circumstances giving rise to a duty to maintain the information's secrecy and limit  its use, which  duty Taylor owed  Fidelity as its agent, employee and representative.

**ANSWER:**    Denied.

77.    Because Respondent's unlawful conduct is ongoing, Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law.

**ANSWER:**    Denied.

## FOURTH CAUSE OF ACTION
### (Unfair Competition)

78.    The allegations of Paragraphs 1 through 77 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**    As and for her answer to Paragraph 78, Taylor adopts and incorporates by reference her answers to Paragraphs 1 through 77 of the Statement of Claim, as well as the allegations of fact set forth in Paragraphs 1 through 159 of her Counterclaims and Third-Party Claims, as if fully set forth herein.

79.    Respondent's conduct constitutes an unfair method of competition under Illinois law. Respondent actively participated in, and induced others to carry out all of the acts of unfair competition outlined above. Moreover, Respondent's acts of unfair competition are willful and intentional.

**ANSWER:**    Denied.

55

80.     As a direct and proximate result of the acts and course of conduct of Respondent described above, Fidelity has suffered and will continue to suffer irreparable harm and loss.

**ANSWER:**     Denied.

81.     Unless this Panel enjoins her from doing so, Respondent will continue her unlawful acts of unfair competition, causing Fidelity immediate, irreparable damage for which it has no adequate remedy at law.

**ANSWER:**     Denied.

82.     Therefore, Fidelity is entitled to permanent injunctive relief enjoining the Respondent from any further acts of unfair competition.

**ANSWER:**     Denied.

## FIFTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

83.     The allegations of Paragraphs 1 through 82 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**     As and for her answer to Paragraph 83, Taylor adopts and incorporates by reference her answers to Paragraphs 1 through 82 of the Statement of Claim, as well as the allegations of fact set forth in Paragraphs 1 through 159 of her Counterclaims and Third-Party Claims, as if fully set forth herein.

84.     Respondent had, and continues to have, a common law duty of loyalty arising as a result of her relationship as an employee, agent and/or representative of Fidelity.

**ANSWER:**     Denied.

85.     Respondent had a confidential relationship with Fidelity.

**ANSWER:**     Denied.

86.     Respondent is now using for her own benefit the customer information she gained as a result of her employment with Fidelity, and is doing so for the purpose of soliciting Fidelity clients to transfer their accounts to her new employer.

**ANSWER:**     Denied.

87.     As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm and loss.

**ANSWER:**     Denied.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Existing Business Relations)

88.     The allegations of Paragraphs 1 through 87 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**     As and for her answer to Paragraph 88, Taylor adopts and incorporates by reference her answers to Paragraphs 1 through 87 of the Statement of Claim, as well as the allegations of fact set forth in Paragraphs 1 through 159 of her Counterclaims and Third-Party Claims, as if fully set forth herein.

89.     Respondent tortiously interfered with Fidelity's client relationships by planning to and in fact soliciting clients to move their accounts to her new firm, including through the use of Fidelity's confidential information and trade secrets.

**ANSWER:**     Denied.

90.     As a direct and proximate result of Respondent's conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, and irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

**ANSWER:**     Denied.

91.     As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm and loss.

**ANSWER:**     Denied.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

92.     The allegations of Paragraphs 1 through 91 are incorporated herein by reference with the same force and effect as if set forth in full below.

**ANSWER:**     As and for her answer to Paragraph 92, Taylor adopts and incorporates by reference her answers to Paragraphs 1 through 91 of the Statement of Claim, as well as the allegations of fact set forth in Paragraphs 1 through 159 of her Counterclaims and Third-Party Claims, as if fully set forth herein.

93.     Respondent has misappropriated Fidelity's trade secrets and confidential information, has breached her Employee Agreements and unfairly competed with Fidelity in the hope of wrongfully benefitting from her actions.

**ANSWER:**     Denied.

94.     As a result of Respondent's wrongful and illegal conduct, he has benefitted in the form of Fidelity customer accounts that have transferred to her at her new firm. Also as a result of Respondent's wrongful and illegal conduct, Fidelity has suffered harm.

**ANSWER:**     Denied.

95.     Allowing Respondent to benefit from such conduct would be unfair.

**ANSWER:**     Denied.

## GENERAL DENIAL

Taylor has endeavored to address all of the allegations directed at her in Claimant's Statement of Claim. To the extent Taylor has not specifically mentioned or directly responded to any of Claimant's allegations, Taylor respectfully denies those allegations.

## AFFIRMATIVE DEFENSES

In addition to the affirmative matters set forth in Taylor's Answer to the Statement of Claim, *supra,* and incorporating the allegations of fact set forth in Paragraphs 1 through 159 of her Counterclaims and Third-Party Claims, *supra,* Taylor respectfully asserts the following affirmative defenses to Claimant's Statement of Claim:

### FIRST AFFIRMATIVE DEFENSE
### FAILURE TO STATE A CLAIM

Claimant's Statement of Claim should be dismissed, in whole or in part, because Claimant has failed to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
### FIRST BREACH

Claimant is barred from recovering any damages, and any failure of performance by Respondent is excused, pursuant to the doctrine of first breach.

### THIRD AFFIRMATIVE DEFENSE
### CLAIMANT'S CONDUCT BARS ITS CLAIMS

Claimant's Statement of Claim is barred, in whole or in part, by the doctrines of waiver,

laches, estoppel and ratification.

### FOURTH AFFIRMATIVE DEFENSE
### NO BREACH

Claimant's Statement of Claim is barred, in whole or in part, pursuant to the express

language of its contractual agreement with Taylor.

### FIFTH AFFIRMATIVE DEFENSE
### UNCLEAN HANDS

Claimant is barred from recovering any damages pursuant to the doctrine of unclean hands.

### SIXTH AFFIRMATIVE DEFENSE
### CONTRIBUTION

To the extent Claimant suffered any damages, those purported damages were not

proximately caused by Respondent, and instead are a result of Claimant's own conduct.

### SEVENTH AFFIRMATIVE DEFENSE
### SET OFF

To the extent Claimant suffered any damages proximately caused by Respondent (and it

did not), then the amount of those damages may only be applied as set-off against the far greater

sums of money that Claimant owes to Respondent because of its unlawful conduct, as set forth in

Respondent's Counterclaims.

### EIGHTH AFFIRMATIVE DEFENSE
### PROMISSORY ESTOPPEL

Respondent provides its financial consultants, including Taylor, with assurances that upon

their departure, it will promptly advise clients of their updated contact information. Taylor relied

on Respondent's assurances in this regard, but Respondent failed to provide the information to

Taylor's clients. Respondent is therefore precluded due to the doctrine of promissory estoppel from pursuing claims against Taylor based upon her contact with clients to discuss those issues.

### NINTH AFFIRMATIVE DEFENSE
### FAILURE TO MITIGATE

Claimant has failed to mitigate any damages it purportedly sustained as a result of the conduct alleged in its Statement of Claim.

### TENTH AFFIRMATIVE DEFENSE
### NO DAMAGES

Claimant has suffered no damages or injury whatsoever as a result of Taylor's alleged conduct.

### ELEVENTH AFFIRMATIVE DEFENSE
### FAIR COMPETITION

Taylor cannot be held liable, and Claimant's claims must be dismissed, because the conduct alleged in non-actionable under the privilege of fair competition.

### TWELFTH AFFIRMATIVE DEFENSE
### RESTRAINT OF TRADE

Claimant's Statement of Claim must be dismissed because the June 30, 2011, Employee Agreement at issue is an unfair restraint on trade, contrary to public policy, and unenforceable as a matter of law.

### THIRTEENTH AFFIRMATIVE DEFENSE
### DISCHARGE OF DUTIES

Claimant's State of Claim must be dismissed because Respondent performed and discharged all contractual duties owed by her.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**IMPROPER PROCEDURE**

Claimant's claim for injunctive relief against Taylor pursuant to FINRA Rule 13804 is barred following Claimant's decision on January 12, 2022, to forego seeking a permanent injunction under Rule 13804(b), so this arbitration could, instead, "proceed on the normal arbitration route" set forth in Rule 13302.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**NO TRADE SECRETS**

Claimant's claim against Taylor for trade secret misappropriation fails as a matter of law because the documents, information, data and materials allegedly at issue do not constitute an enforceable "trade secret" as a matter of law.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**WAIVER AND ESTOPPEL**

Claimant is barred by the doctrines of waiver and estoppel from pursuing claims against Taylor, when Claimant's former employees have habitually and openly engaged in the same conduct allegedly engaged in by Taylor – with Claimant's full knowledge and consent – but Claimant has never sought to enforce its restrictive covenants or otherwise pursued legal action against those employees.

**RESERVATION OF AFFIRMATIVE DEFENSES**

Taylor expressly reserves her rights to assert any additional defenses as they become known or available during the pendency of this matter.

WHEREFORE, having fully responded to the Claimant's Statement of Claim and for all of the reasons set forth above, Taylor respectfully requests that the Panel enter an Award in her favor and against the Claimant, as follows:

      A.    Dismissing Claimant's Statement of Claim in its entirety, *with prejudice*;

B. Denying all relief sought by Claimant in its Statement of Claim;

C. Awarding to Taylor all of her costs and attorneys' fees incurred in connection with this arbitration proceeding; and

D. Awarding to Taylor any such other and further relief as the Panel deems just.

Dated: February 28, 2022                    Respectfully submitted,

                                            **JENNIFER TAYLOR, Respondent,**
                                            **Counterclaimant and Third-Party**
                                            **Claimant**

                                            By: _____
                                                  One of Her Attorneys

                                            Christopher S. Griesmeyer
                                            Zachary P. Mulcrone
                                            GREIMAN, ROME & GRIESMEYER, LLC
                                            205 West Randolph Street, Suite 2300
                                            Chicago, Illinois 60606
                                            (312) 428-2750
                                            (312) 332-2781 (fax)
                                            cgriesmeyer@grglegal.com
                                            zmulcrone@grglegal.com

## CERTIFICATE OF SERVICE

I, Christopher S. Griesmeyer, counsel for Respondent, Counterclaimant and Third-Party Claimant Jennifer Taylor, hereby certify that on February 28, 2022, I electronically filed the foregoing *Respondent/Counterclaimant Jennifer Taylor's Counterclaims, Third-Party Claims, and Answer and Affirmative Defenses to Statement of Claim* with FINRA Dispute Resolution's Online Arbitration Claim Filing System, pursuant to which Claimant will receive notice and service of same. I further certify that, pursuant to FINRA Rule 13303(b), I served a copy of:

- the foregoing *Respondent/Counterclaimant Jennifer Taylor's Counterclaims, Third-Party Claims, and Answer and Affirmative Defenses to Statement of Claim*, and

- copies of all documents previously served by Claimant in this proceeding,

to Third-Party Defendant Scott Ely Marshall via FedEx overnight delivery to the following address:

> Scott Ely Marshall
> Fidelity Brokerage Services, LLC
> Oak Brook Regency Towers
> 1415 West 22nd Street
> Oak Brook, Illinois 60523

Christopher S. Griesmeyer
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
(312) 428-2750
(312) 332-2781 (fax)
cgriesmeyer@grglegal.com

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-2133 |
| | ) | |
| JENNIFER TAYLOR, FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| JENNIFER TAYLOR, FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## DEFENDANT/COUNTER-PLAINTIFF JENNIFER TAYLOR'S
## NOTICE OF DEPOSITIONS

PLEASE TAKE NOTICE that the Defendant/Counter-Plaintiff, Jennifer Taylor, by and through her undersigned counsel, and pursuant to Rule 30 of the Federal Rules of Civil Procedure, hereby notifies the Plaintiff/Counter-Defendant, Fidelity Brokerage Services, LLC, that she shall take the following depositions at the law offices of Greiman, Rome & Griesmeyer, LLC, 205 West Randolph Street, Suite 2300, Chicago, Illinois, 60606, on the dates and times indicated below.

| DEPONENT | DATE | TIME |
|---|---|---|
| Scott Marshall | December 28, 2020 | 9:00 a.m. |

| DEPONENT | DATE | TIME |
|----------|------|------|
| **Charles Meyers** | **December 29, 2020** | **9:00 a.m.** |
| **Fidelity Brokerage Services LLC** *(Rule 30(b)(6) Deposition)* | **December 30, 2020** | **9:00 a.m.** |

PLEASE TAKE FURTHER NOTICE that you are required by this notice to have said deponent(s) present in person for oral examination on the date(s) and time(s) stated above; that the testimony provided by the deponent(s) shall be given under oath before an officer duly authorized to administer oaths and take depositions, and shall be recorded by stenographic, audio and/or audiovisual means; and that the depositions shall be conducted in accordance with the Federal Rules of Civil Procedure and shall continue until completed.

PLEASE TAKE FURTHER NOTICE that, in accordance with Fed. R. Civ. P. 30(b)(6), Plaintiff, Fidelity Brokerage Services LLC (hereafter, **"Fidelity"**) shall designate one or more officers, directors, managing agents, or such other persons to testify on its behalf as to the following matters:

1. The timing, facts, and circumstances regarding Fidelity's investigation into allegations of sex/gender harassment or discrimination between August 1, 2018 and March 6, 2020;

2. The timing, facts, and circumstances regarding Fidelity's investigation into allegations of age discrimination or harassment between August 1, 2018 and March 6, 2020;

3. The timing, facts, and circumstances regarding any workplace complaints about discriminatory conduct and/or harassment at the hands of Fidelity's managers, officers, or directors, including the identity of each complainant, that complainant's contact information, the alleged perpetrator, the outcome of such complaints, including whether the alleged harasser was subject to discipline of any kind, the employment status of the complainant, and whether the complainant resigned or was terminated;

4. Compensation for branch managers, including the various components of compensation (such as salary, bonus, other wages, benefits, etc.), compensation plans, and performance incentives and metrics;

5. Compensation for financial advisors, including the various components of compensation (such as salary, bonus, other wages, benefits, etc.), compensation plans, and performance incentives and metrics;

6. Performance metrics for Fidelity branches and employees within Fidelity branches, including all performance metrics applicable to managers and Financial Advisors;

7. Ms. Taylor's employment (including her job performance and discipline) while employed with Fidelity;

8. Financial Advisors who have separated from Fidelity's Oak Brook branch and the circumstances surrounding their departure, including Fidelity's past practices with respect to such Financial Advisors (including legal actions taken or not taken, investigations into conduct of departing Financial Advisors and any conclusions or findings of such investigations, as well as any actions taken as a result of such investigations);

9. Any and all reports or other information Fidelity contends supports its claim that Ms. Taylor solicited any of her former clients;

10. Communications from Ms. Taylor's former clients to Fidelity relating to Ms. Taylor after her separation from Fidelity;

11. The timing, facts, and circumstances relating to Fidelity's efforts to restrict Ms. Taylor's ability to perform and compete as a Financial Advisor with Fairhaven;

12. The timing, facts and circumstances relating to Fidelity's request that Ms. Taylor agree to the entry of injunctive relief against her;

13. The timing, facts, and circumstances relating to Fidelity's denial or refusal to allow Ms. Taylor access and use of Fidelity's "Wealthscape" tool;

14. Fidelity's past practices relating to Financial Advisors who have left Fidelity's employ, including the termination of any such relationships, the circumstances surrounding such termination, and any actions taken (or not taken) against such Financial Advisors;

15. The training, instruction, or guidance Fidelity provides to Financial Advisors who join Fidelity from another broker-dealer or registered financial advisor firm relating to or concerning their former clients, including their making any announcements to former clients, solicitations, or other communications with such former clients;

16. The timing, facts, and circumstances relating to Fidelity's investigation of any complaints Ms. Taylor made about discrimination or harassment on the basis of gender/sex or age;

17. Disciplinary actions, warnings, and performance plans given to male financial advisors at Fidelity's Oak Brook branch;

18. Disciplinary actions, warnings, and performance plans given to financial advisors under the age of 40 (at the time such action, warning or performance plan was given) at Fidelity's Oak Brook branch;

3

19. The timing, facts, and circumstances relating to Fidelity's conduct following and in response to any complaints Ms. Taylor made about discrimination or harassment on the basis of gender/sex or age, including, Ms. Taylor's cross-filing of her Charge of Discrimination with the EEOC and IDHR;

20. Fidelity's discovery responses in this lawsuit, including the documents Fidelity has produced during the course of discovery in this action, and efforts taken by Fidelity to identify and preserve relevant evidence, including electronically stored information; and

21. Fidelity's answers to interrogatories in this lawsuit.

Dated: November 19, 2020

Respectfully submitted,

**JENNIFER TAYLOR,**
**Defendant/Counter-Plaintiff**

By: *Christopher S. Griesmeyer*
         One of Her Attorneys

Christopher S. Griesmeyer (# 6269851)
Zachary Mulcrone (# 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 23300
Chicago, Illinois 60606
T: (312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

4

## CERTIFICATE OF SERVICE

I hereby certify that, on November 19, 2020, I caused the foregoing **Defendant/Counter-Plaintiff, Jennifer Taylor's Notice of Depositions** to be served upon the Plaintiff/Counter-Defendant and all counsel of record via electronic mail and U.S. Mail:

Joel W. Rice
Franklin Z. Wolf
FISHER & PHILLIPS, LLC
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
jrice@fisherphillips.com
fwolf@fisherphillips.com

Susan M. Guerette
FISHER & PHILLIPS, LLC
150 N. Radnor Chester Road
Suite C300
Radnor, PA 19087
sguerette@fisherphillips.com

Dated: November 19, 2020

By: Christopher S. Griesmeyer

Christopher S. Griesmeyer (# 6269851)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-2133 |
| | ) | |
| JENNIFER TAYLOR, FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| JENNIFER TAYLOR, FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**DEFENDANT/COUNTER-PLAINTIFF
FAIRHAVEN WEALTH MANAGEMENT, LLC'S
NOTICE OF DEPOSITIONS**

PLEASE TAKE NOTICE that the Defendant/Counter-Plaintiff, Fairhaven Wealth Management, LLC ("**Fairhaven**"), by and through its undersigned counsel, and in accordance with Fed. R. Civ. P. 30, hereby notifies the Plaintiff/Counter-Defendant, Fidelity Brokerage Services LLC, that it shall take the following depositions at the law offices of Greiman, Rome & Griesmeyer, LLC, 205 West Randolph Street, Suite 2300, Chicago, Illinois 60606, on the dates and times indicated below.

| <u>DEPONENT</u> | <u>DATE</u> | <u>TIME</u> |
|---|---|---|
| **Denis Hawley** | **January 5, 2021** | **9:00 a.m.** |

| DEPONENT | DATE | TIME |
|---|---|---|
| Amanda Scipione | January 6, 2021 | 9:00 a.m. |
| Michael Romano | January 7, 2021 | 9:00 a.m. |
| Luke Reynolds | January 8, 2021 | 9:00 a.m. |
| Jonathan Matthews | January 11, 2021 | 9:00 a.m. |
| Noel Graydon | January 12, 2021 | 9:00 a.m. |
| Jeffrey Draper | January 13, 2021 | 9:00 a.m. |
| Brian Endicott | January 14, 2021 | 9:00 a.m. |
| Anand Sekhar | January 18, 2021 | 9:00 a.m. |
| David Canter | January 19, 2021 | 9:00 a.m. |
| Marc Squires | January 20, 2021 | 9:00 a.m. |
| Hugh O'Donnell | January 21, 2021 | 9:00 a.m. |
| Cait Healy Burke | January 22, 2021 | 9:00 a.m. |
| Kristen Johnson | January 25, 2021 | 9:00 a.m. |
| Eric Hansen | January 26, 2021 | 9:00 a.m. |
| Doris McTyre | January 27, 2021 | 9:00 a.m. |
| Kathy Marshall | January 28, 2021 | 9:00 a.m. |
| Fidelity Brokerage Services LLC (*Rule 30(b)(6) Deposition*) | January 29, 2021 | 9:00 a.m. |

PLEASE TAKE FURTHER NOTICE that you are required by this notice to have said deponent(s) present in person for oral examination on the date(s) and time(s) stated above; that the testimony provided by the deponent(s) shall be given under oath before an officer duly authorized to administer oaths and take depositions, and shall be recorded by stenographic, audio and/or

audiovisual means; and that the depositions shall be conducted in accordance with the Federal

Rules of Civil Procedure and shall continue until completed.

PLEASE TAKE FURTHER NOTICE that, in accordance with Fed. R. Civ. P. 30(b)(6),

Plaintiff, Fidelity Brokerage Services LLC  (hereafter, **"Fidelity"**) shall designate one or more

officers, directors, managing agents, or such other persons to testify on its behalf as to the

following matters:

1. Fidelity's business operations and organizational structure, including the ownership and operations of its various business units and affiliates;

2. The identity, handling, sharing, protection, and access to Fidelity's confidential information and trade secrets, as those terms are used in the Amended Complaint, specifically:

   a. Information that constitutes Fidelity's confidential information and trade secrets;

   b. Fidelity's confidential information and trade secrets to which Ms. Taylor had access or was otherwise privy in her positions with Fidelity;

   c. All Fidelity employees who, in the last five years, have violated Fidelity's policies and procedures regarding the handling, sharing, protection, or access to Fidelity's confidential information and trade secrets, as those terms are used in the Amended Complaint;

3. The existence, nature, terms, conditions, obligations, performance and extent of Ms. Taylor's contractual or other duties to Fidelity, including the facts and circumstances surrounding any alleged breach by Ms. Taylor of any contractual obligation, confidentiality obligation, fiduciary duty, and/or other duty she owed (or owes) to Fidelity;

4. The timing, facts, and circumstances regarding any reports, disclosures or admission that Fidelity received from any source about the solicitation of Fidelity clients by any Fairhaven employee (including Ms. Taylor);

5. The timing, facts, and circumstances regarding Fidelity's contemplated and actual lawsuit against Ms. Taylor;

6. The timing, facts, and circumstances regarding Fidelity's contemplated and actual lawsuit against Fairhaven;

7. The timing, facts, and circumstances regarding Fidelity's communications with any affiliate, client, customer or other person or entity relating to its termination of the custodial relationship with Fairhaven, including:

    a. The participants in the communications;

    b. The method in which these communications took place (e.g., text message, phone call, e-mail, in-person meeting, etc.);

    c. The content of those communications as they relate to, mention, or concern the following subject matters:

        i. Ms. Taylor;

        ii. The competitiveness *vel non* of Fairhaven's services or products with Fidelity's services or products;

        iii. The potential settlement of any claims between Fidelity and Fairhaven;

8. The precise timing, facts, and circumstances that led to Fidelity's knowledge of Ms. Taylor's employment at Fairhaven;

9. The timing, facts, and circumstances relating to Fidelity's business relationship with Fairhaven, specifically:

    a. The terms of the parties' contracts, including any and all side agreements; and

    b. The timing, facts, and circumstances regarding how the relationship between the parties came to be;

10. Fidelity's past practices relating to its business relationships with other entities to which it provides custodial services, including the termination of any such relationships and the circumstances surrounding such termination;

11. Fidelity's protocols and procedures relating to the recovery of Fidelity confidential information and trade secrets from employees who are terminated, resign, or are laid off, and the past enforcement of such policies against former Fidelity employees;

12. The facts and circumstances surrounding Ms. Taylor's employment at Fidelity, including her access to Fidelity confidential information and trade secrets and any contractual obligations she may have with respect to any such information or trade secrets;

13. The existence, terms, conditions, obligations, and performance (including the facts and circumstances surrounding any alleged breach) of any contracts between Fidelity and Ms. Taylor;

14. The nature and extent of any contractual or other duties (including the facts and circumstances surrounding any alleged breach of any such duties) allegedly owed to Fidelity by Fairhaven;

15. The policies, procedures and practices of Fidelity concerning its solicitation, recruitment and hiring of experienced financial advisors;

16. The policies, procedures and practices of Fidelity concerning its departing employees, including in circumstances of termination, resignation, and constructive discharge;

17. The policies, procedures and practices of Fidelity concerning its filing of legal action(s) against former employees;

18. The policies, procedures and practices of Fidelity concerning its filing of legal action(s) against other entities with which former Fidelity employees have accepted employment;

19. The facts and circumstances supporting (including the existence, amount and mitigation of) the actual damages allegedly incurred by Fidelity as a direct and proximate result of any conduct or action by: (a) Ms. Taylor, and (b) Fairhaven;

20. The facts and circumstances surrounding any alleged interference with any "contractual relationship" by Fairhaven;

21. The identity, ownership, protection, handling and access to any "confidential information" of Fidelity, as identified by Fidelity in the lawsuit;

22. The facts and circumstances surrounding any purported "misappropriation" of any Fidelity "confidential information" by either (or both) of the Defendants, as alleged in the lawsuit;

23. The facts and circumstances surrounding any improper solicitation of any Fidelity client by either (or both) of the Defendants;

24. The facts and circumstances surrounding any client of Fidelity who has transferred any of their asset(s) or account(s) to Fairhaven following the termination of Ms. Taylor's employment with Fidelity;

25. The facts and circumstances surrounding any communications sent or received by any employees of Fidelity following the termination of Ms. Taylor's employment with Fidelity, which concern or relate to any activity that Fidelity contends is unlawful;

26. Fidelity's discovery responses in this lawsuit, including the documents Fidelity has produced during the course of discovery in this action, and efforts taken by Fidelity to identify and preserve relevant evidence, including electronically stored information;

27. The timing, facts and circumstances surrounding the allegations Fidelity has made against Ms. Taylor in this lawsuit;

28. The timing, facts and circumstances surrounding the allegations Fidelity has made against Fairhaven in this lawsuit;

29. The timing, facts and circumstances surrounding the allegations Fairhaven has made against Fidelity in this lawsuit;

30. The facts, timing, and circumstances that Fidelity contends are relevant to any of its affirmative defenses; and

31. Settlement discussions and the potential settlement of any claims involving Ms. Taylor and/or Fairhaven.

Dated: November 19, 2020

Respectfully submitted,

**FAIRHAVEN WEALTH**
**MANAGEMENT, LLC,**
**Defendant/Counter-Plaintiff**

By: _____
One of Its Attorneys

Christopher S. Griesmeyer (# 6269851)
Zachary Mulcrone (# 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

## CERTIFICATE OF SERVICE

I hereby certify that, on November 19, 2020, I caused the foregoing **Defendant/Counter-Plaintiff, Fairhaven Wealth Management, LLC's Notice of Depositions** to be served upon the Plaintiff/Counter-Defendant and all counsel of record via electronic mail and U.S. Mail:

Joel W. Rice
Franklin Z. Wolf
FISHER & PHILLIPS, LLC
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
jrice@fisherphillips.com
fwolf@fisherphillips.com

Susan M. Guerette
FISHER & PHILLIPS, LLC
150 N. Radnor Chester Road
Suite C300
Radnor, PA 19087
sguerette@fisherphillips.com

Dated: November 19, 2020

By: _Christopher S. Griesmeyer_

Christopher S. Griesmeyer (# 6269851)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com