**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-2133 |
| | ) | |
| JENNIFER TAYLOR and | ) | |
| FAIRHAVEN WEALTH MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |
| | ) | |

**FIDELITY BROKERAGE SERVICES, LLC'S
ANSWER TO DEFENDANT JENNIFER TAYLOR'S COUNTERCLAIM**

The Plaintiff/Counter-Defendant Fidelity Brokerage Services LLC by and through its undersigned counsel, submits the following answer to Jennifer Taylor's ("Taylor") counterclaim as follows:

**ANSWERS TO COUNTERCLAIM**

**NATURE OF THE CASE**

1.      This is an action to address the unlawful discrimination, harassment, and retaliation that Ms. Taylor suffered both during the course of, and after her employment ended with, Fidelity on the basis of her sex/gender (female) and age (over 40), in violation of state and federal law including, inter alia, Title VII (42 U.S.C. §§ 2000e, et seq.), the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. §§ 621-630, et seq.), and the Illinois Human Rights Act ("IHRA," 775 ILCS 5/1-101, et seq.), all as amended. Ms. Taylor also seeks redress for Fidelity Brokerage Services LLC's ("Fidelity" or the "Company") bad faith and tortious interference with her employment, business relations, and expectancy.

**ANSWER:**      Fidelity denies the allegations as written and contained in this paragraph.

1

2.     Fidelity is engaged in a "scorched earth" campaign against Ms. Taylor – one of its longest-tenured and most successful financial advisors – whose only transgression was to join a small and independent registered investment advisory ("RIA") firm called Fairhaven Wealth Management ("Fairhaven") *after* Fidelity had constructively discharged her from employment.

**ANSWER:**     Defendant admits that Plaintiff joined Fairhaven Wealth Management. Defendant denies all remaining allegations as written and contained in this paragraph.

3.     While most financial advisors remain with Fidelity for only a couple of years,  Ms. Taylor worked diligently as a financial advisor for Fidelity for 25 years.  During that time, Ms. Taylor nurtured her deep and personal relationships with several clients, and became a valuable and high producing financial advisor in the Company's Oak Brook, Illinois office.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

4.     Ms. Taylor very much enjoyed working at Fidelity, and had no desire (or plans) to ever leave the Company.  To the contrary, after devoting more than 25 years to Fidelity, she hoped to remain with the Company until she retired.

**ANSWER:**     Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

5.     Unfortunately, Fidelity's appointment of Scott Marshall as the branch manager of the Oak Brook office ultimately destroyed any hope for Ms. Taylor's future with the Company. Shortly after his arrival in August of 2018, Mr. Marshall made it clear that he harbored a discriminatory animus against Ms. Taylor because of her age and gender.  He continually harassed Ms. Taylor because of her age and gender, and embarked upon a pretextual campaign to terminate her employment.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

2

6.     Although Ms. Taylor was a top-performer within the Company, Mr. Marshall acted with malice toward Ms. Taylor and seized every chance he had to formally criticize Ms. Taylor in written warnings and improvement "plans" that: (a) were ambiguously based on soft skills such as "client service style," for which there is no corresponding measurable performance metric; (b) were designed to provide Marshall with "cover" for his overt age and sex discrimination; and (c) would ultimately result in Ms. Taylor's constructive discharge from Fidelity.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

7.     When Ms. Taylor complained about Marshall's discrimination and harassment to Fidelity's management, the Company refused to conduct a proper investigation; instead, it merely provided "lip service" to her concerns by allowing a member of the operations department to sit in on meetings between Marshall and Taylor.  In response to her complaints, Marshall retaliated against Ms. Taylor by issuing her an extended "final warning," and letting her know that her employment would likely be terminated within the extended warning period.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

8.     Marshall made it clear to Ms. Taylor that her days at Fidelity were numbered.  Left with no other choice, and mere days before her inevitable and impending termination, Ms. Taylor reluctantly accepted employment with Fairhaven.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

9.     Importantly, prior to her departure from Fidelity, Ms. Taylor never told anyone – not a single client, and not a single employee at Fidelity – that she was leaving the Company or joining Fairhaven.  Ms. Taylor was very careful to ensure that she made a "clean break" from Fidelity; consequently, she never communicated anything about her departure to any clients (or anyone else) until after her registration transfer (i.e., FINRA Form U4) was submitted by

3

Fairhaven.

    **ANSWER:**   Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

    10.    Equally important, Ms. Taylor did not take a single scrap of paper or single byte of Fidelity's data with her when she left. Notwithstanding her constructive discharge – and the harsh treatment, discrimination, harassment and retaliation that she experienced at the hands of Fidelity – Ms. Taylor has abided by the terms of her employment agreement with the Company in all respects.

    **ANSWER:**   Fidelity denies the allegations as written and contained in this paragraph.

    11.    Yet, this was not enough for Fidelity. Almost immediately after Ms. Taylor's departure, Fidelity wrongly accused her of misappropriating the Company's "trade secrets" and taking its confidential information, and using that information to solicit her former clients. The accusations Fidelity has made against Ms. Taylor are untrue, and were made both recklessly and for improper purposes – to further retaliate against her for complaining about the workplace harassment and discrimination that she experienced at the Company, and to eliminate any fair competition in the marketplace.

    **ANSWER:**   Fidelity denies the allegations as written and contained in this paragraph.

    12.    Notably, Ms. Taylor provided full and complete discovery responses and documents responsive to Fidelity's "expedited discovery" requests on June 2, 2020. None of the discovery substantiates any of Fidelity's baseless claims; instead, the evidence shows that Fidelity has overreached and proceeded based on rumors and wholly unreliable information. Instead of withdrawing its claims, Fidelity has chosen to double down on its missteps and bring a third party—Ms. Taylor's current employer, Fairhaven—into this litigation.

4

**ANSWER:**    Fidelity denies the allegations as written and contained in this paragraph.

13.    Fidelity's decision to bring Fairhaven into this lawsuit is malicious and was done for the following improper purposes: (a) to interfere with Ms. Taylor's employment relationship by pressuring Fairhaven to force Ms. Taylor to agree to an injunction (even though she has not breached any obligation owed to Fidelity), and (b) to punish Ms. Taylor for cross-filing her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Illinois Department of Human Rights ("IDHR").

**ANSWER:**    Fidelity denies the allegations as written and contained in this paragraph.

14.    The false claims that Fidelity has asserted against Ms. Taylor and Fairhaven are factually unsupported and designed to (a) punish Ms. Taylor for internally reporting harassment and discrimination, (b) punish Ms. Taylor for cross-filing a Charge of Discrimination with the EEOC and IDHR, and (c) unlawfully eliminate and interfere with legitimate, fair competition in the marketplace.

**ANSWER:**    Fidelity denies the allegations as written and contained in this paragraph.

### THE PARTIES

15.    Defendant/Counter-Plaintiff Jennifer Taylor is a financial advisor with Fairhaven Wealth Management, LLC ("Fairhaven"). Ms. Taylor is domiciled in and a citizen of the State of Illinois.

**ANSWER:**    Admitted.

16.    At all relevant times, Plaintiff and Counter-Defendant, Fidelity Brokerage Services LLC ("Fidelity" or the "Company"), has been a broker-dealer engaged in the sale of securities. Upon information and belief, Fidelity is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the

FP 45203426.3
FP 45203426.3

laws of Massachusetts with its principal place of business located in Boston, Massachusetts.

**ANSWER:**   Admitted.

17.    Defendant/Counter-Plaintiff Fairhaven Wealth Management, LLC ("Fairhaven"), is an Illinois limited liability company that operates as a registered investment advisory firm and is located in Wheaton, Illinois.

**ANSWER:**  Admitted.

**JURISDICTION AND VENUE**

18.    This Court has original subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1331, because Defendant/Counter-Plaintiff's Counterclaims arise under the Constitution, laws, or treaties of the United States – specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*  This Court has supplemental and concurrent jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367 and 15 U.S.C. § 3612, because the state law claims form part of the same case or controversy and because Plaintiff/Counter-Defendant Fidelity transacts business within this district.

**ANSWER:**   Defendant states that the allegations contained in this paragraph constitute legal conclusions to which no response is required, however, Defendant does not dispute diversity.

19.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b), because the events about which Plaintiff complains occurred in this District during the course of her employment with Fidelity and thereafter (and are continuing).

**ANSWER:**   Defendant states that the allegations contained in this paragraph constitute legal conclusions to which no response is required, however, Defendant does not dispute venue.

20.    On or about November 18, 2020, less than 90 days prior to the filing of this

6

counterclaim, the Equal Employment Opportunity Commission issued Ms. Taylor a Notice of Right to Sue ("Right to Sue" letter). A true and correct copy of the Right to Sue letter is attached hereto as **Exhibit 1**.

**ANSWER:** Fidelity admits that Plaintiff purported to have received a Notice of Right to Sue from the EEOC. Fidelity is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

### FACTUAL BACKGROUND

A.    **Ms. Taylor's Career with Fidelity**

21.    Ms. Taylor first became interested in working at Fidelity through her participation in Fidelity's co-op program while she was attending college at Louisiana State University. That was in the year 1994.

**ANSWER:** Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

22.    After that first indication of interest, Ms. Taylor finished her college education with her sights on working in the financial sector and, more specifically, working for Fidelity. The Company's reputation in the industry and the supportive culture she had experienced first-hand while in the co-op program are what fueled Ms. Taylor's passion and desire to assimilate into Fidelity, and she knew she would be able to grow her career and achieve success in the financial services industry.

**ANSWER:** Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

23.    Ms. Taylor worked her way up from a Customer Service representative for Fidelity in 1995, where she greeted customers upon entry and handled service and operations requests, to

becoming an Associate Representative ("Junior Consultant") in Fidelity's Oak Brook office in 1997, to being promoted to a Financial Consultant in December of 1998, where she worked tirelessly on behalf of her clients and enjoyed a successful and rewarding career, until she was constructively discharged on March 6, 2020.

**ANSWER:** Defendant admits that Plaintiff became a Financial Consultant in Fidelity Oak Brook office. Defendant denies all remaining allegations as written and contained in this paragraph.

24. Over the course of her 25-year career with Fidelity, Ms. Taylor had many supervisors who recognized her passion and ability, and the fact that she took pride in her work. Ms. Taylor was a high-performing and high-achieving Financial Consultant, and her clients maintained deep and personal relationships with her as their personal financial advisor.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

25. As Ms. Taylor's book of business grew throughout her career, her work generated large profits for Fidelity, and also translated into her individual success as a Financial Consultant with Fidelity. Ms. Taylor's managers and colleagues recognized that she was, by all accounts, an asset to Fidelity.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

26. Unfortunately, Ms. Taylor's most recent manager, Mr. Marshall (who began supervising Ms. Taylor when he was appointed Branch Manager of Fidelity's Oak Brook office on or about August 10, 2018), immediately took issue with Ms. Taylor – not because of her performance (which was high by Fidelity's own metrics, and far outpaced her peers), but because she was a female over the age of 40.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

**B.** **Fidelity's Goals and Activity Metrics**

27.     The most important performance metrics to Fidelity are: (a) "Tier 3" production, which concerns revenue on managed accounts, managed account referrals, and annuities; and (b) asset "Flows," which measure the amount of money coming into Fidelity versus the amount of money leaving the Company.

     **ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

28.     During Marshall's tenure as Branch Manager, Ms. Taylor generated approximately $140 million of Tier 3 revenue.  Specifically, Ms. Taylor's Tier 3 production was:

a.     Approximately double her sales goal;

b.     $40 million above the approximate $100 million average for Vice Presidents in Fidelity's Central South Region;

c.     $45 million above the approximate $95 million average for Vice Presidents throughout the country;

d.     $25 million more than the next highest producing Financial Consultant in the Oak Brook office;

e.     $70 million above the average for all financial advisors in Fidelity's Central South Region; and

f.     In the top 10th percentile (beating 90% of her peers) of the approximate 200 Vice Presidents in Fidelity's entire Central South Region.

     **ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

29.     During this same time period, Ms. Taylor also generated more than $115 million of net "Flow."  Specifically, Ms. Taylor's net asset flow was:

a.     More than 11% greater than her sales goal;

b.     Nearly $10 million greater than the approximate $107 million average for Vice Presidents in Fidelity's Central South Region;

c.     More than $5 million greater than the approximate $110 million average for Vice Presidents throughout the country; and

d.     In the top 37th percentile (beating 63% of her peers) of Vice Presidents in Fidelity's

9

entire Central South Region.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

30.     As for Fidelity's other performance metrics, Ms. Taylor once again far exceeded Fidelity's expectations.  Ms. Taylor's client transfer ratio was more than double Fidelity's goal, and her average client appointments per week (20, as compared to the goal of 15) placed her in the top 5th percentile (beating 95% of her peers) of Vice Presidents in Fidelity's entire Central South Region. In order to achieve this performance metric, Ms. Taylor utilized Fidelity's Microsoft Outlook calendar to schedule regular client appointments far in advance, and would accommodate the client's requests to meet both telephonically and at locations of the client's choosing.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

31.     In short, over the course of Marshall's tenure as Branch Manager, Ms. Taylor was the longest-tenured, most senior, and highest producing Financial Consultant in the Oak Brook branch, and her performance far exceeded Fidelity's stated goals and activity metrics, as well as the performance of the vast majority of her peers.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

C.     **Fidelity's Unlawful Discrimination, Harassment and Retaliation**

32.     During his tenure as Branch Manager, and despite the foregoing, Marshall displayed unusual personal animosity toward Ms. Taylor.  In every one-on-one interaction with Ms. Taylor, Marshall was aggressive and demeaning because of Ms. Taylor's age and gender. Over time, Marshall's aggression toward Ms. Taylor increased.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

33.     Marshall's discriminatory animus manifested itself in the form of increasingly severe and frequent verbal and written warnings concerning Ms. Taylor's job performance, despite

10

the fact that Ms. Taylor was a consistently high performing Financial Consultant (and among the highest performing Financial Consultants in Fidelity's entire Central South Region).

   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

   34.  Marshall, in his capacity as Ms. Taylor's supervisor, took repeated and continuing employment actions against her which were unfounded and detrimental to her career. Those actions included unjustifiably issuing formal written warnings to Ms. Taylor, unjustifiably scrutinizing Ms. Taylor's performance and comparing same to unwritten and ambiguous metrics, despite her performance meeting Fidelity's goals and being exceptional compared to her peers.

   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

   35.  For example, on August 19, 2019, Marshall issued Ms. Taylor a written 60-day warning concerning her job performance. A true and correct copy of the August 19, 2019 warning is attached hereto as **<u>Exhibit 2</u>**. In this written warning, Marshall asserted that Ms. Taylor's "contribution to business results is significantly lagging others in your position."

   **ANSWER:**  Fidelity admits that it issued Taylor a written warning dated August 19, 2019, and that Plaintiff attached a copy of the written warning to her Complaint. Defendant denies the remaining allegations as written and contained in this paragraph.

   36.  Nothing could be further from the truth: Ms. Taylor had been awarded the annual Fidelity "achiever bonus" in recognition of her 2018 performance and, at the time Marshall issued the August 19, 2019 written warning, was on track to reach another "achiever bonus" for her performance in 2019. When Ms. Taylor raised this discrepancy with Marshall, Marshall offered no legitimate explanation. Instead, Marshall sharply rebuked Ms. Taylor.

   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

   37.  The written warning required biweekly meetings between Marshall and Ms. Taylor

through the 60-day period. Because Marshall harbored discriminatory animosity toward Ms. Taylor (as evidenced by his aggressive attitude and demeaning comments towards her, and because his unfair written warning was mere pretext for discrimination on account of her age and gender), Ms. Taylor complained to Fidelity's management personnel and requested the presence of her operations manager during every biweekly one-on-one meeting that was to be held with Marshall going forward.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

38. Thus, and despite the foregoing malicious acts by her supervisor, Ms. Taylor remained employed with Fidelity and contemporaneously sought redress by: (a) objecting to Marshall's egregious conduct; (b) reporting Marshall's discriminatory conduct and workplace harassment to Fidelity's management; and (c) requesting that any meetings with Marshall and Taylor be supervised and/or monitored.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

39. Fidelity's management acknowledged her complaint, and allowed the operations manager to sit in on Marshall's meetings with Taylor.

**ANSWER:** Fidelity admits that Taylor was permitted to have others sit in on meetings with Marshall if she so chose. Defendant denies the remaining allegations as written and contained in this paragraph.

40. Fidelity had a reasonable opportunity to address Marshall's unlawful discrimination and harassment; ultimately, however, Marshall's behavior was not addressed, corrected, or reformed, and he continued to harass, discriminate, and retaliate against her.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

41. Although Ms. Taylor performed satisfactorily during the 60-day period following

FP 45203426.3
FP 45203426.3

the August 19, 2019 written warning (indeed, her performance continued to far outpace her peers), Marshall unlawfully retaliated against Ms. Taylor for complaining about his conduct by increasing his unlawful discrimination and harassment against her in an effort to force her out of the Company.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

42.    Approximately two weeks after the 60-day warning period lapsed, Marshall escalated his efforts and issued Ms. Taylor **another** written 60-day warning, this time titled a "final performance warning." A true and correct copy of the November 4, 2019 written warning is attached hereto as **Exhibit 3**.

**ANSWER:**    Defendant admits that Taylor was issued a written warning on November 4, 2019 and that Plaintiff attaches a copy of what purports to be a copy of the written warning as Exhibit 3 to her Complaint. Fidelity denies the remaining allegations as written and contained in this paragraph.

43.    At the time Marshall issued the November 4, 2019 written warning, Ms. Taylor's performance was not lagging. Indeed, Ms. Taylor was on track to reach another "achiever bonus" for her performance in 2019, and her performance continued to far outpace her peers. Despite this, Marshall intimated that he would likely terminate Ms. Taylor on January 6, 2020, at the end of the 60-day warning period.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

44.    Ms. Taylor confronted Marshall about his threat and asked him whether he planned to terminate her for alleged performance reasons, even if she continued to exceed Fidelity's production and performance goals and metrics. Marshall responded by ominously telling Ms. Taylor, "I can terminate you at any time, for any reason."

13

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

45.     During this second written warning period, several financial representatives in the Oak Brook branch expressed concern to Ms. Taylor – completely unprompted by her – that Marshall was treating Ms. Taylor "differently" and "less favorably" than other Financial Consultants who were male and/or younger than her.

**ANSWER:**     Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

46.     In fact, in late 2019, the Oak Brook operations manager – who had sat in on each of the one-on-one biweekly performance meetings between Marshall and Ms. Taylor during the 60-day warning period – told Ms. Taylor that she did not understand why Marshall was issuing warnings to Ms. Taylor about her performance. This conversation, too, was unprompted by Ms. Taylor.

**ANSWER:**     Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

47.     Ms. Taylor successfully navigated the second 60-day written warning period, had a very strong fourth quarter 2019 production, and finished the 2019 calendar year as the highest producing Financial Consultant in the Oak Brook branch and in the Chicago region. Once again, Ms. Taylor's performance far exceeded Fidelity's stated goals and activity metrics, as well as the performance of the vast majority of her peers – including Financial Consultants who were male and/or younger than her.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

48.     Because Ms. Taylor far exceeded Fidelity's stated goals and the performance of her peers, Marshall could not – without raising eyebrows – terminate Ms. Taylor on January 6, 2020,

as he had planned.  Instead, on January 9, 2020, Marshall unilaterally "extended" his final written warning by 60 days and made it clear to Ms. Taylor that he would terminate her employment on March 10, 2020.

       **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

     49.    Specifically, Ms. Taylor inquired for a third time about the discrepancy between receiving a written warning for her alleged deficient performance, on the one hand, and her actual performance, on the other hand, and asked Marshall whether the "final written warnings" would ever end.  Marshall responded, ominously, by reading verbatim the following text on her written warning: "you may be subject to dismissal without any additional corrective action process."

       **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

     50.    After a branch meeting in January of 2020, one representative confided to Ms. Taylor that "it's been made clear to most of the branch that some people are looked at less favorably by management than others, and without much explanation."

       **ANSWER:**   Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

     51.    Because Marshall's final written warning "extension" and ominous verbal statements did not reflect Ms. Taylor's actual job performance, and in light of Marshall's response to her inquiry as well as the information that had been conveyed to her by other representatives, Ms. Taylor knew that she would be terminated because of her age and gender (and in retaliation for her complaints about workplace harassment and discrimination), effective March 10, 2020.

       **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

     52.    Marshall – through the foregoing bad acts, threats, and unlawful conduct – acted with malice and in a manner that communicated to Ms. Taylor that her termination was both

inevitable and imminent, and that she would have been terminated by Fidelity on March 10, 2020. Accordingly, Ms. Taylor was constructively discharged from Fidelity on March 6, 2020.

      **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

    **D.**    **Fidelity's Incentive to Unlawfully Discriminate**

53.    While having a long-tenured and high producing Financial Consultant is good for Fidelity, it is not necessarily good for an individual branch.

      **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

54.    Although Ms. Taylor was a top producer for Fidelity, her senior status also carried the highest salary component in the Oak Brook branch.

      **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

55.    When a Financial Consultant departs, Fidelity assigns new Financial Consultants to the client accounts that were previously handled by the departing Financial Consultant. In the case of termination of the longest-tenured Financial Consultant in the branch, those accounts (axiomatically) will be assigned to less-tenured – and less costly – Financial Consultants. In this way, Fidelity, and an individual branch in particular, can absorb the cost of servicing client accounts without increasing its bottom-line expense.

      **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

56.    In addition, when a long-tenured Financial Consultant is terminated, the branch has an incentive to "game the system" by routinely changing Tier 3 client accounts to other Tier 3 solutions over time after the departure of the Financial Consultant. While not necessarily an advantage to Fidelity, the advantage to the particular branch manager is that Tier 3 solutions are measured as gross production, so any new Tier 3 business will count toward branch production, even if it was by converting a portion of an already Fidelity advisory managed Tier 3 solution into

different Tier 3 solution at Fidelity.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

57. Any time a long-tenured Financial Consultant's employment is terminated, the branch recognizes a short term "lift" in branch production numbers that are artificially inflated by "gaming" transactions. This is a common practice at Fidelity's Oak Brook branch, and is encouraged and directed by branch management, including Marshall.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

58. Thus, branch managers can improve the branch's performance metrics – and be handsomely rewarded for doing so – by "managing out" older, more expensive, Financial Consultants, and replacing them with younger, less expensive Financial Consultants, who are guided to creatively game client accounts upon being assigned to them.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

59. Given Ms. Taylor's status as the longest-tenured and highest producing Financial Consultant in the Oak Brook office, Marshall knew that he could improve the branch's numbers (and his own performance-based compensation) significantly by eliminating Ms. Taylor's employment and replacing her with a younger (and cheaper) financial advisor. Marshall therefore embarked upon his Company-sponsored campaign to accomplish precisely that objective.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

60. Fidelity's Market Leader, Bill Meyers, approved of, acquiesced in, and ratified Marshall's unlawful discrimination so the Oak Brook branch could "game" client accounts to artificially inflate production numbers.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

**E.** **Fidelity Retaliates, Constructively Discharges Ms. Taylor from Fidelity, and Continues Retaliatory Conduct After Ms. Taylor's Constructive Discharge**

61.     On March 6, 2020, after enduring over a year of discrimination, harassment and retaliation without any recourse, and immediately before her inevitable and impending termination by Marshall, Ms. Taylor was constructively discharged from Fidelity and accepted a position as a financial advisor with Fairhaven.

   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

62.     When Ms. Taylor met with Marshall and the Oak Brook operations manager on March 6, 2020, she reminded Marshall that Fidelity was required to provide her contact information to any former clients who requested it, and left her cell phone number with Fidelity. Indeed,  providing a departing Financial Consultant's new contact information to a client upon request is not only Fidelity's practice, it is also ***required*** by the Company's internal compliance procedures and FINRA Regulatory Notice 19-10 (regarding customer communications related to departing registered representatives).

   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

63.     Subsequent to Ms. Taylor's constructive discharge, however, she received calls from several of her clients – including "A.G.," "J.L.," "J.G.," "M.G.," and "A.S." – who informed her that Fidelity had refused to provide them with her contact information despite their requests.

   **ANSWER:**  Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

64.     In addition, on March 16, 2020, Fidelity employee Andy Moreau informed client "J.C." that he was "not sure where/what Jennifer is doing."  On March 17, 2020, Fidelity employee Douglas Phillips informed client "R.G." that he "did not know where [Ms. Taylor] went"; the client was "disappointed" that Mr. Phillips did not know.  On April 21, 2020, client "L.Z." asked Mr. Moreau if he knew anything about Ms. Taylor's departure and Mr. Moreau "let her know [he]

18

believe[d] she may have stayed in the industry, but [was] not sure about why or where she went."

**ANSWER:**   Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

65.    These representations were false.  Fidelity knew Ms. Taylor's contact information, as she provided it to Fidelity in her termination letter expressly for this purpose.  Fidelity also knew that Ms. Taylor had joined Fairhaven, as Fidelity copied Fairhaven on a March 20, 2020 letter to Ms. Taylor.

**ANSWER:**   Fidelity denies the allegations as written and contained in this paragraph.

66.    Fidelity has undertaken a malicious effort to continue retaliating against Ms. Taylor in order to harm her professional reputation by refusing to provide her contact information to the clients who have requested it.  More specifically, Fidelity refused to provide Ms. Taylor's contact information to clients in retaliation for (i) Ms. Taylor having complained about Mr. Marshall's sex and age discrimination and retaliation, (ii) Ms. Taylor's then-anticipated EEOC charge of discrimination concerning Fidelity's Title VII violations, and/or (iii) Ms. Taylor having cross-filed her Charge of Discrimination against Fidelity with the EEOC and IDHR.  Fidelity's conduct in this regard violates the Company's own compliance policies and requirements (to say nothing of Title VII, ADEA, and the IHRA), and is malicious and intentional.

**ANSWER:**   Fidelity denies the allegations as written and contained in this paragraph.

67.    In addition to the foregoing, Fidelity has acted with malice and further retaliated against Ms. Taylor by:  (a) filing this lawsuit against Ms. Taylor, even though she has not breached any obligation owed to Fidelity, and even though other financial advisors (male, younger) who have left the Oak Brook office actually breached their contractual obligations to Fidelity and Fidelity took no action (legal or otherwise) against them; and (b) interfering with her employment

with Fairhaven in retaliation for Ms. Taylor's cross-filing her Charge of Discrimination with the EEOC and IDHR, causing strain on her employment relationship and emotional distress to Ms. Taylor.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

### F. Fidelity's Course of Dealing With Past Departing Financial Consultants

68. During her near 25-year career with Fidelity, Ms. Taylor has witnessed dozens of Financial Consultants leave Fidelity to join other financial services firms (both competitive institutional brokerage firms, such as Edward Jones or Wells Fargo, as well as independent registered independent advisory firms, such as Fairhaven).

**ANSWER:** Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

69. Fidelity has as a matter of course permitted those departing Financial Consultants to contact their former clients to: (a) announce their departure from the Company, and (b) provide their new contact information. Each of those departing Financial Consultants had signed the same post-employment "non-solicit" covenants that the Company required of Ms. Taylor; yet, Fidelity never filed a lawsuit or pursued legal action against them.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

70. Between 2005 and 2018, for instance, at least four male Vice Presidents left Fidelity's Oak Brook office to join other financial services firms. Each had a book of business similar in size to, or larger than, Ms. Taylor's. After departing Fidelity, each of these four males called former clients – during the one-year non-solicit period – to announce the job change and to provide new contact information. Large client assets (more significant than those at issue here) followed these Vice Presidents to their new firms. Fidelity was aware of all this activity, yet it did not file any legal action against any of the four male Vice Presidents.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

**G.    Ms. Taylor Retained No Fidelity "Confidential Information" or "Trade Secrets" after Her Constructive Discharge**

71.    At no time prior to Ms. Taylor's constructive discharge from Fidelity did she inform anyone – including her colleagues and clients – that she would be leaving Fidelity or that she had intended to accept a new position with Fairhaven.

**ANSWER:**    Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

72.    When Ms. Taylor's employment with Fidelity ended, Ms. Taylor did not take any Fidelity documents, files, data or information with her.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

73.    At no time prior to or subsequent to Ms. Taylor's constructive discharge from Fidelity did she take, remove, misappropriate, transmit, convey, use, or disclose originals or copies of any of the Company's confidential information (including, but not limited to, trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products) or any other Fidelity documents containing or relating to the names, addresses, phone numbers, social security numbers, transactions, accounts, or financial information of the customers Ms. Taylor serviced at Fidelity. Her access to and use of such information was strictly limited to the work she performed during her employment at Fidelity, in the ordinary course of

Company business, and solely for Fidelity's benefit.

    **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

    74.    Since Ms. Taylor's discharge from Fidelity, she has not been in possession of, or had any access to, any of Fidelity's documents, files, information, materials or data (or any copies thereof). Ms. Taylor does not have in her possession, custody or control the original or copies of any information, materials, documents, files or data containing, reflecting, or referring to any of Fidelity's confidential proprietary, client, or trade secret data or information.

    **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

    75.    After leaving Fidelity, Ms. Taylor created a list of **some** of her most long-standing relationships – people she has known for 25+ years. Given Ms. Taylor's general, non-specialized knowledge, and the fact that she associated with these people so frequently and for such a long period of time, she naturally remembered (but did not "memorize" or "commit to memory") their names, state of residence, and some of their phone numbers (other phone numbers were obtained through publicly available sources).

    **ANSWER:**  Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

    76.    Following Ms. Taylor's constructive discharge, she used only publicly-available information to contact her clients, **_solely_** for the limited purpose of informing those clients that she was no longer affiliated with Fidelity (as expressly authorized by law, and consistent with the practice of countless departing Financial Consultants before her who left Fidelity for competing financial services firms).

    **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

    77.    When contacting her clients, Ms. Taylor was careful to avoid engaging in any type

of conduct that could be construed as a "solicitation" or "inducement" of the client. Instead, utilized a short and carefully worded "announcement script," by which she conveyed **only** the following information: (a) that, as of March 6, 2020, Ms. Taylor was no longer affiliated with Fidelity; and (b) that Ms. Taylor was now affiliated with Fairhaven. That was the entire sum and substance of the information that Ms. Taylor provided to her former clients. Once that information was provided, Ms. Taylor either: (i) answered any follow-up questions posed by the client, or (ii) if the client had no follow-up questions, she terminated the call.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

78. Ms. Taylor has **never** solicited, attempted to solicit, induced, or encouraged any clients, former clients, or prospective clients of Fidelity to transfer or divert accounts or assets to Fairhaven, open new accounts at Fairhaven, or cease or curtail their business relationship with Fidelity in any respect.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

**H. Fidelity Continues to Retaliate Against Ms. Taylor and Interferes with Ms. Taylor's Employment Relationship, Business Expectancy/Economic Advantage, and Business and Contractual Relations**

79. Despite the foregoing, Fidelity filed this lawsuit, and sought and obtained "expedited discovery" from Ms. Taylor relating to its allegations that Ms. Taylor "solicited" her former clients at Fidelity.

**ANSWER:** Admitted.

80. On June 2, 2020, Ms. Taylor fully responded and produced documents responsive to Fidelity's First Set of Requests for Production pursuant to Fed. R. Civ. P. 34, none of which established or even supported that Ms. Taylor violated her employment agreement with Fidelity in any respect.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

23

81.     To the contrary, and consistent with her production of documents, Ms. Taylor has repeatedly maintained that she has not solicited, attempted to solicit, induced, or encouraged any clients, former clients, or prospective clients of Fidelity to transfer or divert accounts or assets to Fairhaven, to open new accounts at Fairhaven, or to cease or otherwise curtail their business relationship with Fidelity in any respect.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

82.     Ms. Taylor has, however, worked to develop substantial new client relationships and accounts while employed with Fairhaven.  Following her arrival at Fairhaven, Ms. Taylor has contracted to provide financial advisory services with clients, including new clients, while employed with Fairhaven.

**ANSWER:**     Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

83.     As part of its business model, Fidelity provides clearing, custody, trading, technology, and practice management consulting to banks, broker-dealers, family offices, and registered investment advisors.

**ANSWER:**     Admitted.

84.     Fairhaven utilizes the Fidelity platform for certain client account custody solutions and services, and compensates Fidelity for providing such solutions and services.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

85.     One of the reasons Ms. Taylor joined Fairhaven (after being constructively discharged from Fidelity), as opposed to another registered investment advisory firm, was because Fairhaven maintained a custodial relationship with Fidelity, whereby Fairhaven utilizes the

Fidelity platform and Fidelity provides certain client account custody solutions and services to Fairhaven's clients for the benefit of Fairhaven, Fairhaven's financial advisors, and Fairhaven's clients.

**ANSWER:** Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

86. Having worked for Fidelity for 25 years, Ms. Taylor is familiar with and knowledgeable about the Fidelity platform, and Fairhaven's custodial relationship with Fidelity is an important piece of Ms. Taylor's continuing success and ability to make a living.

**ANSWER:** Fidelity lacks knowledge or information sufficient to form a belief as to the truthfulness of the allegations contained in this paragraph and, therefore, denies the same.

87. All of Fairhaven's client accounts, including the accounts for all of Ms. Taylor's clients, are custodied at Fidelity and utilize the Fidelity platform.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

88. As an active financial advisor for Fairhaven, Ms. Taylor has a reasonable expectation of entering into new client relationships, which includes opening new client accounts, having such accounts custodied on the Fidelity platform, and utilizing the Fidelity platform for all of the custody solutions and services provided for by such platform.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

89. Fidelity knows that Fairhaven, and thus Ms. Taylor, utilize the Fidelity platform for certain client account custody solutions and services, and that Ms. Taylor expects to be able to maintain her client accounts and custody those accounts on the Fidelity platform.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

90. Fidelity knows that Fairhaven, and thus Ms. Taylor, utilize the Fidelity platform for

certain client account custody solutions and services, and that Ms. Taylor expects to be able to open new client accounts and custody those accounts on the Fidelity platform.

>   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

91.     Fidelity has taken purposeful, direct action to interfere with Ms. Taylor's employment relationship, as well as her business expectancy and relations with Fairhaven and with Ms. Taylor's clients.

>   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

92.     Specifically, Fidelity threatened and repeatedly pressured Fairhaven to take action adverse to the interests of Ms. Taylor, unless Ms. Taylor voluntarily agreed to the entry of a broad injunction order against her (despite the fact that Ms. Taylor has never violated any obligation owed to Fidelity), by:

    a.      repeatedly threatening Fairhaven with expensive and time-consuming litigation, despite having no evidence to support any wrongdoing;

    b.      repeatedly threatening to terminate in bad faith the custodial relationship Fidelity holds for Fairhaven's client accounts; and

    c.      denying and withholding access to "Wealthscape" – the tool utilized by registered investment advisors to access their client's accounts.

>   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

93.     On November 4, 2020, Fidelity made good on its threats and simultaneously (a) initiated frivolous litigation against Fairhaven, and (b) terminated in bad faith Fidelity's custodial relationship with Fairhaven, where all of Ms. Taylor's customer accounts are custodied.  A true and correct copy of Fidelity's November 4, 2020 Bad Faith Termination Letter is attached hereto as **Exhibit 4**.

>   **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

94.     In connection with Fidelity's bad faith termination of its custodial relationship with

Fairhaven, Fidelity refuses to accept applications for or open any new client accounts for Ms. Taylor.

> **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

95. In addition, Fidelity intends to notify all of Ms. Taylor's clients that Ms. Taylor's custodial relationship with Fidelity has ended and that Ms. Taylor is not authorized to manage their accounts on Fidelity's platform. In connection with that communication, Fidelity refers Ms. Taylor's clients to a Fidelity financial advisor who is authorized to use the Fidelity platform.

> **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

96. Fidelity's bad faith termination of its custodial relationship with Fairhaven is maliciously designed to harm Ms. Taylor's employment relationship with Fairhaven as well as her business expectancy and relationship with clients. Fidelity has propagated its unfounded claims against Ms. Taylor relating to her alleged solicitation of Fidelity's customers and cited Ms. Taylor's alleged conduct as the motivation for Fidelity's bad faith actions.

> **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

97. Fidelity's bad faith termination of its custodial relationship with Fairhaven is maliciously designed to harm Ms. Taylor's business relationship and ongoing business expectancy with Ms. Taylor's clients and prospective clients at Fairhaven.

> **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

98. Fidelity's bad faith termination of its custodial relationship with Fairhaven is maliciously designed to convert Ms. Taylor's existing clients to a Fidelity financial advisor operating on the Fidelity platform.

> **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

99. Fidelity's bad faith refusal to accept applications for new accounts unlawfully

27

interferes with and is maliciously designed to forestall Ms. Taylor's ability to make a living and to harm Ms. Taylor's employment at Fairhaven as well as her business expectancy by preventing her from servicing any new clients, and it provides Fidelity with an unfair advantage in the marketplace.

> **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

100.    Fidelity's decision to sue Ms. Taylor's employer, Fairhaven, unlawfully interferes with and is maliciously designed to forestall Ms. Taylor's ability to make a living and to harm Ms. Taylor's employment at Fairhaven as well as her business expectancy.

> **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

101.    Ms. Taylor has suffered and will continue to suffer damages as a direct result of Fidelity's retaliation and interference by, *inter alia*, refusing to open new accounts for Ms. Taylor's new clients and house those accounts on Fidelity's platform; creating confusion among Ms. Taylor's clients regarding Fidelity's unlawful, bad faith termination of the custodial relationship with Fairhaven; removing Ms. Taylor's access to her client's accounts and refusing to accept trading instructions from her; revoking the acceptance of Ms. Taylor's clients' designation of trading or power of attorney authorizations, which prevents Ms. Taylor from making trades on behalf of her clients; and notifying Ms. Taylor's clients that the custodial relationship with Fidelity has ended and referring Ms. Taylor's clients to another financial advisor on the Fidelity platform.

> **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

102.    Ms. Taylor hereby adopts and incorporates by reference the facts alleged in Fairhaven's counterclaims.

> **ANSWER:** Fidelity incorporates by reference its answers to the foregoing paragraphs.

## COUNT I
### AGE DISCRIMINATION – TITLE VII / ADEA

28

103.    Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 of her Counterclaims as if fully set forth herein.

   **ANSWER:**   Fidelity incorporates by reference its answers to the foregoing paragraphs.

104.    At all times material hereto, Fidelity had a duty to maintain a work environment free of age-based discrimination and harassment.

   **ANSWER:**   The allegations set forth in this paragraph constitute conclusions of law to which no response is required.

105.    Throughout her employment with Fidelity, Ms. Taylor performed her duties as a Financial Consultant in a manner that met Fidelity's legitimate expectations.

   **ANSWER:**   Fidelity denies the allegations as written and contained in this paragraph.

106.    During the relevant time period (*i.e.,* August 10, 2018, through her constructive discharge on March 6, 2020), Ms. Taylor was more than 40 years of age.

   **ANSWER:**   Fidelity denies the allegations as written and contained in this paragraph.

107.    At all times during the relevant time period, Ms. Taylor's supervisor, Marshall, and Fidelity's Market Leader, Meyers, were aware of Ms. Taylor's age.

   **ANSWER:**   Fidelity denies the allegations as written and contained in this paragraph.

108.    At all times during the relevant time period, Marshall and Meyers were employed as managers at Fidelity, and their conduct in the workplace is directly imputed to the Company.

   **ANSWER:**   Fidelity admits that Marshall and Meyers were employed as managers at Fidelity.  The remaining allegations set forth in this paragraph constitute conclusions of law to which no response is required.

109.    In his capacity as a Fidelity manager, Marshall discriminated and harassed Ms. Taylor because of her age, and caused her to suffer several adverse employment actions –

FP 45203426.3
FP 45203426.3

including, *inter alia*, verbal and written warnings, final warnings, extensions of final warnings, and ultimately the constructive discharge of her employment. Meyers was aware of, and approved, Marshall's age-based discrimination and harassment of Ms. Taylor.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

110.    Other Financial Consultants at Fidelity who were younger than Ms. Taylor, and under the age of 40, did not receive such treatment by Marshall, and did not suffer the adverse employment actions that Marshall inflicted upon Ms. Taylor.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

111.    Ms. Taylor was treated unfairly by Marshall and Meyers because of her age, and was treated less favorably than her similarly-situated counterparts who were younger than her, and less than 40 years of age.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

112.    Fidelity's hostile and offensive treatment of Ms. Taylor created a discriminatory and hostile and offensive work environment and unreasonably interfered with Ms. Taylor's work. The workplace conduct of Marshall was so pervasive that a reasonable person in Ms. Taylor's position would find the work environment intolerable or unbearable, as Ms. Taylor did.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

113.    Marshall, with Meyers' approval and consent, unilaterally extended the "final written warning" that he issued to Ms. Taylor until March 10, 2020, at which time he intended to terminate Ms. Taylor's employment with Fidelity.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

114.    As a direct and proximate result of Marshall and Meyers' conduct, Ms. Taylor was constructively discharged and her client accounts were placed with younger Financial Consultants.

FP 45203426.3
FP 45203426.3

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

115.    These adverse employment actions were based on Ms. Taylor's age, and Fidelity's desire to get rid of older, more expensive workers and move to a younger, less expensive workforce.  But for Ms. Taylor's age, she would not have experienced any of these adverse employment actions at Fidelity.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

116.    Fidelity knew or should have known of the hostile and offensive work environment inflicted upon Ms. Taylor, and failed to take prompt remedial action reasonably calculated to end the discrimination and harassment.  Indeed, despite her complaints to Fidelity's management, the Company took no corrective action, but instead allowed (and encouraged) Marshall to continue (and even increase) his age-based discrimination and harassment of Ms. Taylor, in violation of the ADEA and Title VII.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

117.    Fidelity knew its conduct was prohibited, or showed a reckless disregard for whether it was prohibited, and willfully violated the ADEA and Title VII.  At all times material hereto, Fidelity engaged in a discriminatory practice or practices with malice or reckless indifference to the statutorily protected rights of Ms. Taylor so as to support an award of compensatory and punitive damages.

**ANSWER:**   The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

118.    As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation

FP 45203426.3
FP 45203426.3

expense and attorney's fees, consequential damages and other expenses and damages recoverable under the ADEA and Title VII, in excess of $500,000.

**ANSWER:** The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent any of the allegations are factual, they are denied.

With respect to the WHEREFORE paragraph immediately following paragraphs 103 through 118 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever. Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT II
### AGE DISCRIMINATION – IHRA

119. Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 of her Counterclaims as if fully set forth herein.

**ANSWER:** Fidelity incorporates by reference its answers to the foregoing paragraphs.

120. Fidelity knew or should have known of the hostile and offensive work environment inflicted upon Ms. Taylor, and failed to take prompt remedial action reasonably calculated to end the discrimination and harassment. Indeed, despite her complaints to Fidelity's management, the Company took no corrective action, but instead allowed (and encouraged) Marshall to continue (and even increase) his age-based discrimination and harassment of Ms. Taylor, in violation of the IHRA.

**ANSWER:** The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent any of the allegations are factual, they are denied.

32

121.     Fidelity knew its conduct was prohibited, or showed a reckless disregard for whether it was prohibited, and willfully violated the IHRA.  At all times material hereto, Fidelity engaged in a discriminatory practice or practices with malice or reckless indifference to the statutorily protected rights of Ms. Taylor so as to support an award of compensatory and punitive damages.

**ANSWER:**     The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

122.     As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable under the IHRA, in excess of $500,000.

**ANSWER:**     The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

With respect to the WHEREFORE paragraph immediately following paragraphs 119 through 121 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever.  Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees.  Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT III
### SEX/GENDER DISCRIMINATION – TITLE VII

123.     Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 of her Counterclaims as if fully set forth herein.

33

**ANSWER:**     Fidelity incorporates by reference its answers to the foregoing paragraphs.

124.     At all times material hereto, Fidelity had a duty to maintain a work environment free of sex-based and gender-based discrimination and harassment.

**ANSWER:**     The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

125.     Throughout her employment with Fidelity, Ms. Taylor performed her duties as a Financial Consultant in a manner that met Fidelity's legitimate expectations.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

126.     At all times during the relevant time period, Ms. Taylor's supervisor, Marshall, and Fidelity's Market Leader, Meyers, were aware of Ms. Taylor's sex / gender (female).

**ANSWER:**     Admitted.

127.     At all times during the relevant time period, Marshall and Meyers were employed as managers at Fidelity, and their conduct in the workplace is directly imputed to the Company.

**ANSWER:**     Fidelity admits that Marshall and Meyers were employed as managers at Fidelity.  The remaining allegations set forth in this paragraph constitute conclusions of law to which no response is required.

128.     In his capacity as a Fidelity manager, Marshall discriminated and harassed Ms. Taylor because she was a woman, and caused her to suffer several adverse employment actions – including, *inter alia*, verbal and written warnings, final warnings, extensions of final warnings, and ultimately the constructive discharge of her employment.  Meyers was aware of, and approved, Marshall's sex-based and gender-based discrimination and harassment of Ms. Taylor.

**ANSWER:**     Fidelity denies the allegations as written and contained in this paragraph.

129.     Male Financial Consultants at Fidelity did not receive such treatment by Marshall,

and did not suffer the adverse employment actions that Marshall inflicted upon Ms. Taylor.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

130. Ms. Taylor was treated unfairly by Marshall and Meyers because she was a woman, and was treated less favorably than her similarly-situated male counterparts.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

131. Fidelity's hostile, offensive and misogynistic treatment of Ms. Taylor created a discriminatory and hostile and offensive work environment and unreasonably interfered with Ms. Taylor's work. The workplace conduct of Marshall was so pervasive that a reasonable person In Ms. Taylor's position would find the work environment intolerable or unbearable, as Ms. Taylor did.

**ANSWER:** The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent any of the allegations are factual, they are denied.

132. Marshall, with Meyers' approval and consent, unilaterally extended the "final written warning" that he issued to Ms. Taylor until March 10, 2020, at which time he intended to terminate Ms. Taylor's employment with Fidelity.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

133. As a direct and proximate result of Marshall and Meyers' conduct, Ms. Taylor was constructively discharged.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

134. These adverse employment actions were based on Ms. Taylor's sex/gender. But for Ms. Taylor's status as a woman, she would not have experienced any of these adverse employment actions at Fidelity.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

35

135.    Fidelity knew or should have known of the hostile and offensive work environment inflicted upon Ms. Taylor, and failed to take prompt remedial action reasonably calculated to end the discrimination and harassment.  Indeed, despite her complaints to Fidelity's management (including representatives from the Company's operations and/or human resources department), the Company took no corrective action, but instead allowed (and encouraged) Marshall to continue (and even increase) his misogynistic, sex-based and gender-based discrimination and harassment of Ms. Taylor, in violation of Title VII.

**ANSWER:**    The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

136.    Fidelity knew its conduct was prohibited, or showed a reckless disregard for whether it was prohibited, and willfully violated Title VII.  At all times material hereto, Fidelity engaged in a discriminatory practice or practices with malice or reckless indifference to the statutorily protected rights of Ms. Taylor so as to support an award of compensatory and punitive damages.

**ANSWER:**    The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

137.    The above-described acts of Fidelity constitute sex discrimination and harassment in violation of Title VII.

**ANSWER:**    The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

138.    As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable

under Title VII, in excess of $500,000.

**ANSWER:** The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent any of the allegations are factual, they are denied.

With respect to the WHEREFORE paragraph immediately following paragraphs 123 through 138 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever. Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT IV
### SEX/GENDER DISCRIMINATION – IHRA

139. Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 of her Counterclaims and Third-Party Claims as if fully set forth herein.

**ANSWER:** Fidelity incorporates by reference its answers to the foregoing paragraphs.

140. Fidelity knew or should have known of the hostile and offensive work environment inflicted upon Ms. Taylor, and failed to take prompt remedial action reasonably calculated to end the discrimination and harassment. Indeed, despite her complaints to Fidelity's management, the Company took no corrective action, but instead allowed (and encouraged) Marshall to continue and even increase) his misogynistic, sex-based and gender-based discrimination and harassment of Ms. Taylor, in violation of the IHRA.

**ANSWER:** The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent any of the allegations are factual, they are denied.

141. Fidelity knew its conduct was prohibited, or showed a reckless disregard for whether it was prohibited, and willfully violated the IHRA. At all times material hereto, Fidelity

engaged in a discriminatory practice or practices with malice or reckless indifference to the statutorily protected rights of Ms. Taylor so as to support an award of compensatory and punitive damages.

**ANSWER:**     The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

142.     The above-described acts of Fidelity constitute sex discrimination and harassment in violation of the IHRA.

**ANSWER:**     The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

143.     As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable under the IHRA, in excess of $500,000.

**ANSWER:**     The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

With respect to the WHEREFORE paragraph immediately following paragraphs 139 through 143 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever.  Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees.  Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT V
### UNLAWFUL RETALIATION – ADEA AND TITLE VII

144.     Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1

through 102 as if fully set forth herein.

      **ANSWER:** Fidelity incorporates by reference its answers to the foregoing paragraphs.

      145.    On multiple occasions, Ms. Taylor complained to Fidelity's management about the unfair, aggressive, and discriminatory and harassing treatment she was receiving from Marshall on account of her age and sex/gender.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

      146.    The sex/gender- and age-based harassment and discriminatory treatment Ms. Taylor received from Marshall became so severe that Ms. Taylor was afraid to have one-on-one meetings with Marshall without another employee present, and she therefore requested that someone sit in on all meetings between her and Marshall.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

      147.    In response to Ms. Taylor's multiple complaints about the unfair, aggressive, and biased treatment she was receiving from Marshall on account of her age and sex/gender, she was retaliated against by receiving subsequent written and verbal disciplinary warnings, being placed on a final warning, told that her employment would be terminated at the end of the 60-day warning period (and again at the end of the "extended" warning period in March, 2020), and constructively discharged from Fidelity.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

      148.    Ms. Taylor was constructively discharged on March 6, 2020, as a direct result of and in response to Ms. Taylor's asserting her rights to be free from unlawful sex/gender- and age-based discrimination in the workplace.

      **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

      149.    But for Ms. Taylor's complaints to Fidelity's management about the unlawful

workplace discrimination and harassment that she suffered on account of her age and sex/gender, the Company would not have retaliated against her by, *inter alia*, placing her on a final written warning, extending her written warning, and constructively discharging her employment.

**ANSWER:** The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent any of the allegations are factual, they are denied.

150. Fidelity's constructive discharge of Ms. Taylor from its employ was done in unlawful retaliation for Ms. Taylor's complaining to Fidelity about Marshall's discriminatory animus toward her, in violation of the ADEA, Title VII, and the public policy of Illinois that requires employers conducting business in this state to operate without unlawfully discriminating against its employees based on their age and sex/gender or retaliating against employees who complain of such discrimination.

**ANSWER:** The allegations set forth in this paragraph constitute conclusions of law to which no response is required. To the extent any of the allegations are factual, they are denied.

151. On June 6, 2020, after Fidelity constructively discharged Ms. Taylor, Ms. Taylor cross-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") seeking redress for Fidelity's sex/gender- and age-based harassment and discriminatory treatment, as well as for Fidelity's unlawful retaliation. A true and correct copy of Ms. Taylor's Amended Charge of Discrimination.

**ANSWER:** Fidelity admits that Taylor filed a Charge of Discrimination with the EEOC. To the extent the allegations set forth in this paragraph constitute conclusions of law, no response is required. To the extent any of the allegations are factual, they are denied.

152. Since Ms. Taylor cross-filed her Charge of Discrimination with the EEOC and IDHR, Fidelity has continued to unlawfully retaliate against Ms. Taylor. Specifically, on

40

November 4, 2020, and because of Ms. Taylor's cross-filing of her Charge of Discrimination with the EEOC and IDHR, Fidelity terminated in bad faith its custodial relationship with Ms. Taylor's employer, Fairhaven, and stopped accepting applications for new accounts from Ms. Taylor.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

153.    As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's unlawful retaliation.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

With respect to the WHEREFORE paragraph immediately following paragraphs 144 through 153 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever. Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT VI
### UNLAWFUL RETALIATION – IHRA

154.    Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 as if fully set forth herein.

**ANSWER:** Fidelity incorporates by reference its answers to the foregoing paragraphs.

155.    Ms. Taylor was constructively discharged on March 6, 2020, as a direct result of and in response to Ms. Taylor's asserting her rights to be free from unlawful sex/gender- and age-based discrimination in the workplace.

**ANSWER:**    The allegations set forth in this paragraph constitute conclusions of law to

41

which no response is required.  To the extent any of the allegations are factual, they are denied.

156.    But for Ms. Taylor's complaints to Fidelity's management about the unlawful workplace discrimination and harassment that she suffered on account of her age and sex/gender, the Company would not have retaliated against her by, *inter alia*, placing her on a final written warning, extending her written warning, and constructively discharging her employment.

> **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

157.    Fidelity's constructive discharge of Ms. Taylor from its employ was done in unlawful retaliation for Ms. Taylor's complaining to Fidelity about Marshall's discriminatory animus toward her, in violation of the IHRA and the public policy of Illinois that requires employers conducting business in this state to operate without unlawfully discriminating against its employees based on their age and sex/gender.

> **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

158.    On June 6, 2020, after Fidelity constructively discharged Ms. Taylor, Ms. Taylor cross-filed a Charge of Discrimination with the EEOC and IDHR seeking redress for Fidelity's sex/gender- and age-based harassment and discriminatory treatment, as well as for Fidelity's unlawful retaliation.  A true and correct copy of Ms. Taylor's Amended Charge of Discrimination.

> **ANSWER:**   Fidelity admits that Taylor filed a Charge of Discrimination with the EEOC.  To the extent the allegations set forth in this paragraph constitute conclusions of law, no response is required.  To the extent any of the allegations are factual, they are denied.

159.    Since Ms. Taylor cross-filed her Charge of Discrimination with the EEOC and IDHR, Fidelity has continued to unlawfully retaliate against Ms. Taylor.  For example, on November 4, 2020, and because of Ms. Taylor's cross-filing of her Charge of Discrimination with the EEOC and IDHR, Fidelity terminated in bad faith its custodial relationship with Ms. Taylor's

employer, Fairhaven, and stopped accepting applications for new accounts from Ms. Taylor.

     **ANSWER:** Fidelity admits that Taylor filed a Charge of Discrimination with the EEOC. To the extent the allegations set forth in this paragraph constitute conclusions of law, no response is required. To the extent any of the allegations are factual, they are denied.

160.    As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's unlawful retaliation.

     **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

161.    Although Ms. Taylor sought redress from Marshall's discriminatory and harassing conduct, Marshall's behavior was not addressed, corrected, or reformed, and he continued to discriminate against and harass her.

     **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

162.    Fidelity had a reasonable opportunity to address Marshall's unlawful discrimination and harassment, but failed to do so.

     **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

163.    Through his unlawful discrimination and harassment, Marshall (and, through him, Fidelity) ultimately made Ms. Taylor's working conditions so intolerable that a reasonable person would be forced to resign.

     **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

164.    In addition, Marshall – through the foregoing bad acts, threats, and unlawful conduct – acted in a manner that communicated to Ms. Taylor that her termination was both inevitable and imminent, and that she would have been terminated by Fidelity on March 10, 2020.

Accordingly, Ms. Taylor was constructively discharged from Fidelity on March 6, 2020.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

165.   Marshall's outrageous discriminatory and harassing conduct was purposefully designed to create a working environment that would be intolerable and unbearable for Ms. Taylor, thereby forcing her to quit.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

166.   One of the primary reasons Marshall wanted to force Ms. Taylor (an experienced financial advisor with a large book of business) to quit was to transfer her client accounts to younger financial advisors, who would then engage in "gaming" transactions to artificially inflate the "new revenue" production metrics of the Oak Brook office, thereby increasing his own incentive compensation as the Oak Brook branch manager.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

167.   Marshall's purposeful misconduct was unlawful, in direct violation of Illinois law and public policy, and constitutes wrongful termination as a matter of law.

**ANSWER:**   The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

168.   As a direct and proximate result of Fidelity's actions, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's unlawful constructive discharge and wrongful termination.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

With respect to the WHEREFORE paragraph immediately following paragraphs 154 through 168 of the Counterclaim, Fidelity denies all of the allegations contained therein and

44

further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever. Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT VIII

### TORTIOUS INTERFERENCE WITH MS. TAYLOR'S EMPLOYMENT RELATIONSHIP WITH FAIRHAVEN

169. Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 as if fully set forth herein.

**ANSWER:** Fidelity incorporates by reference its answers to the foregoing paragraphs.

170. Since March 6, 2020, Ms. Taylor has been employed as a financial advisor with Fairhaven.

**ANSWER:** Admitted.

171. Fidelity was at all times relevant aware of the employment relationship between Ms. Taylor and Fairhaven.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

172. Fidelity was at all times relevant aware that Ms. Taylor, as a financial advisor with Fairhaven, was required to custody client accounts with Fidelity on the Fidelity platform.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

173. Fidelity was at all times relevant aware that Ms. Taylor, through Fidelity's custodial relationship with Fairhaven, relied upon Fidelity and the Fidelity platform for certain client account custody solutions and services in servicing her clients as a financial advisor at Fairhaven.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

174. Fidelity acted with malice and tortiously interfered with Ms. Taylor's employment

relationship with Fairhaven and unfairly competed with Ms. Taylor by (a) terminating in bad faith its custodial relationship with Fairhaven because of false, specious allegations of wrongdoing by Ms. Taylor; (b) threatened to sue her employer, Fairhaven, for an improper purpose; (c) sued her employer, Fairhaven, for an improper purpose; and (d) denying her access to "Wealthscape", all of which unnecessarily strained her employment relationship with Fairhaven and caused her emotional distress.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

175.     As a direct and proximate result of Fidelity's bad faith termination of its custodial relationship with Fidelity, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's tortious conduct.

With respect to the WHEREFORE paragraph immediately following paragraphs 169 through 175 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever. Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT IX
### TORTIOUS INTERFERENCE WITH MS. TAYLOR'S BUSINESS RELATIONS WITH HER CLIENTS

176.     Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 as if fully set forth herein.

**ANSWER:** Fidelity incorporates by reference its answers to the foregoing paragraphs.

177.     Fidelity was at all times relevant aware that Ms. Taylor, as a financial advisor with

Fairhaven, maintains professional relationships and is contractually bound to provide services to her clients.

  **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

  178. Fidelity was at all times relevant aware that Ms. Taylor, as a financial advisor with Fairhaven, housed her client accounts at Fidelity and utilized the Fidelity platform to service her clients.

  **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

  179. Fidelity was at all times relevant aware that Ms. Taylor, through Fidelity's custodial relationship with Fairhaven, relied upon Fidelity and the Fidelity platform for certain client account custody solutions and services in servicing her clients as a financial advisor at Fairhaven.

  **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

  180. Fidelity tortiously interfered with Ms. Taylor's business relations with her clients and unfairly competed with Ms. Taylor by denying her access to "Wealthscape" and terminating in bad faith its custodial relationship with Fairhaven, in an effort to terminate Ms. Taylor's client contracts and convert Ms. Taylor's clients to a Fidelity financial advisor.

  **ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

  181. As a direct and proximate result of Fidelity's bad faith termination of its custodial relationship with Fairhaven, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's tortious conduct.

  With respect to the WHEREFORE paragraph immediately following paragraphs 176 through 181 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever.  Fidelity

requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT X

### TORTIOUS INTERFERENCE WITH MS. TAYLOR'S PROSPECTIVE BUSINESS/ECONOMIC ADVANTAGE - FORMER (NOW PROSPECTIVE) CLIENTS

182.    Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 as if fully set forth herein.

**ANSWER:**  Fidelity incorporates by reference its answers to the foregoing paragraphs.

183.    Fidelity refused to provide Ms. Taylor's contact information to clients that called and inquired about Ms. Taylor or her financial advisory services after Ms. Taylor was constructively discharged from Fidelity.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

184.    By refusing to provide Ms. Taylor's contact information to her former clients, Fidelity interfered with Ms. Taylor's business expectancy.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

185.    When financial advisors change firms, it is common and expected that a certain percentage of their client base will follow the advisor to his or her new firm, without any solicitation on the part of the advisor or the new employer. Accordingly, Ms. Taylor reasonably expected that she would continue her business relationships with a certain percentage of her client base (without any solicitation on the part of Ms. Taylor or Fairhaven).

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

186.    Fidelity knew that if it provided Ms. Taylor's contact information to Ms. Taylor's

FP 45203426.3
FP 45203426.3

former clients upon their request, then more of those clients would have unilaterally reached out to Ms. Taylor, and would have unilaterally continued their relationship with Ms. Taylor (without any solicitation on the part of Ms. Taylor or Fairhaven).

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

187.    Accordingly, by refusing to provide Ms. Taylor's contact information to her former clients, Fidelity tortiously interfered with Ms. Taylor's business expectancy.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

188.    As a direct and proximate result of Fidelity's interference, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's tortious conduct.

**ANSWER:** Fidelity denies the allegations as written and contained in this paragraph.

With respect to the WHEREFORE paragraph immediately following paragraphs 182 through 188 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever. Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## <u>COUNT XI</u>
### TORTIOUS INTERFERENCE WITH MS. TAYLOR'S PROSPECTIVE BUSINESS/ECONOMIC ADVANTAGE – NEW CLIENTS

189.    Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 as if fully set forth herein.

**ANSWER:** Fidelity incorporates by reference its answers to the foregoing paragraphs.

190.     Fidelity was at all times relevant aware that Ms. Taylor, as a financial advisor with Fairhaven, works to develop new business and open new client accounts to perform financial advisory services for such new clients utilizing the Fidelity platform.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

191.     Fidelity was at all times relevant aware that Ms. Taylor, as a financial advisor with Fairhaven, intended to house her client accounts at Fidelity and utilize the Fidelity platform to service new clients.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

192.     Fidelity was at all times relevant aware that Ms. Taylor, through Fidelity's custodial relationship with Fairhaven, relied upon Fidelity and the Fidelity platform for certain new client account custody solutions and services in servicing new clients as a financial advisor at Fairhaven.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

193.     Fidelity tortiously interfered with Ms. Taylor's business relations with her prospective clients and unfairly competed with Ms. Taylor by terminating in bad faith its custodial relationship with Fairhaven, in an effort to forestall Ms. Taylor's ability to acquire new clients and open new client accounts.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

194.     As a direct and proximate result of Fidelity's bad faith termination of its custodial relationship with Fairhaven, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's tortious conduct.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

With respect to the WHEREFORE paragraph immediately following paragraphs 189

50

through 194 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever. Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## COUNT XII

### POST-EMPLOYMENT RETALIATION IN VIOLATION OF TITLE VII, ADEA, AND IHRA

195.    Ms. Taylor repeats, realleges, and repleads the allegations set forth in Paragraphs 1 through 102 as if fully set forth herein.

**ANSWER:**  Fidelity incorporates by reference its answers to the foregoing paragraphs.

196.    Since Ms. Taylor's constructive discharge, Fidelity has engaged in malicious scheme and pattern of unlawful, retaliatory conduct.

**ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

197.    Specifically, Fidelity has retaliated against Ms. Taylor after constructively discharging her from employment in the following ways:

a.    Suing her, even though Ms. Taylor has not breached any obligation owed Fidelity, and despite the fact that it has never taken any legal action against any other (male, younger) financial advisors who have left its Oak Brook office, despite the fact that they breached obligations owed to Fidelity and despite the fact that more clients have followed those other (male, younger) financial advisors to their respective new firms;

b.    Coercing her employer, Fairhaven, to pressure her to agree to an injunction, despite the fact that Ms. Taylor has not breached any obligation owed to Fidelity;

c.    Threatening to sue her employer, Fairhaven, even though Ms. Taylor has not

breached any obligation owed to Fidelity;

        d.       Suing her employer, Fairhaven, even though Ms. Taylor has not breached any obligation owed to Fidelity;

        e.       Terminating Fairhaven's access to the Fidelity platform and refusing to provide custody services to Fairhaven and Ms. Taylor (and their clients);

        f.       Tortiously interfering with Ms. Taylor's client and prospective client relationships; and

        g.       Tortiously interfering with Ms. Taylor's employment relationship with Fairhaven;

     **ANSWER:**   The allegations set forth in this paragraph constitute conclusions of law to which no response is required.  To the extent any of the allegations are factual, they are denied.

        198.     Fidelity engaged in the foregoing unlawful retaliatory acts with malice, and because Ms. Taylor complained about the discriminatory and harassing environment she endured while employed at Fidelity until she was constructively discharged from her employment.

     **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

        199.     As a direct and proximate result of Fidelity's malicious and unlawful retaliation, Ms. Taylor has suffered and will continue to suffer pecuniary losses such as the loss of income and fringe benefits, litigation expense and attorney's fees, consequential damages and other expenses and damages recoverable as a result of Fidelity's tortious conduct.

     **ANSWER:**  Fidelity denies the allegations as written and contained in this paragraph.

     With respect to the WHEREFORE paragraph immediately following paragraphs 194 through 199 of the Counterclaim, Fidelity denies all of the allegations contained therein and further denies that Taylor is entitled to the relief prayed for or to any relief whatsoever.  Fidelity requests that Taylor take nothing by way of her Counterclaim and that Fidelity be awarded its

costs and expenses, including attorneys' fees. Fidelity further incorporates by reference its responses to all previous paragraphs in the Counterclaim.

## **AFFIRMATIVE DEFENSES**

1.     Without prejudice to Fidelity's denials and other statements of its pleadings, Taylor's Counterclaim and each purported cause of action asserted against Fidelity therein fails to set forth facts sufficient to constitute a claim and/or fails to state a claim upon which relief may be granted.

2.     Without prejudice to Fidelity's denials and other statements of its pleadings, Taylor cannot recover to the extent her claims are barred by the statute of limitations, or otherwise are based on untimely events.

3.     Without prejudice to Fidelity's denials and other statements of its pleadings, Taylor cannot recover to the extent she failed to mitigate her damages as required by law.

4.     Without prejudice to Fidelity's denials and other statements of its pleadings, Taylor's claims are barred in whole or in part by the equitable defenses of laches, waiver, estoppel, and/or unclean hands.

5.     Without prejudice to Fidelity's denials and other statements of its pleadings, to the extent that any action complained of by Taylor occurred more than 300 days prior to her filing a charge of discrimination with the EEOC or was not included in her charge of discrimination, it cannot form the bases for relief.

7.     Without prejudice to Fidelity's denials and other statements of its pleadings, Taylor failed to take advantage of opportunities afforded by Fidelity that were designed to prevent or correct harassment or discrimination. Fidelity is insulated from liability for alleged discrimination and/or harassment because Fidelity has adopted and enforced an anti-discrimination/no-

harassment policy, and Fidelity neither knew nor had any reason to know of the alleged acts or admissions complained of in this case.

8.      Taylor's potential recovery is barred in whole or in part because Fidelity exercised reasonable care to prevent and correct promptly any harassing, discriminatory, or retaliatory behavior, and Taylor unreasonably failed to take advantage of preventative and corrective opportunities provided by Fidelity or to avoid harm otherwise.

9.      Without prejudice to Fidelity's denials and other statements of its pleadings, any actions taken by Fidelity toward Taylor were for legitimate, non-discriminatory and non-retaliatory reasons in good faith, and without regard to any protected characteristic or activity.

10.      Without prejudice to Fidelity's denials and other statements of its pleadings, Fidelity is not liable for any alleged injuries or damages resulting from the effects of Taylor's preexisting emotional, psychological, physical conditions, and/or alternative or concurrent cause which may not be the result of any act or omission of Fidelity.

11.      Without prejudice to Fidelity's denials and other statements of its pleadings, to the extent any employee of Fidelity engaged in illegal discrimination or retaliation (which is denied), Taylor cannot recover punitive damages because such actions were contrary to Fidelity's policies and reasonable efforts to prevent discrimination and retaliation in the workplace.

12.      Without prejudice to Fidelity's denials and other statements of its pleadings Fidelity may not be held vicariously liable for punitive damages based on any alleged unlawful employment decisions made by any of Fidelity's managerial agents, if any are proven, because any such allegedly unlawful decisions were contrary to Fidelity's policies and good faith efforts to comply with federal, state, and local laws.

Fidelity reserves the right to plead any additional Affirmative Defenses as they become known or available during the pendency of this litigation.

## **CONCLUSION**

**WHEREFORE**, Fidelity denies that Taylor is entitled to monetary relief or judgment in any sum whatsoever, and respectfully requests that the Court enter judgment in its favor with costs and reasonable attorneys' fees assessed against Taylor, as well as such other and further relief that this Court deems just and proper.

Dated: October 3, 2022

FISHER & PHILLIPS LLP

/s/ *Susan M. Guerette*
Susan M. Guerette (admitted *pro hac vice*)
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
TEL: (610) 230-2133
FAX: (610) 230-2151
sguerette@fisherphillips.com

Jessica D. Causgrove
Joel W. Rice
Franklin Z. Wolf
10 South Wacker Drive, Suite 3450
Chicago, IL 60606
TEL: (312) 346-8061
FAX: (312) 346-3179
jcausgrove@fisherphillips.com
jrice@fisherphillips.com
fwolf@fisherphillips.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2022, I electronically filed the foregoing with the

Clerk of Court using the ECF system, which sent notice of the foregoing to,

Christopher S. Griesmeyer
Zachary Mulcrone
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
(312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

BY:     *Susan M. Guerette*
Susan M. Guerette

FP 45203426.3
FP 45203426.3